**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **WEST MORGAN-EAST LAWRENCE WATER AND SEWER AUTHORITY, and OTTIS SPARKS, MAGEN SPARKS, THERESA POLUDNIAK, individually, and on behalf of a Class of persons similarly situated,** | ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) ) | **Case No. _____** |
| **3M COMPANY, DYNEON, L.L.C., and DAIKIN AMERICA, INC.,** | ) ) ) ) | **JURY DEMAND** |
| **Defendants.** | ) ) | |

## INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiff West Morgan-East Lawrence Water and Sewer Authority ("The Authority") brings this Complaint as an individual Plaintiff. Plaintiffs Ottis Sparks, Magen Sparks, and Theresa Poludniak (collectively "Representative Plaintiffs") bring this Complaint on behalf of themselves, and on behalf of a Class of other people similarly situated. The Authority and Representative Plaintiffs sue Defendants 3M Company, Dyneon, L.L.C., and Daikin America, Inc., and allege as follows:

## STATEMENT OF THE CASE

1.     This is an individual action on behalf of Plaintiff The Authority, which has been damaged and continues to be damaged due to the negligent, willful and wanton conduct of the Defendants, as well as nuisance and trespass caused by the Defendants'

release of toxic chemicals, including perfluorooctanoic acid (PFOA), perfluorooctane sulfonate (PFOS), and related chemicals from their manufacturing processes in Decatur, Alabama. The Authority provides drinking water to residents of Colbert, Franklin, Winston, Cullman, Lawrence and Morgan Counties. The Authority's source of water for its own customers and for sale to other water utilities is the Tennessee River approximately 13 miles downstream of Defendants' facilities. Defendants' toxic chemicals have contaminated the water in the Tennessee River at The Authority's water intake, and the chemicals cannot be removed by the water treatment processes utilized at The Authority's Robert M. Hames Water Treatment Plant.

2. This is a class action on behalf of Representative Plaintiffs and a Class of people similarly situated who have been damaged and continue to be damaged due to the ongoing nuisance and trespass caused by the Defendants' release of toxic chemicals, including perfluorooctanoic acid (PFOA), perfluorooctane sulfonate (PFOS), and related chemicals from their manufacturing processes in Decatur, Alabama. The Representative Plaintiffs and Members of the Class are purchasers of water service from The Authority, V.A.W. Water Systems, Inc., the Falkville Water Works, the Trinity Water Works, the Town Creek Water System, and the West Lawrence Water Cooperative (collectively "Water Utilities"), who have been, and continue to be, provided and subjected to contaminated water as a result of the release of toxic chemicals by the Defendants, as described in detail hereafter.

3. Representative Plaintiffs and proposed Class Members are owners of property, residents, and holders of property interests who receive their water supplies

from the Water Utilities, whose water supplies have been and continue to be contaminated with Defendants' toxic chemicals at levels that can cause serious health effects.

4. As a result of the Defendants' nuisance and trespass, Individual Plaintiff The Authority and Representative Plaintiffs and the proposed Class Members (collectively, "Plaintiffs") have suffered property damages and consequential damages. Plaintiffs are also seeking equitable and injunctive relief to compel the Defendants to remediate and cease the spread of toxic chemicals into and through the water supply. In addition, based on the Defendants' wanton conduct, Plaintiffs are seeking recovery in punitive damages.

## JURISIDICTION

5. This Court has jurisdiction over this action in accordance with 28 U.S.C. § 1332(a), because the Plaintiffs are citizens of the State of Alabama and the named Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6. This Court also has jurisdiction over this action in accordance with 28 U.S.C. § 1332(d)(2)(A), which grants federal subject matter jurisdiction over any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a Class action in which any Member of a Class of Plaintiffs is a citizen of a State different from any Defendant. The proposed Class is greater than 100 persons, Plaintiffs are residents of the State of Alabama, and the named Defendants are residents of different states.

7.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e), in that a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Alabama.

## PARTIES

8.     Plaintiff The Authority is a public corporation formed pursuant to Ala. Code §11-88-3, *et seq.*, with its principal place of business in Morgan County, Alabama. The Authority provides domestic water supplies to its own customers in Morgan and Lawrence Counties, Alabama, and sells water to V.A.W. Water Systems, Inc., the Falkville Water Works, the Trinity Water Works, the Town Creek Water System, and the West Lawrence Water Cooperative (collectively "Water Utilities"), who provide the water to their customers in Morgan County, Lawrence County, and surrounding counties.

