FILED

2017 Jun-05  PM 02:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
1                IN THE UNITED STATES DISTRICT COURT
2              FOR THE NORTHERN DISTRICT OF ALABAMA
3                      NORTHEASTERN DIVISION

4
5    WEST MORGAN-EAST LIMESTONE*
     WATER AND SEWER AUTHORITY,*
     ET AL.,                   *
6              Plaintiffs,     *  5:15-cv-01750-AKK
                               *  May 10, 2017
7    vs.                       *  Huntsville, Alabama
                               *  9:00 a.m.
8    3M COMPANY, ET AL.,       *
               Defendants.     *
9    **************************

10
                  TRANSCRIPT OF EVIDENTIARY HEARING
11          BEFORE THE HONORABLE ABDUL K. KALLON
                  UNITED STATES DISTRICT JUDGE
12

13   FOR THE PLAINTIFFS:

14   Carl A. Cole, III, ESQ.
     COLE LAW FIRM, LLC
15   P.O. Box 2064
     Decatur, Alabama 35602
16
     Gary A. Davis, ESQ.
17   DAVIS & WHITLOCK, PC
     21 Battery Park Avenue
18   Suite 206
     Asheville, North Carolina 28801
19
     Jeffrey E. Friedman, ESQ.
20   FRIEDMAN DAZZIO ZULANAS & BOWLING, PC
     3800 Corporate Woods Drive
21   Birmingham, Alabama 35242

22
     FOR THE DEFENDANTS:
23
     Stephanie L. Gase, ESQ.
24   BREWER ATTORNEYS & COUNSELORS
     1717 Main Street
25   Suite 5900
     Dallas, Texas 75201
```

*CHRISTINA K. DECKER, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, AL 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1      William S. Cox, III, ESQ.
       LIGHTFOOT FRANKLIN & WHITE, LLC
2      The Clark Building
       400 North 20th Street
3      Birmingham, Alabama 35203

4      Robert J. Shaughnessy, ESQ.
       Eden Schiffmann, ESQ.
5      WILLIAMS & CONNOLLY, LLP
       725 12th Street NW
6      Washington, D.C. 20005-5901

7      William Lattimore, ESQ.
       GATHINGS LAW
8      2204 Lakeshore Drive
       Suite 406
9      Birmingham, Alabama 35209

10

11

      COURT REPORTER: CHRISTINA K. DECKER, RMR, CRR

12

13   Proceedings recorded by OFFICIAL COURT REPORTER, Qualified
     pursuant to 28 U.S.C. 753(a) & Guide to Judiciary Policies
14    and Procedures Vol. VI, Chapter III, D.2.  Transcript
          produced by computerized stenotype.

15

16

17

18

19

20

21

22

23

24

25

1            **P R O C E E D I N G S**

2        (In open court.)

3            THE COURT:  Is everyone ready to begin?

4        Mr. Friedman, are you taking lead for the plaintiffs in

08:55:54  5   my case?

6            MR. FRIEDMAN:  Yes, Your Honor.

7            THE COURT:  Thank you.  And who is taking lead for

8   the Owens plaintiffs?

9            MR. LATTIMORE:  Will Lattimore, Judge, of the Owens

08:56:03 10   objectors.

11            THE COURT:  Mr. Lattimore, good morning.

12            MR. LATTIMORE:  Good morning.

13            THE COURT:  Thank you.

14        There are several letters -- and I will come to

08:56:14 15   Mr. Lattimore in more detail later, but let me deal with the

16   individual objectors.

17        That were several letters the Court received from at

18   least eight different people.  Is a Mitchell Morris here by

19   any chance?  Of those eight letters, Mr. Morris was the only

08:56:44 20   one that requested an opportunity to speak here today.

21        Is there anyone else who is a citizen or property owner

22   in the courtroom who has been impacted by the contamination

23   in this case that wants to be heard this morning?

24        What is your name, ma'am?

08:57:08 25            MS. LUTHER:  My name is Heather Luther.  I am not

1   here to speak.  I thought you were just asking who was here

2   that had written a letter.

3                         THE COURT:  You received a copy of a

4   proposed settlement in this case?

08:57:20  5                         MS. LUTHER:  I did.

6                         THE COURT:  And what is your last name

7   again?

8                         MS. LUTHER:  Luther.

9                         THE COURT:  Luther?  Thank you.

08:57:28  10           Anyone else besides Ms. Luther who is here this

11   morning who is a member of a class or has been impacted and

12   wants an opportunity to be heard?

13           Thank you all.

14           I think the letters that were indeed filed as

08:57:50  15   Document Number 97, they all tend to follow the same general

16   pattern.  People are rightly so concerned about the long-term

17   impact, if any, to their health.  They have a concern about

18   what this settlement will mean for any subsequent issues they

19   experienced, and it is the general concern that the

08:58:27  20   disbursements to the class, as relates to this one settlement

21   with this defendant, may not sufficiently compensate the

22   members of the class.

23           Mr. Friedman, since you are taking point, why don't

24   you briefly, although they are not here, the objectors, that

08:58:50  25   is, but since Ms. Luther is here, why don't you go ahead and

1   outline for Ms. Luther, and if there are any other citizens

2   that may get ahold of this transcript, by what the settlement

3   covers, what it does not cover, and what is left, with

4   respect to your representation of the class going forward.

08:59:11  5                    MR. FRIEDMAN:  Thank you.

6                May it please the Court.  Your Honor, if I may take

7   just a moment.  I want to introduce the Court to Mr. Larry

8   Watkins, the class representative, and Mr. Tommy Lindsey here

9   today.  They are our class representatives.

08:59:29  10                   THE COURT:  Good morning, everyone.

11                   MR. FRIEDMAN:  In addition, Your Honor,

12  Mr. Don Sims is here on behalf of West Morgan-East Lawrence

13  Water Authority.  And, of course, my co-counsel, Gary Davis

14  and Carl Cole are with me at counsel table.

08:59:51  15                   THE COURT:  Gentlemen, good morning to all

16  of you.

17                   MR. COLE:  Good morning.

18                   MR. DAVIS:  Good morning.

19                   MR. FRIEDMAN:  Your Honor, thank you for

08:59:58  20  this opportunity to be heard.

21                Everyone who wrote a letter, sent an e-mail, made a

22  phone call, including everyone who's identified in the -- I

23  believe the document Your Honor just referred to, 97.

24                   THE COURT:  Yes.

09:00:21  25                   MR. FRIEDMAN:  We have called them all,

1    and we have explained to them directly what this settlement

2    does and what it doesn't do.

3          The settlement -- so many people have expressed

4    concern about personal injuries.  People have said, well, I

09:00:38 5    don't want to give up my claim to bring a personal injury

6    lawsuit or make a personal injury claim.  And we've explained

7    to people and we'll state on the record those illnesses that

8    people believe they have or they may contract, that is not

9    part of this settlement and it never has been.

09:00:56 10         Your Honor, what we have is a settlement, a partial

11   settlement that's been put together with Daikin to bring

12   clean water to -- clean, safe drinking water to those people

13   and businesses that get their drinking water from West

14   Morgan-East Lawrence.

09:01:18 15         The settlement to be funded, subject to Your Honor's

16   approval, has allowed construction of a Granular Activated

17   Carbon system that is in effect.  And as a result of that

18   construction, our finished water samples are now showing a

19   non detect for PFCs, which before the settlement and before

09:01:45 20  we were able to put this together and construct the GAC

21   system, we weren't able to say that.

22         Our raw water that comes out of the Tennessee River

23   in many tests still shows presence of PFCs that are above the

24   EPA safe drinking water standard, the lifetime health

09:02:05 25  advisory.  So the -- there is a unanimity of interest between

1    the water authority and the people that drink this water, and

2    that is get anything dangerous out of the water.

3              Now, we're not asking any member of the class to

4    release any claims against the water authority, if they have

09:02:27  5    an issue with us.  And they're not releasing any claims

6    against Dyneon and 3M, who this case will continue against.

7              What we have put together in a settlement is

8    analogous to a preliminary injunction, providing injunctive

9    relief in a positive way by addressing the problems with the

09:02:49 10    water.

11             Your Honor, I also explained to people who called us

12    on the phone, who sent us e-mails, and I've explained for the

13    purpose of Ms. Luther here in the audience, that the claims

14    that we have brought on behalf of the class are brought under

09:03:05 15    Alabama common law, and those are based on joint and several

16    liability.

17             So even though that we have put together a very

18    favorable settlement, we believe, with Daikin, who the report

19    will show is only responsible for putting about 5 percent of

09:03:24 20    the PFOA and PFOS in the Tennessee River.  Even though we're

21    getting the benefit of the granular activated system being in

22    place, water bills won't go up.  The members of the -- the

23    members of the class will not have to pay higher interest to

24    satisfy the debt for this construction once it's all done.

