FILED
2019 May-06  PM 09:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TOMMY LINDSEY, LANETTE LINDSEY and LARRY WATKINS, individually, and on behalf of a Class of persons similarly situated,** | ) ) ) ) ) ) | **Case No. 5:15-cv-01750-MHH** |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **CLASS ACTION** |
| **3M COMPANY, DYNEON, L.L.C and DAIKIN AMERICA, INC.,** | ) ) ) | **JURY DEMAND** |
| **Defendants.** | ) ) | |

## CONSOLIDATED INDIVIDUAL AND CLASS ACTION COMPLAINT

Plaintiffs Tommy Lindsey, Lanette Lindsey, and Larry Watkins (collectively "Representative Plaintiffs") bring this Consolidated Complaint on behalf of themselves, and on behalf of a Class of other people similarly situated. Plaintiffs and the Plaintiff Class (collectively "Plaintiffs") sue Defendants 3M Company, Dyneon, L.L.C., and Daikin America, Inc. (collectively "Defendants"), and allege as follows:

## STATEMENT OF THE CASE

This is a class action on behalf of individual Plaintiffs and Class Representatives Tommy and Lynette Lindsey and Larry Watkins and a class of people similarly situated who have been damaged and continue to be damaged due to the negligent, intentional, willful and wanton release of toxic chemicals, including

perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), and other per- and polyfluoroalkyl substances (PFAS) and related chemicals from Defendants' manufacturing processes in Decatur, Alabama, as well as the trespass, nuisance and battery caused by the Defendants' release of toxic chemicals.

The Representative Plaintiffs and Members of the proposed Class are owners and occupants of property served by water service provided by The West Morgan-East Lawrence Water Authority ("WMEL"), V.A.W. Water Systems, Inc., the Falkville Water Works, the Trinity Water Works, the Town Creek Water System, and the West Lawrence Water Cooperative (collectively "Water Utilities"), who have been, and continue to be, provided and subjected to contaminated water as a result of the release of toxic chemicals by the Defendants, as described hereafter. The water supplies of the Representative Plaintiffs and Members of the proposed Class have been contaminated and continue to be contaminated with Defendants' toxic chemicals.

As a result of the Defendants' negligence, trespass, nuisance, and battery, and wanton conduct, Representative Plaintiffs and Members of the proposed Class have suffered damages different in kind and degree from the damage suffered by the public in general as a result of Defendants' discharges of toxic chemicals, including property related damages and consequential damages. Plaintiffs are also seeking equitable and injunctive relief to compel the Defendants to remediate and cease the

spread of toxic chemicals into and through their water supply.  In addition, based on the Defendants' wanton conduct, Plaintiffs are seeking recovery of punitive damages.

**JURISIDICTION**

1.     This Court has jurisdiction over this action in accordance with 28 U.S.C. § 1332(a), because the Plaintiffs are citizens of the State of Alabama and the named Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2.     This Court also has jurisdiction over this action in accordance with 28 U.S.C.§ 1332(d)(2)(A), which grants federal subject matter jurisdiction over any civil action in which the matter in controversy exceeds the sum or value of five million dollars ($5,000,000), exclusive of interest and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant. The proposed Class in this case is greater than 100 persons, the Plaintiffs are residents of the State of Alabama, and the named Defendants are residents of different states.

3.     Venue is appropriate in this Court, pursuant to 28 U.S.C. § 1391(e), in that a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Alabama.

**PARTIES**

4.      Representative Plaintiffs Tommy and Lanette Lindsey are residents of Morgan County, Alabama, and reside at and own property located at 776 County Road 352, Trinity, Alabama 35673.  Plaintiffs are customers of WMEL and use water from the Tennessee River supplied by that utility for drinking, cooking, and other domestic purposes. Plaintiffs' water supply has been and continues to be contaminated with PFAS and related chemicals released from Defendants' manufacturing processes and waste disposal operations.

5.      Representative Plaintiff Larry Watkins is a resident of Morgan County, Alabama, and resides at and owns property located at 1564 County Road 439, Hillsboro, Alabama 35643. Plaintiff is a customer of WMEL and uses water from the Tennessee River supplied by that utility for drinking, cooking, and other domestic purposes. Plaintiff's water supply has been and continues to be contaminated with PFAS and related chemicals from Defendants' manufacturing processes and waste disposal operations.

6.      Defendant 3M Company ("3M") is a foreign corporation qualified to do business in the State of Alabama, and was doing business in Morgan County, Alabama, at all relevant times.

7.      Defendant Dyneon, L.L.C. ("Dyneon"), is a wholly owned subsidiary of Defendant 3M, a foreign corporation, licensed to do business in Alabama and doing business in Morgan County at all times relevant hereto.

8.      Defendant Daikin America, Inc. ("Daikin"), is a foreign corporation qualified to do business in Alabama and doing business in Morgan County at all times relevant hereto.

## FACTUAL ALLEGATIONS

9.      Three of the major manufacturers and/or users of PFAS and related chemicals, are located in Decatur, Alabama: 3M, Dyneon, and Daikin.

