# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| TOMMY LINDSEY, LANETTE LINDSEY and LARRY WATKINS, individually, and on behalf of a Class of persons similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 5:15-cv-01750-AKK |
| v. | ) ) | CLASS ACTION JURY DEMAND |
| 3M COMPANY, DYNEON, L.L.C and DAIKIN AMERICA, INC., | ) ) ) | |
| Defendants. | ) | |

---

## PLAINTIFFS' MOTION AND MEMORANDUM
## <u>FOR CLASS CERTIFICATION</u>

---

Timothy C. Davis (ASB-6834-D63T)
W. Lewis Garrison, Jr. (ASB-3791-N74W)
Christopher B. Hood (ASB-2280-S35H)
HENINGER GARRISON DAVIS
2224 First Avenue North
Birmingham, AL 35203
PH: 205.326.3336
tim@hgdlawfirm.com
lewis@hgdlawfirm.com
chood@hgdlawfirm.com

Kevin S. Hannon, *pro hac vice*
THE HANNON LAW FIRM, LLC
1641 Downing Street
Denver, CO 80218
PH: 303.861.8800
khannon@hannonlaw.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

I.      INTRODUCTION .........................................................................................1

II.     STATEMENT OF FACTS ..........................................................................3

    A.    3M Possessed an Early Understanding of the Dangerous Characteristics and Risks of PFCs. .........................................................................................3

    B.    PFAS Chemicals Are Toxic to Humans.................................................6

    C.    3M Covered-Up the Adverse Effects of PFCs.....................................7

    D.    EPA Releases a Drinking Water Health Advisory for PFOA and PFOS. .........................................................................................................10

    E.    3M's Manufacturing Operations in Decatur. .....................................11

    F.    Dyneon's Decatur Operations. ...........................................................14

    G.    Daikin's Decatur Operations. ..............................................................14

    H.    The Impact of PFAS on WMEL and its Customers............................15

    I.    Injuries of the Class Members..............................................................17

III.    DEFINITION OF THE CLASS .................................................................20

IV.     LEGAL STANDARDS FOR CLASS CERTIFICATION ..........................22

    A.    Rule 23(a) Prerequisites .......................................................................22

        1.    Numerosity...............................................................................22
        2.    Commonality............................................................................23
        3.    Typicality .................................................................................24
        4.    Adequacy of Representation ....................................................24

    B.    Classes Under Fed. R. Civ. P. 23(b) ...................................................25

        1.    Rule 23(b)(2).............................................................................25
        2.    Rule 23(b)(3).............................................................................25

            a.    Predominance ...............................................................26

            b.    Superiority Under Rule 23(b)(3) ..................................27

V.      CERTIFICATION IS PROPER HERE.......................................................28

    A.    The Classes Satisfy the Requirements of Rule 23(a).........................28

        1.    Numerosity and Ascertainability .............................................28
        2.    Commonality.............................................................................29
        3.    Typicality .................................................................................31

4.     Adequacy of Representation ......................................................31

B.     The Classes Satisfy the Requirements of Rule 23(b)(3) ....................32

     1.     The Predominance Prong is Satisfied. ......................................32

     2.     Plaintiffs' Claims and the Common Evidence to Prove the Claims Satisfy the Predominance Requirement .......................33

     3.     Common Issues Related to Plaintiffs' Claimed Damages Predominate ...........................................................................38

           a.     Common Issues Predominate as to Plaintiffs' Damages for Battery...........................................................................39

           b.     The Issues Related to Plaintiffs' Claimed Economic Loss Are Common ...............................................................42

           c.     Common Issues Predominate for Other Class Relief.....43

           d.     Common Questions of Law and Fact Predominate and Overwhelm Any Individual Issues. .................................44

     4.     Managing the Claims of Class Members as a Class Action under Fed. R. Civ. P. 23 Is Superior to Other Methods of Case Management.............................................................................44

C.     Plaintiffs' Claims Satisfy the Requirements of Rule 23(b)(2)............46

D.     Class Certification Is Proper Under Fed. R. Civ. P. 23(c)(4) .............48

VI.     CONCLUSION.............................................................................................49

# TABLE OF AUTHORITIES

## Cases

*Acceptance Ins. Co. v. Brown*,
  832 So. 2d 1 (Ala. 2001) .................................................................... 37

*Albert v. Hsu*,
  602 So. 2d 895 (Ala. 1992) ............................................................... 34

*Allapattah Servs. v. Exxon Corp.*,
  333 F.3d 1248 (11th Cir. 2003) ........................................................ 44

*Allison v. Citgo Petroleum Corp.*,
  151 F.3d 402 (5th Cir. 1998) ........................................................... 47

*Am. Pipe & Const. Co. v. Utah*,
  414 U.S. 538 (1974) ......................................................................... 22

*Bielski v. Alfred Saliba Corp.,*
  984 F. Supp. 2d 1170 (M.D. Ala. 2013) ........................................... 39

*Borland v. Sanders Lead Co.*,
  369 So. 2d 523 (Ala. 1979) ............................................................... 34

*Braggs v. Dunn*,
  317 F.R.D. 634 (M.D. Ala. 2016) ..................................................... 23

*Brannan v. Wells Fargo Home Mortg., Inc.* (*In re Brannan*),
  485 B.R. 443 (Bankr. S.D. Ala. 2013) ....................................... 31, 46

*Burdick v. Tonoga, Inc.*,
  2019 N.Y. App. Div. LEXIS 8498 (N.Y. App. Div. 2019) ............. 28

*Cameron v. Peach Cty., GA*,
  2004 U.S. Dist. LEXIS 30974 (M.D. Ga. June 28, 2004) ............... 48

*Coleman v. Cannon Oil Co.*,
  141 F.R.D. 516 (M.D. Ala. 1992) ..................................................... 45

*Cook v. Rockwell Int'l Corp.*,
  273 F. Supp. 2d 1175 (D. Colo. 2003) ....................................... 43, 44

*Cox v. American Cast Iron Pipe Co.*,

    784 F.2d 1546 (11th Cir. 1986) ...................................................... 23

*Deere & Co. v. Grose*,
    586 So. 2d 196 (Ala. 1991) ............................................................ 42

*Evanston Ins. Co. v. The Break I Inc.*, No. 2:18-CV-01197-KOB,
    2019 U.S. Dist. LEXIS 113109 (N.D. Ala. July 9, 2019) ................................ 39

*Ex parte Atmore Community Hosp.*,
    719 So. 2d 1190 (Ala. 1998) .......................................................... 39

*First Mercury Ins. Co. v. Sudderth*,
    620 F. App'x 826 (11th Cir. 2015) .................................................... 39

*Griffin v. Carlin*,
    755 F.2d 1516 (11th Cir. 1985) ...................................................... 25

*Gulf Atl. Life Ins. Co. v. Barnes*,
    405 So. 2d 916 (Ala. 1981) ........................................................... 40

*Holmes v. Continental Can Co.*,
    706 F.2d 1144 (11th Cir. 1983), ..................................................... 48

*In Re Checking Account Overdraft Litg.*,
    281 F.R.D. 667 (S.D. Fla. 2012) ..................................................... 27

*In re Healthsouth Corp. Sec. Litig.*,
    257 F.R.D. 260 (N.D. Ala. 2009) ..................................................... 22

*In re Monumental Life Ins. Co.*,
    365 F.3d 408 (5th Cir. 2004) ........................................................ 47

*In re Tri-State Crematory Litig.*,
    215 F.R.D. 660 (N.D. Ga. 2003) ...................................................... 44

*J.W. v. Birmingham*,
    2012 U.S. Dist. LEXIS 124183 (N.D. Ala. Aug. 31, 2012) .............................. 47

*Karhu v. Vital Pharm., Inc.*,
    621 F. App'x 945 (11th Cir. 2015) .................................................... 23

*Kennedy v. Tallant*,
    710 F.2d 711(11th Cir. 1983) ........................................................ 38

*Kerr v. City of West Palm Beach,*
875 F.2d 1546 (11th Cir.1989) ......................................................... 26

*Kirkpatrick v. J.C. Bradford & Co.,*
827 F.2d 718 (11th Cir. 1987) ......................................................... 38

*Klay v. Humana, Inc.,*
382 F.3d 1241 (11th Cir. 2004) ...................................... 22, 27, 37, 46

*Lehigh Portland Cement Co. v. Donaldson,*
164 So. 97 (Ala. 1935) .................................................................. 43

*Little v. TMobile USA, Inc.,*
691 F.3d 1302 (11th Cir. 2012) ....................................................... 23

*Moore v. Walter Coke, Inc.,*
294 F.R.D. 620 (N.D. Ala. 2013) ............................................... 47-48

*Murray v. Auslander,*
244 F.3d 807 (11th Cir. 2001) ......................................................... 25

*Navelski v. Int'l Paper Co.,*
244 F. Supp. 3d 1275 (N.D. Fla.) ............................................... 27, 28

*Philadelphia v. Am. Oil Co.,*
53 F.R.D. 45 (D.N.J. 1971) .............................................................. 27

*Piazza v. Ebsco Indus., Inc.,*
273 F.3d 1341 (11th Cir. 2001) ....................................................... 24

*Pullom v. Greater Birmingham Transp. Servs., L.L.C.*, No. 2:15-cv-02081-AKK,
2017 U.S. Dist. LEXIS 125652 (N.D. Ala. Aug. 9, 2017) ............... 39

*Quillen v. Am. Tobacco Co.,*
874 F. Supp. 1285 (M.D. Ala. 1995) ......................................... 39-40

*Sanchez-Knutson v. Ford Motor Co.,*
310 F.R.D. 529 (S.D. Fla. 2015) ..................................................... 27

*Thorpe v. Walter Inv. Mgmt., Corp.*, No. 1:14-CV-20880-UU,
2016 U.S. Dist. LEXIS 33637 (S.D. Fla. Mar. 16, 2016) ............... 24

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,*
350 F.3d 1181 (11th Cir. 2003) ................................................ 22, 25

*Webb v. Encompass Ins. Co.*, No. CA 06-0726-C,
　　2007 U.S. Dist. LEXIS 3505 (S.D. Ala. Jan. 12, 2007) ..................................... 43

