FILED
2019 Dec-03 PM 11:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 42

```
                                    1                                              3
  1         IN THE UNITED STATES DISTRICT COURT    1      A P P E A R A N C E S  (Continuing)
  2         FOR THE NORTHERN DISTRICT OF ALABAMA   2
  3                  NORTHEASTERN DIVISION         3  FOR THE DEFENDANT, 3M COMPANY:
  4                                                4       Mr. M. Christian King
  5  CIVIL ACTION NO. 5:15-cv-01750-AKK            5       Attorney at Law
  6                                                6       Lightfoot, Franklin & White, L.L.C.
  7  TOMMY LINDSEY, et al.,                        7       The Clark Building
  8             Plaintiffs,                        8       400 North 20th Street
  9  vs.                                           9       Birmingham, Alabama 35203
 10  3M COMPANY, et al.,                          10       205.581.0715
 11             Defendants.                       11       cking@lightfootlaw.com
 12                                               12
 13     VIDEO DEPOSITION OF MARY LANETTE LINDSEY  13  FOR THE DEFENDANT, DAIKIN AMERICA, INC.:
 14           Heninger Garrison Davis, LLC        14       Mr. Christopher L. Yeilding
 15              2224 First Avenue North          15       Attorney at Law
 16             Birmingham, Alabama 35203         16       Balch & Bingham LLP
 17                November 21, 2019              17       Post Office Box 306
 18                                               18       Birmingham, Alabama 35201-0306
 19                                               19       205.251.8100
 20  REPORTED BY:   Laura H. Nichols              20       cyeilding@balch.com
 21                 Certified Realtime Reporter,  21
 22                 Registered Professional       22
 23                 Reporter and Notary Public    23

                                    2                                              4
  1              A P P E A R A N C E S             1     A P P E A R A N C E S  (Continuing)
  2                                                2
  3  FOR THE PLAINTIFFS:                           3  OTHERS PRESENT:
  4       Mr. Timothy C. Davis                     4       Mr. Ted Yost, Videographer
  5       Attorney at Law                          5       Freedom Court Reporting
  6       Heninger Garrison Davis LLC              6       2031 Shady Crest Drive
  7       2224 First Avenue North                  7       Hoover, Alabama 35216
  8       Birmingham, Alabama 35203                8       205.397.2397
  9       205.326.3336                             9
 10       tdavis@hgdlawfirm.com                   10
 11  -AND-                                        11
 12       Mr. Kevin Hannon                        12
 13       Attorney at Law                         13
 14       The Hannon Law Firm, LLC                14
 15       1641 Downing Street                     15
 16       Denver, Colorado 80128                  16
 17       303.861.8800                            17
 18       khannon@hannonlaw.com                   18
 19                                               19
 20                                               20
 21                                               21
 22                                               22
 23                                               23
```

```
                                    9
10:13:20  1  al., filed in United States District Court for
10:13:21  2  the Northern District of Alabama, Northeastern
10:13:24  3  Division.
10:13:25  4          This deposition is being held at
10:13:27  5  Heninger Garrison Davis, LLC, located at 2224
10:13:29  6  First Avenue North, Birmingham, Alabama.  My
10:13:32  7  name is Ted Yost from the firm Veritext, and
10:13:34  8  I'm the videographer.  The court reporter is
10:13:37  9  Laura Nichols from Veritext.
10:13:40 10          At this time counsel and all
10:13:41 11  present in the room will now state their
10:13:43 12  appearance and affiliations for the record.
10:13:45 13          MR. DAVIS:  Tim Davis on behalf of
10:13:47 14  the Plaintiffs.
10:13:48 15          MR. HANNON:  Kevin Hannon on
10:13:50 16  behalf of the Plaintiffs.
         17          MR. YEILDING:  Chris Yeilding for
10:13:52 18  defendant Daikin America.
10:13:52 19          MR. KING:  Chris King for 3M.
10:13:56 20          THE VIDEOGRAPHER:  Would the
10:14:03 21  reporter please swear in the witness?
10:14:05 22
         23

                                    10
          1          MARY LANETTE LINDSEY,
          2  having been first duly sworn, was examined and
          3  testified as follows:
          4
10:14:07  5  EXAMINATION BY MR. KING:
10:14:07  6     Q.   Good morning, Mrs. Lindsey.  Will
10:14:09  7  you state your full name, please?
10:14:11  8     A.   Good morning.  Mary Lanette
10:14:12  9  Lindsey.
10:14:12 10     Q.   What is your address?
10:14:15 11     A.   776 County Road 352, Trinity,
10:14:20 12  Alabama 35673.
10:14:23 13     Q.   And your Social Security number,
10:14:24 14  please, ma'am?
         15     A.   (No response.)
10:14:29 16     Q.   Will you state your Social
10:14:30 17  Security number, please, ma'am?
10:14:31 18     A.   I'm sorry.  I don't know my Social
10:14:35 19  Security number by heart.
10:14:36 20     Q.   Okay.
10:14:36 21     A.   I don't use it that much.
10:14:38 22     Q.   All right.  We can get it another
10:14:42 23  way, through your counsel.  You understand,

                                    11
10:14:45  1  Mrs. Lindsey, you are here today because you
10:14:47  2  have filed a lawsuit against 3M and others?
10:14:51  3     A.   Yes.
10:14:51  4     Q.   And will you tell me in your words
10:14:58  5  how you claim 3M has damaged you?
10:15:00  6     A.   By putting toxic chemicals in our
10:15:03  7  drinking water.
10:15:04  8     Q.   And how did that damage you?
10:15:11  9     A.   It has caused me to have -- and a
10:15:16 10  group of people who I am representing to have
10:15:23 11  unclean water.  We paid to have clean water,
10:15:29 12  but we get toxic, polluted water.  It is a
10:15:40 13  nuisance.
10:15:44 14     Q.   Anything else?
10:15:50 15     A.   Not right now.
10:15:54 16     Q.   Okay.  Let me unpack that a little
10:15:57 17  bit.  Do you claim that you have suffered any
10:16:02 18  physical injury as a result of what you call
10:16:06 19  "unclean water"?
10:16:11 20     A.   I'm not sure.
10:16:11 21     Q.   Are you claiming in this lawsuit
10:16:19 22  that you suffered any physical injury as a
10:16:22 23  result of what you called the unclean water?

                                    12
10:16:30  1     A.   I'm not sure.
10:16:32  2     Q.   Are you claiming -- or let me ask
10:16:34  3  you this:  Have you suffered mental anguish,
10:16:37  4  emotional distress as a result of having
10:16:42  5  unclean water?
10:16:44  6     A.   Definitely, yes.
10:16:56  7     Q.   Have you sought any medical
10:17:02  8  treatment for this distress?
10:17:03  9     A.   No.
10:17:10 10     Q.   Can you tell us the ways in which
10:17:15 11  what you term the "unclean water" has caused
10:17:18 12  you distress?
10:17:22 13     A.   It is just so aggravating to have
10:17:27 14  to go out and buy your water when I could be
10:17:30 15  getting it out of my faucet.
10:17:36 16     Q.   Are you still buying water?
10:17:37 17     A.   Yes.
10:17:38 18     Q.   So you have told us that it is
10:17:49 19  aggravating for you to have to go buy water
10:17:54 20  instead of using what is coming out of your
10:17:56 21  faucet.  Can you tell us any other ways in
10:18:01 22  which what you term "unclean water" has
10:18:05 23  affected you emotionally?
```

