UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| TOMMY LINDSEY, LANETTE LINDSEY and LARRY WATKINS, individually, and on behalf of a Class of persons similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 5:15-cv-01750-AKK |
| v. | ) ) | CLASS ACTION JURY DEMAND |
| 3M COMPANY, DYNEON, L.L.C and DAIKIN AMERICA, INC., | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OMNIBUS REPLY IN SUPPORT OF THEIR MOTION
FOR CLASS CERTIFICATION**

Timothy C. Davis (ASB-6834-D63T)
W. Lewis Garrison, Jr. (ASB-3791-N74W)
Christopher B. Hood (ASB-2280-S35H)
Mark R. Ekonen (ASB-0204-R79E)
HENINGER GARRISON DAVIS
2224 First Avenue North
Birmingham, AL  35203
PH:  205.326.3336
tim@hgdlawfirm.com
lewis@hgdlawfirm.com
chood@hgdlawfirm.com
mark@hgdlawfirm.com

Kevin S. Hannon, *pro hac vice*
THE HANNON LAW FIRM, LLC
1641 Downing Street
Denver, CO 80218
PH:   303.861.8800
khannon@hannonlaw.com

*Counsel for Plaintiffs and Proposed Class*

# **TABLE OF CONTENTS**

I.    ARGUMENT ..................................................................................................1

A.    A Class Action Is the Superior Method to Adjudicate this Controversy. ..............................................................................................................1

B.    Manageability is Not an Impediment to Class Certification. ................6

C.    Plaintiffs Are Adequate Class Representatives. ....................................7

    1.    Plaintiffs' claims are representative of claims of class members. ..............................................................................................................9

    2.    Larry Watkins is credible. ...........................................................10

    3.    The Lindseys' bankruptcy petition is irrelevant to their role as class representatives. .................................................................12

        a.    The Lindseys' disclosures were adequate. .....................13

        b.    Judicial estoppel does not apply. ....................................15

    4.    *Res Judicata* does not operate to render Plaintiffs inadequate to serve as class representatives. ...................................................16

    5.    Plaintiffs' medical history is irrelevant to diagnostic testing. ..21

D.    Defendants' Affirmative Defenses Do Not Preclude Class Certification. ..............................................................................................................22

    1.    The Defendants should not escape liability for their bad actions simply because they forced the Plaintiffs to make a "choice of evils." ........................................................................................24

    2.    Assumption of the risk is not available as a defense where the Defendant conceals material information from Plaintiffs. .......26

    3.    Defendants' consent defenses are similarly barred. .................27

E.    Common Issues Predominate ...................................................................29

    1.    Plaintiffs' trespass and nuisance claims...................................29

    2.    Common issues predominate for Plaintiffs' battery claim. ......34

        a.    Variations in PFAS levels and water consumption do not require individual inquiries............................................34

        b.    Alabama applies an objective standard to determine whether a touching was offensive and does not depend upon whether Defendants' touching caused an individual class member emotional distress. ....................................36

        c.    Diagnostic testing is an appropriate additional remedy available to Plaintiffs and class members.......................37

i

        3.    Plaintiffs' negligence claims on behalf of the class predominate any individual claims. ...............................................................40
        4.    The relief requested by the Plaintiffs is clearly stated in the amended complaint. ...................................................................42

    F.    The Economic Loss Doctrine does not preclude Plaintiffs' recovery. ...............................................................................................43
    G.    Plaintiffs' Claims for Injunctive Relief Are Not Moot. ......................47
    H.    Defendants Err by Arguing Rule 23(c)(4) Should Not Apply in this Case. .....................................................................................48
    I.    Ascertainability ...............................................................................49
II.    CONCLUSION..............................................................................................52

**Cases**

Acceptance Ins. Co. v. Brown,
    832 So. 2d 1 (Ala. 2001) .................................................................. 36

Adams v. S. Farm Bureau Life Ins. Co.,
    493 F.3d 1276 (11th Cir. 2007) ............................................. 18, 19, 20

Ala. DOT v. Lee Outdoor Advert., LLC,
    275 So. 3d 542 (Ala. Civ. App. 2018) ............................................. 25

Ala. Power Co. v. McIntosh,
    122 So. 677 (Ala. 1929) ................................................................. 26

Astrazeneca AB v. UFCW (In re Nexium Antitrust Litig.),
    777 F.3d 9 (1st Cir. 2015) .............................................................. 38

Augustin v. Jablonsky (In re Nassau Cty. Strip Search Cases),
    461 F.3d 219 (2d Cir. 2006) ........................................................... 48

Autauga v. Bellsouth Telcoms, LLC,
    2016 U.S. Dist. LEXIS 138787 (N.D. Ala. October 6, 2016) ................... 44, 45

Ball v. Union Carbide Corp.,
    385 F.3d 713 (6th Cir. 2004) ......................................................... 40

Benefield v. International Paper Co.,
    270 F.R.D. 640 (M.D. Ala 2010) ................................ 2, 3, 4, 30, 51

Berry v. City of Chi.,
    133 N.E.3d 1201 (Ill. App. 2019) ................................................... 39

Birmingham Emergency Communs. Dist. v. TW Telcom Holdings, Inc.,
    2017 U.S. Dist. LEXIS 184971 (N.D. Ala. March 2, 2017) ............................ 44

Blake v. Bank of Am., N.A.,
    845 F. Supp. 2d 1206 (M.D. Ala. 2012) ................................... 44, 45

Bonner v. Prichard,
    661 F.2d 1206 (11th Cir. 1981) ..................................................... 18

Booth v. Galveston Cty.,
    2019 U.S. Dist. LEXIS 38971 (S.D. Tex. Mar. 12, 2019) .................... 10, 11, 12

Borland v. Sanders Lead Co.,
    369 So. 2d 523 (Ala. 1979) ............................................................... 19

Boughton v. Cotter Corp.,
    65 F.3d 823 (10th Cir. 1995) ........................................................... 40

Bower v. Westinghouse Elec. Corp.,
    522 S.E.2d 424 (W.Va. 1999) .......................................................... 38

Bradburn Parent/Teacher Store, Inc. v. 3M,
    2004 U.S. Dist. LEXIS 3347 (E.D. Pa. Mar. 1, 2004) ....................................... 8

Brantley, et al. v. Int'l Paper Co.,
    2:09-cv-230-WHA (M.D. Ala.) .......................................................... 20

Braxton v. Farmer's Ins. Grp.,
    209 F.R.D. 654 (N.D. Ala. 2002) ................................................. 20, 21

Burdick v. Tonoga, Inc.,
    2018 N.Y. Misc. LEXIS 2812 (N.Y. Sup. Ct.) ................................... 38

Cahaba Forests, LLC v. Hay,
    927 F. Supp. 2d 1273 (M.D. Ala. 2013) ........................................... 28

Carnegie v. Mut. Sav. Life Ins. Co.,
    2002 U.S. Dist. LEXIS 21396 (N.D. Ala. Nov. 1, 2002) .................................. 6

Ctr. for Biological Diversity, Inc. v. B.P. Am. Prod. Co.,
    704 F.3d 413 (5th Cir. 2013) ...................................................... 47-48

City of Atlanta v. Benator,
    714 S.E.2d 109 (Ga. App. 2011) ...................................................... 45

City of St. Petersburg v. Total Containment, Inc.,
    265 F.R.D. 630 (S.D. Fla. 2010) ...................................................... 49

Cohen v. McIntyre,
    277 Cal. Rptr. 91 (Cal. App. 1991) .................................................. 26

Conner v. Hamlin,
    1947 Ala. App. LEXIS 405 (Ala. App. 1947) .................................................. 46

Cusano v. Klein,
    264 F. 3d 936 (9th Cir. 2001) ..................................................................... 14

Does I through III v. Dist. Of Columbia,
    2006 WL 2864483 (D.D.C. October 5, 2006) ................................................. 36

Donovan v. Philip Morris USA, Inc.,
    268 F.R.D. 1 (D. Mass. 2010) ...................................................................... 39

Engineered Cooling Servs. v. Star Serv.,
    108 So. 3d 1022 (Ala. Civ. App. 2012) ........................................................ 46

Evans v. Walter Indus., Inc.,
    579 F. Supp. 2d 1349 (N.D. Ala. 2008) ........................................................ 27

Ex parte Barran,
    730 So. 2d 203 (Ala. 1998) .......................................................................... 27

Foust v. Kinney,
    80 So. 474 (Ala. 1918) ............................................................................ 19-20

Funliner of Ala., L.L.C. v. Pickard,
    873 So. 2d 198 (Ala. 2003) .......................................................................... 31

Gadsden Indus. Park, LLC v. United States,
    2017 U.S. Dist. LEXIS 163515 (N.D. Ala. Oct. 3, 2017) ................................. 20

Gates v. Rohm & Haas Co.,
    655 F.3d 255 (3d Cir. 2011) ......................................................................... 40

George Lussier Enters., Inc. v. Subaru of New England, Inc.,
    2001 U.S. Dist. LEXIS 12054, (D.N.H. Aug. 3, 2001) .................................... 19

Griffin v. Unocal Corp.,
    990 So. 2d 291 (Ala. 2008) .......................................................................... 19

Gunnells v. Healthplan Servs.,
    348 F.3d 417 (4th Cir. 2003) ........................................................................ 48

Hanes v. Mobile Infirmary Med. Ctr.,
  2005 WL 1840236 (S.D. Ala. 2005) ................................. 37

Hansen v. Mountain Fuel Supply,
  858 P.2d 970 (Utah 1993) ..................................... 38

Hernandez v. Motor Vessel Skyward,
  61 F.R.D. 558 (S.D. Fla. 1973) ................................ 48

Hester v. Brown,
  512 F. Supp. 2d 1228 (M.D. Ala. 2007) ......................... 27

In re Fernald Litig.,
  1989 U.S. Dist. LEXIS 17762 (S.D. Ohio Sep. 29, 1989) ......... 39

In re Furlong,
  660 F.3d 81 (1st Cir. 2011) ................................... 14

In re Modafinil Antitrust Litig.,
  837 F.3d 238 (3d Cir. 2016) .................................... 4

In re Mohring,
  142 B.R. 389 (Bankr. E.D. Cal. 1992) .......................... 14

In re NHL Players' Concussion Injury Litig.,
  327 F.R.D. 245 (D. Minn. 2018) ................................ 39

In re Syngenta AG Mir 162 Corn Litig., No. MDL No. 2591,
  2016 U.S. Dist. LEXIS 132549 (D. Kan. Sep. 26, 2016) ...... 20, 45

In re Tri-State Crematory Litig.,
  215 F.R.D. 660 (N.D. Ga. 2003) ................................ 48

In re Welding Fume Prods. Liab. Litig.,
  245 F.R.D. 279 (N.D. Ohio 2007) ............................... 21

Isabel v. Velsicol Chem. Corp.,
  2006 U.S. Dist. LEXIS 42279 (W.D. Tenn. June 20, 2006) ... 30, 31, 32

Jane B. v. N.Y.C. Dep't of Soc. Servs.,
  117 F.R.D. 64 (S.D.N.Y. 1987) ................................. 11

Kennedy v. Omegagas & Oil, LLC,
   748 F. App'x 886 (11th. Cir. 2018) .................................................... 47

Klay v. Humana, Inc.,
   382 F.3d 1241, (11th Cir. 2004) .................................................... 6, 7

LaBauve v. Olin Corp.,
   2231 F.R.D. 632 (S.D. Ala. 2005) .................................................... 30, 34

Leach v. E.I. Du Pont de Nemours & Co., et al.,
   2002 WL 1270121 (W. Va. Cir. Ct. April 10, 2002) ........................................ 39

Manning v. Auburn,
   953 F.2d 1355 (11th Cir. 1992) .................................................... 16

Marcus v. BMW of N. Am., LLC,
   687 F.3d 583 (3d Cir. 2012) .................................................... 6

Mejdrech v. Met-Coil Systems Corp,
   319 F. 3d 910 (7th Cir. 2003) .................................................... 48

Meyer v. Fluor Corp.,
   220 S.W.3d 712 (Mo. 2007) .................................................... 21

Murray v. Auslander,
   244 F.3d 807 (11th Cir. 2001) .................................................... 31

Neal v. Prince George's Cty.,
   700 A.2d 838 (Md. App. 1997) .................................................... 25

Nielsen v. Dickerson,
   1999 U.S. Dist. LEXIS 8334 (N.D. Ill. May 19, 1999) ...................................... 14

Olson v. Brown,
   284 F.R.D. 398 (N.D. Ind. 2012) .................................................... 10

O'Connor v. Boeing North American, Inc.,
   184 F.R.D. 311 (C.D. Cal. 1998) .................................................... 38

