FILED

2021 Oct-26  PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TOMMY LINDSEY, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NUMBER** |
| | ) | **5:15-cv-01750-AKK** |
| **3M COMPANY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
## FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Timothy C. Davis (ASB-6384-D63T)
W. Lewis Garrison, Jr. (ASB-3791-N74W)
Christopher B. Hood (ASB-2280-S35H)
Mark R. Ekonen (ASB-0204-R79E)
HENINGER GARRISON DAVIS, LLC
2224 First Avenue North
Birmingham, AL 35203
PH: 205-326-3336
tim@hgdlawfirm.com
lewis@hgdlawfirm.com
chood@hgdlawfirm.com
mark@hgdlawfirm.com

Kevin S. Hannon, *pro hac vice*
THE HANNON LAW FIRM, LLC
1641 Downing Street
Denver, CO 80218
PH: 303-861-8800
khannon@hannonlaw.com

*Counsel for Plaintiffs and Proposed Class*

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  SUMMARY OF THE SETTLEMENT .............................................................3

III. FACTUAL BACKGROUND ..............................................................................4

IV.  PROCEDURAL HISTORY .................................................................................7

V.   THE PROPOSED RELIEF ...............................................................................10

VI.  PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED. 12

   A.   Standards for Preliminary Approval of a Class Settlement. .......................12

   B.   Application of the Six *Bennett* Factors. ....................................................14

     1. The likelihood of success at trial .................................................................14

     2. The range of possible recovery and the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable. ...16

     3. The complexity, expense, and duration of the litigation. .............................19

     4. The substance and amount of opposition to the Settlement. ........................20

     5. The stage of proceedings at which the Settlement was achieved. ...............20

VII. THE   SETTLEMENT   CLASSES   SHOULD   BE   CONDITIONALLY CERTIFIED. ..............................................................................................................21

   A.   Definition of the Settlement Class. ............................................................22

   B.   Rule 23(a) Requirements are Satisfied. .....................................................25

   C.   Rule 23(b)(3) Requirements have been Satisfied. .....................................28

     1. The Predominance Prong is Satisfied. ........................................................29

     2.   Managing the Claims of Class Members as a Class Action under Fed. R. Civ. P. 23 Is Superior to Other Methods of Case Management. ...................32

VIII.       THE COURT SHOULD APPROVE THE PROPOSED NOTICE TO MEMBERS OF THE CLASS. .....................................................................................33

IX.  ATTORNEY FEES AND EXPENSES. ............................................................34

X.   SERVICE AWARDS ........................................................................................35

XI.  HEARING ON THIS MOTION. ......................................................................38

CONCLUSION ..............................................................................................................38

# I.     INTRODUCTION

Plaintiffs are customers of the West Morgan-East Lawrence Water and Sewer Authority ("WMEL" or "Authority"), and they seek to represent two subclasses of similarly situated absent plaintiffs: those who purchased water originating from WMEL and those who owned or resided in a household that received water originating from WMEL.  Plaintiffs filed this lawsuit seeking compensation from the Defendants for the pollution of their drinking water source, the Tennessee River, by Defendants' discharges of certain per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonate ("PFOS").

Plaintiffs have reached a proposed settlement with the defendants in this litigation—3M Company ("3M"), Dyneon, LLC ("Dyneon"), and Daikin America, Inc. ("DAI"), (collectively, the "Defendants")—that is fair, adequate, and reasonable.  Accordingly, Plaintiffs seek preliminary approval of this proposed class settlement from the Court.  The settlement requires the Defendants to pay the class $12,000,000.00 as restitution for certain monies paid for contaminated water as well as for all other claims released in the proposed Settlement Agreement ("Settlement") attached to this motion as Exhibit 1.  Additionally, 3M will pay for half of the costs to (1) notify the class members of the Settlement and (2) to administer the Settlement.  This relief is on top of the relief previously obtained from Defendants in this litigation, which WMEL utilized to install a granular activated carbon (GAC)

filtration system that became effective on September 29, 2016 and has been operating since that date to remove PFAS to a level below applicable federal and Alabama regulatory advisories.  WMEL also will utilize relief obtained in this litigation to replace the GAC filtration system with a reverse osmosis (RO) system. Once installed, the RO system will continue the GAC system performance, and improve upon it.  The RO system came online in May of this year (2021), *see* Exhibit 2, attached hereto, and it is the most advanced water filtration available to WMEL. It has been tested against 29 different PFAS compounds and removes all of them. As installed at WMEL, the RO system is expected to have a fifty-year lifespan.

In exchange for the described payments from Defendants, the members of the Class will resolve their claims against the Defendants as set forth in the Consolidated Individual and Class Action Complaint (Doc. 175), and will release the Defendants for certain individual and class claims in accordance with the terms of the Settlement Agreement.  The Settlement will preserve the rights of the members of the Class to assert claims against the Defendants for manifest bodily injuries or illnesses and any mental anguish resulting from such manifest injuries or illnesses, as well as for property damage claims arising out of or related to the application of PFAS-containing biosolids on property owned by a Class Member.

Plaintiffs have moved for conditional certification of the Class and preliminary approval of the proposed Settlement as the first step in the settlement approval process.  If, after reviewing the Settlement under the standards of Rule

23(e) of the Federal Rules of Civil Procedure, the Court preliminarily approves the Settlement, Class Counsel will provide notice of the terms of the Settlement to the Class Members in a form that the Court approves.  After it allows reasonable time for notice, the Court would hold a fairness hearing to consider the terms of the Settlement in detail and any objections or other comments that Members of the Class may submit to the Court. Accordingly, Plaintiffs ask the Court to: (1) conditionally certify the Class for settlement purposes; (2) preliminarily approve the Settlement under Rule 23(e); (3) approve the proposed Notice Plan and form of the Class Notice; (4) set a timeline for notice, Settlement objections, and other events; and (5) schedule a fairness hearing to finally approve the Settlement.

## II.   SUMMARY OF THE SETTLEMENT

The Settlement creates a common fund of 12 million dollars to compensate ratepayers, household members, and household owners for potable water containing PFAS distributed to their households by five water utilities over a three-year period. The ratepayers, or "Ratepayer Subclass," will receive 6.415 million dollars on a pro rata basis (adjusted by a minimum and cap) for their payments for that water, and the other class members will receive a pro rata share of 1 million dollars, based on the number of claims made and subject to a cap.

There are 17,112 residential water customer accounts for which ratepayer claims would be paid.  *See* Exhibit 3 at Table 1.  The other class members, the "Resident Subclass," are estimated to number approximately 26,000 based on

household census data from Morgan County and Lawrence County, the two counties primarily served by the five water utilities.

Class Counsel, if approved, would seek a fee of thirty percent of the common fund (3.6 million dollars).  Expenses which may be reimbursable to Class Counsel are no more than $900,000.  Costs of notice and administration are estimated at $170,000, and any surplus would be distributed on a pro rata basis to the estimated 77 percent of ratepayers whose payments from the Settlement are not capped and are not minimum payments.  An effective notice plan would be commenced promptly after preliminary approval.  Exhibit 4.  The form of notice is Exhibit 5.

