FILED
2021 Dec-01  PM 11:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| TOMMY LINDSEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NUMBER |
| | ) | 5:15-cv-01750-AKK |
| 3M COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CLASS REPRESENTATIVES' MOTION
## FOR AWARD OF ATTORNEY FEES AND COSTS

Pursuant to Fed.R.Civ.P. 23, Class Representatives Tommy Lindsey, Lanette Lindsey, Larry Watkins, and Venetia Watkins, by and through Class Counsel, seek an attorney fee award equal to thirty percent of the common fund created by the Settlement, plus reimbursement of the litigation expenses ($845,353) incurred by Class Counsel. The request of thirty percent, or $3,600,000, for attorney fees is well within the range of reasonableness of guiding Eleventh Circuit precedent, which will be addressed in detail below.

Therefore, Class Counsel hereby move for an order awarding attorney fees and expenses in the amounts of $3,600,000 (three million, six hundred thousand dollars) and $845,353 (eight hundred, forty-five thousand and three hundred and fifty-three dollars), respectively.

## Introduction and Summary

The Settlement preliminarily approved on November 10, 2021 (Doc. 261) resolved six years of litigation in this case.  The Settlement creates a common fund for Class members of $12,000,000.00 (twelve million dollars).  The full net common fund will be paid to the Class.  There is no reversion.  Additionally, settling Defendant 3M Company ("3M")[1] will pay for half of the reasonable costs to (1) notify the Class members of the Settlement and (2) administer the Settlement.

The common fund will provide up to $745 (seven hundred and forty-five dollars) to each water ratepayer in the Class.  The ratepayers are residential customers of five water utilities.  Between $50 and $100 (fifty and one-hundred dollars) will be paid to each household resident and/or owner in the Class.[2]  The Settlement preserves the rights of each Class member to assert claims against the Defendants for manifest bodily injuries or illnesses and any mental anguish resulting from such manifest injuries or illnesses, as well as for property damage claims arising out of or related to the application of PFAS-containing biosolids on property owned by a Class member.

---

[1]    The settling Defendants are 3M, Dyneon, LLC, and Daikin America, Inc. ("DAI").

[2]    A thorough explanation of these payments and eligibility for them appears in the Motion for Preliminary Approval of Class Action Settlement, filed October 26, 2021.  Doc. 258.

These benefits are substantial.  The payments will compensate Class members who either paid for potable water contaminated with PFAS during the Class Period or who owned or resided for at least six months at a home which received potable water contaminated with PFAS during the Class Period.

The total sum of payments to ratepayers is $6.415 million, which is 43 percent of the total sum of payments by class members for potable water in the Class Period.  This is very fair compensation.  Residential water customers ingest on average nineteen percent of the water distributed to them by water utilities.  *See* https://www.epa.gov/watersense/data-and-information-used-watersense (accessed July 28, 2021).  Another twenty percent is used for bathing, *see id.*, which means the total sum of settlement payments to ratepayers is more than 100 percent of their payments to the utilities for water for drinking, cooking, and bathing.

Residents and owners are fairly compensated, too.  Payments to them will be for (1) the nuisance and offensiveness of PFAS in the potable water where they lived or at the household properties they owned, and (2) any diminution of property value to the extent a class member possessed an ownership interest in the household property.  Although the range of individual compensation is small ($50 and $100 dollars), the evidence and exclusions in the Settlement (manifest personal injury and property damage from biosolids) warrant it.

The attorney fee sought is thirty percent of the common fund, within the

range allowed by precedent.  *See Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("The majority of common fund fee awards fall between 20% to 30% of the fund.").  The factors for awarding it clearly are present, namely (1) the amount of attorney time involved and the results obtained, (2) the novelty and difficulty of the issues, (3) the skill required to litigate the issues, (4) the fact that the fee is contingent and customary, (5) fees awarded to Class Counsel in similar cases, (6) the preclusion of other employment by Class Counsel due to the extensive time burdens of the case, (7) time limitations imposed by the circumstances, (8) the experience, reputation, and ability of the attorneys, (9) undesirability of the case, and (10) the nature and length of the professional relationship with the Representative Plaintiffs.  The above are commonly referred to as the *Johnson* factors.