9.     Representative Plaintiffs Ottis and Magen Sparks are residents of Morgan County, Alabama, and reside at and own property located at 1370 Kirby Bridge Road, Danville, Alabama. Plaintiffs are customers of The Authority and use water from that utility for drinking and other domestic purposes. Plaintiffs' water supply has been contaminated with PFOA, PFOS, and related chemicals released from Defendants' manufacturing processes and waste disposal operations.

10.     Representative Plaintiff Theresa Poludniak is a resident of Morgan County, Alabama, and resides at and owns property located at 662 Old Highway 24, Trinity, Alabama. Plaintiff is a customer of The Authority and uses water from that utility for drinking and other domestic purposes. Plaintiff's water supply has been contaminated

with PFOA, PFOS, and related chemicals from Defendants' manufacturing processes and waste disposal operations.

11.     Defendant 3M Company ("3M") is a foreign corporation qualified to do business in the State of Alabama, and was doing business in Morgan County, Alabama, at all relevant times.

12.     Defendant Dyneon, L.L.C. ("Dyneon"), is a wholly owned subsidiary of Defendant 3M, a foreign corporation, licensed to do business in Alabama and doing business in Morgan County at all times relevant hereto.

13.     Defendant Daikin America, Inc. ("Daikin"), is a foreign corporation qualified to do business in Alabama and doing business in Morgan County at all times relevant hereto.

## FACTUAL ALLEGATIONS

14.     Three of the major manufacturers and/or users of PFOA, PFOS, and related chemicals are located in Decatur, Alabama: 3M, Dyneon, and Daikin.

15.     Defendants 3M and Dyneon are the present owners and operators of manufacturing and disposal facilities in Decatur, Alabama, which are releasing PFOA, PFOS, and related chemicals into groundwater and surface water through which the chemicals are discharged into the Tennessee River (Wheeler Reservoir) and its tributaries. Defendants manufactured or used these and other chemicals at their facilities and disposed of hazardous and solid waste containing these chemicals in a landfill and a sludge incorporation area on their property and on adjacent property.

16.     Defendant 3M discharged wastewater containing PFOA, PFOS, and related chemicals from its on-site wastewater treatment plant into Bakers Creek, a tributary to the Tennessee River.  3M incorporated sludge from the on-site wastewater treatment plant by means of subsurface injection in an on-site area designated as the sludge incorporation area. In addition, 3M discharged wastewater containing PFOA, PFOS, and related chemicals to the Decatur Utilities Dry Creek Wastewater Treatment Plant ("WWTP").

17.     Defendant Dyneon's fluoroelastomer facility is on the southern portion of the 3M Decatur facility. Dyneon's fluoroelastomer operations in Decatur previously had been part of 3M's manufacturing processes at the Decatur facility. The processed wastewater from Dyneon's operations has been managed through 3M's wastewater treatment system and discharged to Baker Creek and the Tennessee River. The Dyneon sanitary wastewater has been combined with the 3M sanitary wastewater and discharged to the Decatur Utilities WWTP.

18.     Defendant Daikin manufactures specialty chemicals, including tetrafluoroethylene (TFE) and hexafluoropropylene (HFP) fluoropolymers at its Decatur, Alabama plant and used PFOA in its manufacturing process. The facility discharges wastewater and site stormwater to the Tennessee River. Daikin's Decatur plant was constructed on land that previously served as a site for the land application of the adjacent 3M Company's biosolids contaminated with PFOA, PFOS, and related chemicals. Daikin discharges sanitary wastewater contaminated with PFOA, PFOS, and related chemicals to the Decatur Utilities WWTP.

19. The human health risks caused by exposure to low levels of PFOA, PFOS, and related chemicals include cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. The stable carbon-fluorine bonds that make PFOA and PFOS such pervasive industrial and consumer products also result in their persistence. There is no known environmental breakdown mechanism for these chemicals. They are readily absorbed into biota and have a tendency to accumulate with repeated exposure. PFOS crosses the placenta in humans, accumulates in amniotic fluid, and has been detected in the umbilical cord blood of babies.