09:03:50 25             But through joint and several liability, all their

1    claims -- mental anguish claims, emotional distress, any

2    claims they have -- will still continue in the case, and

3    we'll ultimately get those to trial against the remaining

4    defendants, which are 3M and Dyneon.

09:04:11   5         So to summarize what the settlement does and what it

6    doesn't do.  We are going to put nearly $4 million to retire

7    the cost of the GAC system.  We are paying everyone who got

8    their water from WMEL, we're giving them a credit towards

9    their water bills that will be -- that they'll see on their

09:04:41   10   statements, that basically give them credit for the time in

11   which we -- there was the health advisory from the EPA.  And

12   by the time we started mixing water and addressing that to

13   get our water in compliance, we are giving them a credit,

14   everyone, for that amount.

09:04:57   15        There's only been two people -- and I addressed this

16   in my declaration -- that didn't want the benefit.  And one

17   of those people said that they had worked for a company that

18   did work for 3M, and another one was a person who actually

19   worked for 3M just didn't want the benefit of a credit

09:05:19   20   towards their water bill.  But everyone else has been

21   receptive.

22        And so going forward, we can -- with this

23   settlement, we can give them the promise that you have, at

24   least for the near term, we're going to be able to provide

09:05:38   25   water that's in compliance, water that has non-detective

1    PFCs, and the members of the class are not going to have to

2    pay for that.  They're not going to have to pay for the

3    improvements to the water authority.  And that is all the

4    water authority ever set out to do, and that's all we set out

09:05:54   5    to do in trying to negotiate this thing.

6                THE COURT:  Why don't you address more

7    directly the general point in the individual letters that

8    came in about how one-month credit is an insult.

9         People expressed that they paid their bills

09:06:16  10    repeatedly, and to only focus on one month is adding insult

11    to the injury.  What is the rationale for essentially just

12    focusing on the one-month period in giving people credit for

13    that one month?

14                MR. FRIEDMAN:  Thank you, Your Honor.

09:06:35  15         The focus is -- the focus of the settlement is

16    getting a relief across the board to the class and getting

17    them clean water.  If we didn't do this, instead -- instead

18    of just getting a one-month credit for their bill, they would

19    be getting an increased water bill that would raise prices to

09:06:56  20    everyone getting West Morgan-East Lawrence water for the

21    foreseeable future.  It would go on and on.  There would be

22    over $2 million just in interest on the loan to install this.

23         This is a settlement that's not designed to try to

24    pay money to class members.  That is something that will be

09:07:17  25    addressed as the case proceeds.

1           The focus of this settlement, Your Honor, is not to
2      put money in people's pockets, but to put clean water in
3      their faucets.
4           And to address a situation that, quite frankly, was
09:07:35  5      an alarm to everyone in the Tennessee Valley when, on
6      May 19th of last year, when the lifetime health advisory came
7      out and people were told not to drink the water, the Federal
8      Government told Mr. Sims that he had to notify everyone
9      getting his water that the PFC levels were a potential
09:07:57 10      danger -- or were a danger, not a potential danger, an actual
11      danger.
12           So the focus of the settlement, Your Honor, and what
13      we've told everyone -- every Saturday afternoon I've spent in
14      my office returning calls, when I'd tell people, we'd talk
09:08:11 15      about money, we said this part of the settlement is not about
16      the money.  It's about the relief.  And it's desperately
17      needed relief.
18           And, Your Honor, I will say this for the benefit of
19      everyone within earshot, and for those who would raise an
09:08:28 20      issue -- this settlement negotiation was borne out of talks
21      where we were trying to negotiate tractor trailer deliveries
22      of bottled water and tanks of water to get to constituents,
23      to get to schools, to get to businesses, and to get to
24      people.
09:08:51 25           And one thing led to another.  And that would have

1    just been a Band-aid.  And so we were successful in

2    negotiating a settlement that built a whole new system to

3    treat this water.  And we put it up on our website.

4            There's a time lapse photography of the work that

09:09:11  5    went on.  Mr. Bryan Pate is the engineer who is here today

6    who helped oversee the project.  But it was a -- it took a

7    fantastic amount of work in a short period of time.  We

8    videotaped the whole thing.  And we put it out.

9            And to answer Your Honor's question more directly, I

09:09:27 10    have sent people to not just our class settlement website,

11    but to the WMEL website where they could actually see the

12    construction of the water system that has been -- that will

13    be, if Your Honor approves it, funded by this settlement.

14            So it's not about giving people money back for water

09:09:46 15    bills, or giving them money for emotional distress.  Those

16    things will have their day in this Court.  But they're not

17    here yet.  We addressed the most pressing problem, and that

18    is safe drinking water.

19                 THE COURT:  Thank you.  I will come back

09:10:02 20    to you and perhaps some other folks in a minute.  But for now

21    let me hear from Mr. Lattimore, please.

22            Mr. Lattimore, you represent, I guess what's been

23    designated as the Owens plaintiffs in your case, in this

24    case.  They are the objectors.

09:10:29 25            Several objections have been raised in the filing

1    that you made back on April the 5th.  Let me let you do a

2    summary of which objections you believe are still in play.

3    It could be all of them.  I don't know if you abandoned any

4    of them in light of your response brief, but for now, let me

09:10:57 5    just stop and let you do a summary of what objections still

6    remain, if any.

7                    MR. LATTIMORE:  May it please the Court.

8    We have not waived any of our objections.  They all still

9    stand.

09:11:09 10         I think that the most serious of those objections is

11   the conflict of interest that we have raised related to the

12   lawyers who are representing the proposed class in this case.

13                   THE COURT:  And, basically, you believe

14   that, I guess, Mr. Friedman's law firm cannot represent the

09:11:32 15  water authority and the recipients or the customers for the

16   water authority in this case.

17                   MR. LATTIMORE:  That's correct, Judge.

18   And I want to make clear that this is not an attack on

19   Mr. Friedman, or Mr. Davis, or Mr. Cole personally.  This has

09:11:54 20  to do with -- in fact, they are fine lawyers, and they have

21   done a fantastic job of representing the water authority in

22   this case.

23         My concern is that the members of the proposed

24   class, of whom my firm represents over 300 clients, that

09:12:12 25  proposed class is entitled to receive representation from

1    lawyers who are not saddled with any conflict of interest.

2           The proposed settlement in my mind, Judge, is akin

3    to a remedial subsequent measure in a products liability

4    case.  This is injunctive relief to prevent contamination of

09:12:44   5    water in the future that, in my mind, and my clients believe

6    does not compensate them adequately for what has already been

7    done to them by Daikin America.

8           There are over 400 members of the proposed class who

9    are not here today, Judge, in the Billings case, which I

09:13:08  10    don't know if the Court has had an opportunity to see the

11    complaint in that case.  That is a case on behalf of over 400

12    individuals who received their water from the water authority

13    who fall directly within the proposed class here who have

14    filed a lawsuit against the water authority.

09:13:28  15           Mr. Friedman made a statement earlier that I want to

16    clear up for the record.  Don Sims is here on behalf of the

17    water authority.  To my knowledge, Mr. Sims is not a lawyer.

18    He is represented by the same lawyers who represent the

19    proposed class.

09:13:40  20                    THE COURT:  Right.

21                    MR. LATTIMORE:  Whether this settlement is

22    approved here today or not, those 400 members of the proposed

23    class are still going to have claims pending not just against

24    3M and Dyneon, as this counsel likes to make a big deal out

09:13:59  25    of, but also against the water authority.

1          THE COURT:  How does this settlement

2     impact that claim, though?  I'm assuming, notwithstanding

3     this settlement, the individuals in the Billings class can

4     still go after the water authority.

09:14:16  5          MR. LATTIMORE:  That's correct.

6          My concern is I don't know -- in light of that, I

7     don't know how one lawyer or group of lawyers can propose to

8     represent both those 400 individuals suing the water

9     authority and the water authority itself.  There's a conflict

09:14:34 10   there.

11         And, you know, I haven't really gotten to the

12    fairness of this proposed settlement.  But before we even get

13    to that point, the class is entitled to have that decision

14    made.  Whether the settlement is fair or not, that decision

09:14:51 15   needs to be made by somebody that is not also being sued by

16    the class.

17         THE COURT:  What is the full basis for the

18    alleged conflict?  You essentially say that these lawyers in

19    negotiating this deal were more in line, I guess, more

09:15:11 20   focused on their fiduciary obligations to the water authority

21    than to the members of the class?

22         MR. LATTIMORE:  I believe that's correct.

23         THE COURT:  Based on what?  You can

24    expound on it so I can fully understand.