10.     Defendants 3M and Dyneon are the present owners and operators of manufacturing and disposal facilities in Decatur, Alabama, which have released and are continuing to release PFAS and related chemicals into groundwater and surface water through which the chemicals have been and are continuing to be discharged into the Tennessee River (Wheeler Reservoir) and its tributaries. Defendants manufactured and/or used these chemicals at their facilities and disposed of waste containing these chemicals on their property and on adjacent properties from which properties the chemicals have migrated and continue to migrate into the Tennessee River (Wheeler Reservoir) and its tributaries.

11.     Defendant 3M has discharged and continues to release toxic PFAS and related chemicals from its on-site wastewater treatment plant into Bakers Creek, a tributary to the Tennessee River, and from other sources on property owned by 3M. 3M disposed of sludge from the on-site wastewater treatment plant by means of subsurface injection in a 575-acre area designated as the "sludge incorporation area."

In addition, 3M has discharged and continues to discharge wastewater containing PFAS and related chemicals to the Decatur Utilities Dry Creek Wastewater Treatment Plant ("WWTP"), which in turn discharges wastewater containing PFAS and related chemicals into the Tennessee River. On information and belief, 3M has discharged and continues to release toxic PFAS and related chemicals from other sources on property in owned, leased or used proximate to its Decatur Facility.

12.     Defendant Dyneon's fluoroelastomer facility is on the southern portion of the 3M Decatur facility. Dyneon's fluoroelastomer operations in Decatur previously had been part of 3M's manufacturing processes at the Decatur facility. The manufacturing process wastewater from Dyneon's operations has been and continues to be discharged to 3M's wastewater treatment system, which has discharged and continues to discharge PFAS and related chemicals to Baker Creek and the Tennessee River. In addition, Dyneon has discharged wastewater containing PFAS and related chemicals to the Decatur Utilities Dry Creek WWTP, which in turn discharges wastewater containing PFAS and related chemicals into the Tennessee River.

13.     Defendant Daikin manufactures specialty chemicals, including tetrafluoroethylene (TFE) and hexafluoropropylene (HFP) fluoropolymers at its Decatur, Alabama, plant and has used PFOA in its manufacturing process. PFOA is also a byproduct of its manufacturing process. Daikin's Decatur plant was

constructed on land that previously served as a site for the disposal of the adjacent 3M Company's waste contaminated with PFAS and related chemicals. The Daikin facility has discharged and continues to discharge wastewater and site stormwater to the Tennessee River and Bakers Creek containing PFAS and related chemicals. In addition, Daikin has discharged and continues to discharge process wastewater contaminated with PFAS and related chemicals to the Decatur Utilities WWTP, which in turn discharges wastewater containing PFAS and related chemicals into the Tennessee River.

14.     The stable carbon-fluorine bonds of PFAS are persistent in the environment and the human body. There is no known environmental breakdown mechanism for these chemicals. They are readily absorbed into biota and have a tendency to accumulate with repeated exposure. PFAS cross the placenta in humans, accumulate in amniotic fluid, and has been detected in the umbilical cord blood of babies.

15.     When humans ingest PFAS, these toxic chemicals bind to plasma proteins in the blood and readily are absorbed and distributed throughout the body. The liver and kidneys are important binding and processing sites for PFAS, resulting in physiologic changes to these and other organs.  Because of strong carbon-fluorine bonds, PFAS are stable to metabolic degradation, resistant to biotransformation, and have long half-lives in the body. These toxic chemicals accumulate in the body over

time and cause long-term physiologic alterations and damage to the blood, liver, kidneys, immune system, and other organs.

16.     The human illness, injury and diseases caused by exposure to PFAS and related chemicals include cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol. The association between exposure to these chemicals and certain cancers has been reported by the C8 Health Project, an independent Science Panel charged with reviewing the evidence linking PFAS and related chemicals to diseases based on health research carried out by the Science Panel in the Mid-Ohio Valley population exposed to PFAS and related chemicals. The C-8 Science Panel identified kidney cancer and testicular cancer as having a "probable link" to PFOA exposure in the Mid-Ohio Valley population exposed to PFOA in drinking water. Epidemiological studies of workers exposed to PFOA on the job support the association between PFOA exposure and both kidney and testicular cancer and also suggest associations with prostate and ovarian cancer and non-Hodgkin's lymphoma. Rodent studies also support the link with cancer. The majority of a United States Environmental Protection Agency ("EPA") Science Advisory Board expert committee recommended in 2006 that PFOA be considered "likely to be carcinogenic to humans."

17.     Additionally, the C8 Science Panel has found a probable link between exposure to PFAS and related compounds, and the following human diseases:

pregnancy-induced hypertension, ulcerative colitis, and high cholesterol. Furthermore, in recent years, additional toxicity of PFAS and related compounds, has been demonstrated in a wide variety of species and models, including humans. For instance, a study of ninety-nine Norwegian children at age three found that maternal serum PFOA concentrations were associated with decreased vaccine responses, especially toward rubella vaccine, and increased frequencies of common cold and gastroenteritis. The combined human and experimental evidence is in strong support of adverse effects on immune functions at relatively low exposure levels.

18.     The Defendants have long been aware of the persistence and toxicity of PFAS and related chemicals. Yet, the Defendants knowingly and intentionally discharged and continue to discharge these chemicals into the Tennessee River in Decatur, Alabama, 13 miles upstream of the water supplies used by Plaintiffs.