*W. Morgan-East Lawrence Water & Sewer Auth. v. 3M Co.*,
　　208 F. Supp. 3d 1227 (N.D. Ala. 2016) ................................. 35, 36, 37

*Wilder v. Sigma Nu Fraternity*, No. 7:06-CV-1774-RDP,
　　2009 WL 10688973 (N.D. Ala. Sept. 21, 2009) ............................................. 40

*Williams v. Mohawk Indus., Inc.*,
　　568 F.3d 1350 (11th Cir. 2009) ......................................................................... 24

*Zivojinovich v. Ritz Carlton Hotel Co., LLC*,
　　445 F. Supp. 2d 1337 (M.D. Fla. 2006) .......................................................... 40

**Federal Rules**

Fed. R. Civ. P. 23 ............................................................................ *passim*

**Federal Statutes**

15 U.S.C. § 2607 ................................................................................. 9, 10

**Other**

APJI § 5.00 ............................................................................................ 37

**Restatements**

RESTATEMENT OF TORTS [SECOND], § 19 ............................................. 39

RESTATEMENT OF TORTS [SECOND], § 929 ........................................... 43

**State Statutes**

Ala. Code (1975) § 6-5-123 ................................................................ 35

Ala. Code (1975) § 6-5-160.3 ............................................................ 47

**Treatises**

Newburg on Class Actions § 3 (5th ed. 2012) ................................. 23, 25

## PLAINTIFFS' MOTION AND MEMORANDUM
## FOR CLASS CERTIFICATION

Plaintiffs Tommy and Lanette Lindsey and Larry Watkins, through their counsel, hereby move for certification of their claims against Defendant 3M Company and Dyneon, LLC ("3M" collectively) and Defendant Daikin America, Inc. ("Daikin") under Fed. R. Civ. P. 23. For support, they state and show as follows:

## I.    INTRODUCTION

The Plaintiffs live in North Alabama, in Lawrence County, which is on the Tennessee River. They sue 3M and Daikin for contaminating the drinking water of thousands of Morgan County and Lawrence County residents.

3M has made and used perfluorinated compounds ("PFCs"), since the 1950s. PFCs include perfluorooctanoic acid ("PFOA"), perfluorooctanesulfonic acid ("PFOS"), pentafluorobenzoic acid ("PFBA"), and perfluorobutanesulfonic acid ("PFBS"). These compounds are part of the polyfluoroalkyl substances ("PFAS") family of chemicals. 3M has used these chemicals in many of its product lines, including its popular Scotchguard™ products and in its LightWater aqueous firefighting foam products.

Since at least the 1960s, 3M has understood that these PFCs are stable and not only persist in the environment, but also bioaccumulate in humans and animals. These PFCs have been shown to have significant adverse effects to humans,

1

including developmental effects, liver toxicity, kidney toxicity, immune effects, and cancer. Human epidemiology studies report associations between PFCs and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and cancer (testicular and kidney).

Despite its early and long-held understanding of PFAS effects, 3M affirmatively acted to suppress and delay public knowledge and scientific understanding of these chemicals, by, among other things, using its legal team to suppress information related to its PFCs, using leaders in the scientific community to suppress papers with information contrary to 3M's position, and deliberately failing to provide the EPA and other regulatory agencies with reports and studies delineating the harmful characteristics of the PFCs. Commenting on 3M's malfeasance, Richard Purdy, a former environmental specialist for 3M, wrote in 1999 that "[f]or 20 years [3M] has been stalling the collection of data needed for evaluating the environmental impact of fluorochemicals. PFOS is the most onerous pollutant since PCB and you want to avoid collecting data that indicates that it is probably worse. I am outrage[d]."

3M, through its Decatur operation, and alongside co-defendants Daikin and Dyneon, dumped PFCs directly into the Tennessee River. From there, these toxic

chemicals traveled downstream from the Defendants' facilities to the water intake of the West Morgan - East Lawrence Water and Sewer Authority ("WMEL"), where the toxic chemicals were delivered to the class members through the class members' drinking water. Much like it suppressed information regarding the harmful nature of the PFCs, 3M withheld information from WMEL and the general public relevant to the dangers of PFCs.

In 2016, the EPA released a Drinking Water Health Advisory for PFOA and for PFOS, detailing the numerous adverse effects of these chemicals. In response, WMEL sent a notice to its direct customers that they should avoid drinking or using their water. As a result of the Defendants' contamination of the source of WMEL's water supply, class members were overcharged for contaminated water, forced to purchase more expensive bottled water, suffered battery, and experienced the frustration and distress of knowing they were exposed to dangerous chemicals, lost the use and enjoyment of their property, and were harmed in other ways.

## II.     STATEMENT OF FACTS

### A.     3M Possessed an Early Understanding of the Dangerous Characteristics and Risks of PFCs.

3M knew from the scientific literature and its own studies that ("PFCs")[1] were

---

[1]     Including chemicals in the PFAS family (polyfluoroalkyl substances) such as PFOA, PFOS, PFBA and PFBS.

potentially toxic to humans and the environment. 3M's own toxicity research began in 1950 and confirmed the toxic risks posed by PFCs. Throughout the 1950s, 3M's own animal studies consistently concluded that PFCs are "toxic."[2] A study published in 1961, also found that PFCs induced a range of toxic effects, including anesthesia, depression, inhibition of enzymes, metabolic effects, and effects on blood pressure and the sympathetic nervous system.[3] Additional studies undertaken by 3M in the 1970s demonstrated that PFCs were even "more toxic than was previously believed."[4] After reviewing 3M's studies on the environmental toxicity of PFCs, 3M scientists concluded in 1983 that concerns about PFCs "give rise to legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."[5]

Since the mid-1950s 3M also knew that PFCs accumulate in humans and animals. In 1956, a study at Stanford University used PFCs manufactured by 3M to

---

[2]     *See*, *e.g.*, January 10, 1950 3M Study (3MA02497530, at -7530) (Ex. 1) (acute toxicity study of PFBA in mice); 1954 3M Studies (3MA01828941, at -8941-42) (Ex. 2) (studies on toxic effects of PFOS in rats and PFOA in mice).

[3]     *See* Saunders, *The Physiological Action of Organic Compounds Containing Fluorine*, Advances in Fluorine Chemistry, at 183 (1961) (Ex. 3).

[4]     April 12, 1978, Meeting Minutes—Fluorochemicals Technical Review Committee (3MA10066974, at -6975) (Ex. 4) (emphasis added); *see also* March 20, 1979 Review of Final Reports and Summary (3MA00593073, at -3073) (Ex. 5) (PFOS "certainly more toxic than anticipated").

[5]     May 20, 1983 Fate of Fluorochemicals – Phase II, 3MA10052935, at -2945) (Ex. 6).

conclude that PFCs bind to proteins in human blood.[6] 3M's own studies in the 1970s confirmed the accumulation of PFCs in living organisms and the extent to which the accumulation occurred.[7] A 1978 study by 3M on PFOS and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."[8] Tests of the blood serum of 3M's employees confirmed that PFCs bioaccumulate in humans.[9]

PFCs, such as the PFAS family of chemicals at issue here, not only bioaccumulate in living organisms, they are also adsorbed into the soil. When household water containing PFAS is applied to soils of class properties for irrigation or through other use, a significant portion of the PFAS adsorbs to soil particles.[10] Adsorption continues as additional PFAS containing water comes in contact with soils on properties through continuing household water use.[11] A fraction of PFAS

---

[6]    *See* Nordby et al., *Perfluorooctanoic Acid Interactions with Human Serum Albumin*, J. BIOL. CHEM., at 399 (1956) (Ex. 7).

[7]    *See* August 16, 1978 3M Technical Summary (3MA00326803, at -6820) (Ex. 8); May 22, 1979 3M Technical Report Summary (3MA01409559, at -9559) (Ex. 9), 1978 3M Central Analytical Laboratory Report (3M_MN02343997, at -4000, -4001) (Ex. 10). 3M also understood as early as the early 1960s that PFCs are stable and persist in the environment and that they do not degrade. *See*, *e.g.*, 3M Brand Fluorochemical Surfactants, June 15, 1963 (3MA01201629, at -1635) (Ex. 11) (listing chemical, thermal, and biological stability as "[t]he main features which distinguish these materials"); U.S. Patent No. 2,519,983, August 22, 1950, at 4:33-39 (Ex. 12).

[8]    *See* July 19, 1978 3M Technical Report Summary (3MA10054929, at -4930 (Ex. 13).

[9]    *See* October 19, 1977 3M Interoffice Correspondence (3M_MN00000479, at -0481) (Ex. 14).

[10]   Report of Russel Detwiler at 3, 4, 5 (Ex. 15).

[11]   *Id*. at 3-4.

5

sorbed onto soils will remain persistently adsorbed to soils even after soils are treated with PFAS free water.[12] PFAS chemicals in household water used for irrigation will also be taken up by plants.[13] The mechanism of sorption of soil and plant uptake of PFAS applies to all properties in the class area.[14]

**B.      PFAS Chemicals Are Toxic to Humans.**

As noted, *supra*, PFAS chemicals, including PFOA and PFOS, are known toxic chemicals.[15] PFAS, such as PFBS, which continue to be delivered through WMEL to members of the purported class are also toxic.[16] One route of human exposure to PFAS is through ingestion of contaminated water.[17] Once inside the body, PFAS (including PFOA, PFOS, and PFBS) passes thorough the epithelial layers, primarily the gut, and enters the blood stream where it is distributed to all organ systems.[18] This path of entry of PFAS into the human body exists for all individuals.[19] There is no evidence of substantial metabolism of PFAS in the human

---

[12]     *Id*. at 4-5.
[13]     *Id*. at ¶ 5.
[14]     *Id*. at ¶ 6.
[15]     *See supra* at Section II.A.
[16]     https://www.epa.gov/sites/production/files/2018-11/documents/pfbs_public_comment_draft_toxicity_assessment_nov2018-508.pdf, last accessed November 17, 2019.
[17]     Report of Barry Ryan at 1-2 (Ex. 16).
[18]     *Id*. at 2.
[19]     *Id*. at 2, 4.

body.[20]   Target organs include kidney, blood and testicles.[21]   PFAS are also transferred to newborns through their mother's breast milk.[22]

Studies show that PFAS, such as PFOA and PFOS, have a half-life in the human body ranging from 2-7 or more years, with residence time continuing as exposure continues.[23]   Once in the body, PFAS chemicals alter the body so that even after excretion, the harm of exposure remains.[24]   Every person who has consumed household water contaminated with PFOA, PFOS, or other PFAS from the WMEL system has undergone this contact and the resulting harm of exposure.[25]

## C.     3M Covered-Up the Adverse Effects of PFCs.

3M actively concealed from State and federal government regulators, the scientific community, and the general public the significant risks posed by PFCs, including PFAS.  3M understood by the mid-1970s that PFCs accumulate in people's blood.[26]  3M also possessed evidence of the risks that PFCs posed to humans and the environment from the internal studies that it conducted.[27]  Despite 3M's knowledge

---

[20]     *Id*. at 2.
[21]     *Id*. at 2-3.
[22]     *Id*. at 3.
[23]     *Id*. at 5.
[24]     *Id*.
[25]     *Id*. at 5-6.
[26]     *See*, *e.g.*, August 26, 1977 3M Chronology – Fluorochemicals in Blood (3MA10035028, at -5028) (Ex. 17).
[27]     *See supra* at Section II.A.

of these significant risks for several decades, 3M employed a wide variety of tactics to suppress information about the considerable risks associated with PFCs.