### Page 13

```
10:18:10   1        A.    It has took the joy out of living
10:18:12   2   where I live, because the toxins, contaminated
10:18:24   3   water is all through my house, on our property.
10:18:32   4   And it has took the joy out of living there.
10:18:34   5        Q.    Are you claiming money damages in
10:18:50   6   this lawsuit as a result of this emotional
10:18:54   7   distress that you've described to us?
10:19:10   8        A.    Yes.
10:19:11   9        Q.    Do you have an opinion as you sit
10:19:17  10   here today, Mrs. Lindsey, as to what amount of
10:19:25  11   money would compensate you for what you have
10:19:28  12   been through emotionally as a result of having
10:19:32  13   what you have termed "unclean water" at your
10:19:35  14   home?
10:19:49  15        A.    I just want fairness.
10:19:58  16        Q.    So do you have an amount in mind?
10:20:00  17        A.    I think -- I think 3M and these
10:20:04  18   plants should pay up for what they have done to
10:20:09  19   us.
10:20:11  20        Q.    And just staying with you
10:20:13  21   personally for the moment, Mrs. Lindsey, do you
10:20:15  22   have an amount in mind as to what you think
10:20:19  23   would be a fair payment to you by 3M?
```

### Page 14

```
10:20:24   1        A.    Higher than ten million.
10:20:26   2        Q.    Personally?
10:20:28   3        A.    Yes.
10:20:37   4        Q.    Now, I asked you about emotional
10:20:40   5   damages.  Have you told me everything that you
10:20:43   6   can think of or every way you can think of in
10:20:47   7   which what you term this "unclean water" has
10:20:48   8   damaged you emotionally?  Or is there anything
10:20:53   9   else you want to add to that?
10:21:05  10        A.    I can't think right now.
10:21:11  11        Q.    If during the deposition you think
10:21:13  12   of something you want to add, will you just let
10:21:15  13   me know?  And I will stop and we will cover
10:21:17  14   that.
10:21:17  15        A.    Okay.
10:21:18  16        Q.    Now, I want to ask you about
10:21:23  17   something else.  You have lived on your
10:21:28  18   property on County Road 352 since when?
10:21:34  19        A.    1971.
10:21:45  20        Q.    Have you attempted to sell your
10:21:48  21   property since 1971?
10:21:49  22        A.    No.
10:21:55  23        Q.    Are you claiming in this lawsuit
```

### Page 15

```
10:21:57   1   that the value of your property has decreased
10:22:00   2   as a result of what you term this "unclean
10:22:08   3   water"?
10:22:09   4        A.    Definitely.
10:22:15   5        Q.    And why do you say that?
10:22:16   6        A.    Because the value of it has went
10:22:18   7   down.  There's no value to it at all.
10:22:26   8        Q.    Do you think your property is
10:22:27   9   worthless as a result of the what you term
10:22:30  10   "unclean water"?
10:22:32  11        A.    I do.
10:22:43  12        Q.    And what is your opinion, if you
10:22:45  13   have one, as to what your property, your home
10:22:49  14   and your acreage, would be worth if it weren't
10:22:51  15   for what you term the "unclean water"?
10:22:57  16        A.    Repeat the question, please.
10:22:58  17        Q.    Yes, ma'am.  I will ask it
10:23:00  18   different.  Maybe that will help.  What do you
10:23:03  19   think your property would be worth if you
10:23:08  20   didn't have this water problem that you have
10:23:10  21   described?
10:23:10  22        A.    A lot more than what it is now.
10:23:19  23        Q.    Right.  Because you have told me
```

### Page 16

```
10:23:20   1   now you think it is zero.  So what I am trying
10:23:23   2   to do is figure out what that change is, in
10:23:26   3   your mind, Mrs. Lindsey.  What do you think it
10:23:29   4   would be worth if you didn't have this problem?
10:23:35   5        A.    About a hundred and seventy-five
10:23:37   6   thousand.
10:23:44   7        Q.    So if I am -- is it fair, then, to
10:23:47   8   conclude that in your opinion, your property
10:23:51   9   value for your personal property there -- let
10:23:55  10   me start over because "personal property" is a
10:23:58  11   different term.
10:23:58  12              Would it be fair to conclude,
10:24:00  13   based on your testimony, that you think that
10:24:02  14   your home property has decreased in value by
10:24:09  15   about a hundred seventy-five thousand dollars
10:24:10  16   as a result of what you term "unclean water"?
10:24:17  17        A.    Probably.
10:24:26  18        Q.    What other damages, if any, can
10:24:28  19   you think of that this -- that you say 3M has
10:24:32  20   caused you personally that you haven't already
10:24:35  21   told me about?
10:24:48  22        A.    Repeat the question.
10:24:49  23        Q.    Sure.  You have told me about some
```

17

```
10:24:50  1  emotional distress damages and what you think
10:24:53  2  you ought to be paid for that.  You have told
10:24:57  3  me that you think the value of your property
10:25:02  4  has gone down as a result of 3M's conduct.  And
10:25:06  5  my follow-up question is, are there any other
10:25:09  6  categories of damages, Mrs. Lindsey, that you
10:25:12  7  are claiming 3M has caused you?
10:25:19  8           MR. DAVIS:  Well, I would object.
10:25:20  9  That doesn't encompass everything she said, but
10:25:23 10  she can answer.
10:25:29 11      A.   I've done lost thought now.
10:25:33 12      Q.   (BY MR. KING:)  Let me start over.
10:25:35 13  You have told me about some property damage and
10:25:37 14  some emotional distress damages.  That is sort
10:25:42 15  of two buckets in the law of damages.  Can you
10:25:45 16  think of any other way that 3M has harmed you,
10:25:52 17  damaged you, in your mind?
10:25:54 18           MR. DAVIS:  Same objection.
10:25:55 19      A.   They have done everything that is
10:25:57 20  listed in that lawsuit.  They have done it to
10:25:59 21  us and the whole twenty thousand people.
10:26:07 22      Q.   (BY MR. KING:)  Okay.  Staying on
10:26:09 23  you personally for the time being, I just want
```