Payne v. Wood,
   775 F. 2d 202 (7th Cir. 1985) .................................................... 14

Petito v. A.H. Robins,

    750 So. 2d 103 (Fla. App. 2000) ........................................................ 38

Pitts Sales, Inc. v. King World Prods.,

    383 F. Supp. 2d 1354 (S.D. Fla. 2005) ............................................. 20

Poffenbarger v. Merit Energy Co.,

    972 So. 2d 792 (Ala. 2007) ............................................................. 19

Prickett v. BAC Home Loans,

    946 F. Supp. 2d 1236, (N.D. Ala. 2013) ......................................... 44

Ray v. Judicial Corr. Servs.,

    2019 U.S. Dist. LEXIS 165270 (N.D. Ala 2019) ............................ 49

Rhodes v. E. I. DuPont de Nemours,

    253 F.R.D. 365 (S.D. W.Va. 2008) .................................................. 40

Romeo v. FMA All., Ltd.,

    2016 U.S. Dist. LEXIS 86148 (E.D.N.Y. June 30, 2016) ................ 15

Rountree v. Lerner Dev. Co.,

    52 Md. App. 281, 447 A.2d 902 (1982) ..................................... 24-25

Rowe v. E. I. DuPont de Nemours,

    2008 U.S. Dist. LEXIS 103528 (D.N.J. 2008) ................................. 40

Rushing v. Hooper-Mcdonald,

    300 So. 2d 94 (Ala. 1974) .......................................................... 20, 46

Sadler v. PacifiCare of Nev., Inc.,

    340 P.3d 1264 (Nev. 2014) ............................................................. 21

Seigel v. Long,

    53 So. 753 (Ala. 1910) .................................................................... 46

Slater v. United States Steel Corp.,

    871 F.3d 1174 (11th Cir. 2017) ...................................................... 15

Sterling v. Velsicol Chemical Corporation,

    855 F.2d 1188 (6th Cir. 1988) ........................................................ 40

Stevenson v. Int'l Paper Co.,

516 F.2d 103 (5th Cir. 1975) ...................................................................... 17-18

Sugar Valley Land Co. v. Johnson,

    1920 Ala. App. LEXIS 82 (Ala. Ct. App. April 6, 1920) .................................. 20

Sullivan v. Saint-Gobain Performance Plastics Corp.,

    2019 U.S. Dist. LEXIS 221612 (D. Vt. Dec. 27, 2019) .................................... 39

Surrency v. Harbison,

    489 So. 2d 1097 (Ala. 1986) ....................................................................... 36, 38

Tyson Foods, Inc. v. Bouaphakeo,

    136 S. Ct. 1036 (2016) ................................................................................... 24

Van Reed v. Corizon Health,

    2018 U.S. Dist. LEXIS 28578 (N.D. Ala. Feb. 1, 2018) .................................. 22

Vanover v. NCO Fin. Servs.,

    857 F.3d 833 (11th Cir. 2017) ...................................................................... 17

W. Morgan-East Lawrence Water & Sewer Auth. v. 3M Co.,

    208 F. Supp. 3d 1227 (N.D. Ala. 2016) ........................................................ 28

Walker Builders, Inc. v. Lykens,

    628 So. 2d 923 (Ala. Civ. App. 1993) .......................................................... 31

Ward v. Dixie Nat'l Life Ins. Co.,

    595 F.3d 164 (4th Cir. 2010) .......................................................................... 8

Washington v. Shanahan,

    2019 U.S. Dist. LEXIS 11956 (S.D. Ala. Jan. 24, 2019) ................................ 13

Weinberger v. Solomon Schechter Sch. of Westchester,

    102 A.D.3d 675 (N.Y. App. Div. 2013) ........................................................ 26

White v. E-Loan, Inc.,

    2006 U.S. Dist. LEXIS 62654 (N.D. Cal. Aug. 18, 2006) ............................... 12

Wis.-Alabama Lumber Co.,

    110 So. 31 (Ala. 1926) ............................................................................. 19, 20

## Federal Rules

Fed. R. Civ.P. 23 ............................................... *passim*

Fed. R. Evid. 609 ............................................... 11

## Treatises and Restatements

6 Am. Jur 2d. Assault and Battery § 112 ....................... 25, 28

Newberg on Class Actions § 4:70 .............................. 6

Restatement 2d of Torts § 496 ................................. 23

**PLAINTIFFS' OMNIBUS REPLY IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION**

Plaintiffs Tommy and Lanette Lindsey and Larry Watkins, through their counsel, hereby file their reply brief in support of their motion for certification of their claims against Defendant 3M Company and Dyneon, LLC ("3M" collectively) and Defendant Daikin America, Inc. ("Daikin") for management under Fed. R. Civ. P. 23(a) and (b)(3). For support, they state and show as follows:

## I. ARGUMENT

### A. A Class Action Is the Superior Method to Adjudicate this Controversy.

Defendants maintain that the Billings[1] case presents an insurmountable hurdle on the superiority requirement, yet, if anything, Billings is a testament as to why this case should proceed as a class action. The Defendants trumpet the notion that the mere existence of Billings, allegedly including "three thousand" putative class members, is sufficient to defeat superiority (Doc. 205 at 39), but they do not bother to explain or analyze these conclusory statements, and for good reason. The presence of Billings should in no way impede this Court's certification of a class.

First, Billings is stayed. It has been stayed for three years. It has not advanced beyond the filing of the case. Compared to the instant case, which has been vigorously litigated for years, Billings is essentially nowhere.

---

[1] Billings v. WMEL, CV-2016-900103 (Ala. Cir. Ct., Lawrence Cty.) ("Billings").

Second, while there are large numbers of plaintiffs in <u>Billings</u>—and presumably some which fall into the class definition in this case (prospective intervenors have not identified which of them that may be)—the fact remains that these cobbled together cases in state court will have to be litigated individually. Litigating thousands of individual cases in *any* court would put a strain on judicial resources.

Third, nothing in this case, if certified, will impact <u>Billings</u> in a negative manner. The Plaintiffs in <u>Billings</u> who are in the class will have the right to opt out of the class pursuant to Rule 23(b)(3). They will be free to prosecute their claims on an individual basis without any constraints from this case, if certified.

Fourth, even if all of the plaintiffs in <u>Billings</u> were members of the Plaintiffs' class, Defendants' argument is that this relatively small percentage of the class should be dispositive of the efforts to protect the tens of thousands of people who <u>are not</u> plaintiffs in <u>Billings</u>. Defendants beseech this Court to cast aside those who have not signed up with <u>Billings</u> counsel, notwithstanding that the certification of this case will protect their interests and enable them to pursue their claims.

Defendants futile attack on superiority rests entirely on the case of <u>Benefield v. International Paper Co</u>*.,* 270 F.R.D. 640 (M.D. Ala 2010). <u>See</u>, <u>e.g.</u>, Doc. 205 at 19. The <u>Benefield</u> plaintiffs sought certification of a class of property owners, but that is where the similarities end. The class in <u>Benefield</u> was poorly defined,

rendering it impossible to determine who was in the class. The plaintiffs in <u>Benefield</u> conducted a sampling of a few residences ostensibly designed to prove contamination to the entirety of the class and was rejected by the court. Further, the class representatives asserted distinct individual claims that they did not pursue on behalf of a class, which is problematic for typicality purposes. By the time the court embarked on the Rule 23(b)(3) analysis of superiority, the decision to deny class certification was a fait accompli. Nevertheless, the court addressed the pendency of two other cases, focusing primarily on the <u>Brantley</u> case,[2] which had hundreds of class members. While the court found that that superiority was lacking due to the presence of <u>Brantley</u>, it is important to analyze the host of distinctions between <u>Brantley</u> and the case embraced by the Defendants, <u>Billings</u>.

<u>Brantley</u>, unlike <u>Billings</u>, was significantly advanced. Indeed, Judge Albritton noted that <u>Brantley</u> was "proceeding in an orderly fashion, and have agreed on a method of proof which isolates certain claims and allows for manageability of the case despite the large numbers of plaintiffs." 270 F.R.D. at 649. <u>Billings</u>, as previously mentioned, is stayed. It is in the embryonic stages. Thousands of plaintiffs with no direction and no plan is an apt description of the mired <u>Billings</u> case.

In the <u>Benefield</u> case, there were two plaintiffs who purported to be

---

[2]    <u>Brantley, et al. v. Int'l Paper Co.</u>, 2:09cv230-WHA (M.D. Ala.).

representatives of the putative class, James Benefield and Donald Johnson. However, the wives of these gentlemen were plaintiffs in the <u>Brantley</u> case, and that posed a significant adequacy and typicality hurdle for this reason: The <u>Benefield</u> case sought damages for loss of property value due to the alleged contamination. The spouses of these class representatives were co-owners of the property, yet they were in separate lawsuits claiming the same damage to the same piece of property. The court deemed this an untenable situation and opined that more <u>Brantley</u> plaintiffs could be co-owners of property with putative class members in <u>Benefield</u>. The dilemma the court faced in <u>Benefield</u> is nonexistent here.[3] Plaintiffs are not pursuing real property devaluation claims, and certainly have made no attempt to certify same.[4]

Rule 23(b)(3) requires the Court to consider the "extent and nature of any litigation concerning the controversy already begun by class members" in its

[3]     Daikin adds this twist to <u>Benefield</u>, speculating about potential opt-outs: "Such people might elect not to opt-out, only to find later that their personal-injury claims are barred by a class judgment in this case. <u>See Benefield</u>, 270 F.R.D. at 645 (rejecting argument that class members with personal injuries can be expected to self-select out of class)." Doc. 206 at 35. This speculation misapprehends <u>Benefield</u> and the instant holding. The <u>Benefield</u> court held that "it is not administratively feasible for the court to determine whether a person fits within the exclusion" in the <u>Benefield</u> class definition. 270 F.R.D. at 645. That issue is not present here.

[4]     The Defendants' reliance on <u>Billings</u> and <u>Benefield</u> is flawed for an additional reason. Fed. R. Civ. P. 23(a)(1) requires that "the class is so numerous that joinder of *all members* is impracticable." <u>Id.</u> (emphasis added). That requirement is "binary choice," meaning "Rule 23(a)(1) requires only the binary choice between class actions and joinder of *all parties*." (i.e., *all* class members). <u>In re Modafinil Antitrust Litig.</u>, 837 F.3d 238, 257 n.19 (3d Cir. 2016) (emphasis added). The Defendants advance no credible argument to join *all* class members to prosecute their claims individually, which is why the Defendants are in conflict with Rule 23(a)(1).

superiority analysis. With respect to the "extent" prong, a comparison of the instant case and <u>Billings</u> reveals a stark contrast—with one case moving robustly through expert and fact discovery and the other completely stayed. A comparison of the "nature" of the <u>Billings</u> case compared to the instant case reveals that it predominantly seeks damages for personal injury and property devaluation, neither of which are being sought here. While there are some claims that overlap, whichever <u>Billings</u> plaintiffs elect to pursue their claims individually will be free to exclude themselves from any class this Court might certify. The reverse is also true. There may be plaintiffs in <u>Billings</u> who choose to remain in the class rather than endure the uncertainties that lie ahead in that case. Regardless, the presence of <u>Billings</u> does nothing to justify a denial of class certification in this case, since <u>Billings</u> will not be impacted by whatever this Court does on the certification issue.

Defendants insist that the presence of <u>Billings</u> means that this case, seeking to protect the interests of tens of thousands of class members, should be discarded. This Court, Defendants say, should yield to the 3,000 individual suits that are stayed and ignore the interests of the more than 30,000 who seek to be represented here— the proverbial "tail wagging the dog" scenario. To the contrary, <u>Billings</u> represents why a class action in this case <u>is</u> needed—so that judicial resources are not wasted

by repetitive individual suits.[5]

A class action is the superior method to adjudicate this controversy, and if any members of the <u>Billings</u> case wish to exclude themselves from the class, they will be free to do so.

**B.  Manageability is Not an Impediment to Class Certification.**

A manageability concern will "rarely, if ever" be sufficient by itself to prevent certification of a class. <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241, 1272-73, (11th Cir. 2004) (stating that courts should not deny class certification on concerns pertaining to manageability, even if it appears manageability problems may be "severe" or "substantial"). Even potentially severe management issues have been held insufficient to defeat class certification. <u>See</u>, <u>e.g.</u>, <u>Carnegie v. Mut. Sav. Life Ins. Co.</u>, 2002 U.S. Dist. LEXIS 21396, at *77 (N.D. Ala. Nov. 1, 2002) (holding that "those management issues, although substantial, do not counsel against certifying the class"). The key question when deciding manageability is not whether a class action creates manageability problems, but rather "whether it will create relatively more management problems than any of the alternatives," including the filing of thousands of individual lawsuits. <u>Klay</u>, 382 F.3d at 1273.