A schedule for Class Counsel's motion for an award of fees and costs, notice, Resident Class claims, opt outs and objections, hearings, and all related events are proposed at the end of this Motion.

## III.   FACTUAL BACKGROUND

3M began producing products containing or using PFOS and PFOA in the 1950s.[1]  3M produced or used PFOS in its manufacturing processes in Decatur for a number of years before it phased out of the chemistry in 2002.[2]  3M produced or

---

[1]   *See* November 30, 2007 Report on the Manufacture, Use, and Releases of PFCs at the 3M Cottage Grove Facility (3M_MN00066600, at -6604) (Doc. 202-29).

[2]   *See*, *e.g.*, January 30, 2009 Letter to the EPA (3M_MN01362000, -2002) (Doc. 202-31) (noting that the chemical plant manufactured materials using the PFOS chemistry for use as protective treatment for carpets, papers and textiles).

used PFOA in its manufacturing processes in Decatur from 1998-2000.[3]  PFAS and related chemicals were discharged from 3M's property into Bakers Creek, a tributary to the Tennessee River.[4]  3M also applied PFAS-containing sludge from its on-site wastewater treatment plant by means of subsurface injection in a 575-acre area designated as the "sludge incorporation area."[5]

Dyneon was formed in 1997 upon the merger of 3M's fluoroelastomer business with the German company, Hoescht.[6]  In 1999, 3M purchased Dyneon from Hoescht.[7]  In 1998, Dyneon built its own facility on the southern portion of the 3M Decatur site for production of fluoroelastomers.[8]  Full-scale production of PFOA began at 3M Decatur in 1999.[9] PFAS from Dyneon's operations also contributed to the PFAS discharge into Bakers Creek and the Tennessee River.[10]

In 1991, 3M sold a portion of the 3M sludge incorporation area to DAI as the site for construction of a new DAI fluorochemical plant.  Initial construction of the

---

[3]     *See id.* (noting that the chemical plant also produced ammonium perfluorooctanoate, which is the ammonium salt of PFOA).

[4]     *See* Doc. 202-30, at -6639-45.

[5]     *Id.*, at -6641.

[6]     *See* 3M Decatur Plant, https://www.3m.com/3M/en_US/plant-locations-us/decatur/, last accessed November 22, 2019.

[7]     *See id.*

[8]     *See* 3M Decatur Plant, https://www.3m.com/3M/en_US/plant-locations-us/decatur/, last accessed November 22, 2019.

[9]     Declaration of Larry Neal, Doc. 92-8 at ¶11.

[10]    *See* January 30, 1999 Letter from 3M to EPA (3M_MN01105042, at -5042) (noting that 3M and Dyneon "share many operations, including on-site treatment and direct discharge of process wastewater") (Doc. 202-35).

DAI plant was completed in 1993, with fluoropolymer manufacturing operations beginning in early 1994.  From 1994 to 2011, DAI purchased PFOA for use in the manufacture of certain fluoropolymers.[11]  Stormwater runoff from DAI's property has contained comparatively low volumes of PFOA and PFOS.[12]  DAI never made, used, or sold PFOS.

Based, in part, on the presence of PFAS in the Tennessee River caused by Defendants' discharges, ADEM has placed Wheeler Reservoir from 5 miles upstream of Elk River to the Joe Wheeler Dam on the state's list of impaired waters.[13]  This includes the location where WMEL takes water from the Tennessee River to treat and provide to its customers, including the adjacent water utilities which distribute WMEL water to their customers.[14]

The Tennessee River is the sole source of raw water for WMEL.[15]  WMEL's intake is located on the Tennessee River downstream from each of the Defendants' Decatur facilities.[16]  The water that reaches the intake on the Tennessee River contains trace amounts of PFAS.[17]  There is a single intake from the Tennessee River

---

[11]    Declaration of Larry Neal, Doc. 92-8 at ¶12.

[12]    Declaration of Ralph Werling, Doc. 92-9 at ¶7.

[13]    *See* 2014 Alabama § 303(d) List (relying on data from 2008-2012); 2016 Alabama § 303(d) List; 2018 Alabama § 303(d) List.    ADEM, http://www.adem.state.al.us/programs/water/303d.cnt (last accessed November 21, 2019).

[14]    *See id*.

[15]    Pate Affidavit at ¶ 3 (Doc. 202-36).

[16]    *See id*. at ¶¶ 5, 7.

[17]    *See*, *e.g.*, January 2008 Report at -6699, -6711, -6757, -6767, -6774, -6868-

at the Hames WTP for the entire WMEL distribution system.[18]  WMEL's intake

takes in Tennessee River water containing PFAS and distributes it through a single

water treatment system to all customers and properties.  Water taken in from the

Tennessee River and distributed to customers was tested for PFAS and found to

contain PFOA, PFOS, and other PFAS compounds.[19]  Before WMEL installed a

GAC filtration system in September of 2016,[20] the PFAS content of the Tennessee

River at the WMEL intake was delivered to WMEL customers and adjacent

utilities.[21]  After the GAC filtration system was installed, longer chain PFAS, such

as PFOA and PFOS, were substantially filtered before distribution to all customers

(both direct and indirect) and properties, but some shorter chained PFAS, including

PFBS and PFBA, were not completely removed at all times.[22]

## IV.    PROCEDURAL HISTORY

On October 5, 2015, Plaintiffs filed an Individual and Class Action Complaint

("Complaint") against 3M, Dyneon, and DAI.  *See* Doc. 1.[23]  Plaintiffs alleged that

---

69 (noting that customers of WMEL had "the highest municipal contact doses")
(Doc. 202-30).

[18]     Pate Affidavit at ¶ 4 (Doc. 202-36).

[19]     *Id*. at ¶ 5.

[20]     WMEL imposed a usage surcharge on customers of one dime per 1,000 (one
thousand) gallons to help defray the expense of replacing the GAC contactors.  *Id*.
at ¶ 12.

[21]     *Id*. at ¶¶ 7, 11.

[22]     *Id*. at ¶ 8.

[23]     WMEL was also a Plaintiff in this initial lawsuit.

the drinking water supply of the Authority contains toxic chemicals, including PFOA and PFOS, as a result of the discharges of these chemicals from Defendants' manufacturing plants in Decatur, Alabama.  For their class claims, the Plaintiffs requested injunctive relief and also sought compensatory damages.  Prior to and after filing their original Complaint, Plaintiffs spent considerable time and resources evaluating the facts and law involved in this case.  Extensive discovery has been conducted in this case.  Plaintiffs have reviewed millions of pages of documents produced by the Defendants.  Depositions of representatives of all parties have been taken.  Expert reports have been filed by both sides.  And many expert depositions have been taken.