A thirty-percent fee also is warranted by three additional considerations set by precedent: the length of the negotiation, non-monetary benefits to the Class, and economies of scale.  The reasonableness of the fee is confirmed by a lodestar cross check.  Although this cross check is not required,[3] Class Counsel provides it as an additional measure of reasonableness.

---

[3]     *See e.g., Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1298 (11th Cir. 1999) ("Furthermore, while we have decided in this circuit that a lodestar calculation is not proper in common fund cases, we may refer to that figure for comparison.").

## Argument

In *Shiyang Huang v. Equifax Inc. (In re Equifax Customer Data Sec. Breach Litig.)*, 999 F.3d 1247, 1278 n.22 (11th Cir. 2021), the Eleventh Circuit described the factors for an award of attorney fees from a common fund.   These are the *Johnson* factors, described this way:

> The *Johnson* factors include 12 factors from the opinion itself:
>
> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; (12) awards in similar cases.
>
> *Camden I*, 946 F.2d at 772 & n.3. The *Johnson* factors also include a handful of additional factors this Court added in *Camden I*: "the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action." *Id.* at 775. The Objectors challenging the District Court's decision to award attorney's fees do not directly challenge its application of the factors, so we do not undertake a complete review of the factors.

## A.   The Amount of Fee Sought Is Justified.

As follows below, Class Counsel re-order the factors in *Shiyang Huang* by importance and slightly condense them, and they submit that their work (and expenses) satisfy all the factors.

### 1.    The Time Involved and Results Obtained

Class Counsel devoted 4,098 hours of attorney work to successfully litigate and conclude the case by the Settlement.  *See* Declaration of Class Counsel at Exhibit 1.  The time is heavily weighted with the work of Class Counsel, but includes a large number of hours of senior associates of HGD.  *Id.*  The work was required by the difficult character of the case.

The Plaintiffs bore burdens of proof and law on questions whether and to what extent (1) the potable water distributed by the water utilities was contaminated by PFAS, (2) each Defendant was responsible for the contamination, (3) the contamination was the same for each residential customer of the water utilities, supporting certification of a class of customers, (4) other support and reasons existed for classing the claims, and (5) the PFAS in the potable water supported an award of damages to a class.

To carry the burdens, Class Counsel devoted substantial time and financial resources to obtain, review, and assess extensive and wide-ranging records and test data produced in discovery and obtained from the experts Class Counsel retained for that purpose.  The Class Period commences in 2013, two years before the lawsuit commenced, but the earliest records obtained and reviewed date from decades before 2013 given the long-lasting character of PFAS after it is discharged into the environment.

The skill and labor required to obtain the evidence and assert it effectively for the Class were enormous.  More than a million records were reviewed.  The water utilities involved were subpoenaed, with their distribution systems and customer data thoroughly and painstakingly examined.  Experts were consulted and engaged to conduct field investigations and testing, and other experts were retained to determine and provide testimony on (1) properties of PFAS, (2) health effects of PFAS in the drinking water, (3) "fate and transport" of PFAS in water distributed by the utilities at issue, (4) standards of care for the Defendants' facilities and operations on the Tennessee River (the source of the distributed drinking water), and (5) which ratepayer customers of the water utilities could be included in a class.

That last task (identifying ratepayers for a class) critically included ascertaining damages (an irreducible requirement for class certification), and the work required to successfully complete the task illustrates the overall complexity and burdens in the case.  Class Counsel retained the needed expert (Forensic Strategic Solutions, or FSS) in November, 2019, and during the following two years culminating in the Settlement, FSS and Class Counsel undertook and completed this work *specific* to the task of ascertaining class members and damages:

- Reviewed 7,843 documents most of which were subpoenaed (and otherwise obtained) from the water utilities;

- Provided an affidavit in support of class certification;
- Provided an opinion on how to calculate damages, explaining that it would be reasonable for the water utilities to have the data necessary to do so;
- Prepared for and was examined in deposition on the process and opinions offered in case;
- Determined the data needed from the water utilities and prepared requests to the utilities;
- Visited each water utility to determine what information was available and the characteristics of customers receiving water distributed by WMEL (directly or via the other water utilities);
- Communicated with the utilities to understand data and to request follow-up productions;
- Prepared data from each utility for analysis;
- Analyzed individual data sets produced by utilities to determine if the production was responsive;
- Performed data analysis of each utility data set to ascertain damages for each potential class definition considered and forwarded by Class Counsel;
- Identified ratepayers and service addresses (households) in the class;
- Conducted multiple meetings in person and by zoom to discuss findings and to determine possible distribution models for ratepayers in the class;
- Engaged in conference calls, emails, analysis, and productions to AEA group (the counterpart expert for the defense); and
- Performed and stated payout distribution to ratepayers in the class based on total amount of water charges paid, total individual account payments, payment dates, pro rata shares, and payment minimums and caps.