20. The association of exposure to these chemicals and certain cancers has been reported by the C8 Health Project, an independent Science Panel charged with reviewing the evidence linking PFOA, PFOS, and related chemicals to the risk of disease based on health research carried out by the Science Panel in the Mid-Ohio Valley population exposed to these chemicals as a result of releases from an E. I. du Pont de Nemours and Company chemical plant, as well as other published scientific research. The C8 Science Panel specifically listed kidney cancer and testicular cancer as having a "probable link" to PFOA exposure. Epidemiological studies of workers exposed to PFOA support the association between PFOA exposure and both kidney and testicular cancer and also suggest associations with prostate and ovarian cancer and non-Hodgkin lymphoma. Rodent studies also support the link with cancer. The majority of a United States Environmental Protection Agency ("EPA") Science Advisory Board expert committee recommended in 2006 that PFOA be considered "likely to be carcinogenic to humans."

21.     Additionally, the C8 Science Panel has found a probable link between exposure to PFOA, PFOS, and related compounds, and the following human diseases: pregnancy-induced hypertension, ulcerative colitis, and high cholesterol. Furthermore, in recent years, immunotoxicity of PFOA, PFOS, and related compounds, has been demonstrated in a wide variety of species and models, including humans. For instance, a study of ninety-nine Norwegian children at age three found that maternal serum PFOA concentrations were associated with decreased vaccine responses, especially toward rubella vaccine, and increased frequencies of common cold and gastroenteritis. The combined human and experimental evidence is in strong support of adverse effects on immune functions at relatively low exposure levels.

22.     The EPA in 2009 published provisional drinking water health advisories for PFOA and PFOS, which are currently under review. The advisory for PFOA is 0.4 µg/L (0.4 ppb), and for PFOS is 0.2 µg/L (0.2 ppb).

23.     The EPA 2009 health advisories are based on evidence that was available before 2008. According to more recent studies, the advisories are more than 1,000-fold too high.

24.     In 2014 EPA released a draft of its proposed "reference dose" for PFOA – an estimate of how much a person can safely consume daily over a lifetime. That proposed reference dose would translate to a legal limit in drinking water for PFOA of 0.1 ppb, which is one quarter of the 2009 advisory level.

25.     The State of New Jersey adopted a drinking water health advisory in 2006 for PFOA that is 0.04 ppb, which is 10 times lower than the EPA provisional drinking

water health advisory for PFOA. In 2014 New Jersey proposed lowering this number to 0.02 ppb.

26.     Defendant 3M has long been aware of the persistence and toxicity of PFOA, PFOS, and related chemicals. Yet, it knowingly and intentionally continued to discharge these chemicals into the Tennessee River in Decatur, Alabama, 13 miles upstream of the water supplies used by Plaintiffs.

27.     Defendant 3M has known for at least 35 years that PFOA, PFOS, and related chemicals persist in the environment and accumulate in the bodies of humans, fish, and test animals. For instance, blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas." The same study found that "laboratory workers, with former exposure, but none for 15-20 years, had elevated [organic fluorine levels] above literature normals." A 1979 3M study of fish caught by the Wheeler Dam (26 miles downstream from the 3M plant) showed that the chemicals bioaccumulate in fish under natural conditions.

28.     Defendant 3M has known for at least 35 years that PFOA, PFOS, and related chemicals are toxic. For instance, a 1979 3M study of the effects of fluorochemical compounds on Rhesus monkeys was terminated after 20 days because all of the monkeys, at all dosage levels, died as a result of exposure to the fluorochemicals. It was not until 21 years later, in March 2000, that 3M told the public that a "new study" of the effects of these compounds on Rhesus monkeys is part of the reason 3M pulled one of its consumer products, Scotchgard, off the market. In 1983, a team of 3M toxicologists

recommended broad testing regarding the effects of 3M's fluorochemicals on the environment and human beings.

29. Defendant 3M has known for at least 14 years that PFOA, PFOS and related chemicals are not effectively treated by conventional wastewater treatment plant processes and are discharged to surface waters in the effluent and also accumulate in the sludge from wastewater treatment processes. For example in 2001, 3M found high concentrations of these chemicals in samples from the Decatur Utilities WWTP effluent and sludge as a result of discharges from 3M. These high concentrations were not disclosed to Decatur Utilities.