09:15:24 25        MR. LATTIMORE:  Absolutely, Judge.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1   Mr. Friedman referred to it as a unanimity of interests

2   between the water authority and the class.  And I just don't

3   see that unanimity of interest at all.

4                    THE COURT:  To the extent that you were

09:15:40  5   not going to get to it -- I think you probably were -- as I

6   understand Mr. Friedman's argument, the water authority is

7   charged with providing water to the -- its customers.  And

8   both the customers and the water authority have been

9   adversely impacted by the contamination of the water supply.

09:16:04  10  And the unanimity of interest is trying to address that

11  problem to at least, as it relates to the GAC system, which

12  is designed as a temporary fix to clean the contaminants in

13  the water.  Why is that not sufficient to establish a

14  unanimity of interest amongst authority and --

09:16:36  15                   MR. LATTIMORE:  Well, I appreciate

16  Mr. Friedman's candor in saying that the purpose of this

17  settlement is not monetary relief to the class.  And I

18  certainly do not mean to undermine or underappreciate the

19  importance of clean water to everyone.

09:16:54  20         My concern from where the class is sitting, from

21  where my 300-plus clients are sitting, clean water, though,

22  is something that they were already entitled to.

23         The -- Ms. Luther, I think, actually made an

24  important point in her letter saying that the amounts of

09:17:17  25  monetary relief that would be provided to her under this

1    settlement barely covers the cost of just two weeks worth of

2    bottled water for drinking and cooking.

3          The class has been wronged by actions that have been

4    done to them in the past, and it's not an adequate

09:17:35  5    compensation to just receive injunctive relief that is only

6    going to affect their water supply in the future.

7          I made the comparison a little earlier to a

8    subsequent remedial measure in a products liability case, and

9    I didn't really expound on that.  Let me do that.

09:17:54  10          Say you have got a products liability case where

11    somebody has been affected in the past by a defective

12    product.  If the defendant eliminates the defect from that

13    product, the plaintiff is not then compensated for what has

14    been done to them in the past, obviously.  That -- the harm

09:18:18  15    has already been done.

16          The litigation arose out of what was done to the

17    class in the past for those many months and years that they

18    received contaminated water.  And it wasn't just -- I

19    appreciate that they have a right to go after 3M and Dyneon

09:18:31  20    for compensation for that, but with all due respect to

21    everybody in this room, it wasn't just 3M and Dyneon who

22    caused that water to be contaminated.  It was also Daikin

23    America.

24          That's harm that was done to the class in the past.

09:18:47  25    And it's no true or adequate compensation to say that the

1    defect is going to be eliminated in the future.   The

2    elimination of that defect does nothing to realign the

3    parties.   It does not move -- it does not somehow move the

4    distributor after a defective product onto the same side of

09:19:06   5    the V, so to speak, as the class.

6          And what we have seen in the Billings case is very

7    clear evidence that those two parties are going to be on

8    opposite sides of the V, no matter which way you want to

9    slice it.

09:19:19   10          THE COURT:   At least as it relates to the

11   authority itself, this settlement here that's being brought

12   before the Court does not preclude or impact any of your

13   class members being in the Billings case or in your case --

14          MR. LATTIMORE:   That's right.   We have no

09:19:42   15   exception to --

16          THE COURT:   -- from going --

17          MR. LATTIMORE:   -- the settlement of the

18   authority in that.   We don't represent the authority.   We

19   don't -- I think it's a great settlement for them.

09:19:48   20          THE COURT:   My point is the settlement

21   does not preclude customers from going after the authority if

22   they believe that there's a basis for doing so.

23          MR. LATTIMORE:   That's absolutely right,

24   Judge.

09:20:06   25          And, in all fairness, I -- that fact doesn't

eliminate the conflict of interest of the lawyers

representing the class.  I think it is the basis of the

conflict of interest of those lawyers and the class.

If somebody's -- obviously, the vast majority of the

class members are not here.  You have got a class of, I

think, close to 25,000 people.

The decision to accept a settlement on their behalf

is a big one and an important one.  And it lies in the hands

of lawyers who are going to enter into a binding settlement

of over 25,000 people.

I just think -- as somebody who represents over 300

of those people, I think that those 25,000 folks are entitled

to have that decision made by a lawyer who is not saddled

with any conflict.

THE COURT:  The class action mechanism is

designed essentially to place some of the burden on the Court

to ensure that, among other things, that the interest of

class members are protected.

One way obviously to do so is to review the

settlement itself.  But in the key way of doing so, at least

from my perspective, is through notice to the class and in

reviewing the objections that are made, including ones that

you are here for on behalf of your 300 clients.  And then

ultimately making a determination if the proposed settlement

is fair, among other things, and then making a decision on

1    whether to approve.

2           But, basically, as it relates to the conflict of

3    interest, you just don't believe that the same set of lawyers

4    can represent the class and the authority in the same

09:22:09  5    litigation.

6                       MR. LATTIMORE:  That's right, Judge.  And

7    like I said at the outset, we have not waived any of our

8    other objections.

9                       THE COURT:  We will come back to those

09:22:17 10    other ones.  As you said --

11                       MR. LATTIMORE:  This is just the strongest

12    in my mind.

13                       THE COURT:  Right.

14                       MR. LATTIMORE:  And I certainly, again,

09:22:22 15    don't mean to underplay the role of the Court in reviewing

16    this settlement.  Your Honor, obviously, has many years of

17    litigation experience handling high profile and large

18    litigation, and brings a wealth of knowledge to the table, in

19    terms of reviewing something like this.

09:22:43 20           I would respectfully just point out that the Court

21    now is in the position of a neutral impartial observer.  And

22    a proposed class like this is entitled to a zealous advocate,

23    which is separate from the Court who can review any proposed

24    settlement and act in their best interest.

09:23:07 25           And, again, I haven't really gotten to the fairness.

1    I just think they're entitled to somebody who doesn't have

2    any conflict.

3              THE COURT:  Well, let me understand,

4    though, fully.  You believe that is an inherent conflict.

09:23:25  5    And then let's talk about how you believe that the customers

6    have been impacted by this conflict.

7              I think you may have already alluded to this, but

8    perhaps maybe your bigger point or your main response to this

9    question, you believe, and I guess the class has been

09:23:48  10   impacted because -- the class, being the customers, I should

11   say -- because this settlement does not give them any

12   monetary relief for their losses.

13              MR. LATTIMORE:  That's correct, Judge.  It

14   doesn't give them adequate monetary relief.  And the monetary

09:24:12  15   relief it does give them, it does not split up fairly, in my

16   mind.

17              The analogy that we drew in our reply brief, which

18   was filed in with this Court on May 5th, was to a situation

19   where you've got a class action settlement that requires the

09:24:30  20   class to be subdivided into subclasses, where you've got --

21   for example, in this settlement, you've got businesses and

22   corporations, obviously, restaurants, businesses, what have

23   you, who are getting compensation via one month's water bill

24   for their uses of water that they happened to use during the

09:24:57  25   month of June 2016.  And then you've got a separate class of

1    individual plaintiffs who are showering, and bathing, and

2    doing a number of things that businesses aren't using water

3    for.  And you're just giving them the same one month's water

4    credit from June of 2016.

09:25:21  5         You've also got -- obviously, we've talked at length

6    about the water authority, whose interests I think are

7    totally separate from either of those subgroups, but I think

8    in light of the representation of all of those parties by one

9    set of lawyers, it makes sense to draw an analogy there where

09:25:38 10   you need to subdivide all of those groups up, including the

11   water authority, and have separate counsel for each subgroup.

12        We cite to some cases, *Ortiz vs. Fibreboard*

13   *Corporation*, 527 U.S. 815, which is U.S. Supreme Court court

14   case from 1999.  As well as *Amchem Products vs. Windsor*, 521

09:25:56 15   U.S. 591, a U.S. Supreme Court case from 1997.

16        Those cases involve class actions.  And one of them,

17   I believe, was for asbestos exposure.  And you've got a fund

18   set up in those cases to compensate the class.  It's not a

19   limited fund, but the groups had differing interests that

09:26:24 20   required the Court to split those groups into subclasses that

21   are represented by different counsel.

22        Again, you have got an unlimited fund in those

23   cases.  Nobody -- that was no inkling that anybody would ever

24   run out of money to pay clients in the future under those

09:26:40 25   settlements.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1    But the Court -- the U.S. Supreme Court held that

2    those different subgroups were still entitled to

3    representation by separate groups of counsel so that each of

4    their interests could be fairly represented.  In a case like

09:26:55 5    this, where you have got the water authority, who's receiving

6    payment for some water filters that I understand are already

7    in place, you've got an additional $450,000 that eventually

8    is going to make its way to the class who is still there.