19.     Defendant 3M has known for at least 35 years that PFAS and related chemicals persist in the environment and accumulate in the bodies of humans, fish, and test animals. For instance, blood tests of 3M workers conducted in 1978 found elevated organic fluorine levels "proportional to the length of time that had been spent by employees in the production areas." The same study found that "laboratory workers, with former exposure, but none for 15-20 years, had elevated [organic fluorine levels] above literature normals." A 1979 3M study of fish caught by the

9

Wheeler Dam (26 miles downstream from the 3M plant) showed that the chemicals bioaccumulate in fish.

20.     Defendant 3M has known for at least 35 years that PFAS and related chemicals are toxic. For instance, a 1979 3M study of the effects of fluorochemical compounds on Rhesus monkeys was terminated after 20 days because all of the monkeys, at all dosage levels, died as a result of exposure to the fluorochemicals. It was not until 21 years later, in March 2000, that 3M told the public that a "new study" of the effects of these compounds on Rhesus monkeys is part of the reason 3M pulled one of its consumer products, Scotchgard, off the market. In 1983, a team of 3M toxicologists recommended broad testing regarding the effects of 3M's fluorochemicals on the environment and human beings.

21.     Defendant 3M has known for at least 30 years that its disposal of PFAS and related chemicals through discharge into the Tennessee River and its tributaries and through disposal on its property was unsafe. For instance, a Materials Safety Data Sheet produced by Defendant 3M in 1986 warned that PFOA should be disposed of only through incineration or at specially designed, properly lined landfills for hazardous chemicals, not discharged into rivers and not dumped into the ground.

22.     Defendant 3M has known for at least 14 years that PFAS and related chemicals are not effectively treated by conventional wastewater treatment plant

processes and are discharged to surface waters in the effluent and also accumulate in the sludge from wastewater treatment processes. For example, in 2001, 3M found high concentrations of these chemicals in samples from the Decatur Utilities WWTP effluent and sludge as a result of discharges from 3M. These high concentrations were not disclosed to Decatur Utilities.

23.     Based on information and belief, Defendant Daikin has long been aware of the persistence and toxicity of PFAS and related chemicals, at least as a result of communications with Defendant 3M and other manufacturers and users of these chemicals.

24.     Defendants knew that the Tennessee River downstream of their facilities was the source for domestic water for municipal and individual users. Defendants knew that municipal waters systems downstream of their facilities using Tennessee River water would intake the contamination Defendants released to the River and distribute it to their customers, where their customers would be exposed to the contaminants Defendants released, thereby suffering a battery.   The Defendants knew the contaminated water would be used on the property of the customers of the municipal water systems, contaminating those properties. These harms were known to Defendants in advance of the harms and substantially certain to occur. In particular, Defendants knew that WMEL relied on the Tennessee River for water to distribute to its customers, and that WMEL's distribution of that water

would result in exposure to all who were served by WMEL's intake of water, including the customers of the Water Utilities, thereby resulting in a battery, and contaminate the customers' properties.

25.     EPA and the Alabama Department of Environmental Management ("ADEM") have identified Defendants' facilities as past and continuing sources of PFAS contamination in the Tennessee River in and around Decatur, Alabama, including contamination of surface water, porewater, sediments, and fish. The primary source is the 3M facility, where high levels of PFAS in groundwater continue to discharge into the Tennessee River, in addition to ongoing discharges of contaminated wastewater.

26.     Based on the contamination in the Tennessee River caused by Defendants' discharges, ADEM has placed Wheeler Reservoir from 5 miles upstream of Elk River to the Joe Wheeler Dam on the state's impaired waters list for PFOS contamination impairing swimming and fish & wildlife uses. This includes the area in which WMEL takes water from the Tennessee River to provide to its customers, including the other Water Utilities.

27.     As a result of the contamination in the Tennessee River caused by Defendants' discharges, the Alabama Department of Public Health has issued a fish consumption advisory for portions of Wheeler Reservoir and its tributaries based on contamination of fish with PFOS, including: Baker's Creek embayment at Wheeler

Reservoir (Morgan County), Wheeler Reservoir mid station, main river channel, Tennessee River Mile 296 (Limestone County); Wheeler Reservoir, Tennessee River Miles 303 to 296, area south of the main river channel (Morgan County). The fish consumption advisory includes the area between Wheeler Dam and River Mile 296 where WMEL takes water from the Tennessee River to provide to its customers, including the other Water Utilities.

28.     Concentrations of PFOA as high as 4,980 ppb and PFOS as high as 3,890 ppb have been found in groundwater on the 3M site along the south bank of the Tennessee River. Porewater from the bottom of the riverbed near the 3M facility, which is groundwater discharging into the river, showed average concentrations of PFOA from 0.0977 to 70.4 ppb.

29.     Sediment concentrations in the river have been found as high as an average of 24.1 ppb PFOA, and surface water concentrations as high as an average of 0.420 ppb PFOA at one monitoring site. PFOS concentrations for single samples collected in the lower, middle and upper reaches of the confluence area where Bakers Creek flows into the Tennessee River were 0.450, 0.691 and 0.0237 ppb, respectively. Sediment contamination resulting from past discharges by Defendants represents a continuing source of contamination of surface water in the Tennessee River.