3M knew, as early as 1977, that PFCs not only posed a risk to humans, but that these toxic chemicals were present in the blood of people throughout the United States.[28]  Rather than share this shocking development with the scientific community, 3M chose to bury this information, with its lawyers instructing its scientists  to perpetuate this conspiracy of silence to protect the business interests of 3M.[29]

Sadly, albeit predictably, 3M's efforts to conceal the harmful effects of PFCs did not end there.  Desperate to control the narrative about the dangers of PFCs, 3M actively sought to buy influence from those in the scientific community who were publishing articles about the chemicals.  One such 3M pawn was Professor John Giesy who worked on behalf of 3M to "buy favors" from scientists in the field and, in his role as editor of various journals, conspired with 3M to suppress the truth about the harmful effects of PFCs.[30]  Giesy would review "about half" of the papers in the area of PFC research,[31] routinely forward confidential manuscripts on PFCs to 3M,[32]

---

[28]    3M Timeline (3MA10039277, at -9277) (Ex. 18).
[29]    *Id.*
[30]    *See* Cost Benefit Analyses (3MA02513752, at -3758) (Ex. 19).
[31]    *See* March 26, 2008 Email from Giesy to 3M Employee (3M_MN00110700, at -0700) (Ex. 20).
[32]    *See*, *e.g.*, December 11, 2006 Email from John Giesy to 3M Employees (3MA01461356,

8

reject the publication of articles that contained negative information on PFCs,[33] and strive to ensure that there was no "paper trail" between himself and 3M.[34] Giesy has stated that his goal was to "keep bad papers [regarding PFCs] out of the literature", because negative scientific journal articles would be difficult to refute in "litigation situations."[35]

3M also systematically hid adverse information about PFAS from the EPA and other regulatory agencies. Under federal law, chemical manufacturers are required to immediately notify the EPA of information that reasonably supports the conclusion that one of their products presents a substantial risk of injury to human health or the environment.[36] In March 1999, a 3M scientist and whistleblower, Dr. Richard Purdy, became so concerned with 3M's failure to inform EPA—as required under the Toxic Substances Control Act (the "TSCA")—about the environmental risks of PFCs that he copied the EPA on his resignation letter from 3M.[37] Dr. Purdy has described PFAS chemicals as being "probably one of the most insidious

at -1356) (Ex. 21).

[33]     *See* July 19, 2007 Email from John Giesy to 3M Employees (3MA02516746, at -6746) (Ex. 22).

[34]     *Id*. ("In time sheets, I always listed these reviews as literature searches so that there was no paper trail to 3M.").

[35]     *See*  March 25, 2008 Email from Giesy to 3M Employee (3M_MN05334328, at -4329) (Ex. 23).

[36]     *See* 15 U.S.C. § 2607(e) (hereinafter, "TSCA § 8(e)").

[37]     March 28, 1999 Resignation Letter (3MA00480715, at -0715-16) (Ex. 24).

pollutants, and maybe the most insidious pollutant man has ever made."[38]  In his Resignation Letter, Dr. Purdy explained that he was resigning due to his profound disappointment in 3M's handling of the environmental risks associated with the manufacture and use of perfluorinated sulfonates (PFOS).[39]  As Dr. Purdy explained, "For me it is unethical to be concerned with markets, legal defensibility and image over environmental safety."[40]  Ultimately, 3M's repeated failure to fulfill its § 8(e) requirements resulted in the EPA assessing $1.5 million in penalties against 3M for 244 separate TSCA § 8(e) violations.[41]

While 3M's profits continued to soar, reaping billions of dollars from the manufacture and sale of PFCs, 3M kept the scientific community—and government regulators—in the dark for an astounding two decades before this public health crisis was fully revealed thanks in no small part to Dr. Purdy's exposure of 3M to the EPA. Very clearly, 3M put corporate profits over human safety.

### D.    EPA Releases a Drinking Water Health Advisory for PFOA and PFOS.

---

[38]    Depo Tr. of Dr. Rich Purdy at 195:22-196:3 (Ex. 25)
[39]    March 28, 1999 Resignation Letter (3MA00480715, at -0715-16) (Ex. 24).
[40]    *Id*. at -0716; *see also* March 29, 1999 Email Containing Statement from Purdy (3MA01373218, at -3219) (Ex. 26) ("For 20 years [3M] has been stalling the collection of data needed for evaluating the environmental impact of fluorochemicals.  PFOS is the most onerous pollutant since PCB and you want to avoid collecting data that indicates that it is probably worse. I am outrage[d].").
[41]    *See* U.S. Envtl. Prot. Agency, 3M Company Settlement, available at https://www.epa.gov/enforcement/3m-company-settlement, last accessed November 27, 2019.

In 2016, the EPA released a Drinking Water Health Advisory for PFOA and for PFOS, finding that animal studies of PFOA report numerous adverse effects, including developmental effects such as impacts to "survival, body weight changes, reduced ossification, delays in eye opening, altered puberty, and retarded mammary gland development" as well as "liver toxicity," "kidney toxicity," "immune effects," and "cancer," and that human epidemiology studies report associations between PFOA and "high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and cancer (testicular and kidney)."[42]  For PFOS, the EPA found that animal studies reported developmental effects, such as "decreased body weight, survival, and increased serum glucose levels and insulin resistance in adult offspring," as well as reproductive effects, "liver toxicity," "developmental neurotoxicity," "immune effects," and "cancer (thyroid and liver)."[43]  The EPA concluded that the "developing fetus" is "particularly sensitive" to both "PFOA-induced toxicity" and "PFOS-induced toxicity."[44]

### E.    3M's Manufacturing Operations in Decatur.

---

[42]    *See* U.S. Envtl. Prot. Agency, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA) (May 2016), at 9 (Ex. 27).
[43]    U.S. Envtl. Prot. Agency, Drinking Water Health Advisory for Perflurooctane Sulfonate (PFOS) (May 2016), at 10 (Ex. 28).
[44]    *See id.*; U.S. Envtl. Prot. Agency, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA) (May 2016), at 9 (Ex. 27).

3M began producing products containing or using PFOS, PFOA and PFBA in the 1950s.[45] 3M began its fluorochemical manufacturing operations at its Decatur facility in 1961 when it constructed its chemical manufacturing plant.[46] Shortly afterwards, 3M constructed a film manufacturing plant at its Decatur location.[47] 3M produced or used PFOS in its manufacturing processes in Decatur for the majority of the time its Decatur facility has been in operation.[48] 3M produced or used PFOA in its manufacturing processes in Decatur from 1998-2000.[49] 3M has discharged and continues to release toxic PFAS and related chemicals from its on-site wastewater treatment plant into Bakers Creek, a tributary to the Tennessee River, and from other sources on property owned by 3M.[50] 3M also disposed of PFAS via the on-site wastewater treatment plant by means of subsurface injection in a 575-acre area designated as the "sludge incorporation area."[51] Defendant 3M has known for nearly forty years that its disposal of PFAS and related chemicals through discharge into

---

[45]    *See* November 30, 2007 Report on the Manufacture, Use, and Releases of PFCs at the 3M Cottage Grove Facility (3M_MN00066600, at -6604) (Ex. 29).
[46]    *See* January 2008 Screening Level Human Exposure Assessment Report produced for 3M by Weston Solutions, Inc. (hereinafter "January 2008 Report")(3M_MN00126608, at -6640) (Ex. 30).
[47]    *See id.*
[48]    *See*, *e.g.*, January 30, 2009 Letter to the EPA (3M_MN01362000, -2002) (Ex. 31) (noting that the chemical plant manufactured materials using the PFOS chemistry for use as protective treatment for carpets, papers and textiles).
[49]    *See id.* (noting that the chemical plant also produced ammonium perfluorooctanoate, which is the ammonium salt of PFOA).
[50]    *See* Ex. 30, at -6639-45).
[51]    *Id.*, at -6641.

rivers—such as the Tennessee River and its tributaries—and through disposal on its property was unsafe.[52]  Defendant 3M has known for at least 14 years prior to the filing of this lawsuit that PFAS and related chemicals are not effectively treated by conventional wastewater treatment plant processes and are discharged to surface waters in the effluent.[53]

The EPA has explicitly determined that 3M's documented discharges of PFOA and PFOS polluted the Tennessee River.[54]  Based on the contamination in the Tennessee River caused by Defendants' discharges, ADEM has placed Wheeler Reservoir from 5 miles upstream of Elk River to the Joe Wheeler Dam on the state's impaired waters list for PFOS contamination impairing swimming and fish and wildlife uses.[55] This includes the location where WMEL takes water from the Tennessee River to treat and  provide to its customers, including the adjacent water utilities which distribute WMEL water to their customers.[56]

---

[52]     *See* December 28, 1979 *Fluorochemicals in Tennessee River Fish* (3M_WM00258127, at -8128) (Ex. 32) (A 1979 3M study of fish caught by the Wheeler Dam (26 miles downstream from the 3M plant) showed that the chemicals were bioaccumulating in local fish.).