18

```
10:26:11  1  to make sure, are there any other categories of
10:26:13  2  damages?  And I will suggest some to you, if
10:26:15  3  you can't think of any.
10:26:16  4           Can you think of any other
10:26:19  5  categories of how they have cost you money?
10:26:42  6      A.   I don't know.
10:26:43  7      Q.   Okay.  You told us that you buy
10:26:47  8  bottled water.
10:26:48  9      A.   True.
10:26:49 10      Q.   Do you buy bottled water just to
10:26:55 11  drink, or do you buy bottled water to do other
10:26:59 12  things with?
10:26:59 13      A.   I cook with it, water our gardens
10:27:09 14  with it.
10:27:10 15      Q.   With bottled water?
10:27:12 16      A.   Well, water comes through the --
10:27:14 17  through the system.
10:27:16 18      Q.   Okay.  My question wasn't clear,
10:27:18 19  and I apologize.  You told us earlier, I
10:27:20 20  thought, that instead of using your tap water
10:27:23 21  for some things, you go to the store and get
10:27:26 22  bottled water; is that right?
10:27:28 23      A.   Right.
```

19

```
10:27:28  1      Q.   And my question was, what do you
10:27:34  2  use that bottled water for?
10:27:35  3      A.   To drink and to cook with.
10:27:37  4      Q.   Okay.  Anything else?
10:27:42  5      A.   No.
10:27:42  6      Q.   Do you use your tap water for
10:27:44  7  everything else?
10:27:45  8      A.   You have to wash clothes and take
10:27:49  9  a bath and stuff like that.
10:27:51 10      Q.   And you use tap water to wash your
10:27:54 11  clothes and bathe; is that right?
10:27:56 12      A.   Yes.
10:27:56 13      Q.   Okay.  Do you have an amount that
10:28:05 14  you think you have spent on bottled water that
10:28:07 15  is the fault of 3M?
10:28:22 16      A.   Well, the nuisance it causes and
10:28:27 17  everything, it would be thousands of dollars.
10:28:32 18      Q.   Have you kept up with how much you
10:28:34 19  have spent on your bottled water?
10:28:37 20      A.   I have some receipts.
10:28:42 21      Q.   Okay.  And a few receipts have
10:28:45 22  been provided to us.  Can you give us a
10:28:47 23  ballpark of how much in your mind you think you
```

20

```
10:28:50  1  have spent on bottled water as a result of
10:28:55  2  having what you term "unclean water"?
10:28:58  3      A.   Probably two or three hundred
10:29:00  4  dollars.
10:29:10  5      Q.   Now, in addition to that, are you
10:29:12  6  claiming that you paid too much to West
10:29:23  7  Morgan-East Lawrence Water Authority as a
10:29:23  8  result of anything 3M did?
10:29:27  9      A.   Yes.  We have paid for -- to have
10:29:32 10  clean water, but we got the polluted, toxic and
10:29:39 11  contaminated water.  Or it was supposed to be
10:29:42 12  called water, which it is really not.  It is
10:29:45 13  just a stinky mess that comes out.
10:29:47 14      Q.   Does it smell bad?
10:29:49 15      A.   It used to.  And I don't -- right
10:29:54 16  now I don't trust it.
10:29:55 17      Q.   Does it still smell bad?
10:29:57 18      A.   A little bit at certain times.
10:30:00 19  You can smell the carbon in it, I guess.
10:30:09 20      Q.   What does it smell like?
10:30:11 21      A.   Have you ever smelled carbon?
10:30:12 22      Q.   I don't think I have.
10:30:13 23      A.   Well --
```

33

1  in 1971 and that you got city water in about
2  1998.  Has anyone other than your husband lived
3  with you at that address since 1998?
4      A.   Yes, a grandson lived there with
5  us for a while.
6      Q.   About what years was that?
7      A.   It was in '17.
8      Q.   And how long did he live with you?
9      A.   Three months.  But then he was in
10 and out some.
11     Q.   Okay.  What is his name?
12     A.   Riley Pike.
13     Q.   Where is he now?
14     A.   He is at Tyndall Air Force Base in
15 Panama City, Florida.
16     Q.   In the military?
17     A.   In the military.  He has just
18 gotten staff sergeant.
19     Q.   Okay.  I want to talk about when
20 you first heard that there was some problem
21 with your water.  Can you help me with that?
22     A.   I will try.
23     Q.   Okay.  Thank you.  So when is it

34

1  that you first heard that there was some
2  possible problem with your water?
3      A.   May of '16.
4      Q.   Before you heard that, did you use
5  any bottled water for any purpose?
6      A.   No.  Except just to carry some to
7  a ball game.
8      Q.   But when you were in your home --
9      A.   No.
10     Q.   -- you drank tap water?
11     A.   Tap water.
12     Q.   Okay.  So what did you hear in May
13 of 2016?
14     A.   Well, it came over the news that
15 we shouldn't drink the water.
16     Q.   And did you stop drinking the
17 water in May of '16?
18     A.   Sure did.
19     Q.   Did you ever start back, even for
20 a period of time, drinking the water at your
21 home?
22     A.   No.  I have always kept it in the
23 house to drink, used it.

35

1      Q.   Let me make sure we have got a
2  clear question and answer.  So have you -- is
3  it your testimony that you have used bottled
4  water exclusively to drink since May of 2016?
5      A.   Yes.
6      Q.   And how about your husband, does
7  he drink bottled water exclusively at home or
8  does he sometimes drink tap water?
9      A.   If he drinks water, it is bottled.
10     Q.   How about coffee, what do y'all
11 make coffee with?
12     A.   Jug water.
13     Q.   And you said you cook with jug
14 water too?
15     A.   Right.
16     Q.   Do you buy it in the five-gallon
17 jugs?
18     A.   I do.
19     Q.   And where do you buy it from?
20     A.   Grocery stores.
21     Q.   Okay.  About how many five --
22 well, how many gallons a month of bottled water
23 do you think y'all go through?