---

[5]     <u>See</u> NEWBERG ON CLASS ACTIONS § 4:70 (William B. Rubenstein ed., 5th ed. 2012) (noting that the existence of significant other litigation regarding the same matter could be indicative of the need for a class action); <u>accord</u> <u>Marcus v. BMW of N. Am., LLC</u>, 687 F.3d 583, 594 (3d Cir. 2012) ("The impracticability of joinder, or numerosity, requirement also promotes judicial economy by sparing courts the burden of having to decide numerous, sufficiently similar individual actions <u>seriatim</u>.").

6

Klay v. Humana is the standard by which alleged manageability problems should be judged.  In Klay, virtually all physicians throughout the country sued all the Health Management Organizations (HMOs), alleging a variety of state and federal claims, including RICO.  Klay, 382 F.3d at 1246-1251.  Manageability problems abounded: types of physician practices, location of physicians, time periods of entering contracts, arbitration issues—some contained arbitration clauses—some did not,  and questions of reliance and damages caused to each class member.  Id.  Despite all of these manageability issues, the Eleventh Circuit held that a class action would be more manageable than "clogging the federal courts with innumerable individual suits litigating the same issues repeatedly."  Id. at 1273.

The fact that a class action will be manageable does not mean it will necessarily be easy.  But, compared to the dilemma in Klay, whatever issues might arise in this case can be managed by the Court, using the tools in its arsenal to address any challenges that might arise:  the appointment of a special master, the use of a claims procedure, and the ability to mold the class definition in the event that circumstances in the future dictate such.  See Klay, 382 F.3d at 1273.

Defendants' fears that this case cannot be managed as a class action should be rejected.

**C.    Plaintiffs Are Adequate Class Representatives.**

Both Defendants argue that Tommy Lindsey, Lanette Lindsey, and Larry

Watkins are inadequate class members because their claims are not representative of the claims of the other class members and because there are "unique defenses" applicable to the credibility of each Plaintiff that would be harmful to the absent class members.  See, e.g., Doc. 205 at 13-16; Doc. 206 at 22-23.  For the reasons set forth below, these arguments fail.

The Defendants advance purported conflicts which they say render the Plaintiffs inadequate as class representatives.  These purported conflicts are not fundamental and are speculative.  They afford no ground for finding the Lindseys or Mr. Watkins to be inadequate.  See Ward v. Dixie Nat'l Life Ins. Co., 595 F.3d 164, 180 (4th Cir. 2010) ("For a conflict of interest to defeat the adequacy requirement, 'that conflict must be fundamental.'  A conflict is not fundamental when, as here, all class members 'share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants].'  Moreover, a conflict will not defeat the adequacy requirement if it is 'merely speculative or hypothetical' . . ." (brackets in original) (citations omitted)); Bradburn Parent/Teacher Store, Inc. v. 3M, 2004 U.S. Dist. LEXIS 3347, at *17-18 (E.D. Pa. Mar. 1, 2004) ("Most courts hold that a conflict between class members must be more than merely speculative or hypothetical before a named representative can be deemed inadequate." (quoting 5 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL

PRACTICE 23.25 [4][b] (3d ed. 2003) (brackets omitted and quotation marks omitted in part))).

### 1. Plaintiffs' claims are representative of claims of class members.

This case is about the Defendants' contamination of the class members' water supply. Period. The claims of Plaintiffs and the class do not hinge upon whether the water they received had any specific level of PFAS in it. *Any* amount of PFAS is too much.[6] Defendants have tried to sow confusion by attempting to parse out some distinction between, for example, the water received by the Plaintiffs and the water received by class members who were customers of the adjacent utilities. See Doc. 205 at 16-17.[7] However, any argument concerning whether the WMEL water

---

[6] 3M also asserts that "Plaintiffs believe (without evidence) that WMEL testing results showing very low PFAS levels *are false* and that no amount of PFAS is safe to ingest." Doc. 205 at 18. However, this statement is categorically against the evidence in the record, as Dr. Barry Ryan, an expert on behalf of the Plaintiffs has opined that "[t]here is no known benefit from exposure to PFAS in human populations. Hence, any amount of PFAS exposure likely causes an increase in the risk of these illnesses, diseases, or disease processes in an exposed population." Ryan Decl., Doc. 202-16 at 5. The Plaintiffs' belief is well founded for other reasons, beginning with the Defendants' suppression of facts regarding adverse health effects of PFAS. But that is not all. The reporting to customers about PFAS cited by the Defendants (water quality reports) has routinely omitted the different short-chain PFAS in the water (including but not limited to PFBA and PFBS), and that continues today, and the actual PFOA and PFOS levels in the water today is reported only if those levels exceed the test detection limit employed by the party reporting the test. The bottom line is this: more of all types of PFAS remain in the drinking water than is reported. So, the Plaintiffs' skepticism is highly warranted.

[7] Defendants further attempt to confuse the issue by arguing that the Lindseys have "atypical" facts because "biosolids" were dumped on property neighboring the Lindseys' home. See Doc. 205 at 18; Doc. 206 at 11. In other words, the Defendants are asking this Court to assume, without offering substantial proof on that point, that the material dumped next door to the Lindseys contained PFAS. The ATSDR letters the Defendants cite refer only to biosolids dumped within two miles of the Lindseys which "may" contain "PFCs." E.g., Doc. 205-10. Without substantial

was mixed with water from another utility before reaching a class member is nothing more than sleight of hand and misdirection on the part of the Defendants who are attempting to distract the Court from the issue at hand.[8]  Each Plaintiff and every member of the class received water from WMEL that was contaminated with some level of PFAS, PFAS which was introduced into the Tennessee River by the Defendants.

## 2. Larry Watkins is credible.

Each Defendant has also launched an attack upon Mr. Watkins' credibility, arguing that his tax fraud conviction from 1997 precludes him from serving as a class representative.  <u>See</u> Doc. 205 at 15-16; Doc. 206 at 22-23.  While it is true that a class representative's character deficiencies may impact their fitness to serve as a class representative, the Defendants have cited to—and Plaintiffs' own research has found—no law to suggest that a proposed class representative's prior conviction for a felony crime of dishonesty renders him *per se* inadequate to represent the proposed class.  <u>See</u> <u>Olson v. Brown</u>, 284 F.R.D. 398, 413 (N.D. Ind. 2012).  Instead, courts look at any potential credibility issues "only insofar as they touch upon the lawsuit."

<u>Booth v. Galveston Cty.</u>, 2019 U.S. Dist. LEXIS 38971, at *18 (S.D. Tex. Mar. 12,

---

proof, this argument of "atypical" facts is without merit.  The atypicality is not fundamental by any stretch and is speculative.  It affords no ground for finding the Lindseys to be inadequate.

[8]     Any issues related to whether a putative member of the class was receiving water from WMEL during a specific period of time can be determined by the records of the various adjacent utilities.  As noted later, Plaintiffs are currently planning to depose corporate representatives of these adjacent utilities and expects to reply further to this point in a supplemental filing.

2019) (internal quotation omitted). "The inquiry, then, into the representatives' personal qualities is not an examination into their moral righteousness, but rather an inquiry directed at improper or questionable conduct arising out of or touching upon the very prosecution of the lawsuit." Jane B. v. N.Y.C. Dep't of Soc. Servs., 117 F.R.D. 64, 71 (S.D.N.Y. 1987). This comports with Rule 609(b) of the Federal Rules of Evidence, which counsels that evidence of convictions over ten years old should only be admitted where "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect . . . ." FED. R. EVID. 609(b)(1). Indeed, the Senate when drafting this rule noted that "[i]t is intended that convictions over 10 years old will be admitted very rarely and only in exceptional circumstances." FED. R EVID. 609, Notes of Committee on the Judiciary, Senate Report No. 93-1277.

Mr. Watkin's conviction for tax fraud occurred in 1997, well over twenty years ago. Defendants have not alleged that Mr. Watkins has engaged in any criminal misconduct since 1997 nor have they provided any other basis for impugning his credibility. Mr. Watkins' conviction did not arise out of or touch any of the facts made the basis of this litigation and should not preclude him serving as a class representative in this case. See Booth, 2019 U.S. Dist. LEXIS 38971, at *18-19 (declining to find a proposed class representative to be inadequate despite his prior conviction for check fraud as the "[d]efendants' repeated attacks on [the

proposed representative's] credibility and honesty do not touch upon the prosecution of the lawsuit").  Other courts, in similar situations, have also held that evidence of convictions for offenses of dishonesty decades prior to the filing of the class action is not "strongly probative" of the proposed class representative's personal integrity and should not operate to find the proposed class representative to be inadequate. See, e.g., White v. E-Loan, Inc., 2006 U.S. Dist. LEXIS 62654, at *11 (N.D. Cal. Aug. 18, 2006) (holding that proposed class representative's multiple convictions for theft thirty-years prior to filing the lawsuit lacked any strong probative value as to their current integrity and fitness to serve as a class representative).

Larry Watkins' conviction for tax fraud in 1997 is not probative of his integrity in 2020 and does not render him inadequate to serve as a representative of the proposed class.[9]

### 3. The Lindseys' bankruptcy petition is irrelevant to their role as class representatives.

The Defendants also allege that the Lindseys are inadequate to serve as class

---

[9]     Given the Defendants' evident interest in credibility, it bears noting that their factual contentions against class certification are untrustworthy.  That is proven more than once by their briefing.  A good example is the GAC system for finished water installed by WMEL in 2016.  It does not filter short-chain PFAS, contrary to 3M's contention.  Doc. 205 at 14.  3M has known that fact for more than a decade, specifically that GAC systems for finished water do not filter PFBA, which is a short-chain PFAS.  Its own documents prove that long knowledge.  Ex. 1 (3M_MN00403092) at 8 (indicating GAC ineffective for PFBA); Ex. 2 (June 2008 FAQ by 3M on PFBA) at 3 (referring to Oakdale, MN, where filtration for finished water is through GAC, and explaining that the filtration is for PFOA/PFOS, not PFBA).  Mr. Pate's testimony proves the same fact, too.  Doc. 202-36 (explaining that GAC does not filter, or "adsorb," short chain PFAS, among other facts).

representatives due to alleged inconsistencies in their bankruptcy petition and in their current testimony.[10] 3M argues that this creates potential issues of judicial estoppel and standing that preclude the Lindseys from serving as class representatives.[11] 3M's argument fails because 3M declined to explain why the perceived "discrepancies" in the Lindseys' disclosures render their disclosures inadequate so as to deny them standing and to invoke judicial estoppel.

### a. The Lindseys' disclosures were adequate.

3M alleges that the Lindseys may have standing issues because of their alleged "failure to properly disclose this litigation" in their bankruptcy petition. Doc. 205 at 14. 3M does not contest—for good reason—that the Lindseys disclosed this

---

[10]    In their responses, the Defendants try to make an issue of Mrs. Lindsey's statement that each class member has a $10 million claim against the Defendants. See Doc. 205 at 14; Doc. 206 at 23. Each Defendant insinuates that the difference between this statement and the $5,000 value of their claim included on the Lindseys' bankruptcy petition could be used to "discredit the Lindseys' entire testimony." Doc. 206 at 23.

The $10 million value Mrs. Lindsey ascribes to her claim represents a 2,000-fold increase from her petition ($5,000) to her deposition testimony. However, a court in Alabama's Southern District was unimpressed by similar arguments made by defendants where a plaintiff valued a pending claim at $1 on her bankruptcy petition, but later asserted that her claim was actually valued at $300,000, a 300,000-fold increase. Washington v. Shanahan, 2019 U.S. Dist. LEXIS 11956, at *18-19 (S.D. Ala. Jan. 24, 2019).

To the extent this Court credits this argument in any way, it should be pointed out that the Defendants are seeking to hold Mr. Lindsey responsible for the testimony of his wife, and have not cited to any testimony by Mr. Lindsey in which he makes the same representations as to his valuation of the claims.

[11]    Daikin's primary argument is that the inconsistencies create impeachment issues. However, Daikin has failed to cite *any* authority in support of this argument. Daikin also argues that the Lindsey's representations in their bankruptcy petition could be viewed by a jury as a "cap on damages," again without any case law or other authority to support such an assertion. Doc. 206 at 23. These arguments are unsupported and fail for the same reasons 3M's arguments fail, as discussed in this section.

13

litigation, rather, it contends that the Lindseys' disclosure was inadequate. See Id. Specifically, 3M alleges that the Lindseys failed to meet their disclosure requirements because "[t]hey did not reveal that the case was an already-pending class action, that Daikin and Dyneon were also defendants, or that they purport to have a $10 million claim." Doc. 205 at 14.