On November 17, 2016, Plaintiffs sought approval of a *pro tanto* settlement of the class claims against DAI.  *See* Doc. 73.  Under the terms of the proposed settlement agreement, DAI agreed to fund the installation of a GAC system at WMEL and pay $450,000.00 in monetary compensation to the members of the proposed class.  *See* Doc. 74 at 10-12.  On February 24, 2017, this Court conditionally certified a class and preliminarily approved of the terms of the *pro tanto* settlement with DAI.  *See* Doc. 79.  After holding a fairness hearing and overruling objections, this Court entered an Order granting final approval of the *pro tanto* settlement on May 10, 2017.  *See* Doc. 98.  Shortly thereafter, the objectors filed a notice that they were appealing this Court's certification and final approval to the Eleventh Circuit.  *See* Doc. 101.  Over a year later, the Eleventh Circuit issued

an order vacating the certification of the class and reversing approval of the settlement. *See* Doc. 133. In response to the issues noted by the Eleventh Circuit, current counsel filed their notice of appearance on behalf of the individual Plaintiffs (Tommy Lindsey, Lanette Lindsey, and Larry Watkins) on July 17, 2018. *See* Doc. 138.

After subsequently reaching an agreement to settle its claims individually as to DAI, WMEL filed a joint motion to dismiss its claims against DAI on July 17, 2018. *See* Doc. 137. This Court granted WMEL's motion on November 21, 2018. *See* Doc. 164. Later, after reaching an agreement to settle its claims against the remaining Defendants, WMEL filed a joint stipulation of dismissal, dismissing its claims against 3M and Dyneon on May 10, 2019. *See* Doc. 177. This Court entered an order dismissing WMEL's claims against 3M and Dyneon. *See* Doc. 180. At this point, WMEL's claims against all Defendants have been settled and dismissed.

On May 6, 2019, Plaintiffs filed an amended complaint, styled their Consolidated Individual and Class Action Complaint ("Consolidated Complaint"), against the Defendants. *See* Doc. 175. While DAI filed an answer to the Consolidated Complaint (Doc. 183), 3M and Dyneon filed both an answer as to part of Plaintiffs' Consolidated Complaint (Doc. 182) and a motion to dismiss other parts of Plaintiffs' Consolidated Complaint on June 3, 2019 (Doc. 184). This Court subsequently granted 3M and Dyneon's motion to dismiss as to Plaintiffs' trespass claim and remedy claims for diagnostic testing. Doc. 224.

On December 3, 2019, Plaintiffs filed a motion to certify a class (Doc. 202), which the Defendants opposed. *See* Docs. 205, 206. 3M and Dyneon filed a motion for summary judgment (Doc. 225) which Plaintiffs opposed (Docs. 230). DAI also filed a motion for summary judgment (Doc. 241), but the Parties reached a settlement on Plaintiffs' claims prior to Plaintiffs filing a response.

## V.     THE PROPOSED RELIEF

The proposed Settlement provides substantial benefits to the Class. The Defendants have collectively agreed to make settlement payments of $12,000,000 (Twelve Million Dollars) to the Class. Defendant 3M, in addition, has agreed to pay a specified percentage of the reasonable costs of settlement notice and administration. These payments will compensate those members of the Class who either paid for water contaminated with PFAS during the class period or who owned or resided for at least six months at a home which received water contaminated with PFAS during the class period.

There are two Subclasses: one for residential ratepayers, *i.e.*, those who paid for the water, and the other for household members and owners who were not residential ratepayers.

A.     Residential ratepayers are proposed to be compensated this way: payments will be made to the named ratepayer for each residential service account

in the Ratepayer Subclass.[24]  The amount awarded to each account has been calculated as a pro-rated share of the net fund for the Ratepayer Subclass, which is **$6,415,000 (six million, four-hundred and fifteen thousand dollars)**.  The dollar value of payment for each account was calculated as a percent of total payments made for all accounts.  This percent then was multiplied by the net fund for the Ratepayer Subclass to determine each account's share of the $6,415,000, adjusted by a cap of $745.00 and by a minimum payment of $50.00.   *See* Exhibit 3.  The resulting distribution is exhibit 2 of Exhibit 3.  This distribution shows the payment for each account.  Displayed are the ratepayer's residential water service account number, related name and billing address for the account, and the payment to be made for the account.  *Id.* (subject to redaction for public filing).

A small number of ratepayers have a pro rata share of less than $50.00 (fifty dollars), because their accounts were short-lived or otherwise did not result in much charges.  In those instances, the share is increased to $50.00, which is the minimum award to any member of the Ratepayer Subclass.  The number of accounts due this minimum is 1,774, which is about ten percent of all accounts.  *See* Exhibit 3 at ¶ 5 & nn.2-3.   The number of accounts capped at $745.00 is 2,221, which is about

---

[24]     When two persons are named as ratepayer on the same account (husband and wife for instance), the payment will be made to the persons together as one ratepayer (absent extraordinary circumstances).  Likewise, a timely opt-out by one person on a two-ratepayer account will operate as an opt out for the Ratepayer Subclass claim for that account.

thirteen percent of all accounts.  *See id.*

B.      Resident Subclass Members are proposed to be paid a pro rata share of a total award of **$1,000,000 (one million dollars)**, based on claims made.  This pro rata payment is expected to be between $50.00 to $100.00 and is capped at $100.00. If that cap takes effect, i.e., if too few claims are made and approved for payment to produce a pro rata payment less than $100.00, the excess (or "surplus") will be distributed on a pro rata basis to the estimated 77 percent of ratepayers whose payments from the Settlement are not capped and are not minimum payments.  That also is true of any excess remaining from the reserve for the Class's one-half share of costs for notice and settlement administration.  That reserve is $85,000.  The reserve is one half of an estimated reasonable cost for notice and administration of $170,000.  3M has agreed to pay the other half of the actual and reasonable notice and administration cost.

## VI.      PRELIMINARY APPROVAL OF THE SETTLEMENT IS WARRANTED.

### A.      Standards for Preliminary Approval of a Class Settlement.

When exercising its discretion, pursuant to Rule 23(e), to approve a class settlement, a court should consider the public and judicial policies that strongly favor the settlement of class action lawsuits.  *See In re U.S. Oil and Gas Litig.*, 967 F.3d 489, 493 (11th Cir. 1992); *accord Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.

1977).  "[I]t has been repeatedly recognized that settlements are 'highly favored in the law and will be upheld whenever possible because they are means of amicably resolving doubts and preventing lawsuits.'"  *Bennet v. Behring Corp.*, 96 F.R.D. 343, 348 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984) (*quoting Miller v. Republic Nat. Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977)).  Settlements in class action cases are also favored because they "conserve judicial resources by avoiding the expense of a complicated and protracted litigation process . . . ."  *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000).