The final event in the list was completed on October 25, 2021, two years after the expert was retained.

The work of Class Counsel and the experts retained on the other litigation subjects (contaminant properties, health effects, "fate and transport," standards of care) was equally lengthy and burdensome. The chief distinction is the volume of

records that were obtained and reviewed on those primary subjects.  More than a million document pages were examined, spanning decades of information, requiring Class Counsel to pay a capable vendor (Cicayda) for document hosting, predictive analysis, and review capability.

This heavy volume of attorney time and large expenditures for experts and skilled document review were well warranted, because one gap or insufficiency in proof, even a single stone unturned, posed a risk that class relief would be unattained or a claim would fail.  The converse is true, too: the right use of resources could powerfully advance the case for the Class, which occurred.  The briefing the parties submitted for and against class certification and summary judgment demonstrates these points.  The arguments are thorough and supported by extensive records, test data over many years, the testimony of numerous experts, other witness accounts, and references to reliable third-party information.  The law is skillfully debated, and the major issues are fully joined and hotly contested.  *The Settlement was reached in this sharpened posture, with compromise promoted by it*.  The results for the Class are excellent.  For these reasons, the attorney time involved and results warrant the fee and expenses sought.

## 2.    Novelty and Difficulty of Issues

There is no MCL (maximum contaminant level) for PFAS or other enforceable limit on the contaminant in drinking water.  There are advisory limits,

and those were asserted here.  The novel question was whether those limits, if and when exceeded, support claims for the Class under Alabama law.   The Representative Plaintiffs, through Class Counsel, made a compelling case on the question with the proof required (the difficulties of which are described above). They did so against well-resourced opponents zealously represented by highly competent attorneys.  Thus, the novelty and difficulty of the litigation support the fee and expenses sought.  *Cf. Sullivan v. Saint-Gobain Performance Plastics Corp.*, 2021 U.S. Dist. LEXIS 90089, at *10 (D. Vt. May 10, 2021) ("The case spans more than 30 years of history at two industrial locations. It involves two companies. The issues of the source of environmental contamination and the appropriate remedy have both been complex. This is a large case involving complicated scientific and legal issues. . . . The case has not yet gone to jury trial.   It contains some risk for plaintiffs on the issue of liability and greater risk on the issue of compensable damages.")

### 3.    Skill Required to Litigate

The credentials of Class Counsel to successfully litigate a class action of this complexity are in the record.   Docs. 202-45, 202-46.  Class Counsel diligently applied those skills to advance the case for the Class and to obtain the Settlement. Given the difficult issues met and surmounted, the skills very clearly were required and were effectively employed.

4.    **Contingent Fee**

Class Counsel at all times bore the risks that their time and financial expenditures would be lost, because they prosecuted the case on customary contingency fee agreements with the Representative Plaintiffs. *See* Exhibit 2. "[A] determination of a fair fee for Class Counsel must include consideration of the contingent nature of the fee, the outlay of out-of-pocket expenses by Class Counsel, and the fact that the risks of failure and nonpayment in a class action are extremely high." *Janicijevic v. Classica Cruise Operator, Ltd.*, 2021 U.S. Dist. LEXIS 95561, at *24 (S.D. Fla. May 19, 2021) (citing *Pinto v. Princess Cruise Lines, Ltd.*, 513 F. Supp. 2d 1334 (S.D. Fla. 2007)).  Precedent from environmental litigation confirms that conclusion:

> In environmental tort cases, issues of proof and causation are often difficult. Contingent-fee arrangements will encourage other attorneys to accept and prosecute cases on behalf of individuals who have sustained injuries similar to those of the plaintiffs in this case.