30. The United States Environmental Protection Agency ("EPA") took regulatory action on March 11, 2002 and December 9, 2002 by publishing two significant new use rules (SNURs) under the Toxic Substances Control Act (TSCA) to limit future manufacture of PFOA, PFOS, and related chemicals.

31. EPA and the Alabama Department of Environmental Management have identified Defendants' facilities as sources of PFOA and PFOS contamination in the Tennessee River in and around Decatur, Alabama, including surface water, porewater, sediments, and fish. The primary source is the 3M facility, with high levels of PFOA and PFOS in groundwater migrating into the Tennessee River.

32. Based on the contamination in the Tennessee River, ADEM has placed Wheeler Reservoir from 5 miles upstream of Elk River to the Joe Wheeler Dam on the state's impaired waters list for PFOS contamination impairing swimming and fish &

wildlife uses. This includes the area in which The Authority takes water from the Tennessee River.

33.     The Alabama Department of Public Health has issued a fish consumption advisory for portions of Wheeler Reservoir and its tributaries based on contamination of fish with PFOS, including: Baker's Creek embayment at Wheeler Reservoir (Morgan County), Wheeler Reservoir mid station, main river channel, Tennessee River Mile 296 (Limestone County); Wheeler Reservoir, Tennessee River Miles 303 to 296, area south of the main river channel (Morgan County). This includes the area between Wheeler Dam and River Mile 296 where The Authority takes water from the Tennessee River to provide its customers including the Water Utilities.

34.     Concentrations of PFOA as high as 4,980 ppb and PFOS as high as 3,890 ppb have been found in groundwater on the 3M site along the south bank of the Tennessee River. Porewater from the bottom of the river bed near the 3M facility, which is groundwater discharging into the river, showed average concentrations of PFOA from 0.0977 to 70.4 ppb.

35.     Sediment concentrations in the river have been found as high as an average of 24.1 ppb PFOA, and surface water concentrations as high as an average of 0.420 ppb PFOA at one monitoring site. PFOS concentrations for single samples collected in the lower, middle and upper reaches of the confluence area where Bakers Creek flows into the Tennessee River were 0.450, 0.691 and 0.0237 ppb, respectively.

36.     PFOS was detected in every fish specimen collected in the Tennessee River and Bakers Creek near the 3M plant in the November 2012 sampling event. The median

filet tissue PFOS concentrations ranged from 25.7 ppb in Reach 03 (backwater area at RM 307.5), upstream of the plant, to 435 ppb in Reach 05 (Mouth of Bakers Creek). Concentrations as high as 103 ppb were found in bass below the Joe Wheeler Dam, nearly 40 miles downstream of the plant at Shoal Creek. Median catfish filet tissue PFOS concentrations ranged from 1.50 ppb in Reach 01 (RM 320) to 283 ppb in Reach 05 (Mouth of Bakers Creek). PFOA was detected at up to 6.06 ppb in fish in Bakers Creek cove and up to 4.01 ppb down river at Mallard Creek.

37.     Plaintiff The Authority's source for the water it supplies to its customers is an intake in the Tennessee River (Wheeler Reservoir) approximately 13 miles downstream of Defendants' manufacturing facilities. The other Water Utilities purchase water from The Authority to distribute to their customers. Representative Plaintiffs and Members of the proposed Class receive their domestic water supplies from The Authority and the other Water Utilities.

38.     As a direct and proximate result of Defendants' discharges into the Tennessee River from their manufacturing facilities and waste disposal operations upstream from the water intake for The Authority, the water supplied by The Authority to Representative Plaintiffs and other Members of the proposed Class was and is contaminated with PFOA, PFOS, and related chemicals.

39.     PFOA was detected in all of the finished water samples collected in 2005-2006 from the The Authority-East Lawrence Water Treatment Plant, about 13 miles downstream of the 3M plant, with concentrations ranging from 0.0442 to 0.155 ppb.

40.     The Authority began testing for PFOA and PFOS in its water supply in 2009 and has consistently found PFOA levels at or near 0.1 ppb and PFOS levels at or near 0.19 ppb, which is essentially 0.2 ppb, the current EPA advisory level for PFOS.