9    Something I haven't pointed out is that this

09:27:21 10   settlement does nothing to compensate individuals who have

11   moved away since June 2016.  Those people suffered harm as a

12   result of drinking water, bathing in the water, cooking with

13   the water in June 2016 and for several years prior.  And this

14   settlement does not propose to compensate those individuals

09:27:39 15   at all.  Obviously, if they have moved away, a credit for

16   water authority from -- a credit for water from the West

17   Morgan-East Lawrence Water Authority does nothing to

18   compensate them.

19   THE COURT:  At least as relates to that

09:27:53 20   subset of people who are no longer there and people who are

21   still there, their personal injury claims are not addressed

22   by this settlement at all.

23   MR. LATTIMORE:  That is correct, Judge.

24   The personal injury claims are not addressed by this, but

09:28:10 25   there are claims for mental anguish, property damage, you

1    know.  I don't want to get too far out into hypotheticals.

2                    THE COURT:  I don't believe those are

3    precluded, and I will let Mr. Friedman address that in a

4    minute.

09:28:24  5              But let me -- assuming the amount is $5 million,

6    which is what Daikin -- let's assume that's what Daikin is

7    willing to pay and no more to resolve the claims against it.

8    I gather, or maybe not, what you are saying is instead of the

9    water authority receiving $4 million of that amount, that

09:29:09  10   some of what the water authority's receiving should go to the

11   customers.

12                   MR. LATTIMORE:  Well, my point really is

13   that even the $450,000 that is supposedly eventually going to

14   make its way to the class via water credits, even that's

09:29:29  15   being funneled through the water authority.  All of it's

16   getting paid directly into the water authority in reliance on

17   the water authority to give a credit for some of it -- a very

18   small percentage of it -- out to the class over time in the

19   future.

09:29:45  20              Again, all of this comes back to the conflict of

21   interest of counsel.  And, again, I'm not making any --

22                   THE COURT:  Well, the credit -- I mean, I

23   think -- maybe I don't fully appreciate that point, and

24   that's perhaps why I glossed over it.

09:30:03  25              Isn't that fairly straightforward, you look at what

1    a person paid in, was it June of 2016?  And then that's what

2    he or she gets?

3                    MR. LATTIMORE:  Well, and I don't

4    represent the water authority.  I'm not the water authority.

09:30:17  5    And I'm not going to make that decision.

6         And that's part of my point, is that we need a

7    lawyer here for the water authority and a separate lawyer

8    here for the class.

9                    THE COURT:  Okay.  All right.  As it

09:30:29  10   relates to big pot of money, the $4 million, are you

11   contending that some of that should go to the class instead

12   of the water authority?

13                   MR. LATTIMORE:  Well, to be honest, Judge,

14   we haven't really made that determination yet.  I think we've

09:30:46  15   got to get this case in a posture where everybody can come to

16   the table with independent interests and independent clients,

17   and negotiate something that is fair.

18        And I don't think it would behoove anybody to try to

19   make a determination of what is fair until we've got the case

09:31:10  20   postured that way.

21                   THE COURT:  Okay.  Well, let's cover the

22   rest of your arguments.

23        I guess you're arguing also that the claims of the

24   representative plaintiffs are not typical of the claims of

09:31:29  25   the class.  And I think that's because the representative

1    plaintiffs are individuals, and some of the class includes

2    businesses.

3                    MR. LATTIMORE:  That's right, Judge.  And

4    it's just a very, very broad class.

09:31:50  5         There is no attempt to make any distinction between

6    the various types of groups who receive their water from all

7    these different water authorities.  Everybody gets water,

8    obviously.  Businesses use it just like people use it.

9         And to say that you've got a group of individuals

09:32:13 10   who are adequate to be typical -- adequate to satisfy the

11   typicality requirement, Rule 23, I don't think it's fair to

12   say that.  I don't think you can meet Rule 23 just with three

13   individuals.

14        This goes back a little bit to my argument about

09:32:35 15   subgroups, subclasses.  Everybody needs to be -- the

16   subclasses need to be represented by different counsel who

17   can get them each something that's fair.

18                    THE COURT:  Okay.  And I guess just the

19   following in chronological order your arguments, the

09:32:52 20   secondary point that you made is that an attack on the

21   23(b)(2), that injunctive relief does not predominate here

22   because of the mental anguish claims of the individual class

23   members.

24                    MR. LATTIMORE:  That's right.  I think the

09:33:18 25   mental anguish claims are being seriously undervalued in this

1    case.

2          When you are exposed to the risk of immediate harm,

3    which we assert that the -- our 300 clients were exposed to

4    the risk of immediate harm as a result of their exposure to

09:33:36  5    water that was contaminated at dangerous levels with PFOA and

6    PFOS.

7          The Alabama pattern jury instructions provide that

8    individuals who are placed at that risk are entitled to

9    mental anguish and nuisance claims.  There is a specific

09:33:56 10    Alabama pattern jury instruction on mental anguish and

11    nuisance claims that is specific to plaintiffs who have

12    placed -- been placed -- excuse me -- at risk of physical

13    harm.

14          And this -- I mean, Mr. Friedman was candid that

09:34:11 15    this settlement's not designed to provide monetary relief.

16    It's all injunctive.

17          The monetary claims are just being undervalued.

18    That mental anguish claim is being undervalued.

19                THE COURT:  What about his other point

09:34:27 20    that he is not undervaluing the mental anguish claims, the

21    other claim because those remain pending against the other

22    defendants on a joint and several liability theory?

23                MR. LATTIMORE:  That's absolutely true.

24    The mental anguish claims that do remain pending against 3M

09:34:48 25    and Dyneon.  Respectfully, though, Daikin America is

1    responsible for that same type of wrongful conduct.  They

2    contaminated the Tennessee River, as well, upstream from the

3    water intake.  It was their wrongful conduct that placed the

4    plaintiffs at risk of physical harm.

09:35:10    5         Plaintiffs have a claim for mental anguish arising

6    out of their nuisance and trespass claims that is the same

7    against -- or that is akin to the claims against 3M and

8    Dyneon.  It all arises out of the same conduct.

9         Daikin America was responsible for that conduct,

09:35:28   10   just like 3M and Dyneon was.  And plaintiffs are not entitled

11   to have their claims extinguished against Daikin when they're

12   only getting one month's water credit.  I think the monetary

13   value of plaintiffs' mental anguish claims against Daikin

14   outweighs injunctive relief that's proposed by this

09:35:48   15   settlement.

16              THE COURT:  Okay.  Anything else you want

17   to add?

18              MR. LATTIMORE:  Yes, Judge.  Just briefly.

19         We have reached out to Mr. Friedman, as well as

09:36:04   20   counsel for Daikin America, prior to filing any objections

21   and well prior to this hearing.  And the point of those

22   communications was to make our belief clear to them that, at

23   a minimum, this settlement needs to be an opt-out.

24         Our clients, as well as those who filed objections

09:36:26   25   to this settlement and wrote letters, and anybody else who

1   has concerns with the fairness of the settlement, those

2   individuals are, at a minimum, entitled to opt out.  If this

3   settlement goes through, as proposed, I still think it needs

4   to be one that allows the Owens plaintiffs and Billings

09:36:44  5   plaintiffs, anybody else that's got a problem with the

6   settlement, to opt out of it.

7           And that's all I have, Judge.  Thank you.

8                   THE COURT:  Thank you.

9           If anybody wants to respond?  Mr. Friedman?

09:37:01  10                  MR. FRIEDMAN:  May it please the Court.

11                  THE COURT:  All right.

12                  MR. FRIEDMAN:  Your Honor, what we're

13   talking about here is basic fundamental fairness.  You have

14   talked about having independent counsel and people analyzing

09:37:19  15   this settlement.

16           If there's anyone of the 17,000 notices that went

17   out, if you talked to those people like I have, and told

18   them, look, we're going to let you opt out and keep this

19   drinking water that could kill you, that could hurt you, that

09:37:36  20   could hurt infants, pregnant mothers, we're going to let you

21   opt out and not get this clean water.  Is there anyone who

22   would give a fleeting second of thought that some rational

23   person would say, I want to opt out of that?  I don't want

24   that clean water.

09:37:51  25                  THE COURT:  Well, I think maybe this is

1    your point.  You believe if there's an opt-out mechanism

2    allowed the settlement will be derailed?

3                        MR. FRIEDMAN:  Yes, Your Honor.

4                        THE COURT:  Because I was about to say of

09:38:08  5    course everyone wants the clean water, and I think maybe I

6    will let Mr. Lattimore address this in a minute, as well.