30.     PFOS was detected in every fish specimen collected in the Tennessee

River and Bakers Creek near the 3M plant in the November 2012 sampling event. The median filet tissue PFOS concentrations ranged from 25.7 ppb in Reach 03 (backwater area at RM 307.5), upstream of the plant, to 435 ppb in Reach 05 (Mouth of Bakers Creek). Concentrations as high as 103 ppb were found in bass below the Joe Wheeler Dam, nearly 40 miles downstream of the plant at Shoal Creek. Median catfish filet tissue PFOS concentrations ranged from 1.50 ppb in Reach 01 (RM 320) to 283 ppb in Reach 05 (Mouth of Bakers Creek). PFOA was detected at up to 6.06 ppb in fish in Bakers Creek cove and up to 4.01 ppb down river at Mallard Creek.

31.     The source for the water the Water Utilities supply to their customers is an intake in the Tennessee River (Wheeler Reservoir) approximately 13 miles downstream of Defendants' manufacturing facilities.  Representative Plaintiffs and Members of the proposed Class receive their domestic water supplies from WMEL and the other Water Utilities.

32.     As a direct and proximate result of Defendants' past and continuing discharges into the Tennessee River from their manufacturing facilities and waste disposal operations upstream from the water intake for WMEL, the water supplied by the Water Utilities to Representative Plaintiffs and other Members of the proposed Class has been and continues to be contaminated with PFAS and related chemicals.

33.     3M sampled Decatur area public water supplies for PFOA in 2005-

2006. PFOA was detected in all of the finished water samples from WMEL's Water Treatment Plant with concentrations ranging from 0.0442 to 0.155 ppb.

34.     Multiple tests of WMEL water since 2009 have shown levels of PFAS that exceed the May 2016 EPA Health Advisories. For example, in 2013, the level of PFOA in WMEL's water was 0.1 ppb, the level of PFOS in WMEL's water was 0.15 ppb, and the combined level of these chemicals was 0.25 ppb, more than three times the EPA's Health Advisories. In 2014, the level of PFOA in WMEL's water was 0.1 ppb, the level of PFOS in WMEL's water was 0.13 ppb, and the combined level of these chemicals was 0.23 ppb, more than three times the EPA's Health Advisories. In 2015, the level of PFOA in WMEL's water was 0.087 ppb, the level of PFOS in WMEL water was 0.099 ppb, and the combined level of these chemicals was 0.187 ppb, more than twice the EPA's Health Advisories.

35.     In August of 2009, WMEL contacted 3M officials concerning the presence of PFAS in the water supply. WMEL inquired about EPA's recently published provisional drinking water health advisories for PFAS, levels found in the Tennessee River, and levels found in water at WMEL. Despite access to confidential studies and first-hand experience with the toxicity of PFOS and PFOA, 3M mislead WMEL to believe that the levels of pollution are safe and pose no threat to the users of the water. Contrary to the representations by 3M to WMEL, 3M knew the provisional drinking water health advisories were inadequate to protect the Plaintiffs

and that the PFAS levels in WMEL's water supply are dangerously high.

36.     In a meeting with officials from ADEM, EPA, and the federal Agency for Toxic Substances and Disease Registry ("ATSDR") during the week of October 5, 2015, WMEL's representatives were notified that the EPA provisional drinking water health advisories for PFAS were going to be reduced substantially, with an immediate goal of reducing the drinking water limits for PFAS, and to ultimately achieve a "non-detect" standard. The information provided by ADEM contradicted 3M's public statements and previous statements to WMEL that PFAS levels in WMEL's water supply are safe. WMEL was informed by government representatives purporting to speak for the Defendants that immediate actions would be taken to address the PFAS contamination of the Tennessee River at WMEL's water intake.  Thus far, only marginal actions have been taken by the Defendants to eliminate their discharges into the river.

37.     In announcing the May 2016 Health Advisories, EPA's Deputy Assistant Administrator for the Office of Water stated that Utilities of public drinking water, including WMEL, should "promptly notify consumers" if PFAS are found in drinking water systems above the levels of the May 2016 EPA Health Advisories. The Deputy Assistant Administrator also stated that "public notification is especially important for pregnant or nursing women because of the impact these chemicals can have on the development of fetuses and breastfed or formula-fed

infants." Accordingly, WMEL notified its consumers of the contamination of its and their drinking water far in excess of the May 2016 EPA Health Advisories.

38.     The levels of PFAS in the Water Utilities' water supply, and in the water they have supplied to their customers, are harmful to water users.  In 2010, the ATSDR analyzed blood serum of 121 customers of WMEL for PFAS and found an association between elevated levels of PFAS and related chemicals in their blood serum and the use of drinking water from WMEL. The ATSDR reported this association in an Exposure Investigation Report.

39.     Representative Plaintiffs and other Members of the proposed Class, including the water users of WMEL tested in 2010, were exposed to Defendants' PFAS and related chemicals in their drinking water, which caused their elevated blood serum levels. They continue to be exposed to elevated levels of Defendants' PFAS and related chemicals in their drinking water.