[53]     *See* Ahrens, Lutz, *Polyfluoroalkyl Compounds in the Aquatic Environment: a Review of Their Occurrence and Fate* J. Environ. Monit. Vol. 13, No. 1, January 2011 (3M_MN00646069, at -6072) (Ex. 33).

[54]     *See* October 12, 2018 Letter from Don Sims to Governor Kay Ivey (WMEL03162, at -3163) (Ex. 34).

[55]     *See* 2014 Alabama § 303(d) List (relying on data from 2008-2012); 2016 Alabama § 303(d) List; 2018 Alabama § 303(d) List.  ADEM, http://www.adem.state.al.us/programs/water/303d.cnt (last accessed November 21, 2019).

[56]     *See id*.

## F. Dyneon's Decatur Operations.

Dyneon was formed in 1997 with the merger of 3M's fluoroelastomer business with the German company, Hoescht.[57] In 1999, 3M purchased Dyneon from Hoescht, and it now operates as a wholly owned subsidiary of 3M.[58] In 1998, Dyneon built its own facility on the southern portion of the 3M Decatur site for production of fluoroelastomers.[59] Full-scale production of PFOA began at 3M Decatur in 1999.[60] "Prior to this, a small amount of PFOA was used at the Dyneon facility, and PFOA was present as an impurity at low levels in the production of other 3M perfluorochemicals."[61] The wastewater from Dyneon's operations has been, and continues to be, discharged to 3M's wastewater treatment system, which has discharged and continues to discharge PFAS and related chemicals to Baker Creek and the Tennessee River.[62]

## G. Daikin's Decatur Operations.

In 1991, 3M sold a portion of the 3M sludge incorporation area to Daikin as

---

[57]     *See* 3M Decatur Plant, https://www.3m.com/3M/en_US/plant-locations-us/decatur/, last accessed November 22, 2019.

[58]     *See id.*

[59]     *See* 3M Decatur Plant, https://www.3m.com/3M/en_US/plant-locations-us/decatur/, last accessed November 22, 2019.

[60]     Declaration of Larry Neal, Doc. 92-8 at ¶11.

[61]     *Id.*

[62]     *See* January 30, 1999 Letter from 3M to EPA (3M_MN01105042, at -5042) (noting that 3M and Dyneon "share many operations, including on-site treatment and direct discharge of process wastewater")(Ex. 35).

the site for construction of a new Daikin fluorochemical plant. Initial construction of the Daikin plant was completed in 1993, with fluoropolymer manufacturing operations beginning in early 1994. Daikin later added a telomer finishing facility at the site, which began production in 2001.[63] From 1994 to 2011, Daikin purchased PFOA for use in the manufacture of certain fluoropolymers.[64] In 2004, Daikin determined that stormwater runoff from its property contained PFOA and PFOS.[65] Sampling for those chemicals has continued since that time, and minor amounts of PFOA and PFOS continue to be measured in the discharges from the stormwater outfalls.[66]

### H.    The Impact of PFAS on WMEL and its Customers.

The Tennessee River is the sole source of raw water for WMEL.[67] WMEL's intake is located on the Tennessee River downstream from each of the Defendants.[68] The water that reaches the intake on the Tennessee River is contaminated with the Defendants' waste chemicals.[69]

---

[63]    Declaration of Larry Neal, Doc. 92-8 at ¶12.
[64]    Declaration of Larry Neal, Doc. 92-8 at ¶12.
[65]    Declaration of Ralph Werling, Doc. 92-9 at ¶7.
[66]    *Id.*
[67]    Pate Affidavit at ¶ 3 (Ex. 36).
[68]    *See id.* at ¶¶ 5, 7.
[69]    *See, e.g.,* January 2008 Report at -6699, -6711, -6757, -6767, -6774, -6868-69 (noting that customers of WMEL had "the highest municipal contact doses") (Ex. 30).

WMEL is the direct water provider for approximately 25,000-35,000 people.[70] The people directly serviced by WMEL may be easily identified from reviewing its billing records.[71] In addition to servicing its "direct customers," WMEL sells its water to adjacent water utilities which in turn sell the water to their customers (the "indirect customers").[72] As of May 2016, WMEL served approximately 12,700 residential customers of these adjacent utilities.[73] These indirect customers may also be easily identified by reviewing the billing records of these adjacent utilities.[74] There is a single intake from the Tennessee River at the Hames WTP for the entire WMEL distribution system for all these customers and properties—both direct and indirect.[75] Once the water leaves the WMEL facility and heads out to its customers, it is not treated to eliminate PFAS.[76] All WMEL's customers and all customers of the adjacent utilities receive the same water.[77]

WMEL's intake takes in the contaminant concentrations in the Tennessee

---

[70] Declaration of Don Sims, Doc. 74-4 at ¶ 3.

[71] *See id.*

[72] These utilities are V.A.W. Water System, the Falkville Water Works, Trinity Water Works, Town Creek Water System, and the West Lawrence Water Cooperative. *See* Declaration of Don Sims, Doc. 74-4 at ¶ 3.

[73] *See id.*

[74] *See*, *e.g.*, Affidavit of Kevin Martin at ¶ 4 (Ex. 38) (affidavit of West Lawrence's General Manager stating that he can compile a list of customers for West Lawrence from 2009 to 2016); *See also*, Affidavit of Mark Ekonen (Ex. 37).

[75] Pate Affidavit at ¶ 4 (Ex. 36).

[76] *Id.* at ¶ 11.

[77] *Id.*

River water and distributes them through a single water treatment system to all customers and properties.[78]  Water taken in from the Tennessee River and distributed to customers was tested for PFAS and found to contain PFOA, PFOS and other PFAS compounds.[79]  The same concentrations of PFAS are distributed to every customer and property served.[80]  Before WMEL installed a GAC filtration system in September of 2016,[81] the PFAS content of the Tennessee River at the WMEL intake was delivered to WMEL and adjacent utilities.[82]  After the GAC filtration system was installed, longer chain PFAS, such as PFOA and PFOS, were substantially filtered before distribution to all customers (both direct and indirect) and properties, but shorter chained PFAS, including PFBS and PFBA, continued to be distributed unfiltered to customers and properties.[83]  PFAS continues to be distributed to WMEL and adjacent utilities customers and properties today.[84]

## I.  Injuries of the Class Members.

Plaintiffs Tommy and Lanette Lindsey jointly own residential real property located at 776 County Road 352, Trinity, Alabama 35673, in Morgan County, where

---

[78]     *Id*. at ¶¶ 4, 5.
[79]     *Id*. at ¶ 5.
[80]     *Id*. at ¶¶ 10, 15.
[81]     WMEL imposes a usage surcharge on customers of one dime per 1,000 (one thousand) gallons to help defray the expense of replacing the GAC contactors.  *Id*. at ¶ 12.
[82]     *Id*. at ¶¶ 7, 11.
[83]     *Id*. at ¶ 8.
[84]     *Id*.

they have resided since 1974.[85]  Mr. and Mrs. Lindsey are customers of WMEL and have used water supplied by that utility from the Tennessee River for drinking, cooking, and other domestic purposes.[86]  Plaintiff Larry Watkins is a resident of Lawrence County, Alabama, and resides at and owns property located at 1564 County Road 439, Hillsboro, Alabama 35643, where he has resided since about 1997.[87]  Mr. Watkins is a customer of WMEL and has used water supplied by that utility from the Tennessee River for drinking, cooking, and other domestic purposes.[88]  The members of the class include those who have used water supplied by WMEL and adjacent utilities.[89]  Properties owned by Plaintiffs and the class members have been and are being invaded by contamination caused by Defendants' releases of toxic PFAS into the Tennessee River, and Plaintiffs have been exposed.[90]  All Plaintiffs bring claims for liability on the same legal theories based on the same conduct by Defendants.[91]

Each of the named Plaintiffs, and all of the members of the purported class,

---

[85]    Affidavit of Tommy Lindsey at ¶ 2 (Ex. 39); and Affidavit of Lanette Lindsey at ¶ 2 (Ex. 40).
[86]    *See id.*
[87]    Affidavit of Larry Watkins at ¶ 2 (Ex. 41).
[88]    *See id.*
[89]    *See* Definition of the Class at Section III, *infra.*
[90]    *See* Pate Affidavit at ¶ 4 (Ex. 36).
[91]    *See* Section V, *infra.*

are or were customers of WMEL during the relevant time period.[92] They have all been damaged in ways common to the class. While they all believe that 3M is responsible for the contamination of their water,[93] they also believe that Daikin is responsible for its part in dumping pollutants into the water supply.[94]

As a result of the Defendants' contamination, each of the named Plaintiffs as well as each member of the class—has suffered a loss of enjoyment of their home and property.[95] Prior to learning of the toxic chemicals in their tap water, each of the Plaintiffs used and consumed water from their tap.[96] Since being aware of the Defendants' pollution, however, each of the named Plaintiffs has begun using bottled water.[97] Having to go out and now purchase bottled water is a nuisance.[98] Dealing with the Defendants' contamination has been distressing to the Plaintiffs.[99]

---

[92] *See* Affidavit of Tommy Lindsey at ¶ 2 (Ex. 39); Affidavit of Lanette Lindsey at ¶ 2 (Ex. 40); Affidavit of Larry Watkins at ¶ 2 (Ex. 41).

[93] Depo. of L. Lindsey at 11:4-7 (Ex. 42); Depo. of T. Lindsey at 96:8-97:1 (Ex. 43); Depo. of L. Watkins at 65:4-22 (Ex. 44).

[94] Depo. of L. Lindsey at 121:15-122:2 (Ex. 42); Depo. of T. Lindsey at 96:8-97:1 (Ex. 43); Depo. of L. Watkins at 66:3-12 (Ex. 44).

[95] Depo. of L. Lindsey at 12:18:13-4; 136:17-138:2 (Ex. 42); Depo. of T. Lindsey at 87:3-23, 91:1-17 (Ex. 43); Depo. of L. Watkins at 154:23-156:23 (Ex. 44).