36

1      A.   Well, there's just the two of us.
2  I really haven't kept up with it.
3      Q.   Okay.
4      A.   So I will leave it at that.
5      Q.   So do you think you have used less
6  water at your home from the tap since May of
7  '16 than you did before May of '16?
8      A.   Yes.
9      Q.   Has your water bill gone down?
10     A.   I don't know because -- I don't
11 know.  I'm not sure.
12     Q.   Do you have a garden at home?
13     A.   No, not anymore.
14     Q.   Have you ever had a garden?
15     A.   Oh, yes.
16     Q.   And what years did you have a
17 garden?
18     A.   It has probably been about seven
19 or eight years since we have had a garden.
20     Q.   So you didn't have a garden at the
21 time you heard the news about your water; is
22 that fair?
23     A.   Yes, I guess.

## Page 57

1  And I have done forgot the name of it.  But in
2  a year or two, it changed -- they bought out.
3  You know how companies buy out, banks and all,
4  changes.  And it ended up Wells Fargo.
5      Q.   Okay.  I guess -- let me tell you
6  why I am asking these questions.  Because if I
7  wanted to find that appraisal, which I do --
8      A.   Uh-huh.
9      Q.   -- I was trying to figure out
10 where I would go to Wells Fargo.  But you just
11 mail your payment in to --
12     A.   He goes to the branch there in
13 Decatur, Alabama and makes the payment.
14     Q.   Okay.  And I will ask your
15 husband.  It sounds like he is a better person
16 to ask about that too.
17     A.   He might be.
18     Q.   But y'all don't have a reverse
19 mortgage now.  Y'all just --
20     A.   No.
21     Q.   -- have a traditional mortgage?
22 Traditional mortgage?
23     A.   Yes.

## Page 58

1      Q.   Are you aware of any other
2  appraisals that have been done on your
3  property, other than that one that was done
4  when you refinanced in about 2012?
5      A.   No.
6      Q.   Do you recall how much you paid
7  for your property in 1971?
8      A.   No.  Actually, the house that we
9  live in, my dad owned it.  And he let us have
10 it really, really cheap.  And that was
11 including the lot and everything.
12     Q.   Okay.  I should have asked about
13 that earlier.  The deed that I saw from 1971,
14 it said something like ten dollars and other
15 good and valuable consideration.
16     A.   Uh-huh.
17     Q.   Did y'all just pay a nominal
18 amount for that house?
19     A.   Uh-huh.
20     Q.   Is that a yes?
21     A.   Yes.
22     Q.   Your dad more or less gave that to
23 y'all as a gift?

## Page 59

1      A.   Yes.
2      Q.   And it was next door to your
3  parents?
4      A.   Yes.
5      Q.   And who had built that house?
6      A.   I do not know.
7      Q.   Did he buy it from somebody else?
8      A.   Yes.
9      Q.   Did he buy it with the purpose of
10 giving it to you or had he owned it for a
11 while?
12          MR. DAVIS:  Object to the form.
13          MR. KING:  Let me rephrase it.  It
14 was a crummy question.
15     Q.   (BY MR. KING:)  If you know, did
16 he buy it to give it to you or had he had it
17 for a while?
18     A.   He bought property and would rent
19 it out.  And we started out as renters.  We
20 paid him a little rent.  And then he decided he
21 wanted to sell it and give it to us.
22     Q.   Okay.  So do you know the balance
23 of your mortgage right now?

## Page 60

1      A.   Not exactly, I don't.
2      Q.   How about a ballpark?
3      A.   Maybe one fifty.
4      Q.   So when did you first have a
5  mortgage on that home?
6      A.   He got a VA loan on it, and it was
7  with the Jackson Company back then.
8      Q.   Was that back in the '70s?
9      A.   Yes.
10     Q.   You testified a little earlier
11 about this emotional distress that you have
12 suffered.  Let me ask you some follow-up
13 questions about that.  Okay?
14     A.   Okay.
15     Q.   When did this emotional distress
16 start?  Let me ask a better question.  When did
17 the emotional distress that you attribute to 3M
18 start for you?
19     A.   When I found out that our drinking
20 water had been poisoned by toxic chemicals.
21     Q.   And was that May of 2016, or was
22 that some other date?
23     A.   Around May 16th.

## Page 93

1  the table that we could go by and pick up and
2  ask a question if we wanted to.
3      Q.   Did you ask any questions of
4  anyone?
5      A.   I don't remember asking any
6  questions.
7      Q.   Did you pick up any of the
8  literature?
9      A.   I did.
10     Q.   All right.  I think we will come
11 to some other stuff in a bit.  But let's stay
12 on this exhibit now.
13          If you go to Page 82, it is a
14 September 2015 letter to your husband.  Did you
15 get a similar letter in September of 2015?
16     A.   I am sure I did.
17     Q.   Did y'all get retested?
18     A.   No.
19     Q.   Why not?
20     A.   We were -- we were advised not to.
21     Q.   Okay.  And who gave you that
22 advice?
23     A.   Carl Cole, attorney.

## Page 94

1          MR. DAVIS:  I move to strike that.
2  That is a conversation with an attorney.
3      A.   This has got nothing to do with
4  the water.
5          MR. DAVIS:  Mrs. Lindsey, do not
6  share conversations you had with counsel.
7      A.   Okay.
8      Q.   (BY MR. KING:)  Did you ever have
9  any more communications or contact with anybody
10 with the government about PFCs other than
11 attending this meeting in Moulton?
12     A.   No, sir.
13     Q.   Have you ever talked to anyone at
14 the West Morgan-East Lawrence Water Authority
15 about PFC --
16     A.   No.
17     Q.   I am going to show you another
18 exhibit, which is Exhibit 4, another document
19 you provided to your lawyers, and ask you some
20 questions about it.
21          (Defendants' Exhibit 4 was marked
22          for identification.)
23     Q.   (BY MR. KING:)  Is this one of the

## Page 95

1  documents you picked up at the Moulton meeting,
2  or do you know?
3      A.   I'm not sure.
4      Q.   This has got some underlining and
5  some other handwritten --
6      A.   I did that.
7      Q.   So you don't know whether you had
8  this back in January of '11 or got it sometime
9  thereafter; is that correct?
10     A.   Correct.
11     Q.   Will you turn to Page 70 of that
12 exhibit with me, please, ma'am?  So I want to
13 ask you about what I will call the fourth
14 paragraph.  It starts with "the first follow-up
15 study."  Do you see where I am?
16     A.   Yes, sir.
17     Q.   Okay.  Would you read that
18 paragraph to yourself so I can ask you some
19 questions about it?  Tell me when you are
20 through.
21          (Pause.)
22     Q.   (BY MR. KING:)  Are you ready?
23     A.   Yes.