"[T]he Bankruptcy Code does not require every component of a cause of action to be spelled out on a debtor's schedule." In re Furlong, 660 F.3d 81, 87 (1st Cir. 2011). "As investigation is part of the Trustee's duties under § 704, a debtor is required only to do enough itemizing to enable the trustee to determine whether to investigate further." Id. (internal citations and quotations omitted). The level of disclosure required "is reasonable particularization under the circumstances." In re Mohring, 142 B.R. 389, 395 (Bankr. E.D. Cal. 1992). Indeed, it is enough that the Lindseys revealed their claims against 3M, provided their valuation of the case at that time, and even provided the name of an attorney for the trustee to contact if more information was needed. See, e.g., Cusano v. Klein, 264 F. 3d 936, 946 (9th Cir. 2001) (Schedule was adequate where "listing was not so defective that it would forestall a proper investigation of the asset.").[12]  3M has not alleged that the

---

[12]     See also Payne v. Wood, 775 F. 2d 202, 206 (7th Cir. 1985) (purpose of the schedule of assets is, in part, "to allow the trustee to decide which claims to challenge."); Nielsen v. Dickerson, 1999 U.S. Dist. LEXIS 8334, at *17 (N.D. Ill. May 19, 1999) (failure to identify all possible defendants to a claim did not render disclosure inadequate).

disclosure of the Lindseys' claim failed to provide the trustee with sufficient information to fully investigate the claim. 3M has not alleged that their disclosure was unreasonable under the circumstances when made. 3M did not ask Mrs. Lindsey the basis for her prior valuation or even ask Mrs. Lindsey why her valuation of the claim may have changed in the nearly nineteen months between the closing of her bankruptcy case and her deposition. In short, 3M has completely failed to demonstrate—both legally and factually—why the Lindseys' disclosures were inadequate so as to deprive the Lindseys of standing.

### b. Judicial estoppel does not apply.

The Eleventh Circuit uses a two-part test when determining whether judicial estoppel applies: (1) did the party take an inconsistent position under oath in a separate proceeding and (2) was that inconsistent position "calculated to make a mockery of the judicial system." Slater v. United States Steel Corp., 871 F.3d 1174, 1181 (11th Cir. 2017) (internal citations and quotations omitted). However, this Court need conduct no further analysis into whether the Lindseys are judicially estopped. A determination that a plaintiff's disclosures in their bankruptcy petition were adequate precludes application of judicial estoppel. See, e.g., Romeo v. FMA All., Ltd., 2016 U.S. Dist. LEXIS 86148, at *36-37 (E.D.N.Y. June 30, 2016) (noting that a determination that a plaintiff sufficiently disclosed his claim in bankruptcy to have standing necessarily means that his positions are not inconsistent). As the

Lindseys' disclosures were adequate, they have standing, and therefore, are not judicially estopped from bringing their claim.

### 4. *Res Judicata* does not operate to render Plaintiffs inadequate to serve as class representatives.

Both Defendants wrongly argue that because the Plaintiffs do not seek class relief for (1) bodily harm such as disease caused by the contaminants, or (2) damage to market value of real property caused by the contamination, class members who suffer bodily harm from the contaminants or lose market value of their real property from the contaminants will be forever barred by res judicata from suing for those injuries. See, e.g., Doc. 205 at 12-13; Doc. 206 at 19-22. The argument defies settled law which establishes that claims and facts not litigated for class relief are not later barred by *res judicata*.[13]

Additionally, for *res judicata* to later operate against class members, both the claims *and the facts* of the class relief must be dispositive of the later suit. See Manning v. Auburn, 953 F.2d 1355, 1359 (11th Cir. 1992) (to determine if res judicata operates, the "court must look to the factual issues *to be resolved* [in the second cause of action], and compare them with the issues explored in the first

---

[13] See Manning v. Auburn, 953 F.2d 1355, 1358 (11th Cir. 1992) ("Federal courts apply state law to questions of res judicata. In the state of Alabama, four elements are necessary for the doctrine's application: (1) a final judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of parties, and (4) *with the same cause of action presented in both suits*. If even one of these elements is missing, res judicata is inapplicable. The res judicata argument ultimately fails in this case *because the cause of action is not the same*." (citations omitted) (emphasis added)).

cause of action." (brackets in original) (emphasis added) (quotations omitted)).

Those two requirements–the same claim and the same dispositive fact issues–are not

present. That conclusion is the same whether the argument is labeled res judicata or

"claim splitting." See Vanover v. NCO Fin. Servs., 857 F.3d 833, 841 (11th Cir.

2017) (The "test for claim-splitting 'is not whether there is finality of judgment, but

whether the first suit, assuming it were final, would preclude the second suit.'"

(citation omitted)).

Clearly, class relief is not sought for bodily harm or damage to the market

value of real property, and factually, whether the Defendants caused an individual's

cancer or other physical injury will not be decided by the class claims,[14] nor will

diminution of market value be decided by those claims. No conflict is posed. See

Stevenson v. Int'l Paper Co., 516 F.2d 103, 109 (5th Cir. 1975) ("Where a second

action between the same parties is upon a different cause of action, the principle of

res judicata is applied much more narrowly. In this situation, the judgment in the

prior action operates as an estoppel, not as to matters which might have been litigated

and determined, *but only as to those matters in issue or points in controversy which*

*were actually litigated and determined in the first proceeding*. In this sense, *res*

*judicata* is usually and more accurately referred to as an estoppel by judgment, or

---

[14]     Indeed, Daikin acknowledges that facts of physical injury cannot be litigated for class relief. See Doc. 206 at 18 n. 8. ("Since Amchem, it has been essentially impossible to obtain class certification of such claims.").

collateral estoppel." (emphasis added)).[15]

Settled law on the required notice to the class bears out the above points. Absent class members will be informed that bodily harm caused by the Defendants is not being litigated for the class, that losses of market value caused by the Defendants is not being litigated for the class, and that membership in the class should not negate any right to sue for those harms. See Adams v. S. Farm Bureau Life Ins. Co., 493 F.3d 1276, 1286 (11th Cir. 2007) ("The notice sent to class members must inform them whether 'claims like [theirs] were litigated in the [earlier] action.' In addition, the class members' 'substantive claims must be adequately described [and] the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment.'" (citations omitted) (brackets in original)). Due process for absent class members will be satisfied. See id. at 1285-87. The conflict posited by Defendants is illusory, accordingly.

The foregoing points properly rest in part on substantive distinctions. First, damage to the market value of real property—*i.e.*, diminution, which is not litigated for the class—differs from the loss of use and enjoyment of the property for which the Plaintiffs seek class relief for negligence and nuisance. Alabama law supports

---

[15]    In Bonner v. Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

that distinction, which is substantive. "[T]he law of nuisance applies where the invasion results in no substantial damage to the *res*, but where there is interference with the use and enjoyment of one's property." Borland v. Sanders Lead Co., 369 So. 2d 523, 529 (Ala. 1979). That distinction, because it is substantive, would be described in the notice to the class. See Adams, 493 F.3d at 1286 ("[T]he class members' 'substantive claims must be adequately described . . .").

Second, bodily harm is different and distinguished from offensive touching which is battery. Class relief for battery does not require bodily harm, and facts of bodily harm will not be decided for anyone by that class claim. Diagnostic testing is the same. Those damages (if and to the extent recoverable) are for surveillance and detection, not for physical injury.[16]

Likewise, if a class is certified for trespass, damage to market value is not needed to prevail on that claim and would not be litigated. Nominal damages may be awarded for the trespass (the minimal measure), or damages based on "the tenure of the trespass," meaning the duration of contaminated water at the residence. See Poffenbarger v. Merit Energy Co., 972 So. 2d 792, 799 (Ala. 2007) (citing "tenure of trespass" among measures of damage for trespass); Wis.-Alabama Lumber Co., 110 So. 31, 32 (Ala. 1926) (allowing award for nominal damage for trespass); Foust

---

[16]    It is settled that a claim for physical injury does not accrue unless and until the injury is detected. See e.g., Griffin v. Unocal Corp., 990 So. 2d 291, 293 (Ala. 2008).

v. Kinney, 80 So. 474, 475-76 (Ala. 1918) (nominal damages for trespass); see also Pitts Sales, Inc. v. King World Prods., 383 F. Supp. 2d 1354, 1365-66 (S.D. Fla. 2005) (collecting recent decisions on nominal damages for trespass).[17]

The trespass is contaminated utility water at the property, and a class member with damage to market value caused by that trespass (assuming that fact) could opt out and pursue an individual suit for that damage. See In re Syngenta AG Mir 162 Corn Litig., No. MDL No. 2591, 2016 U.S. Dist. LEXIS 132549, at *1393 (D. Kan. Sep. 26, 2016) ("[A]ny class member who does desire to control the litigation of its own claims may opt out of the class action and pursue its own suit."). Information to facilitate an informed decision to opt out would be provided by the notice required. See Adams, 493 F.3d at 1286. Again, there is no conflict. Accord Braxton v. Farmer's Ins. Grp., 209 F.R.D. 654, 660 (N.D. Ala. 2002) (difference between one type of damages and another type of damages on the same claim poses no conflict when notice advises class members of "the type of damages sought by the class representative," and "class members will have the opportunity to opt out of the class and pursue their claims").[18]

---

[17]    Punitive damages may be recovered for the trespass as well, including when only nominal damages are awarded. "Punitive damages are recoverable for trespass, and may be recovered, though only nominal damage is shown." Wis.-Alabama Lumber Co., 110 So. at 32. Accord Rushing v. Hooper-Mcdonald, 300 So. 2d 94, 98 (Ala. 1974); Sugar Valley Land Co. v. Johnson, 1920 Ala. App. LEXIS 82 (Ala. Ct. App. April 6, 1920).
[18]    These points also are true (for the same reasons) for any class member with knowledge of any *additional* PFAS trespass of his or her same property by the Defendants. The class member can opt out. That meets any concern presented by 3M's citation to Gadsden Indus. Park, LLC v.

## 5. Plaintiffs' medical history is irrelevant to diagnostic testing.

Defendants' manufactured "unique defense" of not producing medical records is not a defense, not unique, and is contrary to law. Plaintiffs' claims for damages in the form of diagnostic testing as a result of the battery does not require proof of present physical injury because they are not physical injury claims.[19]

Thus, not only is present physical injury not at issue in the case, but the individualized issues Defendants hope to find in medical records are not relevant to Plaintiffs claim:

> . . . individual factors [are] primarily *relevant to a personal injury action, not a medical monitoring claim for which there is no necessity of establishing a present physical injury.* . . . It is the common fact of exposure to a set of toxins from a single source that is the common and overriding issue in plaintiffs' case. . . . *Under this theory of liability, individual factors are not particularly relevant because the need for monitoring is based on a common threshold of exposure.*

Meyer v. Fluor Corp., 220 S.W.3d 719 (Mo. 2007) (emphasis added). Because proof of present physical injury is not required, Plaintiffs' current medical condition is not at issue, and Plaintiffs have not waived their medical privilege by making claims for

---

United States, 2017 U.S. Dist. LEXIS 163515 (N.D. Ala. Oct. 3, 2017), where the court found a preclusive effect on a present claim for conversion and negligence involving the same real property involved in earlier lawsuits and an earlier judgment.[18] There is no conflict. Accord Braxton, ante
[19] See, e.g., Sadler v. PacifiCare of Nev., Inc., 340 P.3d 1264, 1270 (Nev. 2014) (holding that requiring proof of present physical injury improper); Meyer v. Fluor Corp., 220 S.W.3d 712, 717 (Mo. 2007) (noting that a present physical injury requirement is "inconsistent with the theory of recovery."); In re Welding Fume Prods. Liab. Litig., 245 F.R.D. 279, 314 n.186 (N.D. Ohio 2007) (identifying *seventeen* federal cases certifying diagnostic monitoring classes).

diagnostic testing. Therefore, Defendants' discovery requests are improper, and no basis for a defense or rejecting the class representatives as inadequate.[20]

## D. Defendants' Affirmative Defenses Do Not Preclude Class Certification.

Defendants' arguments on consent and assumption of the risk can be boiled down to this illogical proposition: those in the class of over 30,000 or so people who had any knowledge, however slight, about the presence of PFAS in their drinking water were obliged to immediately cease any consumption of same, terminate their account with various public utilities charged under Alabama law with providing water to citizens, and essentially "live off the grid"—being accountable for their own water supply. The solution, gratuitously offered by the Defendants, is for those with "any knowledge" of contamination to purchase bottled water for all their needs. Defendants do not say how many truckloads per week would be required to service any particular household.