The Eleventh Circuit has instructed that, in examining the fairness, adequacy, and reasonableness of a settlement, a district court should examine several factors, including: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved."  *In re CP Ships Ltd. Securities Litig.*, 578 F.3d 1306, 1317-18 (11th Cir. 2009) (*quoting Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)).  "Thus, the issues that bear upon whether or not to grant preliminary and final approval here are: a) whether the settlement was procured by collusion among the parties or was the result of arms-length and informed bargaining; and b) whether the proposed settlement is fair, adequate and reasonable, applying the six *Bennett* factors."  *Lipuma v. American Express Co.*, 406

F. Supp. 2d 1298, 1315 (S.D. Fla. 2005).  The Plaintiffs will address each of these issues in turn.[25]

### B.     Application of the Six *Bennett* Factors.

#### 1.     The likelihood of success at trial.

"The likelihood of success on the merits is weighed against the amount and form of relief contained in the settlement." *Lipuma*, 406 F. Supp. 2d at 1319.  In evaluating this factor, the court should not reach any ultimate conclusions with respect to issues of fact or law involved in the case.  "The very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise . . . . [Settlements] could hardly be achieved if the test on hearing for approval means establishing success or failure to a certainty." *Knight v. Alabama*, 469 F. Supp. 2d 1016, 1033 (N.D. Ala. 2006) (*quoting In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981)).

Risks are inherent in all litigation, particularly a high stakes lawsuit like this

---

[25] The *Bennett* factors are functionally identical to the newly enacted Fed.R.Civ.P. 23(e) factors: "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

one.  The Court has weighed in on the sufficiency of Plaintiffs' allegations in their Consolidated Complaint, and has allowed some claims to proceed and dismissed others.  However, at this stage of the litigation, the Court has not considered any evidence or expert testimony.  The Defendants in both their Answers and their motions for summary judgment, have raised several substantial defenses concerning the merits of Plaintiffs' claims which, absent a settlement, could resolve Plaintiffs' claims either before or during trial.  There is a risk the Court could render judgment for the Defendants on these substantive issues.  There also is the risk the Court could refuse to certify a contested class or certify a narrower class if contested.  Defendants are not opposing this motion for settlement purposes only.  Defendants would oppose a motion to certify a contested/litigated class, as Defendants already have in this case.  Moreover, there are additional requirements that must be met to certify a contested class that do not apply to a settlement class, and some of the requirements in Rule 23 apply differently if the class is contested.  For example, for purposes solely of this Settlement, the Defendants do not argue that individualized inquiries prevent the Court from finding the predominance required to certify the class.  They could make such an argument if the class was contested and litigated (and indeed have done so apart from this Settlement).

Moreover, evaluating dispositive motions and trying this case would not only involve uncertain outcomes at each one of those steps, but would also require a lengthy time commitment from the Court and the Plaintiffs.  And, to say the least, a

hearing or trial would not only be lengthy, but logistically complicated and tremendously expensive for the Plaintiffs. For these reasons, the risks faced by the Plaintiffs weigh in favor of accepting the proposed settlement.

> **2.**    **The range of possible recovery and the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable.**

District courts often consider the next two factors together as they are related. *See*, *e.g.*, *Knight*, 469 F. Supp. 2d at 1033; *Lipuma*, 406 F. Supp. 2d at 1322; *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 541 (S.D. Fla. 1988). Analysis of these two factors requires the court to compare the settlement terms "with the likely rewards the class would have received following a successful trial of the case." *Knight*, 469 F. Supp. 2d at 1034. "When making this comparison, the Court should keep in mind that 'compromise is the essence of a settlement and should not make a proponent of a proposed settlement justify each term of a settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Id.* Here, as in many class actions, not only is monetary relief difficult to quantify, but the range of possible recovery "spans from a finding of non-liability through varying levels of injunctive relief." *Assoc. for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 468 (S.D. Fla. 2002).

There is no doubt that the Settlement provides real, valuable, and immediate benefits to the Members of the Class that are an adequate, fair, and reasonable

compromise of their claims against the Defendants.  Although a victory at trial might result in some additional or alternative relief against the Defendants for the members of the Class, the proposed Settlement provides guaranteed benefits much sooner. The Settlement is fair to the members of the Class, even though it does not provide all of the benefits that the Class Representatives initially sought.  "Any settlement typically offers far less than a full recovery.  Indeed, settlements, by their nature, do not yield one hundred percent recovery for plaintiffs." *Fought v. Am. Home Shield Corp.*, No. 2:07-cv-1928-RDP, 2010 WL 10959223, *14 (N.D. Ala. Apr. 27, 2010), *aff'd*, 668 F.3d 1233 (11th Cir. 2011).  This is especially true in light of the prior settlements with WMEL in this same lawsuit (mentioned above) resulting in the installation of additional treatment technologies at WMEL, as well as the Court's dismissal of Plaintiffs' trespass claim and remedy claims for diagnostic testing, which reduced the amount of potential damages recoverable in this suit. Additionally, the timing of the Class benefits in the proposed Settlement weighs heavily in its favor.  Concrete and imminent financial relief is far preferable for the Class Members than either (1) some unknown amount of financial relief years later after the case has been tried and appeals have been exhausted, or (2) no financial relief in the event the outcome favors the Defendants.  A settlement now is also preferable for the Class because the current COVID-19 pandemic has introduced numerous delays into courts throughout the country, and it is uncertain when this case would actually be able to go to trial.

Ratepayer Subclass Members paid a total of $14,865,497 for WMEL water during the Class period, which amount is the uppermost dollar value of their claims for the water they paid for.  *See* Exhibit 3.  The net settlement fund for ratepayers ($6.415 million) is 43 percent of that amount. The net fund is very fair compensation for the water paid for given that residential water customers ingest on average only nineteen     percent     of     water     received     at     their     homes.     *See* https://www.epa.gov/watersense/data-and-information-used-watersense  (pie  chart of "faucet" and other uses) (accessed July 28, 2021).  Another 20 percent is used for bathing, *see id.*, which means the net fund for Ratepayer Subclass Members is more than 100 percent of average ratepayer expenditures for water for drinking, cooking, and bathing (43 percent vs 39 percent on average).

Resident Subclass Members likewise will receive a fair payment.  Depending on the number of claims made, and due to the cap, the payment is not expected to be less than $50 and will not be more than $100.  The compensation is for (a) the nuisance and offensiveness of PFAS in the potable water where they lived or at the household properties they owned, and (b) any diminution of property value to the extent a class members possessed an ownership interest in the household property. Although this range of compensation is small, the evidence and exclusions in the Settlement Agreement warrant it.

There is no release of any physical injury caused by contaminants in the water or of mental anguish resulting from such physical injury – true in all respects for

Ratepayer Subclass Members, too.  *See* Exhibit 1 at ¶ 12.  Contamination of and damage to household properties by other means, specifically dumping of biosolids containing PFAS, are outside of the Settlement and are excluded from the claims released by Class Members.  *See id*.  The compensation is adequate given these important exclusions.