*Collins v. Olin Corp.*, 2010 U.S. Dist. LEXIS 39862, at *24 (D. Conn. Apr. 21, 2010) (quoted parenthetically in *Sullivan*, 2021 U.S. Dist. LEXIS 90089 at *12-13).  This factor is met, along with the factor of customary fee, supporting the fee and expenses sought.

### 5.  Fees in Similar Cases

"Turning to the next factor, the requested fee of 30% of the settlement fund is in keeping with fee awards approved by other courts in class actions." *Janicijevic*, 2021 U.S. Dist. LEXIS 95561, at *24 (collecting decisions). *Accord Wolff v. Cash 4 Tits.*, 2012 U.S. Dist. LEXIS 153786, at *15 (S.D. Fla. Sep. 26, 2012) ("The average percentage award in the Eleventh Circuit mirrors that of awards nationwide—roughly one-third.").  An award of thirty percent accords with precedent from environmental cases specifically and from other circuits generally. *See Sullivan*, 2021 U.S. Dist. LEXIS 90089, at *11-12 (environmental case); *Collins*, 2010 U.S. Dist. LEXIS 39862, at *22-24 (D. Conn. Apr. 21, 2010) (same); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 445 (E.D.N.Y. 2014) ("For example, it is very common to see 33% contingency fees in cases with [common] funds of less than $10 million, and 30% contingency fees in cases with funds between $10 million and $50 million.").  This factor is satisfied, accordingly.

### 6.  Preclusion of Other Employment

Class Counsel, from their first appearance for the Representative Plaintiffs in 2018, devoted thousands of hours to prosecute the case (*see* Exhibit 1), time which could not be devoted to other engagements.  This factor is met.

### 7.    Time Constraints

The Covid pandemic affected the parties, their attorneys, and their experts. Routines were disrupted, and the procedural schedule was wisely adjusted and extended to accommodate the exigent circumstances.   Yet, important events including summary judgment briefing had to be done entirely remotely due to office closures, slowing that work considerably and thereby producing time constraints.  This factor is met.

### 8.    Experience, Reputation, and Ability of Class Counsel

This factor is satisfied by the showing under No. 3 above ("Skill Required to Litigate the Issues.").

### 9.    Undesirability

"Attorneys must have incentive to take undesirable cases in order to assure access to the courts for all people; awarding fees based on a reasonable percentage of the recovered fund provides such an incentive."  *Millsap v. McDonnell Douglas Corp.*, 2003 U.S. Dist. LEXIS 26223, at *41 (N.D. Okla. May 28, 2003).  A case is undesirable, according to *Millsap*, when attorneys are saddled with a significant risk of substantial loss (true here) and burdened by "the substantial commitment required in complex, class-action litigation on behalf of plaintiffs" (true here).  *Id.* at *39-41.  This factor is overwhelmingly satisfied.

### 10.    Relationship with the Client

Class Counsel's professional relationship with the Class Representatives began in 2019 and continues today.  It has entailed multiple in-person interviews in Birmingham and in and near Decatur, numerous other communications, and thorough in-person deposition preparation and representation. The relationship is characterized by diligence, reliability, and trust, satisfying this factor.

### 11.    <u>The Additional Considerations</u>

*Shiyang Huang*, 999 F.3d 1247, 1278 n.22 (11th Cir. 2021), states that the Eleventh Circuit adds these considerations for a fee award: "the time required to reach a settlement, whether there are any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel, any non-monetary benefits conferred upon the class by the settlement, and the economics involved in prosecuting a class action."  The fee and expenses sought account for and are supported by the first, third, and fourth considerations. The second consideration ("any substantial objections by class members or other parties to the settlement terms or the fees requested by counsel") is unaddressed now, because it depends upon objections that may be filed after this motion and the motion for final

14

approval of the Settlement.[4]

The negotiation leading to the Settlement was protracted and pressured by competing interests of the parties.  Proposals were made by the series, backed at each turn by argument and evidence, with the sides' respective positions revised throughout that process.  The amount of time required was lengthy and was increased by a drive to agree on the most inclusive class supported by evidence. That required further investigation by all sides once the parties reached agreements in principle.  The first consideration is satisfied.