41.     In August of 2009, The Authority contacted 3M officials concerning the presence of PFOS and PFOA in the water supply.  The Authority inquired about published drinking water health advisories for PFOS and PFOA levels in the Tennessee River and levels found in water at The Authority.  Despite access to confidential studies and first-hand experience with the hazards of PFOS and PFOA, 3M assured The Authority that documented levels of pollution posed no threat to the Plaintiffs.  Contrary to the representations by 3M to The Authority, 3M knew the levels for safe drinking water standards were inadequate to protect the Plaintiffs and that under new proposed standards, the PFOS and PFOA levels in the The Authority water supply were dangerously high.

42.     As a direct and proximate result of Defendants' contamination of the The Authority water supply Plaintiff The Authority has incurred expenses for monitoring and will incur expenses in the future for installation and operation of more effective treatment processes for removing Defendants' chemicals from the water supply.

43.     In 2013, the Agency for Toxic Substances and Disease Registry ("ATSDR") analyzed blood serum of 121 Members of the proposed Class for PFOA and PFOS and found an association between elevated levels of PFOA in the blood serum and the use of drinking water from the The Authority.

44.     The Representative Plaintiffs and other Members of the proposed Class have had exposure to PFOA as a result of consuming water contaminated by Defendants' chemicals, just as the 121 Members of the proposed Class demonstrated with elevated PFOA levels from the 2013 blood serum testing.

45.     The elevated levels of PFOA in the blood serum in Members of the proposed Class are sufficient to cause many of the health effects reported in recent studies, as discussed in Paragraphs 19-21, including cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol.

46.     As a result of their ongoing exposure to drinking water containing harmful levels of PFOA, PFOS, and related chemicals from Defendants' manufacturing processes, Respresentative Plaintiffs and Members of the proposed Class have been damaged and placed at risk of immediate harm.

## CLASS ACTION ALLEGATIONS

47.     Plaintiffs incorporate all prior paragraphs as if restated herein.

48.     This action on behalf of Representative Plaintiffs and all others similarly situated has been brought and may be properly maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure.

49.     Representative Plaintiffs and Members of the proposed Class are residents of Alabama whose property interests have been damaged through contamination of their drinking water.

50.     The Class proposed by the Representative Plaintiffs and those they represent is as follows:

**all owners and possessors of property who use water provided by the West Morgan-East Lawrence Water and Sewer Authority, the V.A.W. Water System, the Falkville Water Works, the Trinity Water Works, the Town Creek Water System, and the West Lawrence Water Cooperative.**

51.     Excluded from the Class are:

a)      Individual Plaintiff The Authority;

b)      Defendants and any entities in which Defendants have a controlling interest;

c)      Any of the legal representatives, heirs, successors, or assigns of Defendants;

d)      The Judge to whom this case is assigned and any Member of the Judge's immediate family and any other judicial officer assigned to this case;

e)      All persons or entities that properly execute and timely file a request for exclusion from the Class;

f)      Any attorneys representing the Representative Plaintiffs or Members of the proposed Class.

52.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

53.     Numerosity: The Members of the Class are so numerous that separate joinder of each Member is impractical, within the meaning of Rule 23(a)(1). Although the exact number of Class Members will be better established after Class notification, upon information and belief, the number of Members in the Class probably exceeds 25,000 people. Putative Class Members are readily identifiable through records of the

Water Utilities and through property records and may be given any required notices by regular mail, supplemented, if necessary and required by the Court, by published notice.

54.     Common Questions of Law and Fact: There are numerous questions of law and fact common to the Class, as required by Rule 23(a)(2), including:

a.      The factual history of the use, development, and distribution of PFOS, PFOA, and related chemicals manufactured and used by the Defendants at their Decatur, Alabama, facilities;

b.      When the Defendants knew of the harmful effects of PFOS, PFOA, and related chemicals;

c.      Whether the Defendants failed to disclose the harmful effects of PFOS, PFOA, and related chemicals being released from their plants in Decatur, Alabama;

d.      The extent of the contamination at the Defendants' plant sites in Decatur, Alabama, and the migration of that contamination into the Tennessee River;

e.      Whether the water supplied to Representative Plaintiffs and Class Members has been contaminated with PFOS, PFOA, and related chemicals;

f.      Whether Defendants invaded Representative Plaintiffs' and Class Members' property with knowledge of the violation of the rights in their property. Whether Defendants' intentional misconduct constitutes a continuing trespass.

g.      Whether the Defendants' misconduct constitutes a nuisance.

h.      The necessary remedial actions to prevent Defendants' chemicals from contaminating Representative Plaintiffs' and Class Members' water supplies;

i.    The appropriateness of injunctive relief to prevent Defendants' chemicals from entering Representative Plaintiffs' and Class Members' water supplies;

55.    The questions of law and fact common to Members of the Class predominate over any questions affecting only individual Members, and thus a Class action is superior to other available methods for the fair and efficient adjudication of the controversy.