7            Perhaps the underlying assumption is that the

8    Granular Activated System device stays in place, and so the

9    class still gets that benefit, and then they're allowed to go

09:38:34  10    forward, perhaps.  But, anyway, so your point is that from a

11    fairness point of view you still believe that the best thing

12    for the class was to reach this settlement.

13                        MR. FRIEDMAN:  Yes, sir.

14                        THE COURT:  And to get this system in

09:38:51  15    place.

16                        MR. FRIEDMAN:  Yes, Your Honor.

17                        THE COURT:  Let me drill down some of the

18    points that Mr. Lattimore made, and I will come back and let

19    you address some of the things I wanted to say.

09:39:06  20            Can the same set of lawyers represent the water

21    authority and the customers in this lawsuit?

22                        MR. FRIEDMAN:  Your Honor, we studied this

23    issue well before this lawsuit was ever filed.

24            And, Your Honor, if I may point out to the Court,

09:39:25  25    this is -- this may be -- this might not be obvious, but I

1    want to point it out.

2          When we filed this lawsuit, we were representing a

3    water authority, a not-for-profit water authority whose only

4    purpose was to -- was and is to provide clean safe water to

09:39:46  5    its customers.  That is our goal in this case.

6          There is a unanimity of interest there in providing

7    that water both for the class and through the not-for-profit

8    WMEL water system.

9          When we filed this lawsuit, Your Honor, there were

09:40:08  10   no competing classes or no one wanting to get into this.  The

11   plaintiffs in the Owens case, Mr. Lattimore, Mr. Gathings's

12   case, their lawsuit, Your Honor, was filed 16 months after

13   us.  It copied what we filed line and verse.  That lawsuit

14   was not filed until after our preliminary settlement was --

09:40:33  15   hit the press.  This is the classic "me, too" lawsuit.

16          And, Your Honor, for all of the talk about our

17   conflict, Mr. Lattimore didn't raise any claims on behalf of

18   his clients against the water authority.  As a matter of

19   fact, they did not make one claim that the water authority

09:40:54  20   did anything wrong.  The only thing the water authority has

21   done is try to provide clean, safe drinking water.

22          And, Your Honor, it's -- there's really no daylight

23   between the interests of this not-for-profit water authority

24   and the people who drink their water and rely on the water

09:41:15  25   authority to provide safe drinking water.

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

1          So, no, Your Honor, I'd say there's no conflict

2     there.  And I would say this.  You know, there's been -- they

3     tried to hint there's disparity in the amount that's paid to

4     go to the water authority and that goes to the class.

09:41:29  5          First of all, there's more benefit to the class than

6     just this -- a credit for a month.

7                    THE COURT:  Now, how?  He says that -- I

8     think your response -- I anticipate where you are going.

9          Mr. Lattimore says the water authority is obligated

09:41:49 10     to provide clean water anyway, period.  And they are going to

11     do that with or without the settlement.

12          And essentially what you have done is taken -- and

13     this is maybe me extrapolating too much on Mr. Lattimore's

14     point.  So, in fairness, I will let Mr. Lattimore respond to

09:42:09 15     this later.

16          But I think what he's saying is that you have taken

17     money that perhaps should be going to the customers, and

18     essentially allowed the water authority to pay for the system

19     that it would have had to have provide anyway.

09:42:29 20                    MR. FRIEDMAN:  Judge, you're dead on.  But

21     not a zero sum game like that.

22          What happened is sure, the water authority -- that's

23     their charter, that's their mission to provide clean water.

24     But in doing that, they are authorized to charge back to

09:42:41 25     their customers the amount of money that it cost to provide

1    for this clean water.

2              This $4 million that's going in through the

3    settlement to provide this GAC system is going to represent a

4    savings for years to come for all of the members of the

09:42:58  5    class.  It's going to help them avoid, Your Honor, $2 million

6    in interest alone.  It is also going to keep water rates that

7    people are paying down.  It's already allowed us, even at

8    this point, just on the promise that we have attended this

9    settlement, it's allowed the water authority to avoid

09:43:19 10   charging higher rates based on what they've had to put in.

11             So it's a future savings.  You've got present safe

12   water.  You've got future savings on your water bills.  You

13   avoid the interest that would further spike the water bills.

14   And you get a credit on an injunctive package that no right

09:43:40 15   thinking person, whether it's a team of scientists, whether

16   it's lawyers from across America, no one could look at that

17   and say addressing the immediate problem of providing safe

18   water, keeping water bills low, and preserving all your

19   claims.  Even if you want to sue the very water authority

09:43:58 20   that's trying to do this good, all that's still there.  It's

21   still intact, Your Honor.

22             So I may be going far afield in addressing Your

23   Honor's questions, but...

24                  THE COURT:  You are addressing it.

09:44:13 25             Let me throw one more out before I let you pick up

1    with your points.

2           This concern that Mr. Lattimore raised that, at

3    least as relates to Daikin, the monetary value of the mental

4    anguish claims that the class, customer class, will have

09:44:42  5    outweighs the injunctive relief that they are receiving.

6    And, essentially Mr. Lattimore has argued on behalf of his

7    300 clients, and maybe the 400 or so in the Billings case,

8    that their mental anguish claims are being undervalued by

9    this settlement, and that, I guess by extension, that's

09:45:18  10   saying that 3M and/or Dyneon -- well, you can pursue those

11   claims against those two entities may not be enough as far as

12   your duties and obligations to the customer clients that you

13   represent.

14          MR. FRIEDMAN:  Your Honor, we do not

09:45:38  15   believe we've undervalued those.  And a couple of things to

16   say about the emotional stress and mental anguish claims.

17          Imagine the argument that Mr. Lattimore would be

18   making if he was approaching this Court for his clients and

19   saying this water authority had a chance to make the water

09:46:04  20   safe without any cost to the class members and they chose not

21   to do it because they wanted to wait for the litigation to

22   play out and maybe get a higher recovery at the end of the

23   case as a result of what the jury may give them.

24          Your Honor, what we're doing is we're eliminating

09:46:26  25   their emotional distress in the near term by giving them

1   clean water and preserving all the claims that they would

2   have anyway.  So, you know, they're not -- it is a win-win

3   and it's fundamentally fair.

4           And, Your Honor, this business -- the Court is the

09:46:49  5   gatekeeper here.  And the Court, as Your Honor has seen

6   throughout this case, we've -- we brought everything to the

7   Court.  We've been transparent and everything about this

8   settlement.  We've been transparent with -- and Your Honor

9   will make the ultimate decision on whether there's fair

09:47:08  10   compensation.

11           But we believe certainly that the mental anguish

12   issue is being addressed by preserving those claims and

13   eliminating mental anguish for people drinking this water if

14   it's -- this situation is not address with the GAC system.

09:47:27  15           And I will say this, Your Honor, if I may.  Both the

16   lawyers for Daikin, as well as us, we have reached out to

17   every lawyer who has filed any kind of case, including the

18   Billings lawyers, the St. John lawyers, all the lawyers who

19   filed cases that have anything to do with PFC contamination

09:47:48  20   in the Tennessee River, and there's only one firm that has

21   chosen to come here and argue against this settlement.  And,

22   of course, that is -- those are the people who were nowhere

23   to be found when we were faced with the possibility of having

24   to shut down the water authority, having to bring in water on

09:48:12  25   trucks, on flatbed trucks, have to take water from Decatur

1    Utilities, and do all these things that have -- and we

2    covered them in our declarations that have been -- that have

3    been just such a marshaling of assets to try to address a

4    terrible situation.

09:48:29  5    And to Monday morning quarterback and to second

6    guess whether we have a conflict where -- when we are not

7    requiring anybody to release anything, and putting together a

8    settlement that even Mr. Lattimore has to admit that is an

9    outstanding settlement, in terms of addressing this problem.

09:48:52  10   All the claims going forward are still on the table, and they

11   will have a right to pursue them.

12             THE COURT:  Let's, before you sit down,

13   and then Mr. Yeilding, Mr. Shaughnessy, Mr. Casey, I will

14   come to you guys and see if you have anything to add for your

09:49:10  15   client.

16             The argument has been made under 23 -- Rule 23(a)(3)

17   that the claims that are representatives are not typical of a

18   class, it's the same injury here.  Let me move along to the

19   next one that I really need for you to address is the

09:49:34  20   23(b)(2) argument that injunctive relief does not predominate

21   in this case because of the mental anguish claims that the

22   customer class has.

23             MR. FRIEDMAN:  Your Honor, if I may, my

24   colleague, Mr. Davis, was prepared to address the Rule 23

09:50:04  25   issues.