40.     The PFAS in the blood serum in Members of the proposed Class are indicative of the long-term physiologic changes that PFAS cause in the human body and increase the risk to Members of the proposed Class of many of the health effects reported in recent studies including cancer, immunotoxicity, thyroid disease, ulcerative colitis, and high cholesterol.

41.     As a result of their past and ongoing exposure to drinking water containing PFAS and related chemicals from Defendants' manufacturing processes,

Representative Plaintiffs and Members of the proposed Class have sustained present damages, including, but not limited to, battery and property related damages and the need for reasonably future expenses in the form of diagnostic testing. Continued exposure to contaminated drinking water caused by the Defendants' pollution will only make their damages worse.

42.    As a result of their past and ongoing exposure to drinking water containing harmful levels of PFAS and related chemicals from Defendants' manufacturing processes, Representative Plaintiffs and Members of the proposed Class who own residential real property have incurred, and will incur in the future, (a) losses for the purchase of water filters and/or bottled water, and other damages arising from the contamination of the Tennessee River water utilized by the Water Utilities for their customers, (b) damage to their interests in real property, including diminution in value and/or loss of rental value, (c) the need for mitigation and remediation of Defendants' contamination, (d) annoyance, inconvenience and interference and loss of use and enjoyment of their property, and (e) battery and continuing trespass.

## CLASS ACTION ALLEGATIONS

43.    Plaintiffs incorporate all prior paragraphs as if restated herein.

44.    This action on behalf of Representative Plaintiffs and all others similarly situated has been brought and may be properly maintained pursuant to the

provisions of Rule 23 of the Federal Rules of Civil Procedure.

45.     Representative Plaintiffs and Members of the proposed Class are residents of Alabama who have been damaged through contamination of their drinking water and residential properties.

46.     The Class proposed by the Representative Plaintiffs and those they represent is as follows:

> **All owners and occupants of residential property served by water provided by the West Morgan-East Lawrence Water and Sewer Authority, the V.A.W. Water System, the Falkville Water Works, the Trinity Water Works, the Town Creek Water System, and the West Lawrence Water Cooperative.**
>
> **Subclass A (Residential Property Owners - Property Damage):**
>
> **All owners of residential property served by water provided by the West Morgan-East Lawrence Water and Sewer Authority, the V.A.W. Water System, the Falkville Water Works, the Trinity Water Works, the Town Creek Water System, and the West Lawrence Water Cooperative.**
>
> **Subclass B (Residential Property Owners – Battery)**
>
> **All owners of residential property served by water provided by the West Morgan-East Lawrence Water and Sewer Authority, the V.A.W. Water System, the Falkville Water Works, the Trinity Water Works, the Town Creek Water System, and the West Lawrence Water Cooperative who have occupied the property for a cumulative time period of one year or more.**
>
> **Subclass C (Residential Property Non-Owner Occupants – Battery)**
>
> **All non-owner occupants of residential property served by water provided by the West Morgan-East Lawrence Water and Sewer**

19

**Authority, the V.A.W. Water System, the Falkville Water Works, the Trinity Water Works, the Town Creek Water System, and the West Lawrence Water Cooperative who have occupied the property for a cumulative time period of one year or more.**

47.     Excluded from the Class are:

a)     Employees of Defendants and any entities in which Defendants have a controlling interest;

b)     Any of the legal representatives, heirs, successors, or assigns of Defendants;

c)     The Judge to whom this case is assigned and any Member of the Judge's immediate family and any other judicial officer assigned to this case;

d)     All persons or entities that properly execute and timely file a request for exclusion from the Class;

e)     Any attorneys representing the Representative Plaintiffs or Members of the proposed Class.

48.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

49.     Numerosity: The Members of the Class are so numerous that separate joinder of each Member is impractical, within the meaning of Rule 23(a)(1). Although the exact number of Class Members will be better established after Class notification, upon information and belief, the number of Members in the Class probably exceeds 25,000 people. Putative Class Members are readily identifiable

through records of the Water Utilities and through property records and may be given any required notices by regular mail, supplemented, if necessary and required by the Court, by published notice.

50.     Common Questions of Law and Fact: There are numerous questions of law and fact common to the Class, as required by Rule 23(a)(2), including:

a)     The factual history of the use, development, and distribution of PFAS and related chemicals manufactured and used by the Defendants at their Decatur, Alabama, facilities;

b)     When the Defendants knew of the harmful effects of PFAS and related chemicals;

c)     Whether the Defendants failed to disclose the harmful effects of PFAS and related chemicals being released from their plants in Decatur, Alabama;

d)     The extent of the contamination at the Defendants' plant sites in Decatur, Alabama, and the migration of that contamination into the Tennessee River;

e)     Whether the water supplied to Representative Plaintiffs and Class Members has been and continues to be contaminated with PFAS and related chemicals;

f)     Whether Defendants invaded Representative Plaintiffs' and Class Members' property with knowledge of the violation of the rights in their property;

g)     Whether the Defendants' conduct constitutes battery, wantonness,

negligence, trespass, and a nuisance;

h)      Whether the Plaintiffs and proposed class have been damaged in their property and suffered a loss of value of property due to the Defendants' conduct;

i)      The necessary remedial actions to clean Defendants' chemicals from the Representative Plaintiffs' and Class Members' water supplies and property; and

j)      The appropriateness of injunctive relief to prevent Defendants' chemicals from invading the Representative Plaintiffs' and Class Members' water supplies and properties.