[96] Depo. of L. Lindsey at 33:23-34:11 (Ex. 42); Depo. of T. Lindsey at 31:4-10 (Ex. 43); Depo. of L. Watkins at 79:17-80:19 (Ex. 44).

[97] Depo. of L. Lindsey at 19:1-3, 19:13-17 (Ex. 42); Depo. of T. Lindsey at 54:4-11, 56:1-57:1 (Ex. 43); Depo. of L. Watkins at 80:20-84:10, 84:21-85:13, 85:19-22, 88:20-89:2 (Ex. 44).

[98] Depo. of L. Lindsey at 136:13-16 (Ex. 42); Depo. of L. Watkins at 154:23-156:23 (Ex. 44).

[99] Depo. of L. Lindsey at 12:2-6, 12:10-17, 60:10-20 (Ex. 42); Depo. of T. Lindsey at 77:7-78:9, 79:11-23 (Ex. 43); Depo. of L. Watkins at 115:12-118:10, 123:18-124:3, 154:23-156:23 (Ex. 44).

Furthermore, they believe that they were overcharged on their water bill for the polluted water they received.[100] They find it offensive that the Defendants' actions caused them to consume contaminated water.[101] The Plaintiffs still do not believe that the water they receive is safe to drink.[102]

## III. DEFINITION OF THE CLASS

This class action is brought by the Class Representatives as named Plaintiffs on their own behalf and as representatives of a class of persons harmed by the release of contaminants by Defendants resulting in distribution of toxic household water. *See* Dkt. 175 at ¶46. The class of persons harmed are:

Subclass A (Residential Occupants – Public Nuisance and Trespass/Wantonness):

All persons who had a right to occupy and actually occupied a residential property served by either the West Morgan-East Lawrence Water and Sewer Authority, the V.A.W. Water System, the Falkville Water Works, the Trinity Water Works, the Town Creek Water System, or the West Lawrence Water Cooperative.

Subclass B (Residential Occupants – Battery/Wantonness):

All persons who had a right to occupy and actually occupied a residential property served water provided by either the West Morgan-East Lawrence Water and Sewer Authority, the V.A.W. Water System, the Falkville Water Works, the Trinity Water Works, the Town Creek

---

[100]    Depo. of L. Lindsey at 20:5-13 (Ex. 42); Depo. of L. Watkins at 154:23-156:23 (Ex. 44).
[101]    Depo. of L. Lindsey at 141:13-142:1 (Ex. 42); Depo. of T. Lindsey at 105:11-18 (Ex. 43); Depo. of L. Watkins at 154:23-156:23 (Ex. 44).
[102]    Depo. of L. Lindsey at 111:20-112:2 (Ex. 42); Depo. of T. Lindsey at 54:16-55:8, 57:19-58:2 (Ex. 43); Depo. of L. Watkins at 98:7-99:6, 135:1-11, 144:1-11 (Ex. 44).

Water System, or the West Lawrence Water Cooperative and who have occupied the property for a cumulative time period of one year or more while the property received water from one of these water utilities.

Subclass C (Occupants/Ratepayers – Negligence Causing Economic Loss/Wantonness):

All persons who had a right to occupy and actually occupied a residential property served water provided by either the West Morgan-East Lawrence Water and Sewer Authority, the V.A.W. Water System, the Falkville Water Works, the Trinity Water Works, the Town Creek Water System, or the West Lawrence Water Cooperative, and who is or was a purchaser of water from one of these water utilities ("ratepayer").

The Plaintiffs seek class relief and certification on their claim of wantonness for all members of each subclass, as indicated above.

The class period for negligence is October 5, 2013 forward, because the negligence is ongoing and the class is entitled to relief on the claim beginning two years prior to the filing of the Complaint on October 5, 2015. The class period for public nuisance is the same as negligence, for the same reasons. The class period for wantonness is the same as negligence and public nuisance, again for the same reasons. The class period for battery is October 5, 2009 forward, because the battery is ongoing and the class is entitled to relief on the claim beginning six years prior to the filing of the Complaint on October 5, 2015. The class period for trespass is the same as battery, for the same reasons.

Plaintiffs seek certification of their claims pursuant to Fed. R. Civ. P. 23(a),

23(b)(2), 23(b)(3), and 23(c)(4).  The exclusions set out in the Amended Complaint, Dkt. 175 at ¶ 47, remain in effect and are adopted here.

## IV.   LEGAL STANDARDS FOR CLASS CERTIFICATION

Class actions are intended to ensure the "efficiency and economy of litigation." *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974).  Federal Rule of Civil Procedure 23 "establishes the legal roadmap courts must follow when determining whether class certification is appropriate." *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181, 1187 (11th Cir. 2003).  Courts have broad discretion to decide matters of class certification so long as the court's reasoning falls within the parameters of Rule 23.  *In re Healthsouth Corp. Sec. Litig.*, 257 F.R.D. 260, 270 (N.D. Ala. 2009) (citations omitted).  Under Rule 23, class certification is appropriate where one or more plaintiffs satisfy all four requirements of Rule 23(a), and at least one of the standards under Rule 23(b). *Klay v. Humana, Inc.,* 382 F.3d 1241, 1250-51 (11th Cir. 2004) (citations omitted).

### A.   Rule 23(a) Prerequisites

Plaintiffs seeking class certification must initially meet the requirements of Rule 23(a), which contains four prerequisites: numerosity, commonality, typicality, and adequacy of representation.  Fed. R. Civ. P. 23(a).

### 1.   Numerosity

Rule 23(a)(1) requires that class membership be so numerous that joinder of all members is impractical. Fed. R. Civ. P. 23(a)(1). Although the numerosity requirement does not rest on any magic number, joinder is usually deemed impracticable when the class number is forty or more. *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).

It is not necessary that Plaintiffs allege the exact number or specific identity of proposed class members. Newburg on Class Actions § 3:13 (5th ed. 2012). Implicit under Rule 23 is that the definition is sufficient if Plaintiffs have sufficiently described a class which is "clearly ascertainable." *Little v. TMobile USA, Inc.,* 691 F.3d 1302, 1304 (11th Cir. 2012). The Court "need not know the identity of each class member before certification; ascertainability requires only that the [C]ourt be able to identify class members at some stage of the proceeding." *Karhu v. Vital Pharm., Inc.*, 621 F. App'x 945, 952 (11th Cir. 2015) (Martin, J., concurring).

## 2. Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Since commonality may be found on one common question of law or fact, this standard is easily met. 1 Newberg, *supra*, § 3:18 at 228; *see Braggs v. Dunn,* 317 F.R.D. 634, 655 (M.D. Ala. 2016). Rule 23(a)(2) does not require that all questions of fact and law are shared by all class members. *Cox*, 784 F.2d at 1557.

The test for commonality is a "low hurdle," and a party meets the test when there is at least one issue, the resolution of which will affect a significant number of the putative class members. *Thorpe v. Walter Inv. Mgmt., Corp.,* No. 1:14-CV-20880-UU, 2016 U.S. Dist. LEXIS 33637, at *17 (S.D. Fla. Mar. 16, 2016).

### 3. Typicality

Rule 23(a)(3) requires that the claims or defenses of the class representative parties be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). Typicality, along with the related requirement of commonality, focuses on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members. *Piazza v. Ebsco Indus., Inc.,* 273 F.3d 1341, 1346 (11th Cir. 2001). The claims of the class member need only be "sufficiently similar" to those of the absent class members, they need not be identical. *Williams v. Mohawk Indus., Inc.,* 568 F.3d 1350, 1357 (11th Cir. 2009).

### 4. Adequacy of Representation

Rule 23(a)(4) requires that the class representatives will fairly and adequately protect the interest of the class. Fed. R. Civ. P. 23(a)(4). The Eleventh Circuit has determined that ". . . the adequate representation requirement involves questions of whether Plaintiffs' counsel are qualified, experienced, and generally able to conduct

the proposed litigation, and whether plaintiffs have interests antagonistic to those of the rest of the class." *Griffin v. Carlin,* 755 F.2d 1516, 1533 (11th Cir. 1985).

With respect to the adequacy of the class representative, the inquiry for the court is whether such representative will adequately prosecute the action on behalf of the class. *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1189 (11th Cir. 2003). The class representative's knowledge of the case, however, need not be "robust." Newburg on Class Actions § 3:67 (5th ed. 2012).

## B. Classes Under Fed. R. Civ. P. 23(b)

Once the prerequisites of Rule 23(a) have been met, the proponent of class certification must satisfy the requirements of one of the subsections of Rule 23(b).

### 1. Rule 23(b)(2)

To maintain a class under Fed. R. Civ. P. 23(b)(2), Plaintiffs must show that (1) the party opposing the class must have acted or refused to act or failed to perform a legal duty on grounds generally applicable to all class members; and (2) the class must seek final injunctive or declaratory relief with respect to the class as a whole. *Id*. Under Rule 23(b)(2), "there is no requirement . . . that issues subject to generalized proof predominate over those subject to individualized proofs." *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001).

### 2. Rule 23(b)(3)

Once the criteria set forth under Rule 23(a) are satisfied, the Court is obliged to conduct an analysis of the requirements of 23(b)(3). Here, the Court determines if the issues common to the class predominate over those impacting individual issues, whether the class device is the superior method to adjudicate the controversy, and if the case can be managed as a class action. The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." If common evidence supports the claims of the class members, then class issues would predominate rendering Rule 23 the superior device to adjudicate the case.

### a.     Predominance

Pursuant to Rule 23(b)(3), the Court considers whether issues of law or fact common to members of the class predominate over questions affecting only individual members.

It is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions. *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir.1989) (quoting *Nichols v. Mobile Bd. of Realtors, Inc.*, 675 F.2d 671, 676 (5th Cir. 1982)).  When common questions to the class represent a significant part of the case, the action meets the predominance requirement, even if "individual issues" may arise as well.

*In Re Checking Account Overdraft Litg.,* 281 F.R.D. 667, at 676 (S.D. Fla. 2012). If all class members depend on "common evidence" to resolve liability issues, then the need for individualized damage determinations does not prevent a finding that common issues predominate. *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1309 (N.D. Fla.), *reconsideration denied*, 261 F. Supp. 3d 1212 (N.D. Fla. 2017).