## Page 96

1      Q.   Did that tell you there had been
2  testing done of your water that you got from
3  the West Morgan-East Lawrence Authority --
4      A.   Yes.
5      Q.   -- and that the PFCs detected in
6  that water were below the EPA's provisional
7  health advisory levels?
8      A.   That is what it says.
9      Q.   All right.  And did that concern
10 you that there were any levels in your water?
11         MR. DAVIS:  Object to the
12 question.  You are assuming the witness read
13 this particular document.
14     Q.   (BY MR. KING:)  You can answer.
15     A.   I don't know.
16     Q.   Is it true that you not only read
17 the document, but underlined this very
18 sentence?  True?
19     A.   True.
20     Q.   All right.  So what I was trying
21 to get at -- and I will ask it a better way --
22 this sentence told you that the levels were
23 below the EPA's provisional health advisory

97

```
13:45:52  1   levels.  Were you concerned that there were any
13:45:55  2   levels of PFC chemicals in your water?
13:46:02  3        A.   Yes, I was concerned.
13:46:08  4        Q.   What level of PFC chemicals would
13:46:13  5   you have considered safe in your mind?
13:46:15  6             MR. DAVIS:  Object to the question
13:46:17  7   and this witness' qualifications to answer that
13:46:19  8   question.
13:46:23  9        Q.   (BY MR. KING:)  You can answer.
13:46:32 10             MR. DAVIS:  Don't guess at it if
13:46:34 11   you --
13:46:35 12        A.   I don't -- I don't want to answer
13:46:37 13   it.
13:46:37 14        Q.   (BY MR. KING:)  I guess what I am
13:46:39 15   trying to get at is, in your mind, would you
13:46:41 16   drink your water if it had one part per
13:46:44 17   trillion of one of these chemicals in it?
13:46:48 18             MR. DAVIS:  Same objection.
13:46:55 19        A.   No.
13:47:13 20        Q.   (BY MR. KING:)  If you will go to
13:47:15 21   Page 73 of that exhibit, please, ma'am, two
13:47:23 22   questions about that page.  There's a --
13:47:30 23        A.   72?
```

98

```
13:47:31  1        Q.   73, the last page.  There's a
13:47:38  2   reference there to an EPA website.  Did you go
13:47:43  3   on that website and do any research --
13:47:45  4        A.   No.
13:47:45  5        Q.   -- after receiving this document?
13:47:47  6        A.   No.
13:47:47  7        Q.   Did you consider doing that?
13:47:49  8        A.   No.  I don't do computer.
13:47:58  9        Q.   Okay.  It also says in the last
13:48:00 10   paragraph above the contact information, "If
13:48:02 11   persons are concerned about PFC compounds in
13:48:05 12   their drinking water, some water filtration
13:48:07 13   devices, point-of-use devices that are
13:48:11 14   installed at an individual tap, faucet or
13:48:14 15   outlet may remove some of these compounds from
13:48:17 16   water."
13:48:18 17             Did you consider using one of
13:48:22 18   those devices at that time?
13:48:34 19        A.   No.
13:48:34 20        Q.   And it is true -- is it true that
13:48:37 21   after you received this January of 2011 EPA
13:48:44 22   fact sheet, you continued to drink your tap
13:48:47 23   water?  Excuse me.
```

99

```
13:48:55  1        A.   Yes, back then we did.
13:49:12  2             (Defendants' Exhibit 5 was marked
13:49:14  3             for identification.)
13:49:14  4        Q.   (BY MR. KING:)  Let me show you
13:49:16  5   Exhibit 5.  Are these receipts for bottled
13:49:56  6   water that you have supplied to your lawyers?
13:49:58  7        A.   Yes.
13:49:59  8        Q.   So the first receipt appears to be
13:50:11  9   March the 3rd of '17, if I am looking correctly
13:50:16 10   at the first page.  Do you see that?
13:50:27 11        A.   I don't see the date.  Is it the
13:50:29 12   first page?
13:50:29 13        Q.   Yeah.  Look right here.  Do you
13:50:31 14   see where my finger is?
13:50:33 15        A.   Yes.
13:50:33 16        Q.   It says "3/3/17."
13:50:38 17        A.   Okay, yes.
13:50:39 18        Q.   Okay.  Then if I go -- that looks
13:50:41 19   like a two-pager.  If I go to the next one of
13:50:48 20   Gateway Foodland, it looks like on the second
13:50:52 21   page of that one, if you come down to the
13:50:54 22   bottom, that is March 17 of 2017.  Do you see
13:50:58 23   that?
```

100

```
13:50:59  1        A.   Uh-huh, yes.
13:51:04  2        Q.   And then if I go to the next one,
13:51:06  3   which is Publix, you have got a receipt dated
13:51:10  4   at the last page there August 16, 2019,
13:51:14  5   correct?
13:51:15  6        A.   Correct.
13:51:26  7             MR. DAVIS:  Chris, I am sorry to
13:51:28  8   interrupt your question.
13:51:29  9             MR. KING:  That is okay.
13:51:31 10             MR. DAVIS:  Mrs. Lindsey brought
13:51:32 11   some additional receipts.  We are having those
13:51:35 12   copied to give to you.
13:51:38 13             MR. KING:  Okay.
13:51:41 14             MR. DAVIS:  So this is not the
         15   full --
         16             MR. KING:  Thank you.
13:51:43 17             MR. DAVIS:  -- balance of those.
13:51:44 18        Q.   (BY MR. KING:)  So my question was
13:51:45 19   going to be, why do we have these receipts?
13:51:48 20   When did you start keeping receipts for your
13:51:50 21   bottled water?
13:51:58 22        A.   Probably in '16.
13:52:03 23        Q.   And did you understand that those
```

## 109

```
14:04:13  1       A.    Well, they have caused so much
14:04:16  2   damage to our property.
14:04:34  3       Q.    And so do you seek to recover on
14:04:36  4   behalf of the class damages to everyone's
14:04:42  5   property?
14:04:42  6       A.    Yes.
14:04:42  7       Q.    And how was everyone's property
14:04:45  8   damaged?
14:04:51  9       A.    Well, it is just ours was damaged,
14:04:54 10   so theirs was.  The water came from the same
14:04:57 11   place.
14:04:58 12       Q.    Okay.  Are you seeking to
14:05:02 13   recover -- you told us your ten million was for
14:05:04 14   the emotional distress you have been through.
14:05:07 15   Are you seeking to recover emotional distress
14:05:11 16   damages for the rest of the class?
14:05:13 17             MR. DAVIS:  Object to -- object to
14:05:19 18   the question on the basis it doesn't fully
14:05:22 19   encompass her previous testimony.
14:05:25 20       Q.    (BY MR. KING:)  You can answer.
14:05:31 21       A.    I don't know.
14:05:32 22       Q.    So where does your ten million
14:05:34 23   dollars -- where did you get the ten million
```