Defendants say they need to know what people knew about PFAS and when they learned about it because these folks, with knowledge, had the audacity to remain as customers of these public water utilities. By doing so, Defendants argue, these

---

[20] Defendants' cases do not suggest otherwise. In <u>Van Reed v. Corizon Health</u>, 2018 U.S. Dist. LEXIS 28578, *19-20 (N.D. Ala. Feb. 1, 2018), the plaintiff was a prisoner making claims for medical care for an already identified medical issue, which Plaintiffs do not seek here. <u>See id</u>. at *21-23. Defendants' cases demonstrate that they miss the whole point; Plaintiffs are not relying on their medical records or past medical condition for any claim here, merely their exposure to Defendants' known toxins.

people assumed the risk or consented to the damage caused them and therefore individual discovery is needed from every class member.

Putting aside, for now, the decades long coverup 3M orchestrated concerning the dangers of PFAS, the knowledge, and extent thereof, of PFAS for any class member in this case is utterly irrelevant. The gravamen of any assumption of the risk/consent claim is that a Plaintiff had an opportunity to take a different course of action, and that such different course would have been a "reasonable choice" to pursue.[21] Here, the thousands of people in the class depended on these public utilities for the source of their water. They used this water for household purposes, such as drinking, bathing, cooking, and gardening.

The issue is not whether there may be people in the class who have some knowledge about PFAS is not the issue. The issue, insofar as it pertains to these purported defenses, is that these people had no "reasonable choice" to do anything differently. As will be seen below, under these facts, the defenses of assumption of the risk and consent are not available because people have to get their water from somewhere, and the law does not require someone to take an extreme and illogical course of action, Defendants' urgings notwithstanding. [22]

---

[21] See Restatement 2d of Torts § 496E (stating that a "plaintiff's acceptance of a risk is not voluntary if the defendant's tortious conduct has left him no reasonable alternative course of conduct").

[22] The Defendants will have the opportunity to raise individual affirmative defenses throughout litigation. Specifically, contrary to their argument against class certification, certification and class relief will not impair any due process right the Defendants may have to

1. **The Defendants should not escape liability for their bad actions simply because they forced the Plaintiffs to make a "choice of evils."**

Plaintiffs' ability to assume the risk or to consent is called into question by the fact that the actions which supposedly demonstrate their assumption of the risk / consent is their use of the water that came out of the faucets in their houses. Where a defendant's actions force a plaintiff to make a "choice of evils," the defense of assumption of the risk is unavailable:

> [T]he risk is not assumed where the conduct of the defendant has left him no reasonable alternative. Where the defendant puts him to a choice of evils, there is a species of duress, which destroys all idea of freedom of election. . . . In general, the plaintiff is not required to surrender a valuable legal right, such as the use of his own property as he sees fit, merely because the defendant's conduct has threatened him with harm if the right is exercised. . . . By placing him in the dilemma, the defendant has deprived him of his freedom of choice, and so cannot be heard to say that he has voluntarily assumed the risk.

Rountree v. Lerner Dev. Co., 52 Md. App. 281, 285-86, 447 A.2d 902, 904 (1982)

(quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 68, at 487

---

assert affirmative defenses. See Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1778, pp. 123-124 (3d ed. 2005) (footnotes omitted)); accord George Lussier Enters., Inc. v. Subaru of New England, Inc., 2001 U.S. Dist. LEXIS 12054, at *60 (D.N.H. Aug. 3, 2001) (rejecting consideration of unique defenses during class certification; any "unique" defenses can be asserted at the damages stage of this proceeding).

(5th ed. 1984)).[23]   A defendant should not be able to avoid liability by faulting a

plaintiff for utilizing a necessary service provided by a public utility.[24]

> The defendant may be under a legal duty, which he is not free to
> refuse to perform, to exercise reasonable care for the plaintiff's
> safety, so that the plaintiff has a corresponding legal right to
> insist on that care. In such a case it is commonly said that the
> plaintiff does not assume the risk when he proceeds to make use
> of the defendant's services or facilities, notwithstanding his
> knowledge of the danger. This is undoubtedly true where the
> plaintiff acts reasonably, and the defendant has left him with no
> reasonable alternative, other than to forego the right entirely.
> Thus a . . . public utility, which has negligently provided a
> dangerously defective set of steps to its waiting room, cannot set
> up assumption of risk against a patron who makes use of the
> steps as the only convenient means of access.

 Neal v. Prince George's Cty., 700 A.2d 838, 842 (Md. App. 1997) (quoting Keeton

et al., supra, § 68, at 492).  While this discussion was focused upon the liability of

the public utility, the rationale for barring the defense of assumption of the risk in

such a situation applies here, too.   It is uncontroverted that 3M and Daikin

contaminated the water provided to Plaintiffs and the class members via their

respective water utilities.  Seeking to avoid liability by "blaming" Plaintiffs and the

class members for making use of a necessary public service is unconscionable and

---

[23]     Even though the discussion here is centered around assumption of the risk, the same
reasoning also applies to consent.  See 6 Am Jur 2d Assault and Battery § 112 ("consent is
ineffective and does not provide a defense if it is obtained by fraud or duress").

[24]     It is well settled in Alabama that "[t]he law does not require the doing of a futile act." Ala.
DOT v. Lee Outdoor Advert., LLC, 275 So. 3d 542, 547 (Ala. Civ. App. 2018).  Suggesting that
the class members were required to completely abandon using the water from their faucets is
simply that: a futile act.

should not be countenanced by this Court.

### 2. Assumption of the risk is not available as a defense where the Defendant conceals material information from Plaintiffs.

Other jurisdictions have explicitly held that the assumption of the risk doctrine does not apply where the defendant actively concealed the nature of the danger. See, e.g., Weinberger v. Solomon Schechter Sch. of Westchester, 102 A.D.3d 675, 678 (N.Y. App. Div. 2013) ("assumption of risk doctrine does not serve as a bar to liability if the risk is unassumed, concealed, or unreasonably increased"); Cohen v. McIntyre, 277 Cal. Rptr. 91, 92 (Cal. App. 1991) ("assumption of the risk should not apply where the defendant concealed the nature of the danger and plaintiff had no opportunity to either decline to participate or insist on precautionary measures"). While Alabama courts do not appear to have squarely addressed whether a defendant's concealment of the nature of the danger would bar its use of the assumption of the risk defense, it is likely that they would so hold, as such a holding comports with current Alabama law on assumption of the risk. See Ala. Power Co. v. McIntosh, 122 So. 677, 681 (Ala. 1929) ("Assumption of risk does not accompany unknown dangers.").

Plaintiffs, in their motion for class certification, presented extensive evidence that 3M has long known of the risks associated with PFAS chemicals and

engaged in a systematic operation to conceal those risks from the rest of the world.[25]

Evidence of such an extensive effort on 3M's part to conceal the dangers of PFAS is sufficient to allow this court to conclude as a matter of law that Plaintiffs and class members were unaware of the full risks associated with PFAS and, therefore, were unable to assume said risks.[26]  This conclusion would obviate any need to conduct individualized inquiries into what each class member knew of PFAS.

### 3.    Defendants' consent defenses are similarly barred.[27]

Defendants revive the same arguments regarding the defense of consent that they raised in their respective motions to dismiss[28] which this Court addressed in its September 20, 2016 Order (Doc. 65).[29]  In response to the Defendants' motions to

---

[25]    See Doc. 202 at 7-10.  3M's actions ranged from using their own rogue scientist, John Giesy, to suppress scientific papers on the dangers of PFAS, to intentionally concealing adverse reports demonstrating the dangers of PFAS from the EPA.  See id. at 8-10.

[26]    See Ex parte Barran, 730 So. 2d 203, 206 (Ala. 1998) ("Questions of assumption of the risk are often within the province of the jury, but if there is no genuine issue of material fact, that is, if reasonable persons must draw the same conclusion, then whether the plaintiff has assumed the risk becomes a question of law for the court.").

[27]    As recognized by 3M's own authority, Alabama courts have never explicitly recognized consent as a defense to battery outside the contexts of either mutual consent to combat or consent to medical treatments.  See Hester v. Brown, 512 F. Supp. 2d 1228, 1232 (M.D. Ala. 2007).

[28]    Doc. 45 (filed February 29, 2016) and Doc. 47 (filed February 29, 2016).

[29]    Daikin also raises consent as a discrete defense to Plaintiffs' trespass claim, arguing that "it is sufficient merely that a class member voluntarily allowed the entry of WMEL water on his property; that the water contained unwanted or even unknown chemicals does not vitiate the consent." Doc. 206 at 37.  However, the lone case Daikin cites to support this proposition is inapposite to the facts currently before the Court.  In Evans v. Walter Indus., Inc., the court held that the plaintiffs' agreement to allow the defendant's dirt onto their property constituted consent to the contaminants contained therein, even though the plaintiffs were ignorant of the contaminants.  See Evans v. Walter Indus., Inc., 579 F. Supp. 2d 1349, 1369 (N.D. Ala. 2008).

However, where the plaintiffs in Evans contracted directly with the defendants to receive their dirt, the Plaintiffs and class members in the present case never contracted with the Defendants, never agreed to allow any of the Defendants' chemicals onto their property through

dismiss, this Court noted that the Defendants had failed to adduce any case law standing for the proposition that "plaintiffs' consumption of the water constituted consent" and that it would "defer addressing this issue until the summary judgment stage." W. Morgan-East Lawrence Water & Sewer Auth. v. 3M Co., 208 F. Supp. 3d 1227, 1237 (N.D. Ala. 2016). Defendants still have not provided any case law to suggest that using the water constituted consent on the part of the Plaintiffs and class members. Regardless, even if this Court determines that consumption of the water could constitute consent, Plaintiffs and class members were incapable of so consenting due to 3M's actions of concealing information on the dangers of PFAS.

Similar to assumption of the risk, the defense of consent requires that it be given with "knowledge of the consequences of the act" in order for it to be effective. 6 Am Jur 2d Assault and Battery § 111. As discussed, supra, 3M suppressed information critical to the public's understanding of the dangers associated with PFAS. For the same reasons applicable to the Defendants' assumption of the risk defense, the defense of consent is unavailing as to Plaintiffs' class claims against the

---

their water, and, therefore, cannot be said to have consented to the Defendants' trespass. Specifically, "[l]ack of consent arises when there is entry to property 'under a license for some particular purpose and [the licensee] went beyond that purpose.'" Cahaba Forests, LLC v. Hay, 927 F. Supp. 2d 1273, 1286 (M.D. Ala. 2013) (quoting Martin v. Fidelity & Cas. of N.Y., 421 So. 2d 109, 111 (Ala. 1982)). No license to enter of any kind or for any purpose was given to the Defendants, so no possibility of consent arises. If the Defendants benefit an iota from a license given to the water utility to deliver the water to the properties (the Plaintiffs disagree that there is any such benefit), that license was limited to the delivery of potable water, *not water contaminated with the Defendants' PFAS*, a fact clearly outside the purpose for which any such license given.

Defendants.

### E. Common Issues Predominate

#### 1. Plaintiffs' trespass and nuisance claims.

The common issues which go to causation and injury are "whether the activities of Defendants have resulted in the contamination of the water which was distributed to the properties of Plaintiffs and the class members and consumed by Plaintiffs and class members" (Doc. 202 at 30) and "whether Plaintiffs and the class members have suffered annoyance, discomfort or loss of use and enjoyment of their properties because of Defendant's contamination of their properties." Id.

3M raises two arguments to defeat predominance, neither of which have any merit: (1) variation in PFAS levels over time and geography and (2) non-defendant sources of PFAS both in WMEL water and on Plaintiffs' property. Doc. 205 at 21. First, variation in PFAS levels is irrelevant to Plaintiffs' claims—it is the presence of PFAS in the water they received from WMEL (or an adjacent utility), not the amount, that is at the crux of Plaintiffs' claims. The common and predominating issue is whether PFAS was delivered to class members—period. Second, 3M strongly argues that non-defendants were the "sources of PFAS in WMEL water." Doc. 205 at 21. 3M *manufactured* these chemicals. Their origin *is* 3M. Moreover, if 3M is blaming these unnamed defendants for part of the contamination, they could have asserted a third-party claim or indemnity claim against them. 3M has not done

this.

Two Alabama cases are likewise inapposite, <u>LaBauve v. Olin Corp.</u>, 2231 F.R.D. 632,673 (S.D. Ala. 2005) and <u>Benefield v. Int'l Paper Co.</u>, 270 F.R.D. 640, 650-52 (M.D. Ala. 2010). Both asserted claims for trespass and nuisance but are factually distinguishable for two reasons. In each of these cases, (1) the manner of contamination was through air and/or rain, which provided no way to determine contamination other than individual testing, and (2) plaintiffs sought damages for the diminution of property value which would require individual inquiry into the value of plaintiffs' property.[30] These individual inquiries do not exist for Plaintiffs and putative class members.