The compensation is consistent with the evidence.  The named Plaintiffs, after pleading a trespass claim against the Defendants, were unable to allege and prove substantial damage to their residential properties.  That is because testing of the properties detected only extremely low levels of PFAS, if detected at all.  Based on additional investigation, the Plaintiffs believe that is true for other residential properties served by the five utilities in the Class Period, provided the test is for PFAS deposited on the properties by WMEL water distributed to homes.

There are two additional reasons why a relatively small compromise payment for property diminution is fair.  Resident Subclass members with an ownership interest in properties served by WMEL water benefitted from the GAC system installed in 2016 as a result of this litigation, and all households which have received WMEL water since May of this year have the cleanest water possible due to the RO system, which will continue for 50 years.  That also is a result of this litigation. These events helped to protect properties.

### 3. The complexity, expense, and duration of the litigation.

This inquiry overlaps in some respects with the first *Bennett* factor—

likelihood of success on the merits.  In assessing this factor, "[t]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future after protracted and expensive litigation.  In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'"  *Lipuma*, 406 F. Supp. 2d at 1323 (*quoting In re Shell Oil Refinery*, 155 F.R.D. 522, 560 (E.D. La. 1993)).  "Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive."  *In re Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992).  *See also Lipuma*, 406 F. Supp. 2d at 1323-34; *Woodward v. NOR-AM Chemical Co.*, No. Civ. 94-078019, 96 WL 1063670, *21 (S.D. Ala. May 23, 1996).

Again, the need for the immediate relief in the form of financial recompense as compared to the potential of perhaps years of litigation and appeals to possibly achieve the same solution—or worse—weighs in favor of preliminary approval of the Settlement.

### 4. The substance and amount of opposition to the Settlement.

This factor does not apply at the preliminary approval stage.  It becomes relevant after the class members receive notice of the Settlement and have an opportunity to object.

### 5. The stage of proceedings at which the Settlement was achieved.

This case was initially filed on October 5, 2015.  At the time the Parties first reached a settlement in principle, the case had been in active litigation for nearly five years.  Plaintiffs have reviewed the voluminous document productions of the Defendants, have taken many fact depositions, and have retained several, well-qualified experts to support their claims.  Given all this, Plaintiffs have had sufficient opportunity to evaluate the likelihood of whether their claims will succeed on the merits and the risks which the Defendants' dispositive motions present to Plaintiffs' claims.  Plaintiffs are represented by experienced counsel who understand the time and expense that continued litigation, trial and possible appeal would require in this complex case.[26]  Given that they have had the opportunity to evaluate these issues with experienced counsel, this factor weighs in favor of approving the settlement.

## VII.   THE SETTLEMENT CLASSES SHOULD BE CONDITIONALLY CERTIFIED.

The Court should conditionally certify the Settlement Class and set a schedule for notice to the Class and for a fairness hearing for final approval.  For settlement purposes, the proposed Class meets the requirements for certification under Rule 23 of the Federal Rules of Civil Procedure.

Where, as in this case, a class action is settled prior to certification, the appropriate procedure is for the Court to conditionally certify a "temporary

---

[26]    *See* Docs. 202-45, 202-46.

settlement class" for the purpose of providing notice to putative members of a proposed class of the terms of the anticipated settlement and of their opportunity to object. *See In re Beef Industry Antitrust Litig*., 607 F.2d 167, 173-78 (5th Cir. 1979), *cert. denied*, 452 U.S. 905 (1981). The U.S. Supreme Court has emphasized that the district court may not disregard the requirements of Rule 23(a) and (b) in certifying a settlement class. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620-622 (1997).

### A.    Definition of the Settlement Class.

a.    The definition of the Settlement Class as proposed by the parties is a slight modification of the definitions in Plaintiffs' Consolidated Individual and Class Action Complaint.[27]  Plaintiffs shall move the Court to certify, and Defendants shall not oppose certification of, the following "Settlement Class" consisting of the following two subclasses for purposes of this Settlement only:

> (1)    "Ratepayer Subclass": Every Person who (a) was a residential-coded customer of the Authority or of the Town Creek Water System, the West Lawrence Water Cooperative (Route 20 residential customers only), the V.A.W. Water System (residential customers on Routes 08 through 19 only), or the Trinity Water Works at any time between October 5, 2013, and September 29, 2016, and (b) made any payment for water originating with the Authority—whether such water was provided directly by the Authority or through one of the Authority's wholesale customers, namely, the Town Creek Water System, the West Lawrence Water Cooperative (Route 20 residential customers only), the V.A.W. Water System (residential customers on Routes 08 through 19 only), or the Trinity Water Work—on or between (i) November 1, 2013 and October 31, 2016, in the cases of the residential-coded customers of the Authority, the Town Creek Water System, and the West Lawrence Water Cooperative (Route 20 only), or (ii) November 1, 2013, and June 30,

---

[27]    *See* Doc. 175 at ¶ 46.

2016, in the cases of residential-coded customers of the V.A.W. Water System (Routes 08 through 19 only) and the Trinity Water Works; and

(2)     "Resident Subclass": Every Person who currently resides in Alabama, Georgia, or Tennessee, and for at least six months between (a) October 5, 2013 and September 29, 2016, in the cases of the residential-coded customers of the Authority, the Town Creek Water System, and the West Lawrence Water Cooperative (Route 20 only), or (b) October 5, 2013, and May 31, 2016, in the cases of residential-coded customers of the V.A.W. Water System (Routes 08 through 19 only) and the Trinity Water Works, owned or resided in a residential housing unit that received water originating with the Authority, whether such water was provided directly by the Authority or through one of the Authority's wholesale customers, namely, the Town Creek Water System, the West Lawrence Water Cooperative (Route 20 residential customers only), the V.A.W. Water System (residential customers on Routes 08 through 19 only), or the Trinity Water Works.

Persons defined by (1) above are "Ratepayer Subclass Members," and Persons defined by (2) above are "Resident Subclass Members."  Persons who are Ratepayer Subclass Members are excluded as Resident Subclass Members, except that when two persons are named as the ratepayer for the same account, one of those two persons (but not both) is eligible to be a Resident Subclass Member, provided he or she satisfies the Resident Subclass Member definition.  Members of the Resident Subclass shall not be paid for more than one claim in the Settlement.

Excluded from the Settlement Class are employees of Defendants and any entities in which Defendants have a controlling interest; any of the legal representatives, heirs, successors, or assigns of Defendants; the Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case; all persons or entities that properly execute and timely file a request for exclusion from the Settlement Class; and any attorneys representing the Plaintiffs or Members of the proposed Settlement Class.