The litigation produced highly consequential non-monetary benefits for the Class, satisfying the third consideration.  Beginning September 29, 2016, the potable water distributed to the households the utilities serve has been rid of PFAS, first by treatment by a GAC filtration system which eliminated almost all long-chain PFAS during the time it operated, and now, since May of this year, by treatment with a reverse osmosis (RO) system.  The RO system is the most advanced water filtration available.  It removes all 29 different PFAS compounds tested against it and has a fifty-year lifespan.

The fourth consideration is met as well.  This is not a mega fund case or one

---

[4]      The movants respectfully submit that they should be allowed to supplement this motion (or the final approval motion yet to be filed) to address any such objections.

in which a settlement creates $50 million of compensation or more.   In those instances, due to economies of scale, a one-third fee award can produce "a recovery disproportionate to the time spent."   *See e.g., Sullivan*, 2021 U.S. Dist. LEXIS 90089, at *11.   That is not the case here.   The amount of Class Counsel's work is fully commensurate with the litigation's difficulty and the results obtained. Nothing is disproportionate.

## B.   <u>The Cross Check.</u>

Class Counsel's 4,098 hours of attorney work yield a lodestar of $3,261,997. Exhibit 1 at ¶ 4.[5]  That approximates the fee sought, confirming its reasonableness. *See Cox v. Cmty. Loans of Am., Inc.*, 2016 U.S. Dist. LEXIS 195533, at *10 (M.D. Ga. Oct. 6, 2016) ("Thus, the lodestar cross-check approximates the amount being requested under the percentage of the common fund approach and is fair and reasonable.").   The lodestar employs hourly rates in the Laffey Matrix,[6] a recognized tool for determining proper compensation for attorney hours in complex federal cases national in scope or which occur in the largest metropolitan areas. *See Bowens v. Plaza Servs., LLC*, 2021 U.S. Dist. LEXIS 114418, at *29 n.88 (N.D.

---

[5]     Class Counsel presently is engaged in further work for the Class, specifically work required to ensure proper notice to Class members.  Those additional hours, if taken into account later, also would increase the lodestar.

[6]     http://www.laffeymatrix.com/see.html (accessed 12/1/2021).

Ga. Feb. 1, 2021).[7]

If the Court decides that the Laffey Matrix rates are too high for use here,[8] a lodestar adjusted for that determination would support a thirty percent fee nonetheless.  Hourly rates seventy-five percent of the Laffey rates (a very large downward adjustment) yield a lodestar of $ 2,446,498.[9]  That sum approaches the $3.6 million requested, which is a reasonable cross check.  That conclusion is further grounded by crediting the work of prior counsel for the Plaintiffs on important tasks including, but not limited to, investigation, complaint drafting and

---

[7]    Courts outside of the Eleventh Circuit also use, or consider using, the Laffey Matrix.  *See Awalt v. Marketti,* 2018 U.S. Dist. LEXIS 86109, at *7 n.1 (N.D. Ill. May 23, 2018) ("Nevertheless, the Seventh Circuit has 'left it to trial judges to exercise their discretion in evaluating [the Laffey matrix's] usefulness in any particular case,' *id.*, and courts in this district have accepted it as evidence of a reasonable hourly rate."); *Ozinga v. United States HHS*, 2018 U.S. Dist. LEXIS 85387, at *8 n.2 (N.D. Ill. May 22, 2018) ("The Laffey Matrix further supports these requested rates . . ."); *Colllins v. Cargill Meat Sols. Corp.*, 2011 U.S. Dist. LEXIS 69316, at *30 (E.D. Cal. June 28, 2011) ("Class Counsels' rates appear to fall within the reasonable rates of the Laffey Matrix.").

[8]    For instance, although the litigation substantially occurred in large metropolitan areas, Birmingham for the most part but Atlanta too (site of many expert depositions), it was not national in scope.

[9]    This lodestar and the lodestar employing the Laffey rates are not enhanced by a multiplier, even though multipliers are appropriate and frequently used to support lodestar cross-checks of fee awards.  *See e.g., Chieftain Royalty Co. v. Xto Energy*, 2018 U.S. Dist. LEXIS 225922, at *37 (E.D. Okla. Mar. 27, 2018) ("Thus, the requested $32 million fee represents an enhancement lodestar multiplier of 2.58408.  This multiplier is well within the range of multipliers approved in the Tenth Circuit, and other circuits, *when a lodestar cross-check is used*." (emphasis added) (internal citation omitted)).

amendment, successfully opposing the first dispositive motions, and discovery.  All of that work should be taken into account, and crediting it adds another 2,006.15 hours of attorney time to support this motion, boosting the lodestar for work on behalf of the Class by another $684,980.  *See* Exhibit 1 at ¶ 7.  That is greater evidence of reasonableness.