56.    Typicality: The claims of the Representative Plaintiffs are typical of the claims to be advanced by Members of the Class, and their claims encompass those of the other Class Members they seek to represent, as required by Rule 23(a)(3). The claims are typical because the facts and circumstances giving rise to liability are the same, the claims are based on the same legal theories, and the damages suffered by the Representative Plaintiffs are the same kinds of damages suffered by the Members of the Class.

57.    Adequacy of Representation: The Representative Plaintiffs can fairly and adequately protect and represent the interests of each Member of the Class as required by Rule 23(a)(4). The Representative Plaintiffs will fairly and adequately protect and represent the interests of the Members of the Class based on the following facts and circumstances: their interests do not conflict; their interests are co-extensive with common rights of recovery based on the same essential facts and legal theories; they are Members of the same communities, they are similarly damaged and are seeking the same remedies; and they intend to prosecute this action vigorously. Plaintiffs have retained counsel competent and experienced in complex Class action and toxic tort litigation.

58.     The prosecution of separate actions by individual Members of the Class would create a risk of (a) inconsistent or varying adjudications with respect to individual Members of the Class which would establish incompatible standards of conduct for the Defendants and/or (b) adjudications with respect to individual Members of the Class which would as a practical matter be dispositive of the Members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

59.     The Defendants have acted on grounds generally applicable to all Members of the proposed Class, making final declaratory and injunctive relief concerning the Class as a whole appropriate within the meaning of Rule 23(b)(2);

60.     Common questions of fact and law between the Representative Plaintiffs and Members of the Class predominate over questions affecting only individual Class Members, within the meaning of Rule 23(b)(3). Some of the common issues are set forth in Paragraph 54 above.

61.     Additionally, Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy. Certification under Rule 23(b)(3) would be proper in that, among other things: there is no interest by Members of the Class in individually controlling the prosecution of separate actions, the expense of prosecuting individual claims for the matters for which Class certification is sought would be prohibitive in light of the typical claimant's injuries, neither the Plaintiffs nor Members of the proposed Class have filed or are parties to any litigation in which the legal and factual issues raised herein are to be adjudicated, and it is desirable to concentrate the litigation of claims in a single proceeding so as to avoid unnecessary and

expensive duplication of actions and to provide for judicial economy.[1] Whatever difficulties may exist in the management of a Class action will be greatly outweighed by its benefits.

62.      Class action treatment is preferable to other available methods in providing a fair and efficient method for the adjudication of the controversy described herein, which has affected a large number of persons.  The Class action provides an effective method whereby the enforcement of the rights of the Plaintiffs can be fairly managed without unnecessary expense or duplication.

## COUNT ONE – NEGLIGENCE

63.      Defendants owe a duty to Plaintiffs to exercise due and reasonable care in the manufacturing, use, and disposal operations to prevent the discharge of toxic chemicals, including PFOA, PFOS, and related chemicals into the water supply and onto the property of Plaintiffs.

64.      Defendants breached the duties owed to Plaintiffs, and under the circumstances, Defendants' breaches constitute negligent, willful and/or reckless conduct.

---

[1] A case entitled *James St. John, Jr., et al. v. 3M Company, et al.*, was filed in 2002 in the Circuit Court of Morgan County, Alabama, which contains in the most recent amended complaint class action counts based on a definition of the class of plaintiffs as "all owners of property (including water) contaminated with PFOS, PFOA and other 'perfluronated' chemicals ("PFCs") by methods employed by the defendants to manufacture, sell, use, distribute, process, contain, discharge or deposit PFOS, PFOA and other 'perfluronated' chemicals, compounds and products." The factual basis of the *St. John, et al.* lawsuit is a claim that defendants provided contaminated "sludge" to area farms for use as fertilizer and also for contamination of property near the defendants' manufacturing facilities.  The St. John lawsuit includes a number of businesses and individuals as named plaintiffs.  No municipal entity or water service provider is a plaintiff; to the contrary, the St. John lawsuit has named the City of Decatur, Alabama, Morgan County, Alabama, and the Municipal Utilities Board of Decatur, as defendants, along with 3M and a wide array of other corporations.  *James St. John, Jr., et al.* (plaintiffs) *v. 3M Company, et al.* (defendants), Civil Action No. CV 02-000408.  The case remains pending on the Morgan County docket and no ruling has ever been made on class certification.