1              THE COURT:  Let's do that, please.

2       Mr. Davis, good morning again.

3              MR. DAVIS:  Good morning, Your Honor.

4              THE COURT:  I don't need a typicality

09:50:11  5     argument.  Well, yeah.

6              The Rule 23(a)(3) argument is not one of the

7       stronger ones for Mr. Lattimore, but let me hear from you as

8       to his contention that because of the mental anguish relief

9       that the customer class members have, that perhaps a 23(b)(2)

09:50:43  10    analysis weighs against you in this case.

11             MR. DAVIS:  Yes, Your Honor.  Thank you.

12             The Rule 23(b)(2) analysis applies to the settlement

13      that is before the Court.  And clearly the settlement that is

14      before the Court, the injunctive relief predominates over the

09:51:00  15    incidental damages that are provided in the settlement.

16      That's the test for a 23(b)(2) settlement class.

17             Now, the fact that they can posit that if we get in

18      front of a jury some day, that the jury is going to award

19      tens of millions of dollars of mental anguish compensation,

09:51:21  20    it doesn't affect the settlement that's before the Court

21      today.

22             And Mr. Friedman definitely set out what -- why this

23      is a 23(b)(2) class, is because the class members can't

24      really opt out of the class relief in this case, the clean

09:51:43  25    water.  It's something that, frankly, going back to just

1    briefly, to the conflict argument, if we had just brought

2    this case on behalf of the class without the authority as a

3    client, we would have been seeking the same settlement that

4    we're here today for.  Because the primary relief here is the

09:52:05  5    provision of safe water.

6         So that's why this case meets the 23(b)(2) class for

7    this particular settlement.  And it can't be gauged by what

8    might be awarded in some future day by a jury for mental

9    anguish or any of the other damages that are still on the

09:52:30  10    table.

11         We intend to pursue those vigorously, Your Honor.

12    And we hope that we'll be in this courtroom or another

13    courtroom in front of a jury on those issues in the future.

14              THE COURT:  Thank you, Mr. Davis.

09:52:42  15              MR. DAVIS:  And, Your Honor, if the Court

16    would want me to, I can address the other points made in

17    their briefs.

18              THE COURT:  You may.

19              MR. DAVIS:  You know, first of all, when

09:52:52  20    they filed their original objections, the Owens objectors,

21    and even today, the Owens objectors haven't demonstrated

22    their standing to object to this class settlement.

23         They have an allegation in their complaint that's

24    now in the federal court that they represent these 300 people

09:53:15  25    or customers of WMEL.  And we know for a fact that some of

them aren't, but there's been no demonstration of standing,
Your Honor.  That's just a basic point to start with.

But beyond that, the conflict of interest they
raise, first, is under Rule 1.8(g) of the Alabama Rules of
Professional Conduct.  And I think we've made it clear in our
briefs --

THE COURT:  Yes.  I'm satisfied, with
respect to your briefing on the conflict issue.

MR. DAVIS:  Okay, Your Honor.  Thank you.

And then I'm not going to belabor the lack of
conflict of interest that we have under either the Alabama
Rules of Professional Conduct, or this Court's determination
of fairness.  But their frame in their brief was totally on
the class certification.  It really didn't argue fairness in
either the first brief or the reply brief.

The reply brief did argue under the *Ortiz* case and
under *Amchem* that there should be subclasses with different
representatives for those subclasses.  Those cases are
totally different than what we have here, Your Honor.

Those cases were asbestos settlements, national
classes being settled for asbestos exposure.  And there was
an inherent conflict within the class in those cases.  You
had people who had exposure, but no manifest personal injury.
And you had people with manifest personal injuries.  And the
Supreme Court addressed that inherent conflict by sending the

1    cases back and saying that they should have subclasses, and

2    that there should be separate representatives for those

3    subclasses.

4         There's no conflicts like that within the class that

09:55:19  5    we represent here today, Your Honor.  And, as Mr. Friedman

6    has made clear, there's no conflict between the client, the

7    authority, and the class in this settlement.

8              THE COURT:  Mr. Davis, it's a standing

9    point that you are making that some of the 300 people that

09:55:37  10   Mr. Billings -- Mr. Lattimore's law firm represents -- excuse

11   me -- are not customers of the water authority?

12             MR. DAVIS:  Yes, Your Honor.  And we

13   believe the burden is on Mr. Lattimore and his objectors to

14   demonstrate their standing, so we didn't file anything on

09:55:58  15   that.

16             THE COURT:  Okay.

17             MR. DAVIS:  But we don't believe their

18   they've demonstrated their standing at all just by an

19   allegation in their complaint.

09:56:06  20             THE COURT:  I understand fully.  Thank

21   you.

22             MR. DAVIS:  Thank you, Your Honor.

23        Is there any other point in their briefs or our

24   response that Your Honor would like me to cover?

09:56:14  25             THE COURT:  No thanks, Mr. Davis.

1    MR. DAVIS:  Thank you very much, Your

2    Honor.

3    THE COURT:  Does anyone from Daikin want

4    to address the Court?  Mr. Shaughnessy, you may.

09:56:30  5    MR. SHAUGHNESSY:  Yes, Your Honor.  Robert

6    Shaughnessy for Daikin.

7    I'd like to address a few points, but I would like

8    to start with a question about 23(b) and the role of mental

9    anguish in this case.

09:56:40  10    It's important to keep separate the two different

11    provisions of Rule 23 that are at work here.  There's Rule

12    23(b) and Rule 23(e) regarding the Court's assessment of

13    fairness.

14    This case and this settlement classically fall

09:56:57  15    within Rule 23(b)(2).  It's clear under the law that for

16    purposes of assessing the propriety of (b)(2) certification

17    and settlement one looks at the relief provided by the

18    settlement, not the relief sought in the complaint.  This

19    point is explained in the Fourth Circuit's *Berry* case that

09:57:24  20    the plaintiffs cited in their motion, and in other cases, as

21    well.

22    Here, the overwhelming part of the settlement relief

23    is the provision of clean water, classically an injunction.

24    Daikin's conduct has affected all of the class members in

09:57:46  25    precisely the same way.

1          Daikin released PFCs into the Tennessee River.

2     Those PFCs allegedly affected the water downstream at the

3     single intake pipe that is the source of all of the West

4     Morgan's authority.  And so the Daikin activity necessarily

09:58:06  5     affected every class member in the same way.

6          So the two ingredients of the (b)(2) class are met

7     here, uniform conduct, with respect to the class, and an

8     injunctive forward-looking in-kind remedy provided by the

9     defendant.  And that's the end of the (b)(2) analysis.

09:58:30 10          If those two criteria are met, it's a sufficient

11     (b)(2) class.  The analysis then shifts to the Rule 23(e)

12     analysis of is this a fair settlement in light of what the

13     class members are giving and in light of what they're getting

14     as a result of the settlement.

09:58:50 15          And there is a long and robust line of authority

16     stretching back decades and applied to the present time that

17     holds that a class settlement may properly release all claims

18     relating to the factual predicate that underlies the settled

19     claims, including, indeed, claims not asserted in the

09:59:13 20     complaint, and, in fact, claims that could not have been

21     asserted in the complaint because of jurisdictional or other

22     barriers as long as there is adequacy of representation and

23     the Court deems the settlement fair under Rule 23(e), a

24     release of claims covering the entire gamut of theories and

09:59:36 25     forms of injury arising from the same factual predicate as

1      the settled claims is permissible.

2           And that's exactly what has happened here.  As part

3      of the give and take of the settlement process, the class

4      counsel determined, and we believe it's imminently

09:59:56  5      reasonable, that the injunctive relief was more valuable and

6      more important than the speculative value of the monetary

7      claims for mental anguish or other damages theories.

8           And so what Mr. Lattimore is really arguing is not

9      strictly a (b)(2) objection, because this case fits cleanly

10:00:21 10      within the contours of (b)(2).  What it is, is essentially a

11      freehand, ungrounded gripe about the fairness of the

12      settlement.  And, significantly, the Owens plaintiffs did not

13      cite or discuss any of the *Bennett* factors, nor did they

14      discuss the *Rowe vs. DuPont* case, which we submit is the

10:00:46 15      closest template to this settlement.

16           As we explained in our papers, Your Honor, and I

17      believe this point is not contested by anyone in the room

18      today, we estimate that Daikin accounts for 5 percent or less

19      of the mass of PFCs in the Tennessee River.  So that small

10:01:06 20      contribution has to be taken into account in any assessment

21      of the overall importance of the $6 million settlement value,

22      you know, 5 million paid out of pocket, but also -- excuse

23      me -- 7 million, because there's $2 million in saved interest

24      charges to the class members.