51.      The questions of law and fact common to Members of the Class predominate over any questions affecting only individual Members, and thus a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

52.      Typicality: The claims of the Representative Plaintiffs are typical of the claims to be advanced by Members of the Class, and their claims encompass those of the other Class Members they seek to represent, as required by Rule 23(a)(3). The claims are typical because the facts and circumstances giving rise to liability are the same, the claims are based on the same legal theories, and the damages suffered by the Representative Plaintiffs are the same kinds of damages suffered by the Members of the Class.

53.      Adequacy of Representation: The Representative Plaintiffs can fairly

and adequately protect and represent the interests of each Member of the Class as required by Rule 23(a)(4). The Representative Plaintiffs will fairly and adequately protect and represent the interests of the Members of the Class based on the following facts and circumstances: their interests do not conflict; their interests are co-extensive with common rights of recovery based on the same essential facts and legal theories; they are Members of the same communities; they are similarly damaged and are seeking the same remedies; and they intend to prosecute this action vigorously. Plaintiffs have retained counsel competent and experienced in complex class action and toxic tort litigation.

54.     The prosecution of separate actions by individual Members of the Class would create a risk of (a) inconsistent or varying adjudications with respect to individual Members of the Class which would establish incompatible standards of conduct for the Defendants and/or (b) adjudications with respect to individual Members of the Class which would as a practical matter be dispositive of the Members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

55.     The Defendants have acted on grounds generally applicable to all Members of the proposed Class, making final declaratory and injunctive relief concerning the Class as a whole appropriate within the meaning of Rule 23(b)(2).

56.     Common questions of fact and law among the Representative

Plaintiffs and Members of the Class predominate over questions affecting only individual Class Members, within the meaning of Rule 23(b)(3). Some of the common issues are set forth in Paragraph 50 above.

57.     Additionally, Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy. Certification under Rule 23(b)(3) would be proper in that, among other things: there is no interest by Members of the Class in individually controlling the prosecution of separate actions; the expense of prosecuting individual claims for the matters for which Class certification is sought would be prohibitive in light of the typical claimant's injuries; neither the Plaintiffs nor Members of the proposed Class have filed or are parties to any litigation in which the legal and factual issues raised herein are to be adjudicated; and it is desirable to concentrate the litigation of claims in a single proceeding so as to avoid unnecessary and expensive duplication of actions and to provide for judicial economy. Whatever difficulties may exist in the management of a Class action will be greatly outweighed by its benefits.

58.     Class action treatment is preferable to other available methods in providing a fair and efficient method for the adjudication of the controversy described herein, which has affected a large number of persons. The Class action provides an effective method whereby the enforcement of the rights of the Plaintiffs can be fairly managed without unnecessary expense or duplication.

## COUNT ONE – NEGLIGENCE
## (ALL CLASS MEMBERS)

59.     Plaintiffs incorporate all prior paragraphs as if restated herein.

60.     Defendants owe and owed a duty to Plaintiffs to exercise due and reasonable care in their manufacturing, use, and disposal operations to prevent the discharge of toxic chemicals, including PFAS and related chemicals, into the water supply and onto the properties of Plaintiffs.

61.     Defendants breached these duties owed to Plaintiffs, and under the circumstances, Defendants' breaches constitute negligent, willful and/or reckless conduct.

62.     As a direct, proximate and foreseeable result of Defendants' conduct, practices, actions, and inactions, Representative Plaintiffs and Members of the proposed Class who are owners and occupants of residential real property have been caused to suffer, and will continue to suffer, (a) losses for the purchase of water filters and/or bottled water, and other damages arising from the contamination of the Tennessee River water utilized by the Water Utilities for their customers, (b) damage to their interests in real property, including diminution in value and/or loss of rental value, (c) the need for mitigation and remediation of Defendants' contamination, (d) annoyance, inconvenience and interference and loss of use and enjoyment of their property, and (e) battery and continuing trespass.

63.     As a direct, proximate and foreseeable result of Defendants' conduct,

practices, actions, and inactions, Representative Plaintiffs and Members of the proposed Class have been caused to suffer, and will continue to suffer, damage from the battery occasioned by their exposure to Defendants' toxic PFAS and other chemicals in the form of the cost of diagnostic testing to determine the harm from their exposure. In addition to those economic losses, the Representative Plaintiffs and members of the Proposed Class claim damages for mental anguish based on the willful and/or reckless conduct of the Defendants.

64.     Therefore, the Representative Plaintiffs and members of the proposed Class claim money damages in an amount that will fairly and reasonably compensate them for the harm caused by the Defendants.

## COUNT TWO – PUBLIC NUISANCE
## (ALL CLASS MEMBERS)

65.     Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

66.     Representative Plaintiffs and Members of the proposed Class are owners or occupants of property served by the Water Utilities.