Predominance also is met when damages to the class are measurable by a common method. *See Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538 (S.D. Fla. 2015). The predominance requirement is met if there the asserted claim "affects all members of the class[] and damages are ascertainable on a general level." *Philadelphia v. Am. Oil Co.*, 53 F.R.D. 45, 67 (D.N.J. 1971).

### b.    Superiority Under Rule 23(b)(3)

The second prong of Rule 23(b)(3) requires Plaintiffs to show that a class action is superior to other available methods for the fair and effective adjudication of the controversy. The focus of this inquiry is on "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269. As a result, the predominance analysis "has a tremendous impact on the superiority analysis . . . for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims." *Id.* Factors

relevant to the superiority analysis include: (A) the class members' interests in individually controlling the prosecution of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties in managing a class action. *Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d at 1310.

Cases involving PFAS contamination have been certified for class relief. *See*, *e.g.*, *Burdick v. Tonoga, Inc.*, 2019 N.Y. App. Div. LEXIS 8498 (N.Y. App. Div. 2019). Due to their exposure to PFAS, Representative Plaintiffs on behalf of themselves and the members of a class bring claims against Defendants for public nuisance, trespass, battery, wantonness, and negligence causing economic loss. Plaintiffs' claims satisfy the requirements of Rule 23 and should be certified under Fed. R. Civ. P. 23(b)(2) and (3).

## V. CERTIFICATION IS PROPER HERE.

### A. The Classes Satisfy the Requirements of Rule 23(a)

#### 1. Numerosity and Ascertainability

Plaintiffs' claims satisfy Fed. R. Civ. P. 23(a)(1) requirements. The class is clearly so numerous to make joinder impracticable, and the class is ascertainable.

As of September 30, 2018, WMEL itself served approximately 10,472

customers.[103]   The adjacent utilities supply approximately an additional 12,700 customers.[104]   All rate payers served by WMEL and the adjacent utilities and their properties can be determined from the customer records of these utilities; indeed, Plaintiffs have already identified many of them.[105]   Water from the Tennessee River is delivered to all customers of WMEL and the adjacent utilities, including the Named Plaintiffs and class member's property.[106]   The fundamental origin of each class members' claim is the contaminated water obtained from the Tennessee River by WMEL and delivered to every one of its customers, including the adjacent utilities. Simply put, there are thousands of putative class members and it would be impracticable, if not impossible, to join them in this proceeding. The class is also ascertainable through the use of objective criteria.[107]   The numerosity and ascertainability requirements of Fed. R. Civ. P. 23(a)(1) have undoubtedly been met.

## 2. Commonality

There are numerous questions of law and fact common to the claims of class members, including:

---

[103]   https://wmel.org/wp-content/uploads/2019/04/2018-Final-Financial-Statements-Reissue.pdf at 5; last accessed November 16, 2019.

[104]   Declaration of Don Sims, Doc. 74-4 at ¶ 3.

[105]   Affidavit of Kevin Martin at ¶ 4 (Ex. 38) (affidavit of West Lawrence's General Manager); Affidavit of Mark R. Ekonen (Ex. 37).

[106]   Pate Affidavit at ¶¶ 4, 11 (Ex. 36).

[107]   Affidavit of Kevin Martin at ¶ 4 (Ex. 38) (affidavit of West Lawrence's General Manager); Affidavit of Mark R. Ekonen; Declaration of Don Sims, Doc. 74-4 at ¶ 3.

1.   the type or kinds of chemicals that have been and are being released from the Defendants' manufacturing activities;

2.   the activities of Defendants which have affected the Tennessee River resulting in the contamination of the water distributed by WMEL and adjacent water utilities to the properties of the Plaintiffs and the class members;

3.   whether the activities of Defendants have resulted in the contamination of the water which was distributed to the properties of Plaintiffs and the class members and consumed by Plaintiffs and the class members;

4.   whether the Plaintiffs and ratepayer class members of WMEL and the adjacent utilities have suffered economic loss by paying for water which was sold as safe and uncontaminated but which, in fact, was unsafe and contaminated by Defendants' toxic chemicals;

5.   whether Plaintiffs and the class members have suffered annoyance, discomfort, or loss of use and enjoyment of their properties because of Defendants' contamination of their properties;

6.   whether Defendants owed a duty to Plaintiffs and class members, and whether that duty was breached to class members;

7.   whether the contamination of Plaintiffs' persons and properties by Defendants' actions was reasonably foreseeable;

8.   whether Defendants' actions constitute negligence, a trespass, a public nuisance, wantonness, and/or a battery;

9.   whether Defendants' conduct was offensive, wanton, malicious or oppressive and in reckless disregard for the rights and safety of Plaintiffs and the class members.

Here, every single class member has suffered harm from the actions of the

Defendants—contamination by the same toxic chemicals which were released from

a common source and distributed by a common source.

### 3. Typicality

Representative Plaintiffs' claims are typical of those of the class members. Each Class Representative's claims arise out of the same operative facts: the contamination of their household water and properties by water contaminated with Defendants' toxic chemicals.[108] Each class representative makes the same fundamental claim for damages based on the same facts.[109] Thus, the named Plaintiffs' claims are typical of the class. *See e.g. Brannan v. Wells Fargo Home Mortg., Inc.* (*In re Brannan*), 485 B.R. 443, 458 (Bankr. S.D. Ala. 2013).

With respect to the issue of liability, not only are the claims of the class members typical of those of the class—they are identical.

### 4. Adequacy of Representation

The Class Representatives will adequately represent the interests of the absent class members and have no conflicts with members of the class. The Class Representatives have participated in discovery, and each has been deposed for several hours by defense counsel.[110] They have a sufficient understanding of the

---

[108]    *See*, *e.g.*, Depo. of L. Lindsey at 11:4-7, 121:15-122:2 (Ex. 42); Depo. of T. Lindsey at 96:8-97:1 (Ex. 43); Depo. of L. Watkins at 65:4-22, 66:3-12 (Ex. 44).
[109]    *See* Affidavit of Tommy Lindsey at ¶¶ 2,7 (Ex. 39); Affidavit of Lanette Lindsey at ¶¶ 2,7 (Ex. 40); Affidavit of Larry Watkins at ¶¶ 2,7 (Ex. 41).
[110]    *See* Affidavit of Tommy Lindsey at ¶ 5 (Ex. 39); Affidavit of Lanette Lindsey at ¶ 5 (Ex. 40); Affidavit of Larry Watkins at ¶ 5 (Ex. 41).

nature of the claims against the Defendants. The Class Representatives will adequately represent the interests of the members of the Class.

Plaintiffs are represented by counsel who have extensive experience in class action litigation. Rather than extoll the credentials of counsel, the CV's of Tim Davis and Lew Garrison of Heninger Garrison Davis, LLC, as well as the CV of Kevin Hannon of The Hannon Law firm are exhibited to this brief.[111]

## B. The Classes Satisfy the Requirements of Rule 23(b)(3)

### 1. The Predominance Prong is Satisfied.

The common source of the household water transmitting Defendants' contamination to the named Plaintiffs and each class member demonstrates the predominance of common issues and the existence of common proof in this case. WMEL serves as the source of household water to not only WMEL customers but customers of the adjacent utilities.[112] There is a single intake from the Tennessee River at a single location for the entire WMEL distribution system for all these customers and properties served.[113] That intake takes in the contaminant concentrations in the Tennessee River water and distributes them through a single

---

[111]    *See* Affidavit of Tim Davis (Ex. 45); Affidavit of Kevin Hannon (Ex. 46).
[112]    *See* Declaration of Don Sims, Doc. 74-4 at ¶ 3. *See also* Pate Affidavit at ¶ 4 (Ex. 36).
[113]    *See* Pate Affidavit at ¶ 4 (Ex. 36).

water treatment system to all customers and properties.[114]  Water taken in from the river and distributed to customers was tested for PFAS and found to contain PFOA, PFOS and other PFAS.[115]  The same concentrations of PFAS are distributed to every customer and property served.[116]  Before WMEL installed a GAC filtration system in September, 2016, the PFAS content of the Tennessee River at the WMEL intake was delivered to customers of WMEL and adjacent utilities.[117]  After the GAC filtration system was installed, longer chain PFAS, such as PFOA and PFOS, were substantially filtered before distribution to all customers (both direct and indirect) and properties, but shorter chained PFAS, including PFBS and PFBA, continued to be distributed unfiltered to customers and properties.[118]  Those PFAS chemicals continue to be distributed to WMEL and adjacent utilities customers and properties today.[119]  Thus the contamination and the mechanism of distribution to each class member that forms the fundamental basis of their claims is common.

### 2. Plaintiffs' Claims and the Common Evidence to Prove the Claims Satisfy the Predominance Requirement

One of Plaintiffs' claims is negligence. The elements of negligence are the

---

[114]   *See id.* at ¶¶ 4, 5.
[115]   *See id.* at ¶ 5.
[116]   *See id.* at ¶¶ 10, 15.
[117]   *See id.* at ¶¶ 7, 11.
[118]   *See id.* at ¶ 8.
[119]   *See id.*

existence of a duty, the breach of that duty, and damage as a proximate cause thereof. *Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992). Here, Defendants' duty not to pollute is common to all members of the Class; it does not change by property or person. Moreover, whether Defendants' release of toxins is a breach of the duty is a predominant issue common for all class members. Likewise, the Defendants' standard of care was and is the same for any class member who receives or received water from WMEL or adjacent utilities.

The elements of Plaintiffs' trespass claims are also common to the class, and relies on common evidence. Trespass is an intentional invasion of the property of another. To recover under Alabama law for trespass for indirect invasions, a plaintiff must show 1) an invasion affecting an interest in the exclusive possession of his property; 2) an intentional doing of the act which results in the invasion; 3) reasonable foreseeability that the act done could result in an invasion of plaintiff's possessory interest; and 4) substantial damages to the *res*. *Borland v. Sanders Lead Co.*, 369 So. 2d 523, 529 (Ala. 1979). If, as a result of the defendant's operation, the polluting substance is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the *res*, then the plaintiff may seek his remedy in trespass, though his alternative remedy in nuisance may co-exist. *Id*. at 530. Each element set out by *Borland* is common to

all class members: 1) whether there has been an invasion of Defendants' toxic chemicals on class properties, 2) whether Defendants intentionally did the acts which resulted in the invasion, 3) whether it was reasonably foreseeable to Defendants that their toxic PFAS could result in an invasion of class members' possessory interests, and 4) whether the damage caused by the same levels of toxic pollutants to each class property is substantial. Thus, the issues and evidence supporting Plaintiffs' claims for trespass are common.