## 110

```
14:05:37  1   dollars for each class member number?
14:05:39  2       A.    I feel like that is what I am
14:05:41  3   worth.
14:05:42  4       Q.    To compensate --
14:05:45  5       A.    From now to -- from the past and
14:05:47  6   the future.
14:05:48  7       Q.    To compensate for what injury, a
14:05:50  8   property injury or personal injury?
14:05:59  9       A.    Property.  And who knows?  Later
14:06:00 10   on it could be personal.
14:06:17 11       Q.    Do you understand that you are not
14:06:19 12   advancing any personal injury claims in this
14:06:21 13   lawsuit?
14:06:22 14       A.    Yes.
14:06:22 15       Q.    And you are okay with that?
14:06:24 16       A.    Yes.
14:06:24 17       Q.    Now, in your own words, are you
14:06:33 18   also seeking to represent former residents that
14:06:35 19   had water from WMEL in the past?
14:06:40 20       A.    Yes.
14:06:53 21       Q.    So for how far back in your mind
14:06:57 22   are you seeking to represent customers?  In
14:07:01 23   other words, when -- how far back do you think
```

## 111

```
14:07:05  1   you ought to go?
14:07:26  2       A.    From the very beginning.
14:07:29  3       Q.    So from the beginning of when WMEL
14:07:33  4   started?
14:07:42  5             MR. DAVIS:  Don't guess at it,
14:07:45  6   Mrs. Lindsey.  If you know, answer the
14:07:47  7   question.
14:07:47  8       A.    Well, he -- I'm sorry.  He keeps
14:07:49  9   asking.
14:07:50 10       Q.    (BY MR. KING:)  That is my job.  I
14:07:51 11   ask the questions.
14:07:52 12             MR. DAVIS:  And you have a
14:07:53 13   responsibility to answer to the extent that you
14:07:56 14   know, but not to guess at it.
14:08:00 15       A.    Okay.
14:08:04 16       Q.    (BY MR. KING:)  So is it your
14:08:06 17   intent in your mind to represent everybody who
14:08:08 18   has ever had WMEL water?
14:08:12 19       A.    Yes.
14:08:12 20       Q.    And do you think your damages are
14:08:16 21   continuing right now?  Excuse me.
14:08:27 22       A.    Yes.
14:08:27 23       Q.    Do you contend that your water is
```

## 112

```
14:08:35  1   not safe to drink today?
14:08:37  2       A.    Yes.
14:08:37  3       Q.    Do you base that on those water
14:08:41  4   tests results you have received orally?
14:08:48  5       A.    Not really, I don't.
14:08:49  6       Q.    What do you base that on?
14:08:57  7       A.    Because I don't believe it.
14:08:58  8       Q.    You don't believe what?
14:09:00  9       A.    That that is accurate.
14:09:05 10       Q.    You don't trust the information
14:09:07 11   you have received from The Authority about the
14:09:10 12   levels in the water?
14:09:12 13       A.    True.
14:09:12 14       Q.    And why don't you trust it?
14:09:16 15       A.    I just don't.
14:09:21 16       Q.    Do you think they are
14:09:22 17   intentionally misleading you?
14:09:28 18       A.    They have in the past, yes.
14:09:29 19       Q.    The Water Authority?
14:09:31 20             MR. DAVIS:  Listen to his question
14:09:33 21   and understand who he is talking about before
14:09:36 22   you answer.
14:09:42 23       Q.    (BY MR. KING:)  Do you think --
```

121

```
14:32:35  1      Q.   Was it before or after you had the
14:32:38  2  blood testing performed?
14:32:44  3      A.   It was after.
14:32:46  4      Q.   It was before or after you
14:32:48  5  attended the meeting in Moulton that you
14:32:51  6  discussed with Mr. King earlier?
14:32:53  7      A.   I am not sure.
14:32:54  8      Q.   And did someone from the EPA tell
14:33:00  9  your husband not to grow the crops on your
14:33:03 10  property anymore?
14:33:04 11      A.   I don't know what they told him.
14:33:05 12      Q.   But the result was y'all stopped
14:33:10 13  having a garden?
14:33:11 14      A.   (Nodding.)  True.
14:33:12 15      Q.   Now, earlier at the very
14:33:20 16  beginning, Mr. King asked you what 3M had done
14:33:23 17  to damage you.  And I want to ask the same
14:33:25 18  question for Daikin.  What has Daikin done to
14:33:28 19  damage you that you are making claims about in
14:33:34 20  this case?
14:33:35 21      A.   Everything that is listed in the
14:33:36 22  lawsuit.
14:33:37 23      Q.   All the same things you said
```

122

```
14:33:40  1  about 3M?
14:33:41  2      A.   True.
14:33:41  3      Q.   Anything different about your
14:33:44  4  claims against Daikin than your claims
14:33:47  5  against 3M?
14:33:47  6      A.   No.
14:33:48  7      Q.   Do you remember entering into a
14:33:57  8  settlement on behalf of the class with Daikin a
14:33:59  9  few years ago?
14:34:03 10      A.   I read about it in the paper.
14:34:04 11      Q.   I am going to show you what I am
14:34:09 12  marking as Exhibit 8.
14:34:10 13           (Defendants' Exhibit 8 was marked
         14           for identification.)
14:34:17 15      Q.   (BY MR. YEILDING:)  It is three
14:34:19 16  pages.  If you could just take your time, look
14:34:21 17  it over and look at the last page and see if
14:34:24 18  that is your signature or not.
14:34:30 19      A.   Yes.
14:34:30 20      Q.   That is your signature on the last
14:34:32 21  page of this --
14:34:33 22      A.   Yes.
14:34:34 23      Q.   -- Exhibit 8?  Do you remember
```

123

```
14:34:36  1  reviewing and signing this affidavit?
14:34:39  2      A.   Yes.
14:34:40  3      Q.   Did you read it before you signed
14:34:42  4  it?
14:34:47  5      A.   Yes.
14:34:47  6      Q.   And I take it that you agreed with
14:34:51  7  everything you said in this affidavit, subject
14:34:54  8  to the penalty of perjury?
14:35:00  9           MR. HANNON:  Take your time and
14:35:01 10  read it.
14:35:02 11           MR. DAVIS:  Yeah.  You can read
14:35:04 12  it.
14:35:07 13      A.   I can read it now?
14:35:10 14      Q.   (BY MR. YEILDING:)  You are
14:35:11 15  welcome to read it now.
14:35:13 16           (Pause.)
14:35:25 17           MR. HANNON:  This was 9,
14:35:26 18  Exhibit 9?
14:35:30 19           MR. YEILDING:  I think it is
14:35:31 20  Exhibit 8.
14:35:32 21           MR. HANNON:  8?
14:36:33 22           MR. DAVIS:  Let's go off the
14:36:34 23  record a second.  We need to go off the record
```