The cases cited by 3M in ostensible support of its argument that "loss of use and enjoyment" and "annoyance" trigger an individual analysis either support Plaintiffs' claim of predominance or are so factually dissimilar that they should be disregarded by this Court.

On page 25 of its brief, 3M accuses Plaintiffs of "wholly ignoring" cases where trespass and nuisance claims were found to destroy predominance, citing the case of <u>Isabel v. Velsicol Chem. Corp.</u>, 2006 U.S. Dist. LEXIS 42279 (W.D. Tenn.

---

[30] Defendant 3M cites to other cases outside Alabama and the Eleventh Circuit (see Doc. 205 at 25, n. 57) which are distinguishable for the same reasons as <u>LaBauve</u> and <u>Benefield</u>. An exception is <u>Isabel v. Velsicol Chem. Corp.,</u> 2006 U.S. Dist. LEXIS 42279 (W.D. Tenn. June 20, 2006), in which the court held that the plaintiffs satisfied the requirements of Rule 23(b)(3).

June 20, 2006), yet it is 3M which has "wholly ignored" how that court decided

trespass, nuisance, and mental anguish claims in the context of predominance.  In

*rejecting* the Defendant's arguments that mental anguish, trespass, and nuisance

required individual inquiries that would eviscerate predominance, the court stated

that a class action was the preferable vehicle to address "large numbers of lawsuits

arising out of a single disaster or a single disaster or a single course of conduct."

Isabel, 2006 U.S. Dist. LEXIS 42279 at *28 (citing Sterling v. Velsicol Chem Corp,

855 F.2d 1188 (6th Cir. 1988)).   In holding that the plaintiffs *satisfied* the

requirements of Rule 23(b)(3), the court stated that the defendant's arguments to

defeat predominance "pertain[ed] directly to the nature and amount of damages,"

and were therefore no impediment to predominance.  Id. at *30.[31]

The other cases cited by 3M on this issue fare no better.  None arise out of a

common disaster or course of conduct, i.e., the contamination of a public water

supply with chemicals manufactured by the Defendant, and are no support for the

fact that annoyance and loss of use and enjoyment hinder a finding that

predominance exists.  Murray[32] is a Title XIX case, Funliner[33] is an action to recover

monies lost playing defendants video games, and Walker Builders[34] is an individual

---

[31]     Class certification was denied in Isabel on grounds of typicality and adequacy of representation.  See Isabel, 2006 U.S. Dist. LEXIS 42279 at *33-34.
[32]     Murray v. Auslander, 244 F.3d 807, 812 (11th Cir. 2001).
[33]     Funliner of Ala., L.L.C. v. Pickard, 873 So. 2d 198, 210 (Ala. 2003).
[34]     Walker Builders, Inc. v. Lykens, 628 So. 2d 923, 925 (Ala. Civ. App. 1993).

breach of contract case against a homebuilder.

The water supply of this putative class was contaminated by the actions of the Defendants. The water contained PFAS, at some level, at all times during the period sought to be certified. This intrusion into the water supply was an unwelcome event thrust upon every member of the class, and every member of the class suffered as a consequence of this reckless act perpetrated by the Defendants. The fact that this annoyance or loss of use and enjoyment may differ in degree among class members is a damages issue, and consistent with the <u>Isabel</u> case, not a factor which diminishes predominance.

Daiken argues that Plaintiffs' trespass claim, and the proof needed to prosecute same, is sufficient to defeat predominance, but Daiken is wrong on several fronts. First, this is a damages argument dressed up as a predominance argument and fails accordingly. Second, despite all arguments Daiken presents, the law in Alabama entitles one to at least nominal damages upon proving a trespass claim.[35]

The defendants caused a trespass into the water supply of their chemicals. The elements of trespass under Alabama law are satisfied here, entitling each class member to at least nominal damages. <u>See</u> Doc. 202 at 34-35.

Daikin also challenges the predominance of common issues for Plaintiffs' claim for public nuisance–specifically the elements of special damages and "hurt,

---

[35] <u>See</u> Section I.C.4, *supra*.

inconvenience, or harm." Doc. 206 at 38-40. It argues that whether people consume water is an individual issue. Id. at 38. Daikin has it backwards. The issue is not "consumption," but rather the common issue of contamination. Every class member had contamination. This is what sets them apart from those people who were not customers of the contaminated water systems. The delivery of contaminated water to their properties is what makes their damages special and different from anyone else who would want to use and enjoy the Tennessee River.

Daikin parrots the argument of 3M concerning an individual analysis of each class members' discomfort, inconvenience, and harm, and its argument fails for the same reasons. None of the cases Daikin cites are remotely similar to unfortunate facts here: thousands of customers of public utility water systems receiving and consuming contaminated water for years, efforts made by some utilities to install systems that might lessen or eradicate the problem, chemicals that can be directly traced to the manufacturing facilities of Defendants on the Tennessee River, and for these tens of thousands of people, no reasonable option to get water elsewhere. Every potential class member suffered water contamination. This case is unique in its ability to trace the source of the contamination to the Defendants, and to the fact that every potential class member had contaminated water. Daikin's attempts to

prove otherwise by citing factually dissimilar cases are unavailing.[36]

### 2. Common issues predominate for Plaintiffs' battery claim.

Plaintiffs seek certification of their battery claim through which they request monetary damages and diagnostic testing costs. The common facts which predominate over individual issues are: the manner in which Defendants acted to cause a battery, whether Defendants "touched" the plaintiffs by releasing PFAS and related toxic chemicals into the Class' water supply, and whether Defendants discharged these chemicals with knowledge that they would ultimately be delivered and consumed by the Class.

### a. Variations in PFAS levels and water consumption do not require individual inquiries.

---

[36] Daikin ignores the dissimilarities throughout its argument. For instance, it incorrectly contends that, for each class member, sampling data are required to show contamination. Doc. 206 at 46-50. That is not true. This is not a case of chemicals dispersed by air from a remote source decades ago which numerous plaintiffs contend drifted to and settled on their land (see LaBauve v. Olin Corp., 2231 F.R.D. 632,673 (S.D. Ala. 2005)), and it is not a case of polluted water in the vicinity of a plaintiff's property which may or may not have migrated to that plaintiff's land (id.). The evidence here is that PFAS-laden contaminated water, in recent years and continuing, has been transported to and deposited directly in the Plaintiffs' homes via the potable water systems which supply the Plaintiffs and class members–specifically the drinking water the class purchased from the water utilities.

This also is not a case where the class includes residents who were not supplied with the PFAS-laden drinking water. The class is defined to include only the residences which received the contaminated water which was distributed from WMEL's Hames WTP. Any suggestion to the contrary is fiction. The class members received it directly from WMEL or via the other utilities which purchased the WMEL water for their residential customers. Any residential customers these other utilities did not buy the WMEL water for are not in the class, which is clear from the Plaintiffs' initial brief for class certification. These points distinguish class relief here from the Defendants' examples, and the points disprove the argument that only individualized testing can determine if class-member residences received and were contaminated by the Defendants' PFAS.

Defendants argue that variation in PFAS levels and variation in how class members used/consumed the contaminated water are issues requiring individual inquiry. Doc. 205 at 27; Doc. 206 at 41.[37] Each class member received contaminated household water. See Doc. 202-36, Bryan Pate Affidavit. Defendants have produced no evidence that there is a phantom "bottled-water only consumer;" EPA exposure assessment indicates that community water consumption occurs daily, with those reporting zero consumption over a 2-day survey period less than 1%.[38] Defendants cite no Alabama law, and there is none, limiting whether a battery occurred based on the degree of the battery. Thus, Defendants' arguments on levels of contamination or consumption, health history or differences in dose do not create individual differences as to the fact of a battery or Plaintiffs' resulting damages; the issue of whether every class member suffered had an offensive touching is common because 1) the source is common and 2) the amount of PFAS distributed is common, and 3) the fact of consumption is common. See Doc. 202-36, Pate Affidavit. Moreover, the biological mechanisms of absorption, distribution, metabolism and excretion are common; each PFAS-exposed person will experience these. See Doc.

---

[37]     Again, the Defendants misconstrue Plaintiffs' claims. These issues do not predominate because the fact that is at the center of Plaintiffs' claim for battery is whether Defendants touched the Plaintiffs by releasing PFAS and related toxic chemicals into the Class' water supply.

[38]     See Ex. 3, ENVIRONMENTAL PROTECTION AGENCY, UPDATE FOR CHAPTER 3 OF THE EXPOSURE FACTOR'S HANDBOOK, INGESTION OF WATER AND OTHER SELECT LIQUIDS (2019) at Tables 3-1, 3-29.

202-16, Ryan Report at 5, 6.[39]  There is no known benefit from exposure to PFAs in human populations.  See id. at 5.  Therefore, any amount of PFAS exposure likely increases the risk of the illnesses and disease associated with PFAS.  Id.  Exposure to toxic pollution is clearly offensive.

    **b. Alabama applies an objective standard to determine whether a touching was offensive and does not depend upon whether Defendants' touching caused an individual class member emotional distress.**

  Defendant 3M argues that "any harm or offense also would turn on whether PFAS exposure caused a class member any health effects or emotional distress." Doc. 205 at 27.[40]  However, a finding of battery does not turn on health effects or emotional distress.  A battery claim does not require proof of a physical or mental injury.  See Surrency v. Harbison, 489 So. 2d 1097, 1104 (Ala. 1986) (an actual injury to the body is not a necessary element).  Under Alabama battery law, harm and offense is determined based on the manner or spirit in which the touching is done. See Acceptance Ins. Co. v. Brown, 832 So. 2d 1, 4 (Ala. 2001). Thus, to determine whether something is "offensive", the inquiry focuses on the "toucher"

---

[39] The U.S. Centers for Disease Control ATSDR, on which Defendants repeatedly rely, have recommended a health guidance of 7 ppt for PFOS, 11 ppt for PFOA, fractions of what Defendants' rely on, and well below levels to which the class was exposed before filtration was installed at WMEL. https://www.asdwa.org/2018/06/21/atsdr-releases-draft-toxicological-profile-for-pfas/, last accessed January 18, 2020.

[40] For support, Defendant 3M references Does I through III v. Dist. Of Columbia, 2006 WL 2864483, at *4 (D.D.C. October 5, 2006), a case which does not evaluate Alabama battery law.

(Defendants), not on the individual touched.[41]  Thus, Defendants' arguments about age, gender, medical condition and other factors are irrelevant as to whether a harmful or offensive touching has occurred.[42]  In the present case, you have a class whose members have been exposed to toxic chemicals that are absorbed into the body, affect multiple organ systems, pose the risk of cancer and other serious health consequences, and which remain in the body for an extend period of time, with no known benefit (see Doc. 202-16 at 1–4).  Such an exposure is offensive to the reasonable person, provable on a class wide basis, and not a matter of individual differences.  See id. at 5.

> **c.  Diagnostic testing is an appropriate additional remedy available to Plaintiffs and class members.**

While arguing Plaintiffs have no claim for diagnostic testing, Defendants nevertheless produce *four* expert affidavits and totaling 49 pages, not including attachments, to oppose the claims.[43]  Through these, Defendants improperly argue

---

[41]    Opposing this objective standard, Defendants cite Hanes v. Mobile Infirmary Med. Ctr., 2005 WL 1840236, at *8 (S.D. Ala. 2005). Doc. 205 at 28; Doc. 206 at 41, n. 17.   Hanes is a sexual assault case in which the court held "[plaintiff's] failure to complain or otherwise protest [defendant's] alleged conduct at the time it occurred suggests that she did not, for whatever reason, perceive the conduct as offensive at the time." Id.  This is a merits defense.  It is also inapposite to the law Plaintiffs cite for assessing battery by the nature of a defendant's wrongful conduct, which is objective.

[42]    Daikin opposes class relief for battery based upon its trespass argument, specifically that it had no "state of mind" to commit any of these wrongdoings.  Doc. 206 at 42.  This is an assertion which furnishes no ground for denying certification of Plaintiff's battery claims, true also of Daikin's argument against common relief for trespass.  Daikin also raises the defense of consent which Plaintiffs have addressed in Section I.D.

[43]    See Doc. 205-29 (Frankel); 205-41 (Greenberg); 205-42 (Beck); 206-2 (Britt).

the merits of Plaintiffs' claims.[44]  Whether there was, in fact, a battery at all is a

question for the jury.  See Surrency v. Harbison, 489 So. 2d 1097, 1104 (Ala.