The different dates in the foregoing definitions of the Subclasses give effect to the Class Period and to the evidence marshalled by the Plaintiffs.  **The Class**

**Period is October 5, 2013, two years before the suit was filed, to September 29, 2016, the date on which GAC became operational.**  However, payments for water received by Ratepayer Subclass Members in the Class Period (which are basis for the Ratepayer Subclass's main claim) started in November, 2013 and ended in October, 2016, respectively.  So, in the cases of WMEL, Town Creek Water System, and the West Lawrence Water Cooperative, water payments made between November 1, 2013 and October 31, 2016, are payments for water received in the Class Period; and in the cases of V.A.W. Water System (Routes 08 through 19 only) and Trinity Water Works, water payments made between November 1, 2013 and June 30, 2016, are payments for water received in the Class Period.  The latter date (6/30/2016) is employed with respect to V.A.W. and Trinity given the fact that V.A.W. and Trinity quit distributing WMEL water after May, 2016.  *See* Exhibits 8-9.[28] Thus, the June 30, 2016 end date for payments to those two utilities is due for water received in May, 2016.  Eligibility for membership in the Resident Subclass, on the other hand, is limited (1) in the first instance by the start and end of the Class Period, namely October 5, 2013 to September 29, 2016, in the cases of WMEL, Town Creek, and West Lawrence Water Cooperative, and (2) in the second instance by the start of the Class Period and May 31, 2016, which is the last month V.A.W.

---

[28]    Evidence for the class period and class membership of the other three utilities -- WMEL, Town Creek Water System, the West Lawrence Water Cooperative (Route 20 residential customers only) -- is in Doc. 202-36 and Exhibits 10-11.

and Trinity distributed WMEL water in the Class Period. So, for households served by those two utilities, eligibility for Resident Class membership ends May 31, 2016 (versus September 29, 2016 for the other utilities).

The foregoing dates and explanation make it clear that, for the purposes of this Settlement, based on all the evidence obtained and reviewed by the Parties leading to the Settlement, the Class includes those who, during the Class Period, received contaminated water provided by WMEL (and paid for it) or who owned or resided at a household that received contaminated water provided by WMEL. These Settlement Classes are well-defined "such that [] membership is capable of determination." *See Cherry v. Dometic Corp.,* 986 F.3d 1296, 1304 (11th Cir. 2021) ("[W]e limit ascertainability to its traditional scope: a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination.").

### B.     Rule 23(a) Requirements are Satisfied.

Under Rule 23(a) of the Federal Rules of Civil Procedure, a class may be certified if "(1) the class is so numerous that joinder of all members would be impracticable; (2) there are questions of fact and law common to the class; (3) the claims or defenses of the representatives are typical of the claims and defenses of the unnamed members; and (4) the named representatives will be able to represent the interests of the class adequately and fairly." *Valley Drug. Co. v. Geneva Pharms, Inc.*, 350 F.3d 1181, 1187-88 (11th Cir. 2003). These four prerequisites are generally known as "numerosity, commonality, typicality, and adequacy of

representation." *Id*. at 1188.  While the prerequisites are often discussed in isolation, the inquiries necessary to determine whether they are met tend to overlap.  *See Amchem Prods*., 521 U.S. at 626 n. 20 ("The adequacy-of-representation requirement tends to merge with the commonality and typicality criteria of Rule 23(a), which serve as guideposts for determining whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.").

Each of the Rule 23(a) requirements is satisfied for purposes of the proposed Settlement.  The numerosity element requires that the members of a class must be "so numerous that the joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Here, numerosity is proven.  There are 17,112 residential water customer accounts in the Ratepayer Subclass.  *See* Exhibit 3.  Each of those accounts, on average, provided water to 1.55 to 1.59 household residents in addition to the ratepayer.  *See* https://www.census.gov/quickfacts/fact/table/lawrencecountyalabama,morgancountyalabama/PST045219 ("Persons per household, 2015-2019") (accessed July 28, 2021).  These facts more than suffice for the numerosity requirement of Rule 23(a). *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986) (noting that generally "more than forty [class members is] adequate" to satisfy the numerosity requirement (internal quotation omitted)).

"Commonality requires that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams v. Mohawk Indus.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (internal quotation omitted). There are several common issues here, including but not limited to (a) the factual history of the use, development, and discharge of PFOA, PFOS, and related chemicals which were manufactured or utilized by the Defendants at their Decatur, Alabama facilities; (b) when the Defendants knew of the harmful effects of PFOA, PFOS, and related chemicals; (c) whether the Defendants failed to disclose the harmful effects of PFOA, PFOS, and related chemicals discharged by the Defendants from their Decatur, Alabama facilities; and (d) the extent of the contamination of the Defendants' facilities in Decatur, Alabama, and the migration of that contamination into the Tennessee River.  These common questions of fact and law are sufficient to meet the "low hurdle of Rule 23(a)(2)." *Williams*, 568 F.3d at 1356.

Typicality is satisfied if "the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory." *Id*. at 1357 (internal quotation omitted).  "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)." *Id*. (internal quotation omitted).  Here, the Class Representatives' claims and the claims of the members of the Class all arise from receiving and being exposed to contaminated water from a common source,

and all of the claims are based on the same legal theories.

"The adequacy-of-representation requirement encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representative and the class; and (2) whether the representative will adequately prosecute the action." *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008) (internal quotation omitted). For settlement purposes, there are no conflicts of interest between the Class Representatives and members of the Class, and the Class Representatives have continued to vigorously prosecute this action.[29] Moreover, Plaintiffs' attorneys have demonstrated extensive experience as litigators in federal court class action litigation.

### C.    Rule 23(b)(3) Requirements have been Satisfied.

The proposed class must also meet the requirements of at least one of the three class types found in Rule 23(b). Here, Plaintiffs move for certification under Rule 23(b)(3). It is proper to certify class actions pursuant to Rule 23(b)(3) where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In the instant case, both the predominance and superiority prongs are satisfied for purposes of the proposed settlement, and the

---

[29] Tommy Lindsey and Larry Watkins are representatives of the Ratepayer Subclass, while Venetia Watkins and Lanette Lindsey represent the Resident Subclass.

Class should be certified under Rule 23(b)(3).

### 1.    The Predominance Prong is Satisfied.

The common source of the household water transmitting Defendants'
contamination to the named Plaintiffs and each Class Member during the Class
Period demonstrates the predominance of common issues in the settlement context.
WMEL served as the source of household water to not only WMEL customers but
also customers of the adjacent utilities.[30]  There is a single intake from the Tennessee
River at a single location for the entire WMEL distribution system.[31]  That intake
took in the contaminated water and distributed it to all customers and properties.[32]
Water taken in from the river was tested for PFAS and found to contain PFOA, PFOS
and other PFAS.[33]  Before WMEL installed a GAC filtration system in September,
2016, the PFAS-containing water from the Tennessee River was delivered to
customers of WMEL and adjacent utilities.[34]  Thus the contamination and the
mechanism of distribution to each Class member during the Class Period that form
the fundamental basis of their claims are common.

One of Plaintiffs' claims is negligence. The elements of negligence are the
existence of a duty, the breach of that duty, and damage as a proximate cause thereof.

---

[30]    *See* Declaration of Don Sims, Doc. 74-4 at ¶ 3; Pate Affidavit at ¶ 4 (Doc.
202-36).
[31]    *See* Pate Affidavit at ¶ 4 (Doc. 202-36).
[32]    *See id.* at ¶¶ 4, 5.
[33]    *See id.* at ¶ 5.
[34]    *See id.* at ¶¶ 7, 11.

*Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992).  Here, Plaintiffs maintain that those elements present common questions.  Plaintiffs seek to prove that Defendants had a duty not to pollute that is common to all members of the Class; it does not change by property or person.  Moreover, Plaintiffs would rely on common evidence to show that Defendants' release of PFAS is a breach of that duty. Plaintiffs would invoke the same standard of care for Defendants as to any Class Member who receives or received water from WMEL or adjacent utilities.

Plaintiffs' public nuisance claim is grounded upon the discharge of contaminants into a public body of water. *W. Morgan-East Lawrence Water & Sewer Auth. v. 3M Co.*, 208 F. Supp. 3d 1227, 1234 (N.D. Ala. 2016).  An individual may have a cause of action under a public-nuisance theory if that individual suffered a "special damage" that is different in "kind and degree from [the damage] suffered by the public in general." *Id.* at 1234; Ala. Code 1975 § 6-5-123.  Because the plaintiffs allege that the contamination here is the same for every property in the Class, caused by the delivery of contamination from a public water body, Plaintiffs would seek to prove that Class Members have suffered special damages as a question common to all Class Members, the answer to which depends on common evidence.

To state a claim for battery in Alabama, a plaintiff must establish: "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. *W. Morgan-East Lawrence Water & Sewer Auth. V. 3M Co.*, 208 F. Supp. 3d 1227,

1236 & n.8 (N.D. Ala. 2016) (citing *Ex parte Atmore Community Hosp.*, 719 So. 2d 1190, 1193 (Ala. 1998)).  Here, Plaintiffs stand ready to prove all of those elements with common, classwide evidence of Defendants' releases of PFAS into the Tennessee River.

Questions as to Plaintiffs' claimed damages also are common.  Class Members all seek the same remediation, mitigation, and compensation for damages measured by common standards.  Plaintiffs' evidence would show that Ratepayer Subclass Members all received the same contaminated water at common rates. Plaintiffs also contend that Resident Subclass Members all have the same battery or property damages from the same chemicals from the same conduct causing harm. All Class Members seek compensation for the same wrongdoing—which does not vary by Class Member—and emanates from the same route of exposure— contaminated household water.  The members of the Class have a common method and objective criteria for measuring and ascertaining their damages, including but not limited to the records of the water utilities.[35]

Common issues of fact and law predominate if they "ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Klay v. Humana. Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) (citing *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D.

---

[35]     *See* Exhibit 3 at ¶ 7.

Ga. 2001)).  Here, Plaintiffs maintain that the elements of their claims are capable of being proven by common evidence, satisfying the predominance requirement.  *Cf. Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 725 (11th Cir. 1987) (granting class certification because "each of the complaints alleges a single conspiracy and fraudulent scheme against a large number of individuals and thus is particularly appropriate for class action" (quotation marks and citation omitted); *Kennedy v. Tallant*, 710 F.2d 711, 717 (11th Cir. 1983) (granting class certification where the defendants "committed the same unlawful acts in the same method against an entire class").

> **2.     Managing the Claims of Class Members as a Class Action under Fed. R. Civ. P. 23 Is Superior to Other Methods of Case Management.**

In light of the Parties' Settlement, class treatment of these claims is far superior to other methods of management of Class members' claims.  "Confronted with a request for settlement-only class certification, a district court need not inquire  whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial."  *Amchem Prods. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231, 2248 (1997)  Further, because the Class and Subclasses are well-defined with the identity of all Class and Subclass Members easily ascertained, management of a class action of this nature will not present any difficulties.  Here, with identifiable properties and Class members, communications with the Class members can be handled efficiently.  Furthermore, refusal to certify

a class due to manageability is not favored. *Coleman v. Cannon Oil Co.*, 141 F.R.D. 516 (M.D. Ala. 1992).

## VIII. THE COURT SHOULD APPROVE THE PROPOSED NOTICE TO MEMBERS OF THE CLASS.

"[R]ule 23(e) requires that absent class members be informed when the lawsuit is in the process of being voluntarily dismissed or compromised." *Juris v. Inamed Corp.*, 685 F.3d 1294, 1317 (11th Cir. 2012). The notice should be "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985). It is well established that a district court has great discretion in determining the kind of notice to employ in alerting class members to a proposed settlement and settlement hearing, subject to "the broad reasonableness standards imposed by due process." *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979); *Battle v. Liberty National Life Insurance Company*, 770 F. Supp. 1499, 1521 (N.D. Ala. 1991).

The proposed Notice is attached to this Motion as part of the Notice Plan, Ex. 4, and it contains sufficient information to satisfy the requirements of Fed. R. Civ. P. 23(e)(1). The proposed Notice incorporates the "plain language" guidelines set forth in Fed. R. Civ. P. 23(b)(2)(B). The Notice contains clear and concise information about the Settlement, including: (a) the fact of the Settlement of the claims; (b) definitions of the Subclasses; (c) a summary of the Settlement benefits;

(d) a brief description of the case; (e) a statement concerning how attorneys' fees will be paid; (f) the options available to members of the Class, including their right to obtain independent counsel at their expense; (g) the deadlines by which members of the Class need to object; and (i) the date, time, and location of the fairness hearing.

In sum, the proposed Notice offers a more-than-adequate overview of the Settlement, provides the necessary detail, and reasonably advises the Members of the Class where they can obtain additional information. The Notice is simple, easy to understand, and accurately summarizes the key elements of the Settlement. The Court should approve the Notice and direct that the Notice be distributed in accordance with the terms of the Settlement.

## IX.    ATTORNEY FEES AND EXPENSES.

If the Court preliminarily approves the Settlement, Class Counsel will file a petition pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, seeking an award of reasonable attorneys' fees and expenses incurred in connection with representation of the Class Members in the Actions. Class Counsel will seek a fee of thirty percent of the common fund, which is $3,600,000 (three million, six hundred thousand dollars). *See e.g., Dukes v. Air Canada*, 2020 U.S. Dist. LEXIS 16097, at *16-18 (M.D. Fla. Jan. 27, 2020). They will seek approximately (and no more than) $900,000 in expenses. Class Counsel will support the petition with a detailed explanation of the reasonableness of the fees and expenses sought in the context of this litigation, which will be available for all members of the Class to

review and respond to sufficiently in advance of subsequent events, specifically including deadlines to opt out or to object, and well ahead of the final Fairness Hearing.

## X.    SERVICE AWARDS

Service awards in the amount of $5,000.00 (five thousand dollars) should be paid to each Class Representative (Mr. and Mrs. Lindsey, and Mr. and Mrs. Watkins) for ably representing the Class and bearing the burdens of full and effective participation in the litigation.  $20,000.00 (twenty thousand dollars) in total service awards are proposed ($5,000.00 times four Class Representatives.)   The Plaintiffs propose these awards pursuant and subject to settled precedent.[36]  If such awards become disallowed by binding precedent,[37] this request for the Class Representatives

---

[36]    *See e.g., Dorado v. Bank of Am., N.A.*, 2017 U.S. Dist. LEXIS 219407, at *18-19 (S.D. Fla. Mar. 23, 2017) ("Service awards for class representatives promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits. 'While the Eleventh Circuit has not expressly set forth guidelines for courts to use in determining incentive awards, there is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action.'" (citation omitted)).