**C.**   **The Expense Amount Requested Is Warranted.**

The $845,353 in expenses detailed and documented in Exhibit 1 were necessitated by the burdens the Class Representatives bore on the difficult, complex, and intertwined issues resolved and extinguished by the Settlement.  The excellent benefits of the Settlement would not have been attained or possible without the work the expenditures enabled.  The showing above on "The Time Involved and Results Obtained" (first *Johnson* factor) supports that conclusion.

$758,523 of the expenses funded highly effective and intrepid work of experts (1) on the contaminants' chemical properties and health effects, PFAS fate and transport, PFAS presence (or absence) on residential properties and effects if any on property values, and standards of care for the Defendants' facilities, and (2) to determine class membership and damages and develop a distribution plan for Settlement payments.  *See* Exhibit 1 at ¶ 6 & exh. b (HGD expense category "expert").  The expenditures are summed for each expert (by firm name, Forensic Strategic Solutions, for example, or by individual name, Phillipe A. Grandjean for

example) in Exhibit C of Exhibit 1. The expenditures also enabled proficient examination of the vast number of documents produced and potentially relevant to the claims for the Class.  *See id.* ($260,429.19 sum of payments to Cicayda).

Other components of the full sum of expenses sought paid for subpoenas to and document production from third parties, specifically the water utilities whose customer data and distribution system records were necessary to determine the Class and damages, among other subjects.  Exhibit 1 at ¶ 6 & exh. b (HGD expense categories "copies," "misc," "printing," "subpoena, and "filing fees").  Those components total $32,733.35.  *Id.*[10]  $40,712.17 of the full sum sought paid for depositions and required travel for depositions and site visits and investigation.  *See id.* ("court cost," "travel," and "depo" categories for HGD plus "Corrected Ledger of Expenses Advanced by Hannon Law Firm, LLC").  This component enabled Class Counsel Kevin Hannon, who has great expertise in PFAS cases, to travel to meet with, prepare, and represent expert witnesses and the Class Representatives. $11,596.62 was expended by HGD on research, *id.* ("research" category), a modest amount given the protracted and hard-fought motions practice on complex issues.

As the record demonstrates, this litigation was arduous, complex, and hard

---

[10]    This component sum backs out items which do not fit the instant description of the components.  "Misc" for instance contains two $200 notary items and a CLE expense of $358.33 not included in the sum.  The CLE expense is not included in any of the expenses sought by the movants.

fought at every turn. Defendants were represented by counsel experienced in environmental litigation who made this a difficult, time consuming, and expensive case to litigate.  The expenses Class Counsel incurred, while significant and risky, were absolutely necessary to achieve the result which is now before the Court for approval.

For the reasons given, the $845,353 in expenses documented in Exhibit 1 are warranted and should be awarded to Class Counsel.  Additional expenses may be incurred.  For example, depending on the character of objections to the Settlement (if any), expert testimony at the fairness hearing may become advisable.

## <u>Conclusion</u>

This motion should be granted for the reasons given.

Respectfully submitted this the 1st day of December, 2021, by:

<u>/s/ *Christopher B. Hood*</u>
Christopher B. Hood (ASB-2280-S35H)
Timothy C. Davis (ASB-6384-D63T)
W. Lewis Garrison, Jr. (ASB-3791-N74W)
HENINGER GARRISON DAVIS, LLC
2224 First Avenue North
Birmingham, AL 35203
PH: 205-326-3336
tim@hgdlawfirm.com
lewis@hgdlawfirm.com
chood@hgdlawfirm.com
mark@hgdlawfirm.com

Kevin S. Hannon, *pro hac vice*
THE HANNON LAW FIRM, LLC

1641 Downing Street
Denver, CO 80218
PH: 303-861-8800
khannon@hannonlaw.com

*Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of December, 2021, a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to all known counsel of record by operation of the court's electronic system.

/s/ *Christopher B. Hood*
Christopher B. Hood