65.     As a direct, proximate and foreseeable result of Defendants' conduct, practices, actions, and inactions, Plaintiffs have been caused to suffer, and will continue to suffer, damages to their real property.

66.     As a direct, proximate and foreseeable result of Defendants' conduct, practices, actions, and inactions, Individual Plaintiff The Authority has incurred expenditures and will incur reasonably ascertainable expenditures in the future.

67.     Therefore, the Representative Plaintiffs and members of the proposed Class claim money damages in an amount that will fairly and reasonably compensate them for the harm caused by the Defendants.  In addition, the Plaintiffs claim damages for mental anguish in an amount to be determined by the jury that are fair and reasonable in consideration of the willful, reckless and intentional conduct of the Defendants.

## COUNT TWO – NUISANCE

68.     Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

69.     Individual Plaintiff The Authority owns and occupies property used to serve its water customers and other Water Utilities, including a water treatment plant, water distribution system, and offices.

70.     Representative Plaintiffs and Members of the proposed Class are all owners or possessors of property served by the Water Utilities.

71.     Defendants have created a nuisance by their discharge of PFOA, PFOS, and related chemicals into the Tennessee River, which has caused contamination of the The Authority water supply and caused Plaintiff The Authority hurt, inconvenience, and harm as it would to any other reasonable person.

72. The levels of toxic chemical contamination found in the WMEL water supply, directly caused by the Defendants' pollution, have created a condition that threatens the health and well-being of the Representative Plaintiffs and members of the proposed Class, and causes concern, inconvenience and hurt to the Representative Plaintiffs and members of the proposed Class as it would to any other reasonable person.

73. It was reasonably foreseeable, and in fact known to the Defendants, that their actions would place, and have placed, the Representative Plaintiffs and Members of the proposed Class in immediate risk of physical harm. The nuisance has caused, and will continue to cause, emotional distress until it is satisfactorily abated.

74. Therefore, the Individual Plaintiff The Authority claims money damages in an amount that will fairly and reasonably compensate it for the harm caused by Defendants, including property damages, out of pocket expenditures, and reasonably ascertainable future expenses.

75. Therefore, the Representative Plaintiffs and members of the proposed Class claim money damages in an amount that will fairly and reasonably compensate them for the harm caused by the Defendants. In addition, the Plaintiffs claim damages for mental anguish in an amount to be determined by the jury that are fair and reasonable in consideration of the nature, severity, and length of time of the nuisance caused by the Defendants.

## COUNT THREE – TRESPASS

76. Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

77.     Individual Plaintiff The Authority owns and occupies property used to serve its water customers and other Water Utilities, including a water treatment plant, water distribution system, and offices.

78.     Representative Plaintiffs and Members of the Class are all owners or possessors of property served by the Water Utilities.

79.     Defendants' intentional acts in discharging PFOA, PFOS, and related chemicals into the Tennessee River caused an invasion of Plaintiffs' property by Defendants' chemicals, which has affected and is affecting Plaintiffs' interest in the exclusive possession of their property.

80.     Plaintiffs did not consent to the invasion of their properties by Defendants' chemicals.

81.     Defendants knew or should have known that their discharges of PFOA, PFOS, and related chemicals into the Tennessee River could result in an invasion of Plaintiffs' possessory interest in their property.

82.     Defendants' trespass is continuing.

83.     Defendants' continuing trespass has impaired Plaintiffs' use of their property and has caused them damages by diminishing its value.

84.     Therefore, the Individual Plaintiff The Authority claims money damages in an amount that will fairly and reasonably compensate it for the harm caused by Defendants, including property damages, out of pocket expenditures, and reasonably ascertainable future expenses.

85. Therefore, the Representative Plaintiffs and members of the proposed Class claim money damages in an amount that will fairly and reasonably compensate them for the harm caused by the Defendants. In addition, the Plaintiffs claim damages for mental anguish in an amount to be determined by the jury that are fair and reasonable in consideration of the nature, severity and length of time of the trespass caused by the Defendants.