10:01:33 25           So if you essentially normalize the arithmetic here

and say, well, 5 percent responsibility, and you're giving $7

million in class benefits, well, obviously, simple arithmetic

shows that that is, you know, for a defendant who was

entirely responsible for the problem, that is well over $110

million worth of benefit, which is obviously a huge amount,

far more than was involved in the *Rowe* case.

And the Owens plaintiffs, even as speculative as

their discussion of mental anguish was, they pegged the

value -- and, obviously, this is just pie in the sky -- of

the mental anguish claims at 25 million.  So just by doing

the math in that straightforward fashion, they clearly don't

predominate if you essentially multiply the value of Daikin's

settlement by its very small fractional responsibility in

this case.

And so given that fact, given the other *Bennett*

factors that I don't understand the Owens plaintiffs to be

contesting, the fairness of this settlement seems clear.  And

for the class to forego speculative mental anguish claims

against Daikin while retaining those claims against the

remaining defendants is a perfectly rational calculation for

the class and its counsel to make.

I mean, I should also add that we haven't been

pointed to any case in the reported literature where any set

of plaintiffs recovered any significant amount of mental

anguish damages on claims analogous -- on facts analogous to

1    those here, where there's no personal injury, there's no

2    demonstrable harm to the real property, the regulators have

3    been fully aware of the amount of contamination in the water

4    supply, and have taken no action.  There's been no violation

10:03:41  5    of applicable clean water guidelines.

6             So the suggestion that mental anguish should play

7    any significant role in undermining the settlement is really

8    quite remarkable because of the tangible clear forward-going

9    benefits that accrue to the class as a result of the

10:04:05 10    settlement and the completely speculative nature of the

11    mental anguish claims.

12             Mr. Lattimore's question of why can't this be an

13    opt-out settlement, I would just second plaintiffs' counsel's

14    observation.  It can't.  How can they opt out of the benefits

10:04:25 15    of clean water?  I mean, it's for that very reason that

16    (b)(2) does not allow an opt-out mechanism, because it's in

17    the very inherent nature of the relief that class members

18    cannot opt out.

19             So for the Owens plaintiffs to say they want to opt

10:04:44 20    out is really for them to say, well, thank you very much,

21    Daikin, we will take the benefits of the clean water you're

22    providing, but we still want to reserve the right to proceed

23    against you for all the claims that we're asserting.  And the

24    unfairness of that is quite obvious.

10:05:01 25             And that's all I have, Your Honor, unless the Court

1    has questions.  Thank you.

2                        THE COURT:  Thank you.  Mr. Lattimore,

3    feel free to respond.

4                        MR. LATTIMORE:  Yes, Your Honor.

10:05:32  5        I've got a number of points to make in response to

6    everything that's been said here this morning.

7        I guess the first point I should really address is

8    Mr. Davis's argument about standing.

9                    As I mentioned earlier --

10:05:45 10                       THE COURT:  Well, I think -- let me say

11    this.  If he is correct that some of your 300 clients are not

12    customers of the authority, that means there are others who

13    are.  So while Mr. Davis may disagree with me, I think that,

14    at least as it relates to some of your clients, you have

10:06:12 15    standing.  Some I'd have concern.

16                       MR. LATTIMORE:  Thank you, Your Honor.  I

17    think you hit the nail on the head.

18        I will touch real briefly on the Rule 23 arguments

19    before we get back to the elephant in the room that I think

10:06:30 20    still hasn't been substantively addressed, which is the

21    conflict of interest in this case.

22        I appreciate where the Court's coming from on

23    typicality.  I will admit that that argument is not as strong

24    as the conflict of interest argument that we've raised.

10:06:47 25        I would just like to point out for the record that

the individual members of the class obviously are using the

water to clean themselves and to cook with.  Businesses are

not doing that.  And I think they should be treated

differently under the settlement.  And for typicality

10:07:08   purposes, that's a consideration that should be drawn.

But like I said, I appreciate where the Court's

coming from on that and I won't belabor the point.

Regarding the fairness --

THE COURT:  Are you waiving the (b)(2)

10:07:22   argument both Mr. Davis and Mr. Shaughnessy have argued, that

under the law, as far as whether or not the injunctive relief

predominates, I need to look at the settlement itself, the

relief that's being provided by and not binding relief that

was sought in the complaint?

10:07:48   MR. LATTIMORE:  No, sir.  We are

absolutely not waiving that argument.  And, again, that's

another one I'm not going to belabor the Court's time with

that.

THE COURT:  I know you are not waiving it,

10:07:57   but do you have any cases that state differently than the

points or the arguments that Mr. Davis has made and

Mr. Shaughnessy has made?

MR. LATTIMORE:  I don't have any reported

opinions with me here today.  I will say for the record that

10:08:15   there are obviously confidential settlements out there

nobody's, you know -- I'm not going to imply anything from those.  But we're not waiving that argument, although I don't have any reported cases on it.

THE COURT:  All right.  What's your fairness point that you were about to make?

MR. LATTIMORE:  Just going to the idea that the injunctive relief predominates over the monetary damages and how that is being used here to tie everybody into a non opt-out settlement.  To say, on behalf of both the water authority and the class -- I know I am coming back to the conflict issue -- but to say that the settlement is fair and nobody can opt out, to me, it, again, the monetary damages of the mental anguish -- they are being undervalued.

To say that Daikin is only responsible for 5 percent of the contamination without putting those issues in front of a jury or getting farther down the line --

THE COURT:  Well, I think the contaminants have allegedly been released into the water source as far back as 1961.

Daikin came into the picture very recently.  I don't know if that's where the 5 percent argument is derived from.  But you would at least agree, even if it's not at a 5 percent level, that Daikin is only culpable for its conduct since it took over the operation.

MR. LATTIMORE:  Well, and what I would

1    really take issue with is the idea that a $4 million

2    settlement to the water authority benefits the class to the

3    tune of $10 million.

4                    THE COURT:  That is -- we didn't talk

10:10:37  5    about that the first go around, but that's a very good point

6    for you to address.

7                    The point's been made that the water authority

8    obviously has the right to pass on the cost to the client for

9    the system if the money is not received through a settlement,

10:11:06 10    for example.  And that your clients and the class as a whole

11    would see their bills go up.  And there will also be, I

12    guess, another value, perhaps, or cost based on any bonds and

13    interests.  Granted, you don't agree with the amount that

14    Mr. Friedman mentioned, but do you agree at least that your

10:11:43 15    clients and the class customers as a whole are benefitting

16    from not having the water authority pay for the GAC system?

17                    MR. LATTIMORE:  It is a delicate

18    situation, Your Honor, because clean water -- our position is

19    that clean water is something that our clients are entitled

10:12:00 20    to.  They purchased water from the water authority that, in

21    fact, was contaminated.  To say you're going to be benefitted

22    from receiving clean water in the future, you know, that's to

23    say that you are benefitted by having clean air.  That's to

24    say that's a benefit that the rest of the world -- or the

10:12:26 25    rest of the country has every single day with -- when they

1    wake up in the morning, without having to go through the

2    mental anguish experience when you drink contaminated water

3    every day for years.

4                   THE COURT:  Now, your law firm is in

10:12:38  5    Birmingham.  I don't know if you live in Jefferson or Shelby

6    County, but --

7                   MR. LATTIMORE:  I do.

8                   THE COURT:  -- if you do live in

9    Jefferson, you know that our bills have gone up exponentially

10:12:48  10   because of certain upgrades that the water authority in

11   Birmingham added because of environmental issues.  And those

12   costs are passed onto the client.

13        So, absolutely, while we're all entitled to clean

14   water, at least as I understand the law -- I think I'm a

10:13:11  15   class member of some of the lawsuits against them -- the

16   water authority, those costs clearly are passed onto the

17   customers.  So I think the point that's being made is not

18   that the customers are not entitled to clean water.  They

19   have that right.  They obviously have not been able to get it

10:13:34  20   because of the contaminants in the water.  And for the water

21   authority to provide clean water to them, it has to

22   initially, anyway, take on and implement this GAC system and

23   ultimately move onto a permanent fix.

24        All of those are costs that are going to be passed

10:13:51  25   onto the customers.

1              MR. LATTIMORE:  I absolutely understand

2      that point.  And to be frank, I don't dispute it.

3              I do think that that point really goes to one that

4      Mr. Friedman made earlier, and Mr. Shaughnessy touched on it,

10:14:07   5      as well.  The argument is that this proposed settlement will

6      save you, I think the number was $2 million in future

7      interest alone, and the argument to the class in support of

8      the settlement was, hey, look what a great deal you're

9      getting, essentially.  We're saving you money on water in the

10:14:28  10      future by entering into that settlement.  It's a terrific

11      deal.