67.     Under Alabama Law, a nuisance "is anything that works hurt, inconvenience, or damage to another." Ala. Code § 6-5-120 (1975). "A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." Ala. Code § 6-5-121 (1975). "If a public nuisance causes a special damage to an individual in which the public does not participate, such special damage gives a right of action." Ala. Code §

26

6-5-123 (1975).

68.     Defendants have created a nuisance by their discharge of PFAS and related chemicals into the Tennessee River, which has caused and continues to cause contamination of the Water Utilities' water supply.

69.     The levels of toxic chemical contamination found in the Water Utilities' water supply, directly caused by the Defendants' pollution, have created a condition that threatens the health and well-being of the Representative Plaintiffs and members of the proposed Class, and these Plaintiffs' ingestion of PFAS and related toxic chemicals, causes concern, inconvenience and hurt to the Representative Plaintiffs and members of the proposed Class, as it would to any other reasonable person.  It was reasonably foreseeable, and in fact known to the Defendants, that their actions would cause interference with the property rights of Representative Plaintiffs and Class Members and would place, and have placed, the Representative Plaintiffs and Members of the proposed Class at increased risk of physical harm. The nuisance has caused, and will continue to cause, mental anguish to Representative Plaintiffs and Members of the proposed Class until it is satisfactorily abated.

70.     The Plaintiffs have suffered special damages from the Defendants' discharge of toxic chemicals into the Tennessee River, because the Representative Plaintiffs and Members of the proposed Class consume and have consumed this

contaminated drinking water, constituting battery, and the contaminated water has invaded their residences, and continues to invade them, altering and damaging their property. These damages are different in kind and degree from the damages suffered by the public in general.

71.     The Defendants' nuisance is continuing, because Defendants' discharges and releases of PFAS and related chemicals into the Tennessee River are continuing. In addition, the past discharges of PFAS and related chemicals have caused contamination of sediments in the river, which provide a continuing source of contamination of the water.

72.     Therefore, the Representative Plaintiffs and members of the proposed Class claim money damages in an amount that will fairly and reasonably compensate them for the harm caused by the Defendants, including for (a) losses for the purchase of water filters and/or bottled water, and other damages arising from the contamination of the Tennessee River water utilized by the Water Utilities for their customers, (b) damage to their interests in real property, including diminution in value and/or loss of rental value, (c) the need for mitigation and remediation of Defendants' contamination, (d) annoyance, inconvenience and interference and loss of use and enjoyment of their property, and (e) battery and continuing trespass.  In addition, the Plaintiffs claim damages for mental anguish in an amount to be determined by the jury that are fair and reasonable in consideration of the nature,

severity, and length of time of the nuisance caused by the Defendants.

## COUNT THREE – ABATEMENT OF NUISANCE
## (ALL CLASS MEMBERS)

73.     Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

74.     Plaintiffs have the right to bring an action to abate the nuisance caused by Defendants' discharge of PFAS and related chemicals into the Tennessee River, which has caused and continues to cause contamination of the water supplies of the Water Utilities, because their injury is different in kind and degree from the injury suffered by the public at large.

75.     In addition to their claims for damages, Plaintiffs are entitled to an injunction to abate the nuisance created and maintained by Defendants. The Court should issue an injunction requiring Defendants to remove their chemicals and toxins from the water supplies of Plaintiffs and to prevent these chemicals and toxins from continuing to contaminate Plaintiffs' water supplies and properties, based on the continuing irreparable injury to Plaintiffs posed by the continuing nuisance and damage to Plaintiffs' property interests, for which there is no adequate remedy at law.

## COUNT FOUR – BATTERY
## (SUBCLASSES B AND C)

76.     Plaintiffs re-allege all prior paragraphs as if set forth fully herein.

77.     The Defendants touched or contacted the Representative Plaintiffs and

Members of Subclasses B and C of the proposed Class through their release of PFAS and related toxic chemicals into the Plaintiffs' water supply.

78.    The Defendants knew or should have known that their intentional release of PFAS and other toxic chemicals into the Plaintiffs' water supply would touch or contact the Plaintiff Class.  This touching or contact of the Representative Plaintiffs and Members of the proposed Class by Defendants was and is harmful and offensive.

79.    The intentional acts of the Defendants were substantially certain to result in such harmful or offensive contact.  The Defendants knew that fact.

80.    The Defendants' battery is continuing, because Defendants' discharges and releases of PFAS and related chemicals into the Plaintiffs' water supply are continuing.

81.    As a result of the Defendants' battery, the Plaintiffs have been and continue to be damaged.

82.    Therefore, the Representative Plaintiffs and members of the proposed Class claim money damages in an amount that will fairly and reasonably compensate them for the economic harm caused by the Defendants' battery, including the cost of diagnostic testing to determine the harm from their exposure. In addition, the Plaintiffs claim damages for mental anguish in an amount to be determined by the jury that are fair and reasonable in consideration of the nature, severity and length of time of the battery caused by the Defendants.

## COUNT FIVE – TRESPASS
## (SUBCLASS A – PROPERTY OWNERS)

83.    Plaintiffs incorporate all prior paragraphs as if restated herein.

84.    Defendants' manufacturing, use, and disposal operations have discharged PFAS and related chemicals into the water supply and onto the properties of Plaintiffs and Class Members without their permission, constituting an invasion by foreign substance.   These acts by the Defendants were intentional, and the Defendants knew or should have known that the acts would produce the trespass, *i.e.*, the invasion by foreign substance.