Plaintiffs' public nuisance claim is grounded upon the discharge of contaminants into a public body of water. *W. Morgan-East Lawrence Water & Sewer Auth. v. 3M Co.*, 208 F. Supp. 3d 1227, 1234 (N.D. Ala. 2016). An individual may have a cause of action under a public-nuisance theory if that individual suffered a "special damage" that is different in "kind and degree from [the damage] suffered by the public in general." *Id.* at 1234; Ala. Code 1975 § 6-5-123. Because the contamination here is the same for every property in the class, caused by the delivery of contamination from a public water body, the issue of whether class members have suffered special damages is common to all class members and will be derived by common evidence.

Plaintiffs' expert Russell Detwiler confirms that common questions relating to Plaintiffs' claims for trespass and nuisance damages predominate and can be

answered with common questions. When household water containing PFAS is applied to soils to class properties for irrigation or through other use, a significant portion of the PFAS adsorbs to soil particles.[120] Adsorption continues as additional PFAS containing water comes in contact with soils on properties through continuing household water use.[121] A fraction of PFAS sorbed onto soils will remain persistently adsorbed to soils even after soils are treated with PFAS free water.[122] PFAS chemicals in household water used for irrigation are also taken up by vegetation.[123] The mechanism of sorption of soil and plant uptake of PFAS applies to all properties in the class.[124] Thus, whether there has been a trespass on class properties, or whether Defendants' chemicals have caused a public nuisance resulting in special damages, both can be proven by common evidence.

To state a claim for battery in Alabama, a plaintiff must establish: "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. *W. Morgan-East Lawrence Water & Sewer Auth. v. 3M Co.*, 208 F. Supp. 3d 1227, 1236 & n.8 (N.D. Ala. 2016) (citing *Ex parte Atmore Community Hosp.*, 719 So. 2d

---

[120] Report of Russel Detwiler at 3, 4, 5 (Ex. 15).
[121] *See id.* at 5.
[122] *See id.* at 4, 5.
[123] *See id.*
[124] *See id.* at 5.

1190, 1193 (Ala. 1998)). A claim for battery in Alabama does not require an actual injury. *Id.*; *accord* APJI 5.00 ("Any touching by one person of the person or clothes of another in rudeness, or in anger, or in a hostile manner, is an assault and battery. An intent to injure is not an essential element."). The wrong consists not in the touching, so much as in the manner or spirit in which it is done. *Acceptance Ins. Co. v. Brown*, 832 So. 2d 1, 4 (Ala. 2001). Here, the manner in which the Defendants acted to cause a battery is an issue common to all class members. Defendants did not act differently toward any individual class member. Whether Defendants "touched" the Plaintiffs by releasing PFAS and related toxic chemicals into the Class' water supply, is an issue common to each class member. The Defendants discharged these chemicals into the Tennessee River with knowledge that the chemicals would ultimately be delivered to and consumed by customers of WMEL or the adjacent utilities. That common fact reflects the intent and "spirit" of the battery.

Common issues of fact and law predominate if they "ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Klay v. Humana. Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) (citing *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)). Here, all questions of the elements of Plaintiffs' claims are capable of

37

being proven by common evidence, satisfying the predominance requirement. *Cf.*

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 (11th Cir. 1987) (granting

class certification because "each of the complaints alleges a single conspiracy and

fraudulent scheme against a large number of individuals and thus is particularly

appropriate for class action" (quotation marks and citation omitted); *Kennedy v.*

*Tallant*, 710 F.2d 711, 717 (11th Cir. 1983) (granting class certification where the

defendants "committed the same unlawful acts in the same method against an entire

class").

### 3. Common Issues Related to Plaintiffs' Claimed Damages Predominate

Common questions as to Plaintiffs' claimed damages also predominate. Class

members all seek the same remediation and mitigation, and compensation for

damages measured by common standards. Ratepayer class members all received the

same contaminated water at common rates. Occupants all have the same battery

from the same toxic chemicals from the same conduct causing harm. They all seek

compensation for the same wrongdoing and for the same adverse effects of that

wrongdoing. The compensation will be based on the common inherent risk of the

chemicals released by the Defendants which does not vary by class member, and

emanates from the same route of exposure—contaminated household water. The

class has a common method and objective criteria for measuring and ascertaining its

damages, including but not limited to the records of the water utilities, further satisfying predominance.[125]

### a. Common Issues Predominate as to Plaintiffs' Damages for Battery

Issues related to whether defendants have caused the class harmful and offensive touching are common. For proof of battery, a plaintiff must only show that the touching was "conducted in a harmful or offensive manner." *Ex parte Atmore Community Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998). A bodily contact is offensive if it offends a <u>reasonable</u> sense of personal dignity." RESTATEMENT OF TORTS [SECOND] § 19 (emphasis added).[126] The question is not whether the plaintiff found the contact by defendant to be offensive, but instead whether a reasonable person would do so. *First Mercury Ins. Co. v. Sudderth*, 620 F. App'x 826, 829 (11th Cir. 2015); *see also Evanston Ins. Co. v. The Break I Inc.*, No. 2:18-CV-01197-KOB, 2019 U.S. Dist. LEXIS 113109, at *16-17 (N.D. Ala. July 9, 2019) (applying reasonable person standard); *Pullom v. Greater Birmingham Transp. Servs., L.L.C.*, No. 2:15-cv-02081-AKK, 2017 U.S. Dist. LEXIS 125652, at *20 (N.D. Ala. Aug. 9, 2017) (same); *Quillen v. Am. Tobacco Co.*, 874 F. Supp. 1285, 1298-99 (M.D.

---

[125]     *See* Affidavit of Ralph Q. Summerford (Ex. 47).
[126]     "Alabama generally follows the RESTATEMENT OF TORTS [SECOND] . . . ." *Bielski v. Alfred Saliba Corp.*, 984 F. Supp. 2d 1170, 1175 (M.D. Ala. 2013).

Ala. 1995) (same). Thus, whether the battery committed by Defendants is offensive is judged by the standard of a reasonable person in the community, not on an individual basis, and based on the common toxic qualities of the chemical. Thus, common questions as to damages for Plaintiffs' battery claim predominate and are answered with common evidence.

In addition, the class claim for diagnostic testing arising from exposure to Defendants' toxic substances is a common issue. It is an issue of compensable economic loss. *See Gulf Atl. Life Ins. Co. v. Barnes*, 405 So. 2d 916, 925 (Ala. 1981); *Zivojinovich v. Ritz Carlton Hotel Co*., LLC, 445 F. Supp. 2d 1337, 1341 (M.D. Fla. 2006) (damages for medical testing were potentially recoverable for alleged battery); *Wilder v. Sigma Nu Fraternity,* No. 7:06-CV-1774-RDP, 2009 WL 10688973, at *3 (N.D. Ala. Sept. 21, 2009) (granting judgement as a matter of law for the plaintiff's battery claim, resulting in over $760,000 in medical expenses).

Whether the battery resulting from Defendants' release of toxic chemicals has caused the reasonable need for diagnostic testing is a predominate common issue because all class members (1) received the same levels of the same PFAS contamination,[127] and (2) bore the same risk of harm from the contamination.[128] The battery subclass is based on common minimum time period of occupancy of one

---

[127]     *See* Pate Affidavit at ¶¶ 4, 11 (Ex. 36). *See also* Table 1, *supra*.
[128]     https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf, last accessed November 17, 2019.

year while receiving the contaminated water, a common baseline for the exposure that resulted in battery. While Defendants may debate whether the contamination is sufficient to constitute battery this is a fact issue common to all class members.

Plaintiffs' expert Barry Ryan demonstrates that whether Defendants' contamination constitutes harmful and offensive contact is answered by common evidence for all class members. PFAS chemicals are proven hazardous substances[129] In particular, PFOA and PFOS, are known toxic chemicals.[130] Further, PFAS such as PFBS, which continue to be delivered to WMEL and adjacent utilities, are themselves toxic.[131] Whether PFOA is a proven hazardous substance is based on its inherent toxicity and does not vary by member of the class.

One route of exposure is through ingestion of contaminated water.[132] Once inside the body, PFAS (including PFOA, PFOS, and PFBS) pass thorough the epithelial layers, primarily the gut, and enters the blood stream where it is distributed to all organs systems.[133] This path of entry of PFAS into the human body exists for all humans.[134] There is no evidence of substantial metabolism of PFAS in the human

---

[129] *See* Section II.A, *supra*.
[130] Report of Barry Ryan at 2-5 (Ex. 16).
[131] *Id*. *See also* https://www.epa.gov/sites/production/files/2018-11/documents/pfbs_public_comment_draft_toxicity_assessment_nov2018-508.pdf, last accessed November 17, 2019.
[132] Report of Barry Ryan at 1-2 (Ex. 16).
[133] *Id*. at 2.
[134] *Id*. at 2-4.

body.[135]  Target organs include kidney, blood and testicles.[136]  Studies show that long chain PFAS such as PFOA and PFOS have a half-life in the human body ranging from 2-7 or more years, with residence time continuing as exposure continues.[137]  Once in the body, PFAS chemicals alter the body so that even after excretion, the harm of exposure remains.[138]  Every person who has consumed household water contaminated with PFOA, PFOS, or other PFAS from the WMEL system has undergone this contact and the resulting harm of exposure.[139]

> **b.**  **The Issues Related to Plaintiffs' Claimed Economic Loss Are Common.**

The claims of customers of WMEL and adjacent utilities (Subclass C) for economic loss for paying for uncontaminated water that they did not receive because of Defendants' contamination are based on predominant common issues.  Every customer of WMEL and the adjacent utilities paid for clean water[140] but received contaminated water.[141]  Whether a class member suffered an economic loss because

---

[135]    *Id*. at 2,5.
[136]    *Id*. at 2-3.
[137]    *Id*. at 5.
[138]    *Id*.
[139]    *Id*. at 5-6.
[140]    *See* Depo. of L. Lindsey at 20:5-13 (Ex. 42); Depo. of L. Watkins at 154:23-156:23 (Ex. 44).
[141]    *See* Report of Barry Ryan (Ex. 16). This report and the facts of the PFAS in the class' drinking water are due to be assessed by "reasonable safety expectations of an 'ordinary consumer' that is, an objective 'ordinary consumer,' possessed of the ordinary knowledge common to the community." *Deere & Co. v. Grose*, 586 So. 2d 196, 198 (Ala. 1991) (quoting *Ex parte Morrison's Cafeteria of Montgomery, Inc*., 431 So. 2d 975, 978 (Ala. 1983).

they paid for clean water that they did not receive, and whether that loss was a direct result of Defendants' tortious conduct are common questions capable of being proven by common evidence. Certification of the claims of the named Plaintiffs and class members for economic loss is therefore proper under Rule 23(b)(3).