124

```
14:36:36  1  a second.
14:36:37  2           THE VIDEOGRAPHER:  We are going
14:36:38  3  off the record at 2:36 p.m.
14:36:41  4           (Whereupon, a break was had from
14:36:41  5            2:36 p.m. until 2:41 p.m.)
14:41:11  6           THE VIDEOGRAPHER:  We are back on
14:41:12  7  the record at 2:41 p.m.
14:41:18  8           MR. DAVIS:  So there was a
14:41:19  9  question of the witness about a "settlement."
14:41:22 10  And Chris, it is my understanding that there
14:41:26 11  was a proposed settlement that was eventually
14:41:30 12  set aside.  And so I want to clarify that
14:41:36 13  matter and the reference to a "settlement."
14:41:40 14           And furthermore, I am not going to
14:41:42 15  allow her to testify to matters surrounding
14:41:47 16  that proposed settlement at this point.
14:41:53 17           MR. YEILDING:  It was a class
14:41:55 18  action settlement.  It was approved by Judge
14:41:59 19  Kallon.
14:41:59 20           MR. DAVIS:  Right.
14:42:01 21           MR. YEILDING:  And I understand it
14:42:03 22  was overturned by Eleventh Circuit.
         23           MR. DAVIS:  Right.
```

## Page 133

1  Q.  Are you on disability?
2  A.  I am.
3  Q.  How long have you been on disability?
4
5  A.  Since '98.
6  Q.  Is your husband also on disability?
7
8  A.  No.
9  Q.  What has caused you to be disabled since 1998?
10
11      MR. DAVIS:  I instruct you not to answer, again, based on our claims in the case and claims that are not in the case.
12
13
14  Q.  (BY MR. YEILDING:)  Do you know the basis for being exempt from property taxes?  Is it just your age?
15
16
17  A.  No.
18  Q.  Okay.
19      MR. YEILDING:  Can I borrow that?
20      MR. DAVIS:  (Handing document.)
21  Yeah.
22  Q.  (BY MR. YEILDING:)  So do you see that the appraised value on there is a little

## Page 134

1  over a hundred and ten thousand dollars?
2  A.  Yes.
3  Q.  Have y'all ever -- do you know the process where you can protest the amount that the government assesses your property for?
4
5
6  A.  I'm not sure.
7  Q.  Have you or your husband ever protested the amount that the government has assessed your house for?
8
9
10  A.  No.
11      MR. YEILDING:  Just looking over a bunch of notes here.
12
13  Q.  (BY MR. YEILDING:)  I know Mr. King asked you this, but have you seen any type of counselor or medical provider, anyone like that for emotional distress or mental anguish?
14
15
16
17
18  A.  No.
19  Q.  And I believe you said -- how much water do you and your husband buy on average?  And by buying water, I am talking about buying water from the store.
20
21
22
23  A.  Well, it depends on -- a

## Page 135

1  twenty-four pack, one a week and one jug a week.
2
3  Q.  About a case of water a week and then one jug of distilled water?
4
5  A.  Now, those cases come in different sizes.
6
7  Q.  You are talking about a case with twenty-four bottles?
8
9  A.  Yes.
10  Q.  Do you have a water filtration system at your house now?
11
12  A.  No.
13  Q.  And y'all had that installed back in 1998 or so; is that right?
14
15  A.  Approximately, yes.
16  Q.  And that was for other types of chemicals, not the PFC chemicals we are here about today; is that right?
17
18
19  A.  Right.
20  Q.  And at what point did you get rid of that water filtration system at your house?
21
22  A.  I know I have done answered this once today, but we quit using that system

## Page 136

1  because we knew that it wouldn't take the PFOs out of the water.
2
3  Q.  Was this something attached to your sink?
4
5  A.  To the faucet, yes.
6  Q.  To the faucet.  Do you think your property is currently damaged now and the damage is continuing?
7
8
9  A.  Yes, they continue.
10  Q.  And is the damage you are referring to the decrease in value?
11
12  A.  Yes.
13  Q.  Any other damage to your property other than the decrease in value due to PFCs?
14
15  A.  Well, it is a nuisance.  We have to go out and buy this water by the case.
16
17  Q.  You are talking about buying water, decrease in value of your property, nuisance.  Anything else that I have left out that you contend in this lawsuit was caused by the PFCs?
18
19
20
21
22  A.  Well, it's caused us not to have our garden that we use for food and the
23

## Page 137

1  enjoyment of living there and the mental part
2  of it.  It hurts.  Shame on 3M and Daikin.
3      Q.   Do you remember who told y'all not
4  to have a garden?
5           MR. DAVIS:  Object to the form.
6      Q.   (BY MR. YEILDING:)  It is okay if
7  you don't, but I'm just trying to figure out if
8  you remember if somebody else told you not to
9  have a garden or if that was a decision y'all
10 made on your own.
11     A.   We made it on our own.
12          MR. YEILDING:  I think I am almost
13 through.
14     Q.   (BY MR. YEILDING:)  Has there been
15 any other testing of your property, either the
16 soil or the water coming out of the faucet,
17 other than the instances that you mentioned
18 that were this year, working with your lawyers?
19 Did you follow me?
20     A.   No.  Ask it again.
21     Q.   Okay.  I'm sorry.  Has there been
22 any other testing of the soil other than the
23 soil tests that were earlier this year in

## Page 138

1  working with your lawyers?
2      A.   No.
3      Q.   Has there been any other testing
4  of the drinking water at your house other than
5  the testing you referred to earlier today?
6      A.   No.
7      Q.   And have you ever seen the results
8  of either one of those tests?
9      A.   I haven't seen them.
10     Q.   Is the most recent appraisal of
11 your property the one that was for the
12 refinance back in 2012?
13     A.   Right.
14          MR. YEILDING:  That is all I have.
15 Thank you very much for your time.
16          MR. KING:  Do you have any, Tim?
17          MR. DAVIS:  I do.  Not many.
18
19 EXAMINATION BY MR. DAVIS:
20     Q.   Mrs. Lindsey, do you recall being
21 handed these exhibits, Exhibits 3 and 4?  These
22 were documents that were dated back in 2010 and
23 2011.  Do you recall looking at those during