1986).[45]

The present burden of the cost of diagnostic testing is no less an invasion of a

legally protected interest justifying compensation than is a physical injury.  Hansen

v. Mountain Fuel Supply, 858 P.2d 970, 977 (Utah 1993).  Those exposed have

suffered legal detriment: the offensive exposure to the toxin itself, the risk of disease

and the concomitant cost of the needed medical testing constitute an injury.  Bower

v. Westinghouse Elec. Corp., 522 S.E.2d 424, 430 (W.Va. 1999) (citations omitted).

See also Petito v. A.H. Robins, 750 So. 2d 103, 104 (Fla. App. 2000), cert. den. 780

So. 2d 912, 105 (2001).  Because exposure to toxic pollution creates an increased

risk causing the medically reasonable need to incur the cost of diagnostic testing,

there is an invasion of legally protected interest.  Plaintiffs have suffered a present

injury: the reasonable need to incur the cost of diagnostic testing and the economic

---

[44]    See Burdick v. Tonoga, Inc., 2018 N.Y. Misc. LEXIS 2812 at *7-9, *26, *37, 110
N.Y.S.3D 219 (N.Y. Sup. Ct.) (certification of a monitoring class upheld on appeal in Burdick v.
Tonoga, Inc., 2019 N.Y. App. Div. LEXIS 8498 (N.Y. App. Div. Nov. 21, 2019)).  In Burdick, the
court noted, like here, that virtually all of defendants' assertions in opposition consisted of disputed
merit-based argument.  Id. at *19.  The differences which Defendants' assert exist between the
present case and Burdick (Doc. 205 at 33 n. 79) are ephemeral.  Plaintiffs here have received
contaminated water from the Tennessee River and, therefore, have exposure above that of the
general population.
[45]    Further, Plaintiffs need not prove that class members have been injured at the class
certification stage.  Astrazeneca AB v. UFCW (In re Nexium Antitrust Litig.), 777 F.3d 9, 24 (1st
Cir. 2015); O'Connor v. Boeing North American, Inc., 184 F.R.D. 311, 320 (C.D. Cal. 1998).

loss that results, provable by common facts.

That damages for diagnostic testing are provable on a class wide basis is evidenced by existing monitoring programs. The C8 Medical Monitoring program, arising out of the certified class in <u>Leach v. E.I. Du Pont de Nemours & Co., et al.</u>, 2002 WL 1270121 (W. Va. Cir. Ct. April 10, 2002), is a single common program diagnostic testing for five diseases known to be linked to exposure to PFOA.[46] Screening is distinguished by age, and gender.[47] Persons who have already been diagnosed for a screened condition do not get rescreened.[48] The C8 Monitoring Program makes clear that Defendants' claimed individual issues do not exist as to plaintiffs' diagnostic testing damages.[49] Additional courts have certified classes for diagnostic testing specifically for PFAS exposure.[50] The cases relied upon by the

---

[46] <u>See</u> Information on the C-8 (PFOA) Medical Monitoring Program Screening Tests, available at http://www.c-8medicalmonitoringprogram.com/docs/med_panel_education_doc.pdf, last accessed January 20, 2019.

[47] <u>See id</u>.

[48] <u>See id</u>.

[49] Similarly, <u>In re Fernald</u> implemented an eighteen-year medical monitoring program for residents within a five-mile radius of a US Department of Energy uranium processing site. <u>See In re Fernald Litig.</u>, 1989 U.S. Dist. LEXIS 17762 (S.D. Ohio Sep. 29, 1989). <u>See</u> also <u>In re NHL Players' Concussion Injury Litig.</u>, 327 F.R.D. 245, 259-60 (D. Minn. 2018); <u>Donovan v. Philip Morris USA, Inc.</u>, 268 F.R.D. 1, 8, 28-29 (D. Mass. 2010) (granting certification for monitoring under both Rule 23(b)(2) and (b)(3)).

[50] In <u>Sullivan v. Saint-Gobain</u>, the Court certified a medical monitoring class under Fed. R. Civ. 23(b)(3). <u>See</u> Ex. 4, <u>Sullivan v. Saint-Gobain</u>, No. 5:16-cv-00125, Decision on Motion for Class Certification (Doc. 107) at 29, 35 (D. Vt. Aug. 23, 2019). Separately, the court ruled that Vermont would recognize a claim for diagnostic testing damages. <u>See Sullivan v. Saint-Gobain Performance Plastics Corp.</u>, 2019 U.S. Dist. LEXIS 221612, at *55 (D. Vt. Dec. 27, 2019). In <u>Berry v. City of Chi.</u>, 133 N.E.3d 1201 (Ill. App. 2019) (appeal pending), the court found that a claim for diagnostic testing presents a claim for present injury without proving a present physical injury.

Defendants to demonstrate that diagnostic testing is not a remedy available to plaintiffs are unavailing as they are factually inapposite to the present case.[51]

Defendants' claims of other individualized issues are also baseless as have been repeatedly discussed throughout this reply.  At best, these are arguments for the merits of the diagnostic testing program.  Defendants' claims of other sources of exposure is irrelevant.  At issue in this case is whether Defendants' tortious contamination constitutes an offensive touching and occasioned the need for diagnostic testing because of that offensive touching.[52]

### 3. Plaintiffs' negligence claims on behalf of the class predominate any individual claims.

Customers of WMEL and adjacent utilities (Subclass C) paid for uncontaminated water.  Simply put, they did not get what they paid for.  Instead,

---

[51]    Rhodes v. E. I. DuPont de Nemours, 253 F.R.D. 365, 377, 378 (S.D. W.Va. 2008) and Rowe v. E. I. DuPont de Nemours, 2008 U.S. Dist. LEXIS 103528 at *33, *46-47, *58 (D.N.J. 2008) both were decided before the C8 Panel peer-reviewed literature was published, and before the C8 Monitoring Program was carried out.  Rhodes, 253 F.R.D. at 379 (panel results preliminary).  Both were decisions on the merits of the specific risk assessments there.  In Gates v. Rohm & Haas Co., 655 F.3d 255, 259 (3d Cir. 2011), there was no contamination of drinking water and no evidence of actual exposure.  In Ball v. Union Carbide Corp., 385 F.3d 713, 717, 718, 726, 728 (6th Cir. 2004), plaintiffs claimed personal injuries.  Id. at 726.  The court distinguished the case from Sterling v. Velsicol Chemical Corporation, 855 F.2d 1188, 1197 (6th Cir. 1988), which upheld certification of a monitoring class where conduct was identical for each of the plaintiffs.  See Ball, 385 F.3d at 728 (citing Sterling, 855 F.2d at 1197).  In Boughton, plaintiffs also claimed personal injuries which are not at issue here.  Boughton v. Cotter Corp., 65 F.3d 823, 824, 827 (10th Cir. 1995).

[52]    Whether the Plaintiffs also were exposed to PFAS in "microwave popcorn" is irrelevant.  Whether there is even a route of exposure for "microwave popcorn" or "stain resistant carpet" is a speculative defense that does not defeat class certification because those guesswork issues cannot diminish the provable exposure from Defendants' tortious conduct.

they received contaminated water.  The water was contaminated by the actions of the Defendants. This is a fact—indeed, an undisputed fact—common to the entire class.

Defendants  arguments that the water was *safe*, that the amounts of PFOS varied, and that it is unknown how much water any one class member used for drinking, are a combination of merits and damages arguments, neither of which impacts predominance.  See, e.g., Doc. 205 at 33-36; Doc. 206 at 31-35.

The claims for negligence predominate as follows:

**Duty**:  The Defendants had a duty not to contaminate the water supply.  They had a duty not to dump pollutants in the Tennessee River.  This duty was owed to all class members—people who were customers of the public utilities supplying water to citizens in this part of Alabama.

**Breach of the Duty**:  Defendants breached this duty by its actions and inactions regarding the use and disposition of the chemicals, PFAS, and others. Defendants breached this duty in the same manner to each class member.  If a person was a customer of one of these public utility water systems, that person was an unwitting recipient of a breach of the duty not to contaminate the water supply perpetrated by the Defendants.  Indeed, the manner of this breach, and the willfulness of same, is likewise common to the class.  Every class member has the same claim for wantonness against the Defendants for the gross, intentional, willful, reckless,

and wanton discharge of these chemicals into the Tennessee River, where it was eminently foreseeable that the chemicals would work their way into the water supply of the public utilities in the area. And they did.

**Injury**: Each plaintiff was injured. Not one person escaped injury. By definition, every class member was a customer of a water system. Every person paid for the water. Every person paid for water that was not contaminated. No one got what they paid for. Defendants take great pride in the fact that certain EPA levels regarding PFAS were not exceeded, but this misses the point entirely—especially in the class context. **Any level of PFAS is too much. Any level renders the water contaminated.** This is a fact that is common to the class and it predominates over any other individual issue.

## 4. The relief requested by the Plaintiffs is clearly stated in the amended complaint.

Defendants argue that certification for Plaintiffs' negligence claim should be rejected because refunds for water charges is not stated in the complaint or Plaintiffs' initial disclosures. Doc. 205 at 34; Doc. 206 at 47. Plaintiffs are not seeking refunds, rather they are seeking damages for drinking water contaminated by Defendants, with the price paid for the water the most appropriate measure. Plaintiffs requested such relief in their amended complaint. Doc. 175, ¶¶ 42, 62 ("other damages arising from the contamination of the Tennessee River water utilized by the Water Utilities for their customers"). Although Defendants interpret the expert affidavit of Ralph

Summerford to say that "any refunded amounts should exclude what class members paid for uses other than drinking," (Doc. 205 at 35; see also Doc. 206 at 49), he testified that the damages amount is the amount of *all* contaminated water purchased from the water utilities. Ex. 5, Depo of Summerford at 62:8-18; 65:18-66:1; 84:20-85:3; 85:15-86:1; 97:15-98:1; 101:7-12; Summerford report, Doc. 202-47. That is an ascertainable sum, because the purchasers are identifiable through the utility records (they are the utility's customers), and the purchase amounts are identifiable that same way. See Ex. 5, Depo. of Summerford at 27:17-28:3; 48:3-5.[53]

**F.     The Economic Loss Doctrine does not preclude Plaintiffs' recovery.**

Daikin argues that the Plaintiff class members cannot be compensated for the financial harm caused them by the negligent and wanton conduct of the Defendants. Despite undisputed evidence of monthly payments by class members for *clean water*, and despite overwhelming evidence that the Defendants knowingly discharged known pollutants into the primary water supply of these class members resulting in *contaminated water*, Defendants claim that the "Economic Loss Doctrine" (or "ELD") shields them from liability for such monetary losses. Doc. 206 at 31.

---

[53] The case law Defendants use for support does not analyze what happens when the relief requested in certification is not in the complaint. Doc. 205 at 34; Doc. 206 at 47-48. The cases cited analyze new claims, not new forms of relief. Plaintiffs' negligence claim is not new, and they have pled for the relief, contrary to the premise of the Defendants' argument.

Daikin cites two Alabama cases, very limited in their scope, for its sweeping argument that rate-payers—who clearly did not get what they paid for—should not be permitted to recover such losses. The cases are <u>Prickett v. BAC Home Loans</u>, 946 F. Supp. 2d 1236, (N.D. Ala. 2013) and <u>Blake v. Bank of Am., N.A.</u>, 845 F. Supp. 2d 1206 (M.D. Ala. 2012). This Court and others have addressed the boundaries of these decisions.

In <u>Birmingham Emergency Communs. Dist. v. TW Telcom Holdings, Inc.</u>, 2017 U.S. Dist. LEXIS 184971 (N.D. Ala. March 2, 2017), this Court reviewed the <u>Prickett</u> and <u>Blake</u> decisions, along with one other case, and held as follows:

> The reliance on these cases is misplaced, because each involved a contractual relationship. <u>See</u> <u>e.g.</u> <u>Blake</u>, 845 F. Supp. 2d at <u>1210</u> ("Alabama does not recognize a tort-like cause of action for the breach of a duty created by contract.") As the District correctly notes, those courts did not hold that "purely economic losses can never be recovered" on a negligence claim under Alabama law. Moreover, aside from situations in which a contract gave rise to the subject duty, the Alabama Supreme Court has only applied the economic loss rule in product liability cases.