[37]    The Eleventh Circuit recently has held "that service payments are impermissible," *Knox v. John Varvatos Enters.*, 2021 U.S. Dist. LEXIS 29410, at *30 (S.D.N.Y. Feb. 17, 2021), but the Eleventh Circuit decision at issue, *Johnson v. NPAS Sols.*, LLC, 975 F.3d 1244 (11th Cir. 2020), is subject to a petition for *en banc* review, and the mandate in it has not issued.  *See* Exhibit 12 (*Johnson* docket sheet accessed 9/14/21 and other relevant items in that appeal).  Thus, the decision is not final.  *See Sabal Trail Transmission, LLC v. Lasseter*, 823 F. App'x 914, 918 (11th Cir. 2020) ("Until the mandate issues, an appellate judgment is not final; the decision reached in the opinion may be revised by the panel, or reconsidered by the en banc court, or certiorari may be granted by the Supreme Court." (citation omitted)).  Courts have held that until *Johnson* is final, service awards may be considered.  *See*

shall be withdrawn and not be renewed.  This provision is severable from the

remainder of this Motion for Preliminary Approval of the Class Settlement, and any

withdrawal of it, or other event which disallows the service awards, shall not affect

the Class Settlement or other provisions of this Motion.  Specifically, this Motion

for Preliminary Approval of the Class Settlement is not contingent on approval of

service awards, and the Class Representatives' decisions to agree to the Settlement

and to seek its approval are not influenced by the possibility of receiving service

awards.

| TASK | DATE OR DEADLINE | DESCRIPTION |
|---|---|---|
| Defendant will Send the Class Data to the Settlement Administrator | Within 10 days of the Preliminary Approval Order | |
| Notice to Members of the Classes | Beginning approximately 30 days after the date of entry of the Preliminary Approval Order and completed, including supplemental notices and skip-tracing, no later than 60 days after the Preliminary Approval Order. | The proposed Notice Plan and Notice are attached to this Motion and referenced in the proposed Preliminary Approval Order.  The long-form notice, postcard notice, and publication notice to be utilized under the notice plan are Exhibits 5-7 of this Motion. |
| Filing of Class Counsel's | 14 days after entry of the | The  Parties  have  agreed |

*Fruitstone v. Spartan Race Inc.*, 2021 U.S. Dist. LEXIS 19385, at *19-20 (S.D. Fla. Feb. 2, 2021); *see also Harvey v. Hammel & Kaplan Co.*, LLC, 2020 U.S. Dist. LEXIS 229017, at *9 (M.D. Fla. Dec. 7, 2020); *see also Marcrum v. Hobby Lobby Stores*, 2021 U.S. Dist. LEXIS 157855, at *12, 23 & n.2 (N.D. Ala. Aug. 20, 2021).

| | | |
|---|---|---|
| Petition for Attorneys' Fees and Expenses. | Preliminary Approval Order. | that Class Counsel shall seek any award of attorneys' fees, costs or expenses from the Settlement Amount. The Court will decide on the payment of fees and expenses based on Class Counsel's Petition for Attorneys' Fees and Expenses. The Notice Plan and the filing deadline for the motion for fees and expenses ensure that Class members will have full notice of, and a full opportunity to assess, the motion before deadlines to opt out or object. |
| Filing of a motion for final approval of the settlement. | Due 60 days after the Preliminary Approval Order. This deadline should be set in the Preliminary Approval Order. | The motion for final approval will set forth the reasons for final approval of the Settlement. Under the Notice Plan, it will be available for class members to assess prior to deadlines to opt-out and to object. |
| Opt-Out Deadline | This deadline should be set in the Preliminary Approval Order and such opt-outs should be postmarked or delivered no later than 90 days after the Preliminary Approval Order. | Procedures applicable to opt-outs are set out in the proposed Preliminary Approval Order. The Notice Plan includes them as well. |

| | | |
|---|---|---|
| Objection Deadline | This deadline should be set in the Preliminary Approval Order and such objections should be postmarked or delivered no later than 90 days after the Preliminary Approval Order (same as the opt-out deadline). | Procedures applicable to the filing of objections are set out in the proposed Preliminary Approval Order. The Notice Plan includes them as well. |
| Administrator's report on opt outs | 30 days after opt-out and objection deadline. | |
| Filing of a supplement of the motion for final approval of the settlement. | 21 days before the Fairness Hearing to be set by the Court. | The supplement will respond, *inter alia*, to any timely-received objections to the Settlement. |
| Fairness Hearing. | Available dates on the Court calendar beginning no earlier than 65 days after deadlines to opt out or to object | The Parties request that the Court designate this date as part of its Preliminary Approval Order, because it is necessary for notice to the Classes. |
| Resident Subclass claims | 30 days after Fairness Hearing (postmarked) | Procedures and deadline for Resident Subclass claims will be set out in the Notice |

## XI.   HEARING ON THIS MOTION.

The Plaintiffs ask for a hearing on this motion.  Seven days prior to the hearing, or earlier, they will submit a proposed order for preliminary approval of the Settlement.

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily approve the Settlement and find, based on the Court's initial review, that the proposed Settlement is fair and reasonable and worthy of submission to the Class members. Plaintiffs also request the Court to conditionally certify the proposed class for purposes of notice and the fairness hearing. Plaintiffs also ask the Court to find that the proposed Class Notice satisfies due process and Rule 23 of the Federal Rules of Civil Procedure and to direct that Class Counsel mail the Notice to members of the Classes. Finally, Plaintiffs ask the Court to set dates for the final fairness hearing and for preceding objection, opt-out, and other deadlines.

Respectfully submitted this 26th day of October, 2021:

/s/ Timothy C. Davis
Timothy C. Davis (ASB-6384-D63T)
W. Lewis Garrison, Jr. (ASB-3791-N74W)
Christopher B. Hood (ASB-2280-S35H)
Mark R. Ekonen (ASB-0204-R79E)
HENINGER GARRISON DAVIS, LLC
2224 First Avenue North
Birmingham, AL 35203
PH: 205-326-3336
tim@hgdlawfirm.com
lewis@hgdlawfirm.com
chood@hgdlawfirm.com
mark@hgdlawfirm.com

Kevin S. Hannon, *pro hac vice*
THE HANNON LAW FIRM, LLC
1641 Downing Street
Denver, CO 80218
PH: 303-861-8800
khannon@hannonlaw.com

*Counsel for Plaintiffs and Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of October, 2021, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice

of this filing will be sent to all known counsel of record by operation of the court's electronic system.

/s/ Timothy C. Davis
Timothy C. Davis