## COUNT FOUR – WANTONNESS AND PUNITIVE DAMAGES

86. Plaintiffs incorporate all prior paragraphs as if restated herein.

87. Defendants owe a duty to Plaintiffs to exercise due and reasonable care in the manufacturing, use, and disposal operations to prevent the discharge of toxic chemicals, including PFOA, PFOS, and related chemicals into the water supply and onto the property of Plaintiffs.

88. In breaching the duties described above, Defendants acted in a wanton, willful, and reckless manner.

89. Defendants knew or should have known the danger to Plaintiffs created by Defendants' conduct, practices, actions, and inactions.

90. Defendants knew of should have known of the likely impact, harm, damage, and injury their conduct would have on the Plaintiffs.

91. Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard for Plaintiffs' property and the health of Representative Plaintiffs and Members of the Class.

92.     In addition to compensatory damages, Defendants should also be liable for punitive damages as a result of Defendants' wantonness in an amount determined by the character and degree of Defendants' wrongful conduct, and the necessity to prevent the same or similar wrongful conduct by the defendants and others in the future.

## COUNT FIVE - CLAIM FOR INJUNCTIVE RELIEF

93.     Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

94.     Plaintiffs request that this Court enter an Order enjoining Defendant from continuing the conduct described above and require Defendant to take all steps necessary to remove their chemicals from Plaintiffs' water supplies and property.

95.     There is continuing irreparable injury to Plaintiffs if an injunction does not issue, as Defendants' chemicals in their water supplies pose a continuing threat to Plaintiffs' property interests, as well as to the health of Representative Plaintiffs and Class Members, and there is no adequate remedy at law.

## RELIEF DEMANDED

WHEREFORE, Plaintiffs and Members of the above proposed Class respectfully request this Court to grant the following relief:

a)     Award Individual Plaintiff The Authority damages in an amount greater than Seventy-five Thousand Dollars ($75,000) sufficient to compensate it for real property damage, loss of use of property, out of pocket expenses, and reasonably ascertainable future expenses;

b)     Award Representative Plaintiffs and Members of the Class damages in an amount greater than Five Million Dollars ($5,000,000) sufficient to

compensate them for real property damage, loss of use of property, loss of quality of life, aggravation and inconvenience, and emotional distress;

c)      Issue an injunction requiring Defendants to remove their chemicals from the water supplies of Plaintiffs and to prevent these chemicals from continuing to contaminate Plaintiffs' water supplies;

d)      Award attorney fees and costs and expenses incurred in connection with the litigation of this matter;

e)      That this case be certified as a Class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; and

f)      Award such other and further relief as this Court may deem just, proper, and equitable.

## JURY TRIAL DEMAND

Plaintiffs demand a trial of this action by a struck jury.

Dated: October 5, 2015.

/s/ *Jeff Friedman*_____
Jeff Friedman, Ala. Bar No. asb-6868-n77j
Friedman, Dazzio, Zulanas & Bowling, Pc
3800 Corporate Woods Drive
Birmingham, Alabama 35242
T: 205-278-7000
F: 205-278-7001
jfriedman@friedman-lawyers.com

Carl Allen Cole, III, Ala. Bar No. asb-1309-r75c
The Cole Law Firm, LLC
P.O. Box 2064
Decatur, Alabama 35602-2064
T: 256-353-0550
F: 256-353-0552
carl@carlcolelaw.com

Gary A. Davis, NC Bar No. 25976
(admission requested *Pro Hac Vice*)
James S. Whitlock, NC Bar No. 34304
(admission requested *Pro Hac Vice*)
DAVIS & WHITLOCK, P.C.
21 Battery Park Ave., Suite 206
Asheville, NC 28801
T: (828) 622-0044
F: (828) 398-0435
gadavis@enviroattorney.com
jwhitlock@enviroattorney.com

**PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL AT:**

3M COMPANY
c/o The Corporation Company
2000 Interstate Park Drive, Suite 204
Montgomery, AL 36109

DYNEON, L.L.C.
c/o The Corporation Company
2000 Interstate Park Drive, Suite 204
Montgomery, AL 36109

DAIKIN AMERICA, INC.
c/o The Corporation Company
2000 Interstate Park Drive, Suite 204
Montgomery, AL 36109