12              Well, that -- to be frank, that may be.  But to get

13      back to the elephant in the room, you don't get to represent

14      both the buyer and the seller.  If you want to sell water to

10:14:42  15      people and say, hey, look at this great deal we're giving

16      you, that's fine.  You can do that.  You can represent the

17      water authority.  And, like I said, this is a fantastic

18      settlement for the water authority.

19              Nobody has addressed yet today how you can represent

10:14:57  20      both the seller of the water and the customers of that water,

21      over 400 of which have sued the seller.

22              If they want to say you're getting a great deal,

23      that's fine.  But you don't represent the person who enters

24      into that deal, in addition to the seller.

10:15:14  25              THE COURT:  You have made this point

1    before.  I'm not sure I have asked you directly this

2    question.  Other than, I guess, being a client versus a

3    customer issue as it relates to this case, where is the

4    inherent conflict, with respect to this proposed settlement?

10:15:52    5               MR. LATTIMORE:  Well, Mr. Friedman touched

6    on it indirectly in his comments to the Court earlier when he

7    said imagine what Mr. Lattimore, who represents 300

8    members of the -- imagine what Mr. Lattimore would be arguing

9    if we turned down this settlement and kept moving on.

10:16:12    10         Imagine -- and I think the implication was there --

11    and I don't mean to extrapolate too much from those

12    comments -- but the implication was there, there would be

13    some liability against the water authority.

14         I know the Stewart firm out of Anniston has asserted

10:16:25    15    that there is liability against the water authority.  We've

16    mentioned the Billings case at length.  But you can't ignore

17    it.  We can't ignore it.  It's there.

18         Part of this settlement is to protect the water

19    authority from future liability.  And if they want to do that

10:16:42    20    on behalf of the water authority, again, that's absolutely

21    fine.  But the water authority's interests are not aligned

22    with the interests of the class.

23               THE COURT:  As it relates to clean water,

24    though, there is a common interest there, I believe.  And to

10:17:02    25    the extent that the class members believe that they have a

claim against the water authority, this settlement, I don't

believe, impacts them.

But one of the points along these lines that

Mr. Friedman made is that even you, in your lawsuit, have not

sued the water authority.  And he, of course, has argued that

means even you agree that your clients', at least at this

point, interest aligned with the water authority.  Does the

fact that you have not sued the water authority in your case

also undercut your argument?

MR. LATTIMORE:  That is a fantastic

question, Your Honor.  And the simple answer to it is no, it

does not.  You have mentioned that our law firm has not --

and our law firm, on behalf of 300 affected people, has not

sued the water authority at this point.  Nobody is here

saying that the statute of limitations on those claims has

run.

THE COURT:  Correct.

MR. LATTIMORE:  I'm not here to make any

threats by any mean.

Like I said at the outset of my comments here, most

recently -- it's a very delicate situation.  It would not

be -- you know, and these are determinations that haven't yet

been made.  But it wouldn't necessarily be to my clients'

benefit to bankrupt the water authority.

Now, is there some liability against the water

1   authority there?  That's a determination that hasn't been

2   made, and one we're wrestling with.  Like I said, the statute

3   of limitations hasn't run on it.

4              THE COURT:  That's the segue to my next

10:18:55  5   point, though.  Does my analysis -- shouldn't matter in my

6   analysis that, at least as it relates to the settlement, it

7   does not preclude any of the class members from going after

8   the water authority?  And so even if there is an alleged

9   conflict, does the fact that the individual class members can

10:19:18 10   still sue the water authority if they believe such a cause of

11   action is a warranted matter?

12              MR. LATTIMORE:  Well, I think it matters,

13   but I think I'm interpreting that a little differently, that

14   the fact that the class members who have filed claims against

10:19:39 15   the water authority, proposed class members who haven't filed

16   claims against the water authority yet, but whose statute of

17   limitations hasn't run, the fact that they might have a claim

18   there, I think it absolutely factors into this Court's

19   analysis.  But from my perspective, the way that it factors

10:19:57 20   in is by pointing out that you can't have class counsel

21   represent the class and the water authority.

22         And by separating that out, you know, these

23   gentlemen on either side of me, ladies and gentlemen on

24   either side of me, have worked on this for a long period of

10:20:17 25   time, and they might be able to answer this question.  But if

1    you've got separate counsel for the class and the water

2    authority, does the settlement fall apart at that point?  I

3    think that's an important question.

4         And if the answer to it is yes, it does, then I

10:20:34  5    don't think that should be -- still don't think that should

6    be used to hold the class hostage to this settlement when you

7    have got class counsel representing somebody --

8    simultaneously representing somebody who the class has a

9    claim against.

10:20:48  10         Like I say, I think it factors into the Court's

11   analysis, my interpretation of it.  I hope the Court can

12   appreciate and understand it.  It's that you don't get to

13   decide whether or not this is a good settlement when that

14   settlement exposes or protects one of your other clients from

10:21:09  15   potential liability.

16              THE COURT:  Okay.  Thank you,

17   Mr. Lattimore.

18         Mr. Lattimore's correct that the strongest argument

19   that he has, at least from Court's analysis of the issues

10:21:33  20   before it, is the purported conflict in the representation of

21   both the authority and the customer class.

22         The Rule 23(a)(3) argument is one that the Court

23   does not accept.  The Court finds that the class

24   representatives and the class that they seek to represent

10:22:07  25   both suffered from the same injury by the same set of -- cast

1    of defendants.  They were all allegedly exposed to the same

2    contaminants.

3            The fact that, I guess, some individuals, that is,

4    the customers, that are persons instead of businesses

10:22:37  5    potentially have a mental anguish claim and that the

6    commercial customers do not, at least from this Court's

7    perspective, does not mean that the representative's claims

8    are not typical of the class that they seek to represent.

9            The Court also is not persuaded by the Rule 23

10:23:00 10    (b)(2) argument.  As both Mr. Davis and Mr. Shaughnessy

11    pointed out, since this is a settlement, the analysis focuses

12    on a relief that's being provided as part of the settlement.

13    And that relief is injunctive in nature and certainly

14    predominates over any individual damages that the class may

10:23:31 15    have.

16            I don't believe that there's a conflict, but I am

17    worried that I may be overly dismissive of the points that

18    Mr. Lattimore's made.  My thinking is this:  The interests of

19    the authority and the customers are aligned.  And both -- the

10:24:18 20    authority obviously is charged with providing clean water to

21    its customers.  That clean water has been impacted by the

22    contaminants, and both the authority and the customer class

23    were affected by the contamination.

24            And so from my perspective, I don't see a conflict.

10:24:49 25    And I certainly also don't see a conflict in the settlement

1    that's proposed here, as well.

2         The clean water component of the settlement not only

3    benefits the authority, but also benefits the customers by

4    providing them with clean water.  And then, as Mr. Friedman

10:25:11 5    has pointed out both in his papers and again in court today,

6    in addition to the clean water is also a cost benefit to the

7    customers by them not having to pay any costs for upgrading

8    this system going forward.

9         I also agree with Mr. Shaughnessy's point that he

10:25:41 10    succinctly put, Mr. Lattimore's class cannot be an opt-out

11    one, that essentially want -- the individuals who would want

12    to opt out would be to benefit from Daikin's willingness to

13    pay for the upgrade -- well, I guess for the GAC system.  And

14    anyone turn around and still sue Daikin for the contamination

10:26:09 15    of the water supply.

16         Let me do this:  I think I'm inclined to overrule

17    the objections, but let me mull that over in my drive back to

18    Birmingham this afternoon.  And I will let you guys know my

19    decision at some point today.

10:26:31 20         It also gives Mr. Friedman and his colleagues, to

21    the extent they are so inclined, to revisit the issue that

22    Mr. Lattimore pointed out at the very end, about whether or

23    not this settlement can go forward, even if there are

24    additional counsel in play for the so-called customer base.

10:27:03 25         That's where I am.  I'll give you guys an answer

1   this afternoon when I get back to Birmingham.

2           That gives you -- I have got two matters to handle

3   this morning, and then I will immediately drive back.  That

4   gives you until at least probably 2:00 o'clock to talk some

10:27:19   5   more.

6           Thank you all.

7           (Whereupon, the above proceedings were concluded at

8   10:27 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Christina K. Decker, RMR, CRR*
Federal Official Court Reporter
101 Holmes Avenue, NE
Huntsville, Alabama 35801
256-506-0085/ChristinaDecker.rmr.crr@aol.com

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Christina K Decker_                    06-2-17

Christina K. Decker, RMR, CRR                    Date

Federal Official Court Reporter

ACCR#:  255