85.    Defendants' manufacturing, use, and disposal operations have physically intruded onto the property of Representative Plaintiffs and Class members and physically altered the physical aspects of Plaintiffs' and Class members' properties.   This physical alteration is substantial damage.

86.    As a direct, proximate and foreseeable result of Defendants' conduct, practices, actions, and inactions causing a trespass, Representative Plaintiffs and Members of the proposed Class who are owners of residential real property have been caused to suffer, and will continue to suffer, damage to their interests in real property including, (a) losses for the purchase of water filters and/or bottled water, and other damages arising from the contamination of the Tennessee River water utilized by the Water Utilities for their customers, (b) damage to their interests in real property, including diminution in value and/or loss of rental value, (c) the need

for mitigation and remediation of Defendants' contamination, (d) annoyance, inconvenience and interference and loss of use and enjoyment of their property. In addition, the Plaintiffs claim damages for mental anguish in an amount to be determined by the jury that are fair and reasonable in consideration of the nature, severity, and length of time of the trespass caused by the Defendants.

## COUNT SIX – WANTONNESS AND PUNITIVE DAMAGES
### (ALL CLASS MEMBERS)

87.     Plaintiffs incorporate all prior paragraphs as if restated herein.

88.     Defendants owe a duty to Plaintiffs to exercise due and reasonable care in their manufacturing, use, and disposal operations to prevent the discharge of toxic chemicals, including PFAS and related chemicals into the water supply and onto the property of Plaintiffs.

89.     In breaching the duties and performing the other tortious acts and inaction described above, Defendants acted in a wanton, willful, and reckless manner.

90.     Defendants knew or should have known the danger to Plaintiffs created by Defendants' conduct, practices, actions, and inactions.

91.     Defendants knew of should have known of the likely impact, harm, damage, and injury their conduct would have on the Plaintiffs.

92.     Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard for Plaintiffs' property and the health of Representative Plaintiffs

and Members of the proposed Class.

93.    In addition to compensatory damages, Defendants should also be liable for punitive damages as a result of Defendants' wantonness in an amount determined by the character and degree of Defendants' wrongful conduct, and the necessity to prevent the same or similar wrongful conduct by the Defendants and others in the future.

## CLAIM FOR RELIEF

WHEREFORE, Individual and Representative Plaintiffs and Members of the proposed Class respectfully request this Court to grant the following relief:

a)    Award Representative Plaintiffs and Members of the proposed Class compensatory damages to the utmost extent allowed by law, in an amount greater than Five Million Dollars ($5,000,000) sufficient to compensate them for damage from wantonness, negligence, trespass, and nuisance, and including but not limited to diminution in value of real property and/or loss of rental value, the cost of mitigation or remediation of Defendants' contamination, annoyance and interference, loss of use and enjoyment of real property, aggravation and inconvenience, and mental anguish;

b)    Award Representative Plaintiffs and Members of the proposed Class compensatory damages to the utmost extent allowed by law, in an amount greater than Five Million Dollars ($5,000,000) sufficient to compensate them for battery and

reasonably ascertainable future expenditures including reasonably necessary diagnostic testing;

c)      Award Representative Plaintiffs and Members of the proposed Class punitive damages to the utmost extent allowed by law;

d)      Issue an injunction requiring Defendants to remove their chemicals and toxins from the water supplies of Plaintiffs and to prevent these chemicals and toxins from continuing to contaminate Plaintiffs' water supplies, based on the continuing irreparable injury to Plaintiffs posed by the continuing nuisance and damage to Plaintiffs' property interests, for which there is no adequate remedy at law;

e)      Award attorney fees and costs and expenses incurred in connection with the litigation of this matter;

f)      That this case be certified as a Class action pursuant to Rule 23 of the Federal Rules of Civil Procedure; and

g)      Award such other and further relief as this Court may deem just, proper, and equitable.

## JURY TRIAL DEMAND

Plaintiffs demand a trial of this action by a struck jury.

Dated: May 6, 2019.

/s/ Christopher B. Hood
Christopher B. Hood (ASB-2280-S35H)

34

Timothy C. Davis (ASB-6834-D63T)
W. Lewis Garrison, Jr. (ASB-3791-N74W)
HENINGER GARRISON DAVIS
2224 First Avenue North
Birmingham, AL  35203
PH:  205.326.3336
tim@hgdlawfirm.com
lewis@hgdlawfirm.com
chood@hgdlawfirm.com

Kevin S. Hannon
(*pro hac vice*)
THE HANNON LAW FIRM, LLC
1641 Downing Street
Denver CO 80218
PH: 303.861.8800
khannon@hannonlaw.com

Of Counsel:

Carl Allen Cole, III
Ala. Bar No. asb-1309-r75c
The Cole Law Firm, LLC
P.O. Box 2064
Decatur, Alabama 35602-2064
T:  256-353-0550
F:  256-353-0552
carl@carlcolelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered counsel.

/s/ Christopher B. Hood
Christopher B. Hood