### c. Common Issues Predominate for Other Class Relief.

Non-economic damages recoverable for property invasions include (1) loss of use and enjoyment of property and (2) annoyance and discomfort. *See Lehigh Portland Cement Co. v. Donaldson*, 164 So. 97, 98 (Ala. 1935) (approving jury instructions for annoyance and discomfort); *Webb v. Encompass Ins. Co.*, No. CA 06-0726-C, 2007 U.S. Dist. LEXIS 3505 (S.D. Ala. Jan. 12, 2007) (denying motion to dismiss on claims of "loss of use and enjoyment" of plaintiff's home); RESTATEMENT OF TORTS [SECOND], Section 929(b),(c). All residential occupants (Subclass A) have suffered annoyance and loss of enjoyment as a result of the contamination of their household water and the disruption and inconvenience associated with it. Annoyance and discomfort and loss of use and enjoyment are damages arising out of interests in property, are determined by the reaction of the normal person under the circumstances in the community, and so do not present any individualized issues which might preclude class action treatment and adjudication. *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1203, 1204 (D. Colo. 2003)

(citing, RESTATEMENT OF TORTS [SECOND] Section 821F: significant invasion of another's interest in the use and enjoyment of property exists "if normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable.")  The community to be considered is the community in which the affected property is located, rather than a community encompassing the general public as a whole.  *Id*. at 1206, n.32, (citing RESTATEMENT § 821F cmt. e).  Thus the standard is an objective one, and therefore would preclude (and indeed proscribe) any individualized inquiry into each class members' annoyance and loss of enjoyment damages.

> ### d.  Common Questions of Law and Fact Predominate and Overwhelm Any Individual Issues.

In this case, common questions of law and fact not only predominate, they overwhelm any individual issues that may exist.  *See Allapattah Servs. v. Exxon Corp.*, 333 F.3d 1248, 1260-61 (11th Cir. 2003) (where issues were subject to generalized proof and predominated over the individual issues raised by defendant, class certification was proper); *see also In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 692 n.20 (N.D. Ga. 2003) ("The requirement to determine damages on an individual basis does not foreclose a finding of predominance or defeat certification of the class.").

> ### 4.  Managing the Claims of Class Members as a Class Action

**under Fed. R. Civ. P. 23 Is Superior to Other Methods of Case Management.**

Class treatment of these claims is superior to other methods of management of class members' claims.  Resolving predominant, common issues of Defendants' liability and Plaintiffs' and class members' damages in the present case will result in substantial savings of judicial resources and minimize the overall expense of the litigation.  Class treatment will eliminate repetition of court resources and expense in trying the same claims against the same defendants for the same conduct resulting in the release of the same contaminants of the same facility contaminating air, soil and groundwater by the same mechanism.  Individual claims would require the same experts and lay witnesses to present their testimony time after time, likely hundreds of times.

Finally, because the classes are well-defined with the identity of all class members easily ascertained, management of a class action of this nature will not present any difficulties.  Here, with identifiable properties and class members, communications with the class members can be handled efficiently.  Furthermore, refusal to certify a class due to manageability is not favored.  *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516 (M.D. Ala. 1992).  Class Counsel has experience prosecuting and completing environmental class actions, demonstrating their

manageability.[142]

For class members' claims arising out of the Defendants' contamination of the Tennessee River, a class action is vastly superior to individual actions as a method for resolving the claims of the named Plaintiffs and the class. First, the common issues discussed in detail above can be efficiently and economically addressed on a class-wide basis. Second, the Court in this action has the benefit of experienced counsel who can assist the court in managing the action. Third, given the expense of the litigation, many plaintiffs would not be able to obtain redress absent class treatment if they were forced to proceed on an individual basis. Finally, resolving the common issues on a class-wide basis will create uniform resolution of these issues providing a framework for the adjudication or settlement of any individual damage issues, if any remain. *Brannan v. Wells Fargo Home Mortg., Inc.* (*In re Brannan*), 485 B.R. 443, 459 (Bankr. S.D. Ala. 2013) (class action is superior to individual cases due to the potential size of the class and the common facts, questions, and injury); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004) ("It is ridiculous to expect 600,000 doctors across the nation to repeatedly prove these complicated and overwhelming facts.").

### C. Plaintiffs' Claims Satisfy the Requirements of Rule 23(b)(2)

---

[142]    Affidavit of Kevin Hannon (Ex. 46).

Certification under Fed. R. Civ. P. 23(b)(2) is appropriate where, as here, broad, class-wide injunctive or declaratory relief is necessary. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 at 412 (5th Cir. 1998) (citing *Holmes v. Continental Can Co.*, 706 F.2d 1144 at 1155 n.8 (11th Cir. 1983)). Certification is appropriate under FRCP 23(b)(2) when "members of the proposed class would benefit from the injunctive relief they request." *In re Monumental Life Ins. Co.*, 365 F.3d 408, 416 (5th Cir. 2004) (reversing decision to not certify a 23(b)(2) class where one million policy holders could potentially benefit from injunctive relief). Under Rule 23(b)(2), there is no requirement that issues subject to generalized proof predominate over those subject to individualized proof. *See e.g. J.W. v. Birmingham*, 2012 U.S. Dist. LEXIS 124183 at *33 (N.D. Ala. Aug. 31, 2012) (certifying Rule 23(b)(2) class).

Certification of Plaintiffs' claims seeking injunctive relief to abate the nuisance caused by Defendants' toxic releases (Count III) is proper. When the existence of a nuisance is found, which here itself is a class-wide issue, a judgement "may include actual damages and an injunction to restrain, abate, and prevent the continuance or reoccurrence of the nuisance." Ala. Code (1975) § 6-5-160.3. Injunctions may be an appropriate remedy for abatement of a nuisance, particularly when continuing pollution emissions are occurring. *See Moore v. Walter Coke, Inc.*, 294 F.R.D. 620, 632 (N.D. Ala. 2013) (denying motion to dismiss on claim that

plaintiff failed to plead a valid claim of injunctive relief stemming from pollution from a coke processing plant, stating that it is "well established that cases involving continuing harm to land may be appropriate candidates for injunctive relief"). *See also Cameron v. Peach Cty., GA,* 2004 U.S. Dist. LEXIS 30974, at *33 (M.D. Ga. June 28, 2004) (noting that "[w]hen a continuing nuisance is found, the court further has the discretion to fashion an appropriate injunction to remedy the nuisance.")

Defendants have clearly acted or refused to act on grounds that apply generally to the class, satisfying Fed. R. Civ. P. 23(b)(2). The contamination itself, the impact of the contamination and the remedies for the contamination are all common to every class member. The members of the Class are bound together by the significant common trait of contamination at the hands of Defendants. *Cf. Holmes,* 706 F.2d at 1155 n.8. The substantial cohesion of the interest in abating the contamination means the class representatives can adequately represent the interests of absent members and that the need for and interest in individual representation will be minimal. *Id*. Further, whether the elements of a claim for abatement of the nuisance have been met does not vary by class member. The need for abatement to prevent continuing contamination applies to every member of the class. Thus, the class is cohesive as to this claim. *Id.*

**D.      Class Certification Is Proper Under Fed. R. Civ. P. 23(c)(4).**

When appropriate, an action may be maintained as a class action with respect to particular issues. Fed. R. Civ. P. 23(c)(4). If the court does not grant certification of Plaintiffs' claims under Rule 23(b)(3), particular issues are appropriate for certification under Rule 23(c)(4). These common issues, once certified, would advance the disposition of this matter. Here, many common issues predominate, and they include, but are not limited to:

- whether Defendants were negligent;

- whether Defendants' actions constitute a trespass;

- whether Defendants' actions constitute battery;

- whether Defendants' actions constitute a public nuisance; and

- whether Defendants' conduct was wanton, malicious or oppressive and in reckless disregard for the rights and safety of Plaintiffs and the class members.

Resolution of these issues would significantly advance the determination claims for all class members.

## VI. CONCLUSION

The claims presented by Plaintiffs and class members are perfectly suited for class treatment. The requirements of Rule 23 are satisfied. Plaintiffs therefore respectfully request that this Court certify the proposed class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) or in the alternative Fed. R. Civ. P. 23(c)(4).

49

Certification should be granted on the claims of negligence, public nuisance, trespass, battery, and wantonness.

Respectfully submitted,

/s/ Christopher B. Hood
Christopher B. Hood (ASB-2280-S35H)
Timothy C. Davis (ASB-6834-D63T)
W. Lewis Garrison, Jr. (ASB-3791-N74W)
HENINGER GARRISON DAVIS
2224 First Avenue North
Birmingham, AL  35203
PH:  205.326.3336
tim@hgdlawfirm.com
lewis@hgdlawfirm.com
chood@hgdlawfirm.com

/s/ Kevin S. Hannon
Kevin S. Hannon, *pro hac vice*
The Hannon Law Firm, LLC
1641 Downing Street
Denver, CO 80218
(303) 861-8800
khannon@hannonlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered counsel.


/s/ Christopher B. Hood
Christopher B. Hood