## Page 139

1  the course of your deposition?
2      A.   I do.
3      Q.   And you reviewed those during your
4  deposition --
5      A.   Yes.
6      Q.   -- to some degree, right?  In 2010
7  and 2011, what was your understanding as to why
8  you were being asked to get your blood tested?
9      A.   For the sludge.
10     Q.   All right.  And on this 2010
11 letter, the first sentence, if you will just
12 read along with me, it says, "You have been
13 sent this letter because your property is less
14 than two miles near a field that had treated
15 sewer sludge or biosolids applied to it from
16 Decatur utilities."  Did I read that correctly?
17     A.   Correct.
18     Q.   And was that what you understood
19 the subject matter was related to you getting
20 your blood tested back in 2010 and 2011?
21     A.   True.
22          MR. DAVIS:  I may not have any
23 other questions.  Let me confer with co-counsel

## Page 140

1  for two minutes.  And you can just sit right
2  there, Mrs. Lindsey.
3      A.   Okay.
4           THE VIDEOGRAPHER:  Going off the
5  record at 3:00 p.m.
6           (Whereupon, a break was had from
7           3:00 p.m. until 3:04 p.m.)
8           THE VIDEOGRAPHER:  Going back on
9  the record at 3:04 p.m.
10     Q.   (BY MR. DAVIS:)  Mrs. Lindsey --
11 got your microphone on there?
12     A.   I think so.
13     Q.   Yeah.  Mrs. Lindsey, before May of
14 2016, did you consume, did you drink water from
15 the tap in your home, tap water?
16     A.   Yes.
17     Q.   All right.  And during May of 2016
18 or thereafter, did you learn that your tap
19 water in your home was contaminated?
20     A.   Yes.
21     Q.   Did you find that offensive, the
22 fact that you had consumed that contaminated
23 water?

141

```
15:05:06  1        A.   I sure did.
15:05:07  2        Q.   Is that part of your mental
15:05:09  3   anguish that you have -- that you claim in this
15:05:14  4   lawsuit?
15:05:14  5        A.   True.
15:05:15  6        Q.   And you were asked questions
15:05:20  7   earlier by defense counsel about the class and
15:05:26  8   providing notice to the class.  Do you remember
15:05:30  9   those questions?
15:05:31 10        A.   Uh-huh, yes.
15:05:33 11        Q.   Are you relying on your attorneys
15:05:36 12   to take the proper procedures as required by
15:05:39 13   the Court and the rules of law with respect to
15:05:45 14   notifying the class?
15:05:46 15        A.   Yes.
15:05:51 16             MR. DAVIS:  That is all I have.
15:05:52 17             MR. KING:  I just have a couple of
15:05:56 18   follow-ups to Mr. Yielding's questions.
15:06:00 19
15:06:00 20   REEXAMINATION BY MR. KING:
15:06:01 21        Q.   Let me ask you about your garden.
15:06:04 22   Is the only reason you quit gardening the
15:06:07 23   concern over these PFC chemicals?
```

142

```
15:06:18  1        A.   Well, yes.
15:06:19  2        Q.   And that happened well before you
15:06:21  3   said you were concerned about the drinking
15:06:23  4   water, right?
15:06:32  5        A.   Along about the same time.
15:06:34  6        Q.   Do you remember telling me this
15:06:36  7   morning that that was significantly before May
15:06:40  8   of '16 that you quit your gardening?
15:06:48  9        A.   I may have.  I don't --
15:06:50 10        Q.   Okay.  And so did you quit your
15:06:55 11   garden because you didn't want to use your tap
15:06:59 12   water to -- were you worried about using your
15:07:02 13   tap water to water?
15:07:03 14        A.   No.
15:07:04 15        Q.   So you quit your gardening for
15:07:07 16   what reason?
15:07:27 17        A.   We felt like it was -- it came
15:07:29 18   from the PFOs that was in the sludge that had
15:07:38 19   been put on a field.
15:07:40 20        Q.   So were you concerned that because
15:07:44 21   sludge had been put on a field less than two
15:07:46 22   miles away, that that might somehow affect your
15:07:49 23   produce?
```

143

```
15:07:53  1        A.   Actually, the field is one
15:07:56  2   driveway between the field and our garden.
15:08:01  3        Q.   And so were you concerned that the
15:08:04  4   spreading of sludge on that field might have
15:08:07  5   affected your produce?
15:08:18  6        A.   Yes.
15:08:21  7        Q.   And you said your husband had
15:08:25  8   taken fruit somewhere to see if it could be
15:08:29  9   tested?
15:08:30 10        A.   I wasn't with him.
15:08:33 11        Q.   So I need -- but your memory is
15:08:36 12   that he did take fruit to some agency to see if
15:08:40 13   it could get tested?
15:08:41 14        A.   Yes.
15:08:42 15        Q.   And do you know when that was?
15:08:43 16        A.   No.
15:08:43 17        Q.   Do you -- strike that.
15:08:59 18             MR. KING:  No further questions.
15:09:05 19             MR. DAVIS:  Just one second.
15:09:07 20             (Off-the-record discussion.)
15:09:11 21             MR. DAVIS:  Okay.  Do you have any
15:09:15 22   more?
15:09:16 23             MR. KING:  Oh, I thought of one
```

144

```
15:09:18  1   more.  Maybe it is not technically my turn
15:09:21  2   anymore --
15:09:21  3             MR. HANNON:  It is not.
15:09:23  4             MR. KING:  -- but I have just this
15:09:24  5   one.
15:09:24  6        Q.   (BY MR. KING:)  Do you know what
15:09:29  7   impact, if any, the spreading of sludge two
15:09:35  8   doors down had on your property in terms of its
15:09:40  9   value or its contamination?
15:09:50 10        A.   Ask the question again.
15:09:51 11        Q.   Yes, ma'am.  Do you believe that
15:09:54 12   having that sludge spread just a couple of
15:09:57 13   doors down from you has affected the value of
15:10:01 14   your property?
15:10:01 15        A.   Yes, I do believe that.
15:10:03 16        Q.   Do you believe that the spreading
15:10:05 17   of that sludge two doors down may have
15:10:08 18   contributed to the contamination of your
15:10:10 19   property?
15:10:17 20        A.   I'm not sure.
15:10:18 21             MR. KING:  No further questions,
15:10:20 22   and I mean it this time.
15:10:22 23             MR. DAVIS:  All right.  Okay.  All
```