<u>Birmingham Emergency Communs. Dist.</u>, 2017 U.S. Dist. LEXIS 184971 at 12 (citations omitted). Other courts, within this district and beyond, are in accord with this Court's narrow application of the ELD. In <u>Autauga v. Bellsouth Telcoms, LLC</u>, 2016 U.S. Dist. LEXIS 138787 (N.D. Ala. October 6, 2016), a case cited by this court in its <u>Birmingham Emergency Communs. Dist.</u> opinion, the court rejected the

defendant's contention that <u>Prickett</u> and <u>Blake</u> establish a "categorical holding that economic injury alone does not give rise to tort liability." <u>Id</u>. at *14.[54]

Likewise, in <u>In re Syngenta AG MIR 162 Corn Litig.</u>, 131 F. Supp. 3d 1177 (D. Kan. 2015), a multi-district case, the federal court conducted a comprehensive review of the ELD.  In addressing the defendant's argument invoking the ELD, the court noted that "although the ELD is often applied in the context of a defective product or a contractual relationship between the parties, Syngenta argues that the Court should apply the 'stranger' ELD ('SELD') in this case in which plaintiffs . . . had no contractual or direct relationship to Syngenta, the defendant." <u>In re Syngenta</u>, 131 F. Supp. 3d at 1194-95.  As part of its review of the laws of the states at issue, the Kansas federal court found that "in Alabama, courts have not applied the SELD and have applied the ELD only in the context of product liability claims." <u>Id</u>. at 1198.

The case before this Court is not founded upon a contractual duty, and it is not a case brought within a product liability context.  Therefore, neither the SELD nor

---

[54] One related point: Daikin draws on the fact that the drinking water was purchased by the Plaintiffs from the water utilities to incorrectly posit that the negligence claim for economic loss is cognizable only in contract, and only against the water utilities, not against the Defendants for negligently contaminating the purchased water.  Doc. 206 at 48.  Daikin relies on *Blake* for this argument, and the Plaintiffs show why <u>Blake</u> is inapposite and does not operate against class relief.  Daikin also invokes for this same argument a case decided under Georgia law on inapposite facts and inapposite contract causes of action, specifically malfunctioning utility meters which caused customers to be overbilled and for which class relief was sought under contract and third-party beneficiary theories.  That decision is <u>City of Atlanta v. Benator</u>, 714 S.E.2d 109 (Ga. App. 2011).  The <u>Benator</u> court applied Georgia's economic loss rule to the claims against the contractors involved, 714 S.E.2d at 115, and the economic loss rule is inapplicable here.

the ELD immunizes Defendants from liability for the economic losses caused by their negligent and wanton conduct. The Plaintiffs and class purchased drinking water which the Defendants damaged with contamination, making the purchase price the fitting measure of these economic losses. The Plaintiffs and the class also claim damages for offense to their persons (battery) and for damages to their residential property (loss of use and enjoyment, nuisance, and trespass), further distinguishing the ELD from this case.

Moving beyond economic losses to those which arise from personal injury or property damage, Daikin acknowledges that such damages are beyond the scope of the ELD. Daikin argues that pPlaintiffs have disclaimed any personal injuries. See Doc. 206 at 31. To be clear, Plaintiffs make no claim that they have suffered a "manifest, present injury" and therefore do not seek damages related to bodily harm. Plaintiffs do, however, maintain their claims for battery and all damages legally recoverable on such claims.[55] As the Court has ruled in denying the Defendants'

---

[55] Alabama allows an award of nominal damages for battery. See Seigel v. Long, 53 So. 753, 753-54 (Ala. 1910). "Nominal damages are proper where there has been a breach of a legal duty, and either no damages are suffered, or there is a failure of proof of actual damages." Conner v. Hamlin, 1947 Ala. App. LEXIS 405, *8, 29 So. 2d 570 (Ala. App. 1947). Punitive damages may be recovered as well, provided the evidence warrants them. See Rushing v. Hooper-Mcdonald, 300 So. 2d 94, 98 (Ala. 1974) ("It is the rule in this state that proof of nominal damages will support a claim for punitive damages. . . The proof in this case warrants a jury determination of nominal damages. Further, the evidence was supportive of a jury issue pertaining to punitive damages in the event a jury felt the plaintiff should recover nominal damages."); accord Engineered Cooling Servs. v. Star Serv., 108 So. 3d 1022, 1034-37 (Ala. Civ. App. 2012) (assessing reasonableness of punitive damages award where only nominal damages awarded on the tort claim).

motions to dismiss in this case, "a claim for battery in Alabama does not require an actual injury to the body as an element of the claim." Doc. 65 at 15.

**G.    Plaintiffs' Claims for Injunctive Relief Are Not Moot.**

3M argues that Plaintiffs' claim for injunctive relief is moot due to the in-process installation of a reverse osmosis ("RO") filtration system by WMEL. See Doc. 205 at 43-44.   However, this argument is unavailing for two reasons.   In contrast to the first case 3M relies upon, the RO system is not actually in place and is currently not scheduled to be operational until sometime in 2021.  See Doc. 205 at 3.  Contrast Kennedy v. Omegagas & Oil, LLC, 748 F. App'x 886, 891 (11th. Cir. 2018) (claim for injunction was moot **after** ADA violations were remedied).  Next, in contrast to the second case 3M relies upon, the Defendants ignore that Plaintiffs are seeking to enjoin the Defendants to "remove their chemicals and toxins from the water supplies of Plaintiffs."  Doc. 175 at ¶ 75.  This goes beyond simply ensuring that the water reaching the class members has had these chemicals and toxins filtered out of it using the best current technology, and seeks an order requiring the Defendants to take affirmative steps to remove the contaminants from the water supply itself.  Neither of the Defendants has alleged that they are taking any efforts to remediate their pollution of the Tennessee River, so any argument that Plaintiffs' claims for injunctive relief seeking to force the Defendants to remove their contaminants from the Tennessee River is somehow moot necessarily fails.  Contrast

Ctr. for Biological Diversity, Inc. v. B.P. Am. Prod. Co., 704 F.3d 413, 431 (5th Cir. 2013) (claim for injunction mooted by **existing** cleanup efforts).

**H.    Defendants Err by Arguing Rule 23(c)(4) Should Not Apply in this Case.**

Defendant 3M incorrectly state that Plaintiffs have neglected to provide any sort of evidence, authority or meaningful argument for why Rule 23(c)(4) should not apply in this case. Doc. 205 at 47. Issue certification can help "'reduce the range of disputed issues' in complex litigation . . . ." Gunnells v. Healthplan Servs., 348 F.3d 417, 426 (4th Cir. 2003) (quoting In re A.H. Robins Co., 880 F.2d 709, 740 (4th Cir. 1989)).  Courts recognize that oftentimes the greatest efficiency and fairness can be achieved by "carving at the joints" of the dispute and resolving any common issues on a class-wide basis. Mejdrech v. Met-Coil Systems Corp, 319 F. 3d 910, 911 (7th Cir. 2003). Defendants make a blanket statement and completely disregard the numerous arguments through-out Plaintiffs' brief as to why class certification is appropriate. See Doc. 202 at 28-32 & 44-45.

Defendants also ignore that many courts, including district courts within the Eleventh Circuit, have certified classes on an issue-by-issue basis even when the entire action does not satisfy Rule 23(b)(3).[56] Even cases that hold Defendants' view

---

[56]    See, e.g., Augustin v. Jablonsky (In re Nassau Cty. Strip Search Cases), 461 F.3d 219 (2d Cir. 2006); In re Tri-State Crematory Litig, 215 F.R.D. 660, 697-700 (N.D. Ga. 2003); Hernandez v. Motor Vessel Skyward, 61 F.R.D. 558, 561 (S.D. Fla. 1973).

note that the Eleventh Circuit has not provided clear guidance on the matter. <u>See</u> <u>City of St. Petersburg v. Total Containment, Inc.</u>, 265 F.R.D. 630, 647 n.11 (S.D. Fla. 2010); <u>Ray v. Judicial Corr. Servs.</u>, 2019 U.S. Dist. LEXIS 165270, 73 (N.D. Ala 2019). For the sake of brevity, Plaintiffs' brief lays out the argument for the 5 individual issues for certification and how common issues predominate. <u>See</u> Doc. 202 at 32-44. Lastly, Defendants inaccurately state that Plaintiffs have not proved issue certification is superior to other available methods. <u>See</u> Doc. 205 at 49. As described above and in their brief, Plaintiffs can prove that class certification is the superior method to adjudicating this controversy and will not duplicate the argument here. <u>See</u> Doc. 202 at 27-28.

The Lindseys and Mr. Watkin are still WMEL customers. This is undisputed. The live where they have always lived, of that there is also no dispute. The polluting conduct has not abated, a merits question to be resolved. Therefore, they are perfectly adequate and armed to seek injunctive relief.

## I. Ascertainability

The Plaintiffs' expert Mr. Summerford opined that, on his review of the record to date, he should be able to ascertain as damages all sums paid by class members for the contaminated water. Ex. 9 (Expert Report of Ralph Summerford); Ex. 5, Depo. of Summerford at 12:19-13:1; 16:2-13; 27:17-28:3; 35:5-36:3; 48:3-5; 78:11-22. His opinion is consistent with the Plaintiffs' showing in their initial brief for

class certification. The record produced by WMEL for the Lindseys and Mr. Watkins bears out Mr. Summerford's opinion, showing that the water utility has and can produce the record of customer billing and payments from the start of the earliest class relief (October, 2009) to the present (in this instance, the date in 2019 when WMEL produced the record to the Plaintiffs). Ex. 6 (PLS_WATKINS_000001, WMEL Billing Record).

The record also indicates that the Plaintiffs can ascertain, from contemporaneous records of the water utility, the identities of household members who objectively can qualify for the battery subclass along with the residential ratepayer. Ex. 7 (WMEL Application Form). No individualized inquiry is required, only production of responsive records by the utility (which is a single inquiry).[57]

The Defendants, to muddle the identification of class members, submit the declarations of officers or employees of the six water utilities. E.g., Docs. 206-4/-9 (Declarations of Don Sims, Mike Parker, Donna Gossett, Vaughn Goodwin, Ken Winkles, and Kevin Martin). The declarations were obtained by subpoenas to testify at deposition (or in Mr. Sims' case by other means), and once the declarations were given to the Defendants, the depositions of these six fact witnesses were cancelled

---

[57] For household members, objective criteria for qualifying for the battery subclass, i.e., once the household member is identified by the utility record, are available from licenses, voter registration, school enrollment, and the like—one or more of which could be part of a required proof of claim. The ratepayer's qualification for the subclass is self-proving by the utility record, namely the record of one year (or more) of purchases of the water for his or her residence.

and the subpoenas were withdrawn.[58]  For that reason, the Plaintiffs did not have an

opportunity to examine the declarants, and Daikin (which issued the subpoenas) has

refused the Plaintiffs' timely request to make these fact witnesses available for

examination.

The Plaintiffs are communicating with 3M and with WMEL to obtain Mr.

Sims' deposition before the fact discovery cut off at the end of February, and the

Plaintiffs have prepared subpoenas for depositions to serve on the other five water

utilities.  Those will be served in time to conduct examinations of the declarants (or

the utilities' corporate representatives, as the case may be) before the cut off.

The subpoenaed examinations should further vindicate Mr. Summerford's

opinion that the damages paid by ratepayers are ascertainable and dispel any doubt

sowed by the Defendants' use of the six declarations.  The objective will be to

confirm what the Plaintiffs already have shown, which is that class members can be

ascertained.  The discovery will conclude before the cut off (and is allowed by it),

and if the results of the discovery warrant, the Plaintiffs may redefine the class and

subclasses to facilitate identification of class members.[59]  The Plaintiffs intend to

supplement this reply with those results, redefining the class if and as appropriate in

light of the them.

---

[58]     One of the subpoenas is attached for reference.  Ex. 8 (Subpoena to VAW).
[59]     Even the court in the <u>Benefield</u> decision the Defendants invoke acknowledged that a class
may be redefined to cure deficiencies in ascertainabilty.  <u>See</u> <u>Benefield</u>, 270 F.R.D. at 645.

## II.  CONCLUSION

For the reasons set forth below and in Plaintiffs' Motion for Class Certification (Doc. 202), certification of Plaintiffs' proposed classes is due to be granted.

/s/ Christopher B. Hood
Christopher B. Hood (ASB-2280-S35H)
Timothy C. Davis (ASB-6834-D63T)
W. Lewis Garrison, Jr. (ASB-3791-N74W)
Mark R. Ekonen (ASB-0204-R79E)
HENINGER GARRISON DAVIS
2224 First Avenue North
Birmingham, AL  35203
PH:  205.326.3336
tim@hgdlawfirm.com
lewis@hgdlawfirm.com
chood@hgdlawfirm.com
mark@hgdlawfirm.com

/s/ Kevin S. Hannon
Kevin S. Hannon, *pro hac vice*
The Hannon Law Firm, LLC
1641 Downing Street
Denver, CO 80218
(303) 861-8800
khannon@hannonlaw.com

*Counsel for Plaintiffs and Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all registered counsel.

/s/ Christopher B. Hood
Christopher B. Hood